## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF DELAWARE

| | |
|---|---|
| In re | Chapter 11 |
| AMERICAN BLUE RIBBON HOLDINGS, LLC, a Delaware limited liability company, *et al.*,[1] | Case No.: 20-10161 (___) |
| Debtors. | (Joint Administration Requested) |

### DEBTORS' MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS PURSUANT TO 11 U.S.C. §§ 105, 362, 363, 364 AND 507 (I) APPROVING POSTPETITION FINANCING, (II) GRANTING LIENS AND PROVIDING SUPERPRIORITY ADMINISTRATIVE EXPENSE STATUS, (III) MODIFYING AUTOMATIC STAY, (IV) GRANTING RELATED RELIEF, AND (V) SCHEDULING A FINAL HEARING

American Blue Ribbon Holdings, LLC ("Blue Ribbon"), Legendary Baking, LLC

("Legendary Baking"), Legendary Baking Holdings, LLC ("Legendary Holdings"), Legendary

Baking of California, LLC ("Legendary California"), and SVCC, LLC ("SVCC"), the debtors

and debtors in possession (the "Debtors") in the above-captioned chapter 11 cases (the "Cases"

or the "Chapter 11 Cases") hereby move the Court (the "Motion") for entry of an interim order

(the "Interim Order"), substantially in the form attached hereto as **Exhibit A**, and following a

final hearing to be set by the Court, entry of a final order (the "Final Order" and, with the Interim

Order, the "DIP Orders"), pursuant to sections 105, 362, 363, 364 and 507 of title 11 of the

United States Code, 11 U.S.C. §§ 101–1532 (the "Bankruptcy Code"), Rules 2002, 4001, 6004

and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rule

4001-2 of the Local Rules of the United States Bankruptcy Court for the District of Delaware

(the "Local Rules"), authorizing the Debtors, among other things, to obtain senior secured

---

[1] The Debtors and the last four digits of their respective federal taxpayer identification numbers are as follows: American Blue Ribbon Holdings, LLC (1224-Del.); Legendary Baking, LLC (2615-Del.); Legendary Baking Holdings, LLC (2790-Del.); Legendary Baking of California, LLC (1760-Del.); and SVCC, LLC (9984-Ariz.). The Debtors' address is 3038 Sidco Drive, Nashville, TN 37204.

postpetition financing (the "DIP Facility") on an interim and final basis pursuant to the terms and

conditions of that certain *Senior Secured, Superpriority Debtor-in-Possession Credit Agreement*

(the "DIP Credit Agreement") by and among the Debtors and Cannae Holdings, Inc. ("Cannae"

or the "DIP Lender") attached to the Interim Order as Exhibit B.[2]

In support of the Motion, the Debtors rely on the *Declaration of Kurt Schnaubelt in*

*Support of First Day Motions* (the "Schnaubelt Declaration") filed concurrently herewith.  In

further support of the Motion, the Debtors respectfully represent as follows:

## I. OVERVIEW

1.     By this Motion, the Debtors seek entry of the Interim Order:

    a.    authorizing, under sections 364(c) of the Bankruptcy Code and Bankruptcy Rule 4001(c), the Debtors to obtain secured, superpriority postpetition loans, advances and other financial accommodations (the "DIP Facility"), on an interim basis;

    b.    authorizing the Debtors to execute and deliver the DIP Credit Agreement and all other related documents and agreements as contemplated by the DIP Credit Agreement and requested by the DIP Lender (collectively, the "DIP Loan Documents") and to perform such other acts as may be necessary or desirable in connection with the DIP Loan Documents;

    c.    authorizing the Debtors, prior to the entry of the Final Order, to request extensions of credit under the DIP Facility up to an aggregate principal amount of $10,000,000 at any one time outstanding;

    d.    granting allowed superpriority administrative expense claim status pursuant to section 364(c)(1) of the Bankruptcy Code to all obligations owing under the DIP Credit Agreement and the other DIP Loan Documents, subject to certain carve-outs;

    e.    granting to the DIP Lender automatically perfected security interests in and liens on all of the DIP Collateral;

    f.    authorizing and directing the Debtors to pay the principal, interest, fees, expenses and other amounts payable under the DIP Loan Documents;

---

[2]     Capitalized terms not defined herein shall have the meanings ascribed to them in the Interim Order.

  g.  vacating and modifying the automatic stay imposed by section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms and provisions of the DIP Loan Documents and the Interim Order;

  h.  granting related relief; and

  i.  scheduling the final hearing on this Motion (the "<u>Final Hearing</u>").

## II. JURISDICTION

2.  The United States Bankruptcy Court for the District of Delaware (the "<u>Court</u>") has jurisdiction over these Cases and the Motion pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware dated February 29, 2012.  This is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).  Venue of these Cases and the Motion in this district is proper under 28 U.S.C. §§ 1408 and 1409.

3.  Pursuant to Rule 9013-1(f) of the Local Rules, the Debtors consent to the entry of a final judgment or order with respect to the Motion if it is determined that the Court, absent consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution.

4.  The statutory and legal predicates for the relief requested herein are sections 105, 362, 363, 364 and 507 of the Bankruptcy Code, Rules 2002, 4001, 6004, and 9014 of the Bankruptcy Rules, and Rule 4001-2 of the Local Rules.

## III. BACKGROUND

**A.  General Background.**

5.  On the date hereof (the "<u>Petition Date</u>"), each of the Debtors commenced a voluntary case under chapter 11 of the Bankruptcy Code.

6.      The Debtors are authorized to continue to operate their businesses and manage their property as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

7.      The Court has not appointed a trustee or examiner in these Cases.  To date, no statutory committee has been appointed in these Cases by the Office of the United States Trustee for the District of Delaware (the "U.S. Trustee").

8.      The Debtors have requested that the Cases be jointly administered pursuant to Bankruptcy Rule 1015(b).

9.      The Debtors' business consists of three brands: (i) Village Inn, (ii) Bakers Square, and (iii) Legendary Baking.  Founded in 1958 and 1969, respectively, Village Inn and Bakers Square are full-service sit-down family dining restaurant concepts (together, the "Family Dining Business") that feature a variety of menu items for all meal periods.  As of the Petition Date, in connection with the Family Dining Business, the Debtors operate 97 restaurants in 13 states, franchise 84 Village Inn restaurants, and maintain an e-commerce presence as well.

10.      Legendary Baking is the Debtors' manufacturing operation that produces pies in two Debtor-owned production facilities.  Legendary Baking provides those pies to the Family Dining Business for sale in Village Inn and Bakers Square restaurants while also selling pies to other restaurants, independent bakers, and customers.  In connection therewith, the Debtors own and operate two bakery facilities located in Oak Forest, Illinois and Chaska, Minnesota, and lease a cold storage distribution center located in Chicago, Illinois.

11.      The Debtors' revenues are primarily derived from restaurant sales, bakery operations, franchise fees and sales royalties.  As discussed in detail in the First Day Declaration, in the ordinary course of business, the Debtors engage in certain affiliate transactions with their

non-debtor parent, ABRH, LLC ("ABRH"), including relying on employees provided by ABRH

via a contract staffing arrangement, as well as on numerous support services that are provided by

ABRH and shared among the Debtors' businesses and non-debtor affiliates' restaurant brands.[3]

12.    The detailed factual background relating to the Debtors and the commencement

of these Cases is set forth in the *Declaration of Kurt Schnaubelt in Support of First Day Motions*

(the "First Day Declaration") filed substantially concurrently herewith.

**B.    Events Leading Up to the DIP Facility.**

13.    Several factors contributed to the Debtors' financial distress and subsequent

bankruptcy filings.  First, there has recently been increased competition in the restaurant business

and particularly in the segment thereof in which the Family Dining Business competes, due to,

among other things, (i) new brands and new competitor locations in existing markets; (ii) growth

from existing larger family dining companies that have substantial advertising expenditures

(many multiples of expenditures by the Debtors' brands) to message consumers; and

(iii) increasing competition from grocery stores as the gap between consumers' cost of food

away from home remains elevated from cost of dining at home, including grocery stores'

expanded prepared meal offerings.  Second, the Debtors have been faced with a continuing

margin pressure from rising labor costs, including dramatic increases over the past two years in

Arizona, Colorado, Illinois and Minnesota, four states in which, as of December 31, 2019, 67

(over half) of the Debtors' then 130 company-operated stores were located, resulting in a

negative financial impact of approximately $2.0 million over the last two years.  Third, the

Debtors had an increasing number of unprofitable restaurants due to, among other things,

---

[3]    As noted in the First Day Declaration, although Pass-Through Costs are currently approximately $2 million per
week, the final prepetition payment for Pass-Through Costs from the Debtors to ABRH occurred on or about
January 24, 2020, and covered approximately two weeks of Pass-Through Costs (for costs through January 9,
2020), and thus was in the amount of approximately $5.5 million.

unfavorable trade area locations and above-market rents or otherwise high occupancy costs. Fourth, the restaurant industry has faced a decline in foot traffic, owing to, among other things, an increase in convenience via takeout and delivery at the expense of dine-in customers at restaurants. Finally, despite a positive turn in 2019, the financial performance of Legendary Baking declined from fiscal 2016 through fiscal 2018 as a result of over-expansion, the addition of a new leased production facility combined with a significant drop in operating efficiencies in existing facilities.

14.     The Debtors' financial trends were negative and of concern at the end of fiscal 2017. During 2018, a potential transaction to separate the businesses from existing equity ownership was proposed but did not ultimately occur, despite considerable effort. At that point, in the third quarter of 2018, both the Family Dining Business and Legendary Baking had new leadership designated to address the performance shortfalls.

15.     The Debtors have sustained large operating losses[4] over the last two years, including losses of approximately $11 million in fiscal 2018 and approximately $7 million in fiscal 2019. During 2018, ABRH and other non-debtor affiliates assisted the Debtors in funding the Debtors' operations. During 2019, in order to fund the operating losses, the Debtors closed and sold their corporate headquarters in Denver, closed and sold three fee simple restaurant properties, and accelerated collections of Legendary Baking's receivables, which were all one-time sources of cash flow. While new leadership substantially improved the performance of the Debtors' businesses by cutting losses by more than a third (with most of the improvement coming from the turnaround at Legendary Baking), the projections for fiscal year 2020 indicate

---

[4]     For the purposes of this motion, operating losses are a non-GAAP measure defined as a) Adjusted EBITDA (or Earnings Before Interest, Taxes, Depreciation, and Amortization) less b) capital expenditures less c) rent payments on closed restaurants, and less d) project costs to dispose of assets or carve out the businesses.

25941438.1

6

continued losses estimated at $5 million if Blue Ribbon continued to operate according to status quo.  Under the circumstances, ABRH and the Debtors' other affiliate companies indicated to the Debtors that they are no longer willing to fund the Debtors' money-losing operations.

16.        In the absence of continued funding by ABRH, the Debtors projected that they would face a liquidity crisis on or about the Petition Date.   Accordingly, in an effort to avert continued losses and avoid further deterioration of the businesses, the Debtors have filed these Cases to (i) explore strategic options while under the protection of the Bankruptcy Code, including by focusing the Family Dining Business on the Debtors' remaining store locations, and (ii) obtain postpetition financing that will provide sufficient liquidity for the Debtors to fund their operations during the Chapter 11 Cases.

17.        Accordingly, the Debtors sought financing from several sources, including third-party lenders, none of whom were interested in providing financing to the Debtors, citing, among other things, the Debtors' continued losses, the volatile restaurant industry, and the small size of the requested financing.  Notably, the parties with whom the Debtors had discussion were not interested, notwithstanding that the Debtors had no prepetition secured debt encumbering their assets.

18.        In parallel to these third-party discussions, the Debtors also engaged in discussions with Cannae regarding providing the Debtors with a credit facility.  Cannae is the Debtors' indirect ultimate majority owner.  Cannae is a publicly traded company that manages and operates businesses in multiple industries.  One of those investments is a majority ownership in ABRH, which, as discussed earlier, is the direct parent and 100% owner of Debtor Blue Ribbon.  Cannae agreed to provide the Debtors with postpetition financing on the terms and conditions set forth in the DIP Loan Documents and summarized herein.

25941438.1

19.     Although Cannae is an affiliate of the Debtors, the Debtors negotiated with Cannae in good faith to ensure that the terms of the DIP Facility are consistent with market terms, and are fair and reasonable to the Debtors.  To that end, the Debtors, on the one hand, and Cannae, on the other hand, each had separate business teams and used separate counsel in negotiating the DIP Facility.  In addition, the Debtors analyzed the terms of debtor-in-possession financings from other recent restaurant-industry bankruptcy cases to ensure that the terms of the DIP Facility were consistent with the terms in those cases.

20.     Based on the foregoing, the Debtors submit that the terms of the DIP Facility are fair and reasonable to the Debtors and appropriate under the circumstances, and the relief requested in this Motion is both necessary and in the best interests of the Debtors' estates and their creditors.  The DIP Facility is on the best terms and conditions available to the Debtors. The Debtors have sought and were unable to obtain post-petition financing to support the reorganization from any other sources, including a preferable DIP facility that would be on an unsecured, administrative expense basis.

## IV.  NEED FOR THE DIP FACILITY

21.     The Debtors have an urgent and immediate need to obtain postpetition financing.  Here, the DIP Facility not only sends a fundamentally positive signal to the Debtors' vendors, employees, customers, and other parties critical to maintaining the Debtors' viability as a going concern, but it also provides the Debtors with the time and flexibility that they need to operate their businesses during these Chapter 11 Cases and explore their strategic options to maximize value for all stakeholders.

22.     As reflected in the budget attached to the Interim Order as Exhibit A (the "Budget"), the Debtors have an immediate need to access approximately $10,000,000 of the DIP Facility during the expected interim period (i.e., until the entry of the Final Order), with the

25941438.1

8

balance being available upon entry of the Final Order. The DIP Facility will provide the Debtors

with sufficient funds during these Cases to meet their obligations in these Chapter 11 Cases.  In

particular, funds from the DIP Facility are expected to be used for, among other things, working

capital purposes, payments for goods, services and capital expenditures in the ordinary course of

business, and amounts owing to the DIP Lender under the DIP Facility.  Without the availability

provided under the DIP Facility, the Debtors would be unable to fund operations in these Chapter

11 Cases.

      23.      Hence, the Debtors have determined, in the exercise of their sound business

judgment, that they require financing under the terms of the DIP Credit Agreement and hereby

request authority to obtain such financing through the proposed DIP Orders.

## V.  CONCISE STATEMENT OF RELIEF REQUESTED

      24.      In accordance with Rule 4001 of the Bankruptcy Rules and Local Rule 4001-2,

below is a summary of the terms of the DIP Credit Agreement[5]

| (a) | Borrowers: | American Blue Ribbon Holdings, LLC (Lead Borrower); Legendary Baking, LLC<br>Legendary Baking Holdings, LLC<br>Legendary Baking of California, LLC<br>SVCC, LLC<br><br>(*see* introduction of the DIP Credit Agreement) |
|-----|------------|---|
| (b) | Guarantors: | None |
| (c) | DIP Lender: | Cannae Holdings, Inc.<br><br>(*see* introduction of the DIP Credit Agreement) |
| (d) | Purpose: | The DIP Facility will be used (i) for working capital |

---

[5]    This summary is intended solely for informational purposes and is qualified in its entirety by the DIP Credit Agreement and the DIP Orders.  In the event there is any conflict between this Motion and the DIP Orders, the DIP Orders will control in all respects.  Capitalized terms used in the following chart but not defined therein have the meanings set forth in the DIP Credit Agreement and the Interim Order, as applicable.

|   |   |   |
|---|---|---|
|   |   | purposes and to pay administrative expenses, (ii) to pay for goods, services and capital expenditures in the ordinary course of business, (iii) to pay amounts owing to the DIP Lender under the DIP Credit Agreement, including, without limitation, the payment of professional fees of the DIP Lender, (iv) to pay transaction expenses in connection with the DIP Credit Agreement, (v) to pay claims in respect of certain prepetition creditors, which may include, without limitation, employees and taxing authorities in the ordinary course, in each case to the extent authorized by orders of the Bankruptcy Court reasonably acceptable to the DIP Lender, (vi) for other payments permitted to be made by the Interim Order or the Final Order and any other order of the Bankruptcy Court, (vii) to pay fees, expenses, and costs incurred in connection with the Chapter 11 Cases, and (viii) to pay the Administrative Carve-Out. <br><br> (*see* § 2.3 of the DIP Credit Agreement; ¶ 7 of the Interim Order) |
| (e) | Type and Amount of DIP Facility: | $20 million senior secured, superpriority revolving credit facility. <br><br> (*see* introduction of the DIP Credit Agreement; defined terms of the DIP Credit Agreement; and § 2.1 of the DIP Credit Agreement) |
| (f) | Maturity Date: | The earliest to occur of: (a) October 27, 2020; (b) the effective date of a plan in the Chapter 11 Cases; (c) the effective date of a dismissal of the Chapter 11 Cases; and (d) the date of any termination of the Revolving Commitment Period pursuant to Section 8.2 of the DIP Credit Agreement. <br><br> (*see* defined terms of the DIP Credit Agreement) |
| (g) | Interest Rate: | Non-Default Rate:  Prime Rate plus 6.00% (10.75%) <br><br> Default Rate:  Prime Rate plus 8.00% (12.75%) <br><br> (*see* § 2.5 of the DIP Credit Agreement) |
| (h) | Other Fees: | Upfront Fee:  $200,000 <br><br> Commitment Fee:  On a per annum basis, 0.25% times the actual daily amount by which the amount of the Revolving Commitment exceeds the aggregate outstanding amount of all Loans <br><br> DIP Lender's Fees:    The Debtors are required to pay certain    prepetition    and    postpetition    fees,    costs, |

| | | |
|---|---|---|
| | | disbursement and expenses of the DIP Lender in accordance with the DIP Credit Documents and the Interim Order, including fees of the DIP Lender's professionals.<br><br>(*see* §§ 2.6 & 9.2 of the DIP Credit Agreement; ¶ 17 of the Interim Order) |
| (i) | Conditions Precedent to Lending: | The obligation of the DIP Lender to make the initial Credit Extension and to make any Loan on any Credit Date, including the Closing Date, are subject to the DIP Lender's satisfaction or waiver of certain conditions precedent, as set forth in detail in the DIP Credit Agreement.<br><br>(*see* §§ 3.1 & 3.2 of the DIP Credit Agreement) |
| (j) | Interim Borrowing Limit: | $10,000,000<br><br>(*see* defined terms of DIP Credit Agreement; ¶ (b) and ¶ 2 of the Interim Order) |
| (k) | Limitations on Use of Proceeds: | The Borrowers shall not be permitted to use the proceeds of any Credit Extension: (i) for the payment of interest and principal with respect to subordinated debt; (ii) to finance in any way any action, suit, arbitration, proceeding, application, motion or other litigation of any type adverse to the rights and remedies of the DIP Lender under the DIP Credit Agreement, the other Credit Documents, the Interim Order or the Final Order; (iii) to make any payment in settlement of any claim, action or proceeding, before any court, arbitrator or other governmental body without the prior written consent of the DIP Lender; or (iv) to pay any fees or similar amounts to any person who has proposed or may propose to purchase interests in the Borrowers or their assets to the extent not permitted herein (including so-called "topping fees," "exit fees," and similar amounts) without the prior written consent of the DIP Lender.<br><br>(*see* § 2.3(b) of the DIP Credit Agreement)<br><br>None of the DIP Facility, the loans extended pursuant thereto, the DIP Collateral, proceeds of any of the foregoing, any portion of the Administrative Carve-Out or any other funds may be used, directly or indirectly, by any of the Debtors, any Committee, or any trustee or other estate representative appointed in the Chapter 11 Cases or any Successor Cases or any other person or entity to do any of the following (nor shall any professional fees, disbursements, costs or expenses be paid in connection |

| | | |
|---|---|---|
| | | therewith): (a) to object to, contest, prevent, hinder, delay or interfere with, in any way, the DIP Lender's enforcement or realization upon any of the DIP Collateral once an Event of Default (as defined in the DIP Credit Agreement) occurs; (b) to object to or challenge in any way the DIP Liens, the DIP Obligations or the DIP Collateral or any other claims or liens held by the DIP Lender; or (c) to investigate (including by way of examinations or discovery proceedings, whether formal or informal), prepare, assert, join, commence, support or prosecute any action for any claim, counter-claim, action, proceeding, application, motion, objection, defense, or other contested matter seeking any order, judgment, determination or similar relief against, or adverse in any material respect to the interests of, the DIP Lender or any of its agents, officers, directors, shareholders, employees, attorneys, advisors, professionals, predecessors in interest, successors and assigns with respect to any transaction, occurrence, omission, action or other matter arising under, in connection with or related to this Interim Order, the DIP Facility or the DIP Credit Documents, including, without limitation, (A) any Avoidance Claims, (B) any so-called "lender liability" claims and causes of action, (C) any claim or cause of action with respect to the validity, enforceability, priority and extent of, or asserting any defense, counterclaim, or offset to, the DIP Obligations, the DIP Superpriority Claim, the DIP Liens or the DIP Credit Documents, (D) any claim or cause of action seeking to challenge, invalidate, modify, set aside, avoid, marshal, subordinate, disallow, or recharacterize in whole or in part, the DIP Obligations, the DIP Liens, the DIP Superpriority Claim or the DIP Collateral, (E) any action seeking to modify any of the rights, remedies, priorities, privileges, protections and benefits granted to the DIP Lender under this this Interim Order or under any of the DIP Credit Documents (in each case, including, without limitation, claims, proceedings or actions that has the effect of preventing, hindering or delaying any of the DIP Lender's assertions, enforcements, realizations or remedies on or against the DIP Collateral in accordance with the applicable DIP Credit Documents and this Interim Order). <br><br> (*see* ¶ 9 of the Interim Order) |
| (l) | Budget and Financial | The Borrowers are required to strictly perform in accordance with the Budget, subject to the following (the |

| | | |
|---|---|---|
| | Covenants: | "Permitted Variances"): |

> (i)     the Borrowers may make disbursements under any Budget line item for any Measurement Period that are no more than 110% of the disbursements projected for such line item for such Measurement Period in the Budget;
>
> (ii)     no amounts allocated to a particular line item in the Budget shall be used to pay any expenses under any other line item(s) in the Budget without the prior express written consent of the DIP Lender, in the DIP Lender's sole and exclusive discretion;
>
> (iii)     the Borrowers may carry forward any unused amounts contained in any line item in the Budget for any Measurement Period to any subsequent Measurement Period for that line item in the Budget; and
>
> (iv)     payments to the DIP Lender and the DIP Lender's professionals shall not be subject to the limitations set forth above and shall not be included in determining compliance with the covenants set forth in Section 6.7 of the DIP Credit Agreement.
>
> (*see* § 6.7 of the DIP Credit Agreement; ¶ 7 of the Interim Order)

| | | |
|---|---|---|
| (m) | Cash Dominion: | The Borrowers are not subject to cash dominion. |
| (n) | DIP Lien / Superpriority Claim: | The DIP Lender is granted liens in the DIP Collateral (under section 364(c) of the Bankruptcy Code) subordinate only to (i) the Administrative Carve-Out, and (ii) Permitted Prior Liens.  In addition, the DIP Lender is granted a superpriority administrative expense claim.<br><br>(*see* § 7.7 of the DIP Credit Agreement; ¶¶ 3-6 of the Interim Order) |
| (o) | DIP Collateral: | To secure the prompt payment and performance of all Obligations, each Borrower grants to the DIP Lender a continuing security interest in and Lien upon all property and assets of such Borrower, whether real, personal or mixed, tangible or intangible, whether now owned or hereafter acquired, and wherever located, except for Excluded Property.<br><br>Excluded Property means the "Receivables" as defined in |

| | | the Kroger Receivables Financing Agreement, so long as the Kroger Receivables Financing Agreement is in effect and such "Receivables" are thereunder purchased by, or granted as collateral to, Citibank.  For clarity, Excluded Property does not include any consideration given to the Lead Borrower under the Kroger Receivables Financing Agreement. |
|---|---|---|
| | | (*see* ¶ 3 of the Interim Order; ¶ 7.1 of the DIP Credit Agreement; defined terms of the DIP Credit Agreement) |
| (p) | Lien on Avoidance Claims | Subject to Final Order. |
| | | (*see* § 7.1 of DIP Credit Agreement; ¶ 3 of the Interim Order) |
| (q) | Administrative Carve-Out: | The Administrative Carve-Out means the sum of: |
| | | (a) all incurred or accrued professional fees and expenses of professionals for the Borrowers and professionals for the Unsecured Creditors Committee to the extent (i) allowed at any time by the Bankruptcy Court (if required), regardless of whether allowed by interim order, procedural order or otherwise, (ii) incurred or accrued through the date of service by the DIP Lender of a Carve-Out Trigger Notice and (iii) up to and as limited by the respective aggregate Budget amounts for each professional for the Borrowers (as set forth on page 2 of the Budget) and each professional for the Unsecured Creditors Committee (as set forth on page 2 of the Budget) or category of professionals for the Borrowers and category of professionals for the Unsecured Creditors Committee through the date of service of said Carve-Out Trigger Notice, less the amount of any Prepetition retainers received by such professionals and not previously applied to fees and expenses (for clarity, all requirements in the foregoing clauses (i) through (iii) must be satisfied for the inclusion of the fees and expenses covered by clause (a) in the Administrative Carve-Out); |
| | | (b) all accrued and unpaid fees, disbursements, costs and expenses incurred by the professionals for the Borrowers from and after the date of service of a Carve-Out Trigger Notice, to the extent allowed at any time, in an aggregate amount not to exceed $400,000 less the remaining amount of Prepetition retainers received by such professionals not previously applied to the fees, disbursements, costs and |

25941438.1

14

| | | |
|---|---|---|
| | | expenses set forth in clause (a)(iii) above; |
| | | (c) all accrued and unpaid fees, disbursements, costs and expenses incurred by the professionals for the Unsecured Creditors Committee from and after the date of service of a Carve-Out Trigger Notice, to the extent allowed at any time, in an aggregate amount not to exceed $100,000; and |
| | | (d) allowed administrative expenses (i) for fees payable to the Office of the United States Trustee pursuant to 28 USC §1930(a)(6), as determined by agreement of the United States Trustee or by final order of the Bankruptcy Court and (ii) for fees required to be paid to the Clerk of the Bankruptcy Court pursuant to 28 U.S.C. § 156(c). |
| | | (*see* defined terms of the DIP Credit Agreement; ¶ 11 of the Interim Order) |
| (r) | Waivers: | Subject to entry of the Final Order, the DIP Lender shall be entitled to a waiver of the provisions of sections 506(c) and 552 of the Bankruptcy Code.  In addition, the Debtors waive the right to prime the DIP Liens. |
| | | (*see* § 7.7 of the DIP Credit Agreement; ¶ 9 and ¶ 20 of the Interim Order) |
| (s) | Perfection Other Than Under State Law: | The DIP Liens shall be automatically perfected upon entry of the Interim Order. |
| | | (*see* § 7.7 of the DIP Credit Agreement; ¶ 6 of the Interim Order) |
| (t) | Events of Default: | The following constitute Events of Default: |
| | | (a) Failure by the Borrowers to pay (i) the principal of any Loan whether at stated maturity, by acceleration or otherwise; (ii) when due, any installment of principal of any Loan, by notice of voluntary prepayment, by mandatory prepayment or otherwise; or (iii) within five (5) days after date due, any interest on any Loan or any fee or any other amount due under the DIP Credit Agreement; or any other amount payable under the Interim Order or Final Order, as applicable, or any other Credit Document; or |
| | | (b) Subject to the Bankruptcy Code, (i) failure of the Borrowers to pay when due any principal of or interest on or any other amount payable in respect of one or more items of Postpetition or unstayed Indebtedness (other than Indebtedness referred to in Section 8.1(a) of the DIP Credit Agreement) in an individual principal amount greater than the Threshold Amount beyond the grace period, if any, |

provided therefor; or (ii) breach or default by any Borrower with respect to any other term of (A) one or more items of Postpetition or unstayed Indebtedness in the principal amount referred to in <u>clause (i)</u> above, or (B) any loan agreement, mortgage, indenture or other agreement relating to such item(s) of Indebtedness, in each case beyond the grace period, if any, provided therefor, if the effect of such breach or default is to cause, or to permit the holder or holders of that Indebtedness (or a trustee on behalf of such holder or holders), to cause, that Indebtedness to become or be declared due and payable (or subject to a compulsory repurchase or redeemable) prior to its stated maturity or the stated maturity of any underlying obligation, as the case may be; or

(c) Failure of any Borrower to perform or comply with any term or condition contained in <u>Sections</u> 2.3, 5.1, 5.2, 5.3, 5.4, 5.5, 5.6, 5.7, 5.8 or 6 of the DIP Credit Agreement; or

(d) Any representation, warranty, certification or other statement made or deemed made by any Borrower in any Credit Document or in any statement or certificate at any time given by any Borrower in writing pursuant to or in connection with any Credit Document shall be false in any material respect as of the date made or deemed made; or

(e) Any Borrower shall default in the performance of or compliance with any term contained in any of the Credit Documents, other than as provided in <u>Section 8.1</u> of the DIP Credit Agreement, and such default shall not have been remedied or waived within 30 days after the earlier of (i) an officer of such Borrower becoming aware of such default, or (ii) receipt by such Borrower of notice from the DIP Lender of such default; or

(f) Any money judgment, writ or warrant of attachment or similar process involving in excess of the Threshold Amount (to the extent not adequately covered by insurance as to which a solvent and unaffiliated insurance company has acknowledged coverage) shall be entered or filed against any Borrower or any of its respective assets and shall remain undischarged, unvacated, unbonded or unstayed for a period of 60 days (or in any event later than 5 days prior to the date of any proposed sale thereunder); or

(g) Any order, judgment or decree shall be entered against any Borrower decreeing the dissolution or split up of such Borrower and such order shall remain undischarged or

unstayed for a period in excess of 30 days; or

(h) A Change of Control shall occur; or

(i) At any time after the execution and delivery thereof, (i) the DIP Credit Agreement or any Collateral Document ceases to be in full force and effect (other than by reason of a release of Collateral or the satisfaction in full of the Obligations in accordance with the terms of the DIP Credit Agreement) or shall be declared null and void, or (ii) the DIP Lender shall not have or shall cease to have a valid and perfected Lien in any Collateral purported to be covered by the Collateral Documents with the priority required by the relevant Collateral Document, in each case for any reason other than the failure of the DIP Lender to take any action within its control, or (iii) any Borrower shall contest the validity or enforceability of any Credit Document in writing or deny in writing that it has any further liability under any Credit Document to which it is a party; or

(j) Except as authorized by the DIP Lender in writing, the occurrence of any of the following in the Chapter 11 Cases:

(1) the failure of the Bankruptcy Court to enter a Final Order, in form and substance satisfactory to the DIP Lender, within 35 days after the Petition Date;

(2) the bringing of a motion, taking of any action or the filing of any plan of reorganization or disclosure statement attendant thereto by any Borrower in the Chapter 11 Cases other than in connection with a proposed refinancing and repayment in full of the Obligations (other than contingent indemnification Obligations to the extent no claim giving rise thereto has been asserted in accordance with the terms of the DIP Credit Agreement) on the date of the order granting such motion or the effective date of such plan of reorganization: (A) to obtain additional financing under Section 364(c) or (d) of the Bankruptcy Code not otherwise permitted pursuant to the DIP Credit Agreement; (B) to grant any Lien other than the Senior Permitted Liens upon or affecting any Collateral; or (C) except as provided in the Interim Order or Final Order, as applicable, to use Cash Collateral of the DIP Lender under Section 363(c) of the Bankruptcy Code without the prior written consent of the DIP Lender;

(3) the entry of an order in any of the Chapter 11 Cases confirming a plan or plans of reorganization or liquidation

that does not contain a provision for repayment in full in cash of all of the Obligations under the DIP Credit Agreement on or before the effective date of such plan or plans;

(4) the entry of an order amending, supplementing, staying, vacating or otherwise modifying the Credit Documents or the Interim Order or the Final Order, as applicable, without the written consent of the DIP Lender or the filing of a motion for reconsideration with respect to the Interim Order or the Final Order, as applicable;

(5) other than as provided in the "first day" motions, the payment of, or application for authority to pay prior to the effective date of a confirmed plan, any Prepetition claim without the DIP Lender's prior written consent unless otherwise permitted under the DIP Credit Agreement or expressly consented to in writing by the DIP Lender in connection with any plan in the Chapter 11 Cases;

(6) the appointment of an interim or permanent trustee in the Chapter 11 Cases or the appointment of a receiver or an examiner in the Chapter 11 Cases with expanded powers to operate or manage the financial affairs, the business, or reorganization of the Borrowers; or the sale without the DIP Lender's consent, of all or substantially all of the Borrowers' assets either through a sale under Section 363 of the Bankruptcy Code, through a confirmed plan of reorganization in the Chapter 11 Case, or otherwise that does not provide for payment in full in cash of the Obligations;

(7) the dismissal of any Chapter 11 Case, or the conversion of any Chapter 11 Case from one under Chapter 11 to one under Chapter 7 of the Bankruptcy Code or the filing by any Borrower of a motion or other pleading seeking the dismissal of its Chapter 11 Case under Section 1112 of the Bankruptcy Code or otherwise;

(8) the entry of an order by the Bankruptcy Court granting relief from or modifying the automatic stay of Section 362 of the Bankruptcy Code (x) to allow any creditor to execute upon or enforce a Lien on any Collateral, in either case in excess of the Threshold Amount, or (y) with respect to any Lien of or the granting of any Lien on any Collateral to any state or local environmental or regulatory agency or authority, in each case with a value in excess of the Threshold Amount;

(9) the commencement of a suit or action against the DIP

Lender that asserts or seeks (A) a claim in any Chapter 11 Case in excess of the Threshold Amount, (B) any legal or equitable remedy that would have the effect of subordinating any or all of the Obligations or Liens of the DIP Lender under the Collateral Documents to any other claim, or (C) would otherwise have a Material Adverse Effect, including a Material Adverse Effect on the rights and remedies of the DIP Lender under any Credit Document or the collectability of all or any portion of the Obligations;

(10) the entry of an order in any Chapter 11 Case avoiding or requiring repayment of any portion of the payments made on account of the Obligations owing under the DIP Credit Agreement or the other Credit Documents;

(11) the failure of any Borrower to perform any of its material obligations under the Interim Order or Final Order, as applicable;

(12) the marshalling of any Collateral other than at the request of the DIP Lender;

(13) the consolidating or combining of any Borrower with any other Person except (A) as permitted under the DIP Credit Agreement, (B) pursuant to a confirmed plan of reorganization or liquidation which provides or the refinancing and repayment in full of the Obligations (other than contingent indemnification Obligations to the extent no claim giving rise thereto has been asserted in accordance with the terms of the DIP Credit Agreement), or (C) with the prior written consent of the DIP Lender; or

(14) the entry of an order in any Chapter 11 Case granting any other superpriority administrative claim or Lien equal or superior to that granted to the DIP Lender (other than in respect of the Administrative Carve-Out or any Permitted Prior Lien).

(*see* § 8.1 of the DIP Credit Agreement)

| (u) | Remedies / Relief from Automatic Stay: | Upon the occurrence and during the continuance of any Event of Default, the DIP Lender may take any or all of the following actions, subject to the terms of the Interim Order, including paragraph 14 thereof: |
| --- | --- | --- |
| | | (a) without any application, motion or notice to, hearing before, or order from, the Bankruptcy Court notwithstanding the provisions of Section 362 of the Bankruptcy Code: terminate the Revolving Commitment |

Period; increase the rate of interest applicable to the Obligations to the Default Rate; and declare all or any portion of the Obligations, including all or any portion of any Loan to be forthwith due and payable all without presentment, demand, protest or further notice of any kind, all of which are expressly waived by Borrower;

(b) upon application to, following hearing before, and upon entry of any necessary order from, the Bankruptcy Court; direct the Borrowers to sell or otherwise dispose of any or all of the Collateral on terms and conditions acceptable to the DIP Lender pursuant to Sections 363, 365 and other applicable provisions of the Bankruptcy Code and, without limiting the foregoing, direct the Borrowers to assume and assign any lease or executory contract included in the Collateral to the DIP Lender's designees in accordance with and subject to Section 365 of the Bankruptcy Code (and following such direction, the Borrowers shall assist the DIP Lender in effecting any Asset Sale or other disposition of the Collateral upon such terms as are acceptable to the DIP Lender); enter onto the premises of any Borrower in connection with an orderly liquidation of the Collateral; or exercise any rights and remedies provided to the DIP Lender under the Credit Documents or at law or equity, including all remedies provided under the Bankruptcy Code and pursuant to the Interim Order and Final Order, as applicable;

(c) if an Event of Default has occurred and is continuing, each Borrower irrevocably waives the right to direct the application of any and all payments at any time or times thereafter received by the DIP Lender from or on behalf of any Borrower (including the proceeds of any Asset Sale or other realization upon all or any part of the Collateral), and the DIP Lender shall have the continuing and exclusive right to apply and to reapply any and all such payments received at any time or times after the occurrence and during the continuance of an Event of Default to the Obligations as provided in Section 2.10(e) of the DIP Credit Agreement; and

(d) to the extent any Default or Event of Default is cured, whether timely or with the DIP Lender's consent, such cure shall: (i) be effective as of the date of the initial occurrence of such Default or Event of Default, as applicable, and (ii) operate as if no such Default or Event of Default had occurred.

(*see* § 8.2 of the DIP Credit Agreement and ¶ 14 of the

25941438.1

| | | Interim Order) |
|---|---|---|
| (v) | Indemnification and Exculpation: | The DIP Credit Agreement provides for indemnification by the Borrowers of the DIP Lender, its Affiliates and their respective officers, partners, directors, trustees, employees and agents. |
| | | (*see* § 9.3 of the DIP Credit Agreement and ¶ 18 of the Interim Order) |

## VI.  LOCAL RULE 4001-2 DISCLOSURES

25.     The Debtors do not believe that this Motion or the Interim Order contain any provisions requiring special disclosure under Local Rule 4001-2(a) except as set forth below:

26.     The Budget provides different line item amounts for the Debtors' and the Committee's professionals.  Local Rule 4001-2(a)(i)(F).  *See* ¶ 11 of the Interim Order.

27.     The Interim Order purports to grant the DIP Lender a lien on Avoidance Claims.  The DIP Lender has insisted on this provision.  In any event, the Interim Order provides that this provision is subject to the Final Order.  Local Rule 4001-2(a)(i)(D).  *See* ¶ 3 of the Interim Order.

28.     The Interim Order provides that the "equities of the case" exception of section 552 of the Bankruptcy Code section 552(b) shall not apply to the DIP Lender.  The DIP Lender has insisted on this provision and the Debtors believe it is a standard provision and is appropriate for a postpetition lender with no outstanding prepetition loan.  In any event, the Interim Order provides that this provision is subject to the Final Order.  Local Rule 4001-2(a)(i)(H).  *See* ¶ 20 of the Interim Order

29.     The Interim Order purports to waive any surcharge of costs or expenses under section 506(c) of the Bankruptcy Code.  The DIP Lender has insisted on this provision and the Debtors believe it is a standard provision and is appropriate for a postpetition lender with no

outstanding prepetition loan.  In any event, the Interim Order provides that this provision is

subject to the Final Order.  Local Rule 4001-2(a)(i)(C).  *See* § ¶ 20 of the Interim Order.

30.    These terms are justified because the Debtors are in immediate and critical need

of the DIP Facility.  The only acceptable proposal that would provide the critical liquidity to the

Debtors was provided after good faith negotiations with the DIP Lender on the terms set forth in

the DIP Loan Documents and the DIP Orders.  Without this financing, the Debtors would not be

able to operate their businesses as a going concern.

## VII.  BASIS FOR RELIEF

### A.    The Debtors Should Be Permitted to Obtain Postpetition Financing Pursuant to Section 364(c) of the Bankruptcy Code.

31.    Section 364(c) of the Bankruptcy Code requires a finding, made after notice and

a hearing, that the debtors seeking postpetition financing on a secured basis cannot "obtain

unsecured credit allowable under section 503(b)(1) of [the Bankruptcy Code] as an

administrative expense . . . ." 11 U.S.C. § 364(c).

32.    In evaluating proposed postpetition financing under section 364(c) of the

Bankruptcy Code, courts perform a qualitative analysis and generally consider similar factors,

including whether: (i) unencumbered credit or alternative financing without superpriority status

is available to the debtor; (ii) the credit transactions are necessary to preserve assets of the estate;

(iii) the terms of the credit agreement are fair, reasonable, and adequate; (iv) the proposed

financing agreement was negotiated in good faith and at arm's-length and entry thereto is an

exercise of sound and reasonable business judgment and in the best interest of the debtor's estate

and its creditors; and (v) the proposed financing agreement adequately protects prepetition

secured creditors.

25941438.1

33.        *See, e.g.*, *In re Los Angeles Dodgers LLC*, 457 B.R. 308, 312 (Bankr. D. Del.

2011) (applying the first three factors); *In re Aqua Assoc.*, 123 B.R. 192, 195-96 (Bankr. E.D. Pa.

1991) (applying the first three factors in making a determination under section 364(c)); *In re*

*Crouse Group, Inc.*, 71 B.R. 544, 546 (Bankr. E.D. Pa. 1987) (same); *Bland v. Farmworker*

*Creditors*, 308 B.R. 109, 113-14 (S.D. Ga. 2003) (applying all factors in making a determination

under section 364(d)).

34.        For the reasons discussed below, the Debtors satisfy the standards required to

obtain postpetition financing under section 364(c) of the Bankruptcy Code.  For the avoidance of

doubt, the Debtors are not seeking any relief pursuant to section 364(d) of the Bankruptcy Code.

**B.        The Debtors Were Unable to Obtain Financing on an Unsecured Basis.**

35.        Whether debtors were unable to obtain unsecured credit is determined by

application of a good faith effort standard, and debtors must make a good faith effort to

demonstrate that credit was not available without granting a security interest.  *See In re YL West*

*87th Holdings I LLC*, 423 B.R. 421, 441 (Bankr. S.D.N.Y. 2010) ("Courts have generally

deferred to a debtor's business judgment in granting section 364 financing."); *In re Gen. Growth*

*Props., Inc.*, 412 B.R. 122, 125 (Bankr. S.D.N.Y. 2009).  The required showing under section

364 of the Bankruptcy Code that unsecured credit was not available is not rigorous.  *See, e.g.*,

*Bray v. Shenandoah Fed. Sav. & Loan Ass'n (In re Snowshoe Co.)*, 789 F.2d 1085, 1088 (4th

Cir. 1986) (stating that section 364(d) of the Bankruptcy Code imposes no duty to seek credit

from every possible lender, particularly when "time is of the essence in an effort to preserve a

vulnerable seasonal enterprise").

36.        Here, as detailed in the Schnaubelt Declaration, the Debtors filed these Cases to

avert a liquidity crisis and prevent further deterioration of their business, and to explore strategic

options.  The Debtors are unable, in the present circumstances, to meet their liquidity needs by

obtaining financing on an unsecured, administrative expense basis.  The Debtors quickly found

that potential lenders to the Debtors were not even interested in providing financing to the

Debtors on a senior-secured basis, citing, among other things, the Debtors' losses, their

perspective on the restaurant industry, and the small size (in their view) of the requested

financing.

        37.       The Debtors respectfully submit that their efforts to obtain postpetition

financing therefore satisfy the standards required under section 364(c) of the Bankruptcy Code.

*See, e.g.*, *In re Simasko Production Co.*, 47 B.R. 444, 448-49 (Bankr. D. Colo. 1985)

(authorizing interim financing stipulation where debtor's best business judgment indicated

financing was necessary and reasonable for benefit of estates); *In re Ames Dept. Stores*, 115 B.R.

34, 38 (Bankr. S.D.N.Y. 1990) (with respect to postpetition credit, courts "permit debtors in

possession to exercise their basic business judgment consistent with their fiduciary duties"); *In re*

*Sky Valley, Inc.*, 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988) (where few lenders can or will

extend the necessary credit to a debtor, "it would be unrealistic and unnecessary to require [the

debtor] to conduct such an exhaustive search for financing").

**C.      The Proposed Financing Is Necessary to Preserve the Assets of the Debtors' Estates.**

        38.       Cash is necessary for working capital, operating costs and expenses incurred

during these Cases, including funding payroll to the Debtors' over 5,000 employees.  The DIP

Facility thus is essential to the Debtors' continued operational viability and will provide the

Debtors with the opportunity to preserve their businesses during these Chapter 11 Cases.

        39.       As debtors in possession, the Debtors have a fiduciary duty to protect and

maximize their estates' assets.  *See Burtch v. Ganz (In re Mushroom Transp. Co.)*, 382 F.3d 325,

339 (3d Cir. 2004).  As noted above, the Debtors require postpetition financing under the terms

of the DIP Loan Documents to continue their operations during these Chapter 11 Cases.

**D.       The Terms of the Proposed Financing Are Fair, Reasonable, and Appropriate.**

40.      In considering whether the terms of postpetition financing are fair and

reasonable, courts consider the terms in light of the relative circumstances and disparate

bargaining power of both the debtor and the potential lender.  *In re Farmland Indus., Inc.*, 294

B.R. 855, 886 (Bankr. W.D. Mo. 2003); *see also Unsecured Creditors' Comm. Mobil Oil Corp.*

*v. First Nat'l Bank & Trust Co. (In re Ellingsen MacLean Oil Co.)*, 65 B.R. 358, 365 n.7 (W.D.

Mich. 1986) (a debtor may have to enter into hard bargains to acquire funds).

41.      The terms of the DIP Credit Agreement and the proposed DIP Orders were

negotiated between the Debtors and the DIP Lender.  Although, as noted, Cannae is an affiliate

of the Debtors, the Debtors negotiated with Cannae in good faith to ensure that the terms of the

DIP Facility are consistent with "market" terms, and are fair and reasonable to the Debtors.  To

that end, the Debtors, on the one hand, and Cannae, on the other hand, each had separate

business teams and used separate counsel in negotiating the DIP Facility.  In addition, the

Debtors analyzed the terms of debtor-in-possession financings in other recent restaurant-industry

bankruptcy cases to ensure that the terms of the DIP Facility were consistent with the disclosed

financing terms in those cases.

42.      The following chart summarizes the key terms of those other financing

facilities, as well as the same key terms of the proposed DIP Facility. As evidenced in the chart,

the interest rate charged by the DIP Lender under the DIP Facility is well within the range of

comparable rates in restaurant-industry cases, and the fees charged by the DIP Lender under the

DIP Facility are significantly lower (as a percentage of the total commitment) than the fees

charged in comparable cases.  Taken as a whole, the Debtors' cost of borrowing under the DIP

Facility is at the very low end of financing facilities in similar bankruptcy cases.

|  | Debtors | Granite City | Perkins/Marie Callender's | Houlihan's (HRI) |
|---|---|---|---|---|
| Lender | Cannae | JPM Capital Partners | Bank of America | CIT Bank |
| Type | Revolving | Term | Revolving | Revolving |
| Amount | $20.0MM | $5.0MM | $7.75MM | $5.0MM |
| Rate | 10.75% (Prime+6%) | 9.0% (Fixed) | 10.75% (Prime+6%) | 11.75% (Prime+7%)[6] |
| Total Fees | $237,500 | $850,000 | $235,600 | $275,000 |
| Total Fees as a Percentage of Commitment | 1.2% | 17.0% | 3.0% | 5.5% |

**E.      Entry Into the Proposed Financing Reflects the Debtors' Sound Business Judgment.**

43.      A debtor's decision to enter into a postpetition lending facility under section

364 of the Bankruptcy Code is governed by the business judgment standard.  *See, e.g.*, *Trans*

*World Airlines, Inc. v. Travelers Int'l AG (In re Trans World Airlines, Inc.)*, 163 B.R. 964, 974

(Bankr. D. Del. 1994) (approving postpetition credit facility because such facility "reflect[ed]

sound and prudent business judgment"); *In re Ames Dep't Stores, Inc.*, 115 B.R. at 38 ("cases

consistently reflect that the court's discretion under section 364 is to be utilized on grounds that

permit reasonable business judgment to be exercised so long as the financing agreement does not

contain terms that leverage the bankruptcy process and powers or its purpose is not so much to

benefit the estate as it is to benefit a party-in-interest").  One court has noted that "[m]ore

exacting scrutiny [of the debtors' business decisions] would slow the administration of the

debtor's estate and increase its cost, interfere with the Bankruptcy Code's provision for private

---

[6]      HRI agreement also permitted LIBOR Loans under certain circumstances at a rate equal to the prevailing LIBO Rate (as defined therein) + 8%.

control of administration of the estate, and threaten the court's ability to control a case impartially." *Richmond Leasing Co. v. Capital Bank, N.A.*, 762 F.2d 1303, 1311 (5th Cir. 1985).

44.    Here, the Debtors' sound business judgment clearly supports entry into the DIP Credit Agreement to gain access to needed funding and maximize value for all constituents.

**F.    The DIP Lender Is Extending Credit in Good Faith.**

45.    Section 364(e) of the Bankruptcy Code provides that:

> The reversal or modification on appeal of an authorization under this section to obtain credit or incur debt, or of a grant under this section of a priority or a lien, does not affect the validity of any debt so incurred, or any priority or lien so granted, to an entity that extended such credit in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and the incurring of such debt, or the granting of such priority or lien, were stayed pending appeal.

11 U.S.C. § 364(e).

46.    As set forth in the Schnaubelt Declaration, the Debtors and the DIP Lender negotiated the DIP Credit Agreement in good faith.  Accordingly, the DIP Orders should provide that the DIP Lender, as a good faith lender, is entitled to all of the protections set forth in section 364(e) of the Bankruptcy Code.

## VIII.  INTERIM ORDER AND FINAL HEARING

47.    Pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2), the Debtors request that the Court set a date for the Final Hearing that is as soon as practicable, and fix the time and date prior to the final hearing for parties to file objections to the Motion.

48.    The urgent need to preserve the Debtors' businesses, and avoid immediate and irreparable harm to the Debtors' estates, makes it imperative that the Debtors be authorized to obtain postpetition financing as of the Petition Date, pending the Final Hearing, in order to continue their operations and administer the Cases.  Without the ability to obtain access to such

25941438.1

funding, the Debtors would be unable to meet their postpetition obligations, including payroll

obligations to over 5,000 employees, and otherwise would be unable to fund their working

capital needs, thus causing irreparable harm to the value of the Debtors' estates.

49.     Accordingly, the Debtors respectfully request that, pending the hearing on the

Final Order, the Interim Order be approved in all respects, and that the terms and provisions of

the Interim Order be implemented and be deemed binding, and that, after the Final Hearing, the

Final Order be approved in all respects and the terms and provisions of the Final Order be

implemented and be deemed binding.

## IX.  IMMEDIATE RELIEF IS NECESSARY

50.     Bankruptcy Rule 6003 provides that the relief requested in this Motion may be

granted if the "relief is necessary to avoid immediate and irreparable harm." Fed. R. Bankr. P.

6003.  The Debtors submit that for the reasons already set forth herein, the relief requested in this

Motion is necessary to avoid immediate and irreparable harm to the Debtors.

## X.  WAIVER OF ANY APPLICABLE STAY

51.     The Debtors also request that the Court waive any applicable stay of the DIP

Orders, including any stay that may be imposed by Bankruptcy Rule 4001(a)(3) and Bankruptcy

Rule 6004(h).  As described above, the relief that the Debtors seek in this Motion is necessary

for the Debtors to operate their businesses without interruption and to preserve value for their

estates.  The exigent nature of the relief sought herein justifies immediate relief.[7]

## XI.  NOTICE

52.     Notice of this Motion has been or will be given to (i) the U.S. Trustee;

(ii) holders of the thirty (30) largest unsecured claims on a consolidated basis against the

---

[7]     The Debtors also seek waiver of the notice requirements of Bankruptcy Rule 6004(a), to the extent applicable.

Debtors; (iii) counsel for the DIP Lender; (iv) any party that the Debtors believe has asserted or

may assert a lien in the Debtors' assets; (v) the Debtors' landlords; (vi) all parties who have filed

a notice of appearance and request for service of papers pursuant to Bankruptcy Rule 2002; (vii)

applicable state taxing authorities; (viii) the United States Internal Revenue Service; and (ix) the

United States Securities and Exchange Commission.  As the Motion is seeking "first day" relief,

within two business days of the hearing on the Motion, the Debtors will serve copies of the

Motion and any order entered respecting the Motion as required by Local Rule 9013-1(m).  Due

to the volume of the exhibits attached to this Motion and any interim or final orders approving

this Motion, the Debtors do not intend to serve such exhibits, but such exhibits are available, free

of charge, at https://dm.epiq11.com/AmericanBlueRibbon. The Debtors submit that, in light of

the nature of the relief requested, no other or further notice need be given.

## XII.  NO PRIOR REQUEST

53.        No prior request for the relief sought in this Motion has been made to this or

any other court.

*Remainder of page intentionally left blank*

25941438.1

## XIII.  CONCLUSION

WHEREFORE, based upon the foregoing, the Debtors request entry of the DIP Orders

granting the relief requested herein and such other relief the Court deems just and proper.

Dated:  January 27, 2020  

*/s/ Robert F. Poppiti, Jr.*

Michael R. Nestor, Esq. (DE Bar No. 3526)
Robert F. Poppiti, Jr., Esq. (DE Bar No. 5052)
Ian J. Bambrick, Esq. (DE Bar No. 5455)
Young Conaway Stargatt & Taylor, LLP
Rodney Square
1000 North King Street
Wilmington, DE 19801
Tel:     (302) 571-6600
Fax:     (302) 571-1253

and

David A. Fidler, Esq.
Jonathan M. Weiss, Esq.
Sasha M. Gurvitz, Esq.
KTBS Law LLP, *f/k/a Klee, Tuchin, Bogdanoff & Stern LLP*
1999 Avenue of the Stars, 39th Floor
Los Angeles, CA 90067
Tel:     (310) 407-4023
Fax:     (310) 407-9090

*Proposed Counsel to Debtors and Debtors in Possession*

# EXHIBIT A TO MOTION

**Proposed Interim Order**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| AMERICAN BLUE RIBBON HOLDINGS, LLC, a Delaware limited liability company, *et al.*,[1] | ) ) ) | Case No. 20-10161 (___) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |
| | ) | **Related to Docket No.** |

**INTERIM ORDER PURSUANT TO 11 U.S.C. §§ 105, 362, 363, 364, 503 AND 507 AND FED. R. BANKR. P. 2002, 4001, 6004 AND 9014 (I) AUTHORIZING DEBTORS TO OBTAIN SENIOR SECURED, SUPERPRIORITY, POSTPETITION FINANCING, (II) GRANTING LIENS AND SUPERPRIORITY CLAIMS, (III) MODIFYING THE AUTOMATIC STAY, (IV) SCHEDULING FINAL HEARING, AND (V) GRANTING RELATED RELIEF**

Upon consideration of the motion (the "**Motion**") of American Blue Ribbon Holdings, LLC, Legendary Baking, LLC, Legendary Baking Holdings, LLC, Legendary Baking of California, LLC, and SVCC, LLC, each as a debtor and debtor in possession (collectively, the "**Debtors**"), pursuant to sections 105, 362, 363, 364(c)(1), 364(c)(2), 364(c)(3), 364(e), 503 and 507 of title 11 of the United States Code (the "**Bankruptcy Code**"), Rules 2002, 4001, 6003, 6004 and 9014 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), and Rules 2002-1, 4001-2 and 9013-1(m) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "**Local Bankruptcy Rules**"), seeking entry of an interim order (this "**Interim Order**") and final order (the "**Final Order**"):

(a)    authorizing the Debtors to obtain post-petition financing pursuant to a senior secured, superpriority debtor-in-possession new money revolving credit facility ("**DIP Facility**") in an aggregate principal amount of up to $20,000,000 on the terms and conditions set forth in the Senior Secured,

---

[1] The Debtors and the last four digits of their respective federal taxpayer identification numbers are as follows: American Blue Ribbon Holdings, LLC (1224-Del.); Legendary Baking, LLC (2615-Del.); Legendary Baking Holdings, LLC (2790-Del.); Legendary Baking of California, LLC (1760-Del.); and SVCC, LLC (9984-Ariz.). The Debtors' address is 3038 Sidco Drive, Nashville, TN 37204.

Superpriority Debtor-In-Possession Credit Agreement substantially in the form attached hereto as Exhibit B (and as hereafter amended, restated, amended and restated, supplemented, or otherwise modified from time to time in accordance with the terms thereof and hereof, the "**DIP Credit Agreement**")[2], by and among the Debtors and Cannae Holdings, Inc. (in such capacity, and together with its successors and assigns, the "**DIP Lender**");

(b)     authorization that during the period (the "**Interim Period**") commencing on the date of this Court's entry of this Interim Order and ending on the earlier of (a) the date this Court enters the Final Order and (b) the occurrence of the Maturity Date (as defined in the DIP Credit Agreement), a portion of the revolving commitment under the DIP Facility shall be borrowed by Debtors, in accordance with the Budget (defined below) and subject to compliance with the terms, conditions, and covenants contained in in this Order and in the DIP Credit Documents, in an aggregate amount up to $10,000,000 (the "**Interim Financing**");

(c)     authorizing the Debtors to execute and deliver the DIP Credit Agreement and other documentation, including security agreements, pledge agreements, mortgages, deeds of trust, guaranties, promissory notes, certificates, instruments, deposit account control agreements and such other documentation which may be necessary or required to implement the DIP Facility and perform thereunder and/or that may be requested by the DIP Lender, in each case, as amended, restated, supplemented or otherwise modified from time to time in accordance with the terms thereof and hereof (collectively, together with the DIP Credit Agreement, the "**DIP Credit Documents**"); to incur and repay or pay, as applicable, all loans, advances, extensions of credit, financial accommodations, reimbursement obligations, fees (including, without limitation, commitment fee and upfront fee), costs, expenses and other liabilities, all other obligations (including indemnities and similar obligations, whether contingent or absolute) and all other amounts due or payable under the DIP Credit Documents, collectively, the "**DIP Obligations**"), and to perform such other and further acts as may be necessary, desirable or appropriate in connection therewith;

---

[2] Capitalized terms used herein but not otherwise defined herein shall have the meanings given to them in the DIP Credit Agreement.

(d)        granting to the DIP Lender allowed superpriority administrative expense claims pursuant to section 364(c)(1) of the Bankruptcy Code in respect of all DIP Obligations, and valid, enforceable, non-avoidable and automatically perfected liens on and security interests in all DIP Collateral (as defined below), pursuant to sections 364(c)(2) and 364(c)(3) of the Bankruptcy Code, to secure the DIP Obligations, in each case as and to the extent, and subject to the relative ranking and priorities (and, in any event, junior to the Administrative Carve-Out), set forth in this Interim Order;

(e)        authorizing the Debtors to use proceeds of the DIP Facility, solely in accordance with the Budget and consistent with this Interim Order and the DIP Credit Documents;

(f)        vacating or modifying the automatic stay imposed by section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms and provisions of this Interim Order;

(g)        subject to entry of the Final Order, authorizing the grant of liens to the DIP Lender on the proceeds of the Debtors' claims and causes of action arising under Bankruptcy Code sections 544, 545, 547, 548, 549 and 550 (collectively, the "**Avoidance Claims**");

(h)        subject to, and only effective upon, the entry of a Final Order granting such relief, approving the waiver by the Debtors of any right to surcharge against the Collateral pursuant to Bankruptcy Code section 506(c) or otherwise;

(i)        waiving any applicable stay (including under Bankruptcy Rule 6004) and providing for immediate effectiveness of this Interim Order; and

(j)        scheduling a final hearing (the "**Final Hearing**") to consider entry of the Final Order granting the relief requested in the Motion on a final basis and authorizing the balance of the borrowings under the DIP Credit Documents on a final basis, as set forth in the Motion and the DIP Credit Documents filed with this Court and approving the Debtors' notice with respect to the Motion.

The hearing on the Motion (the "**Interim Hearing**") having been held by this Court on January [•], 2020, pursuant to Bankruptcy Rules 2002 and 4001(c)(2); and based upon all of the pleadings filed with this Court, the evidence presented at the Interim Hearing and the entire record herein; and this Court having

heard and resolved or overruled any objections to the interim relief requested in the Motion; and the Court having noted the appearances of all parties in interest; and it appearing that the relief requested in the Motion is in the best interests of the Debtors, their estates, and creditors and an appropriate exercise of the Debtors' business judgment; and the Debtors having provided notice of the Motion as set forth in the Motion, and it appearing that no other or further notice of the Motion need be given; and after due deliberation and consideration, and sufficient cause appearing therefor:

**IT IS FOUND, DETERMINED, CONCLUDED AS A MATTER OF LAW AND ADJUDGED**, that:

A.    **Petition Date.**

On January 27, 2020 (the "**Petition Date**"), each of the Debtors filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware commencing these Chapter 11 cases (the "**Chapter 11 Cases**").

B.    **Debtors-in-Possession.**

The Debtors are continuing to operate their businesses and manage their respective properties as debtors-in-possession pursuant to sections 1107 and 1108 of the Bankruptcy Code. No trustee or examiner has been appointed in any of the Chapter 11 Cases.

C.    **Jurisdiction and Venue.**

This Court has jurisdiction over these proceedings, this Motion, the parties, and the Debtors' property pursuant to 28 U.S.C. § 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(D). Venue of the Chapter 11 Cases and the Motion is proper under 28 U.S.C. §§ 1408 and 1409. The statutory predicates for the relief sought herein are Bankruptcy Code sections 105, 362, 363, 364, 503 and 507 and Bankruptcy Rules 2002, 4001, 6004, and 9014 and Local Rules 2002-1, 4001-2 and 9013-l(m).

D.    **Notice.**

The notice given by the Debtors of the Motion and the Interim Hearing was appropriate under the circumstances. Such notice constitutes due and sufficient notice of the Debtors' request for the interim relief granted herein and of the Interim Hearing under the circumstances and complies with Bankruptcy Rules

2002 and 4001(c) and Local Rules 2002-1, 4001-2 and 9013-1(m), such that no other or further notice is necessary or required.

**E.    Committee Formation.**

As of the date hereof, no statutory committee ("**Committee**") has been appointed in the Chapter 11 Cases.

**F.    Permitted Prior Liens.**

Nothing herein shall constitute a finding or ruling by the Court that any alleged Permitted Prior Lien or Senior Permitted Lien (as such terms are defined in the Credit Agreement) is valid, senior, enforceable, prior, perfected, or non-avoidable. Moreover, nothing herein shall prejudice the rights of any party-in-interest, including, but not limited to the Debtors or the DIP Lender, to challenge the validity, priority, enforceability, seniority, avoidability, perfection, or extent of any alleged Permitted Prior Lien or Senior Permitted Lien.

**G.    Immediate Need for Postpetition Financing.**

The Debtors have requested immediate entry of this Interim Order pursuant to Bankruptcy Rule 4001(c)(2) and the Local Bankruptcy Rules. Good cause has been shown for immediate entry of this Interim Order pursuant to such rules. An immediate need exists for the Debtors to obtain funds and liquidity in order to, as the case may be, continue operations, to pay the costs and expenses of administering the Chapter 11 Cases, and to administer and preserve the value of their businesses and estates. The ability of the Debtors to finance their operations, to preserve and maintain the value of their assets and to maximize the return for all creditors requires the availability of the DIP Facility. In the absence of the availability of such funds and liquidity in accordance with the terms hereof, the continued operation of the Debtors' businesses would not be possible, and immediate and irreparable harm to the Debtors and their estates, creditors and other stakeholders would occur. Thus, the ability of the Debtors to preserve and maintain the value of their assets and maximize the return for creditors requires the availability of working capital from the DIP Facility.

**H.**      **No Credit Available on More Favorable Terms.**

The Debtors have been unable to obtain (a) adequate unsecured credit allowable under section 503(b)(1) of the Bankruptcy Code as an administrative expense or (b) credit for money borrowed with priority over any or all administrative expenses of the kind specified in sections 503(b) or 507(b) of the Bankruptcy Code. The Debtors have been unable to obtain credit for borrowed money without granting the DIP Liens (defined below), the DIP Superpriority Claims (defined below) and certain other protections set forth herein for the DIP Lender. Moreover, the Debtors were unable to obtain sufficient financing from sources other than the DIP Lender on more favorable terms and conditions than the terms and conditions of the DIP Facility.

**I.**      **Extension of Financing.**

The DIP Lender has indicated a willingness to provide financing to the Debtors in accordance with the DIP Credit Agreement and the other DIP Credit Documents, subject to (i) the entry of this Interim Order, including, among other things, approval of the benefits and protections for the DIP Lender contained herein, (ii) approval of the terms and conditions of the DIP Facility, and (iii) findings by this Court that such financing is essential to the Debtors' estates (and the continued operation of the Debtors), that the DIP Lender has acted in good faith, and that the DIP Lender's claims, superpriority claims, security interests and liens and other protections granted pursuant to and in connection with this Interim Order (and the Final Order) and the DIP Facility (including the DIP Superpriority Claims and the DIP Liens), will not be affected by any subsequent reversal, modification, vacatur, stay or amendment of, as the case may be, this Interim Order, the Final Order or any other order, as provided in section 364(e) of the Bankruptcy Code.

**J.**      **Business Judgment and Good Faith Pursuant to Section 364(e).**

(a)      The Debtors, in consultation with their advisors, concluded that the DIP Facility represents the best available financing under the circumstances. The DIP Credit Agreement and the other DIP Credit Documents were negotiated in good faith among the Debtors and the DIP Lender. The terms and conditions of the DIP Facility, the DIP Credit Agreement and the other DIP Credit Documents are fair, reasonable, and the best available under the circumstances, reflect the Debtors' exercise of prudent business

judgment consistent with their fiduciary duties, and constitute reasonably equivalent value and consideration.

(b)    All obligations incurred, payments made, and transfers or grants of security set forth in this Interim Order, the DIP Credit Agreement and the other DIP Credit Documents by any Debtor are granted to or for the benefit of the Debtors for fair consideration and reasonably equivalent value, and are granted contemporaneously with the making of the loans and/or commitments and other financial accommodations secured thereby.

(c)    The credit to be extended under the DIP Credit Agreement, the DIP Facility and the other DIP Credit Documents shall be deemed to be extended by the DIP Lender in good faith and for valid business purposes and uses, and in express reliance upon the protections offered by section 364(e) of the Bankruptcy Code, and the DIP Lender (along with each of its successors and assigns) is entitled to the full protection and benefits of section 364(e) of the Bankruptcy Code whether or not this Interim Order or any provision hereof is vacated, reversed or modified, on appeal or otherwise.

**K.    Adequacy of the Budget.**

The Debtors have prepared and delivered to the DIP Lender a budget, a copy of which is annexed hereto as Exhibit A (as it may be modified, amended, updated, restated or supplemented with the consent of the DIP Lender on the terms set forth in the DIP Credit Agreement, the "**Budget**"). The Budget has been thoroughly reviewed by the Debtors and their management. The Debtors and their management believe the Budget and the estimate of administrative expenses due or accruing during the period covered by the Budget were developed using reasonable assumptions, and based on those assumptions the Debtors anticipate that sufficient assets will be available to pay all administrative expenses due or accruing during the period covered by the Budget.

**L.    Relief Essential; Best Interest.**

The relief requested in the Motion (and provided in this Interim Order) is necessary, essential and appropriate for the continued operation of the Debtors' businesses and the management and preservation of their respective assets and property. It is in the best interest of the Debtors' estates that the Debtors be

allowed to enter into the DIP Credit Agreement and the other DIP Credit Documents, incur the DIP

Obligations and grant the liens and claims contemplated in the DIP Credit Agreement, in this Interim Order

and under the other DIP Credit Documents to the DIP Lender.

       **NOW, THEREFORE**, on the Motion of the Debtors and the record before this Court with respect

to the Motion, including the record made during the Interim Hearing and the declarations submitted in

support of the Motion, and with the consent of the Debtors and the DIP Lender, and good and sufficient

cause appearing therefor,

       **IT IS HEREBY ORDERED** that:

      1.     **Motion Granted**. The Motion is hereby granted on an interim basis in accordance with the

terms and conditions set forth in this Interim Order. Any objections to the Motion with respect to entry of

this Interim Order to the extent not withdrawn or otherwise resolved, and all reservation of rights included

therein, are hereby denied and overruled.

      2.     **Authorization of DIP Facility; Interim Borrowing**.

      (a)     The DIP Facility and the DIP Credit Documents are hereby approved. The Debtors

are hereby authorized to enter into the DIP Credit Documents and to pay all DIP Obligations without further

order of the Court. The Debtors are hereby authorized to borrow money during the Interim Period pursuant

to the DIP Credit Documents up to the aggregate amount of the Interim Financing, in accordance with and

subject to the Budget and the terms of this Interim Order and the DIP Credit Documents.

      (b)     In furtherance of the foregoing and without further approval of this Court, each

Debtor is authorized to perform all acts, to make, execute and deliver all instruments and documents

(including, without limitation, the execution or recordation of any DIP Credit Documents), and to pay all

fees, that may be required or necessary for the Debtors' performance of their obligations under the DIP

Facility, including, without limitation:

(i)      The execution, delivery and performance of the DIP Credit Documents, including, without limitation, the creation and perfection of the DIP Liens described and provided for herein;

(ii)     The non-refundable payment to the DIP Lender of the fees referred to in the DIP Credit Agreement and any other DIP Credit Document (which fees, whether paid prior to or after the date hereof, are hereby approved) and costs and expenses as may be due under such DIP Credit Documents from time to time (whether or not contained in the Budget and irrespective of any estimates contained in the Budget), including, without limitation, fees and expenses of the professionals retained by the DIP Lender as and to the extent provided for in the DIP Credit Documents without the necessity of filing retention motions or fee applications (subject to paragraph 17 hereof with respect to the payment of such professional fees and expenses); and

(iii)    The performance of all other acts that may be necessary, required or advisable under or in connection with the DIP Credit Documents.

(c)      The DIP Credit Agreement and the other DIP Credit Documents shall represent, constitute and evidence the DIP Obligations, and the DIP Credit Documents and DIP Obligations shall be valid and binding, joint and several, obligations of the Debtors, enforceable against the Debtors, their estates and any successors thereto, including without limitation, any trustee appointed in any of the Chapter 11 Cases or any case under chapter 7 of the Bankruptcy Code upon conversion of any of the Chapter 11 cases (collectively, the "**Successor Cases**") in accordance with the terms thereof and this Interim Order. All obligations incurred, payments made, and transfers or grants of security set forth in this Interim Order, the DIP Credit Agreement or the other DIP Credit Documents by any Debtor are granted to or for the benefit of the DIP Lender for fair consideration and reasonably equivalent value, and are granted contemporaneously with the making of the loans and/or commitments and other financial accommodations secured thereby. No obligation incurred, payment made, transfer or grant of security set forth in this Interim Order, the DIP Credit Agreement or the other DIP Credit Documents, in each case whether pre- or post-petition, by any Debtor as approved under this Interim Order shall be stayed, restrained, voided, voidable

or recoverable under the Bankruptcy Code or under any applicable non-bankruptcy law, or subject to any defense, reduction, subordination, setoff, recoupment, counterclaim or any other challenge under the Bankruptcy Code or any applicable non-bankruptcy law, rule or regulation.

3.    **DIP Liens**. Immediately upon the entry of this Interim Order, and effective as of the Petition Date, in order to secure the DIP Obligations, the DIP Lender is hereby granted valid, binding, fully and automatically perfected, continuing, enforceable and non-avoidable liens and security interests (collectively, the "**DIP Liens**") in the DIP Collateral as collateral security for the prompt and complete performance and payment when due (whether at the stated maturity, by acceleration or otherwise) of the DIP Obligations. The term "**DIP Collateral**" shall mean all prepetition and postpetition assets and properties (real and personal) of the Debtors, including all "**Collateral**" as defined in the DIP Credit Agreement, whether now owned by or owing to, or hereafter acquired by, or arising in favor of, the Debtors (including under any trade names, styles, or derivations thereof), whether owned or consigned by or to, or leased from or to, the Debtors, and wherever located including, without limitation, all cash and cash equivalents of the Debtors wherever located including, inventory, accounts and accounts receivable, other rights to payment, contracts, instruments, documents and chattel paper, all securities (whether or not marketable), goods, equipment, inventory and fixtures, all real and leasehold property interests, general intangibles, patents, copyrights, trademarks, trade names and all other intellectual property, capital stock, investment property, all books and records, commercial tort claims (including, subject to the approval of the Court in the Final Order, the proceeds of all Avoidance Claims) and all accessions to, substitutions and replacements for, and rents, profits and products of, each of the foregoing; *provided, however*, that the DIP Collateral shall not include Excluded Property (as defined in the DIP Credit Agreement); *provided, further, however*, that DIP Collateral shall include all proceeds and products of Excluded Property that are not themselves Excluded Property.

4.    **Priority of DIP Liens**. The DIP Liens shall have the following priorities (in each case subject to the Administrative Carve-Out and Senior Permitted Liens):

(a)    pursuant to Section 364(c)(2) of the Bankruptcy Code, a first-priority perfected lien on, and security interest in, all DIP Collateral that is not subject to a valid, perfected, enforceable and unavoidable lien or security interest on the Petition Date or subject to a valid lien or security interest in existence on the Petition Date that is perfected subsequent thereto as expressly permitted by Section 546(b) of the Bankruptcy Code (the "**Permitted Prior Liens**"), and

(b)    pursuant to Section 364(c)(3) of the Bankruptcy Code, a junior perfected lien on, and security interest in, all DIP Collateral that is subject to a Permitted Prior Lien, subject to such Permitted Prior Liens.

5.    **DIP Superpriority Claim**.

(a)    Upon the entry of this Interim Order, effective as of the Petition Date, the DIP Lender is hereby granted pursuant to section 364(c)(1) of the Bankruptcy Code, against each of the Debtors an allowed superpriority administrative expense claim (the "**DIP Superpriority Claim**") for all DIP Obligations, (a) which shall rank junior to the Administrative Carve-Out and (b) with priority over any and all administrative expense claims, unsecured claims and all other claims asserted against the Debtors (without the need to file a proof of claim) or their estates in any of the Chapter 11 Cases or any Successor Cases at any time, now existing or hereafter arising of any kind or nature whatsoever, including all other administrative expenses of the kind specified in or ordered pursuant to sections 105, 326, 328, 330, 331, 364, 365, 503(a), 503(b), 506(c) (subject to entry of the Final Order), 507(a), 507(b), 546(c), 546(d), 726, 1113 and 1114 of the Bankruptcy Code or applicable non-bankruptcy law, and over any and all other administrative expenses, unsecured or other claims arising under any other provision of the Bankruptcy Code. The DIP Superpriority Claim shall, for purposes of section 1129(a)(9)(A) of the Bankruptcy Code, be considered an administrative expense claim allowed under section 503(b) of the Bankruptcy Code, shall be against each Debtor on a joint and several basis, and shall be payable from and have recourse to all prepetition and postpetition property and assets of the Debtors, including all DIP Collateral (including, subject to the approval of the Court in the Final Order, all proceeds of Avoidance Claims). The DIP Superpriority Claim shall be entitled to the full protection of section 364(e) of the Bankruptcy Code in the

event that this Interim Order or any provision hereof is vacated, reversed or stayed in any respect, or modified or amended in any manner, on appeal or otherwise.

(b)      Except as expressly permitted herein or in the other DIP Credit Documents, the DIP Liens and the DIP Superpriority Claim, as applicable, (i) shall not be made subject to or *pari passu* with (A) any lien, security interest or claim heretofore or hereinafter granted in any of the Chapter 11 Cases or any Successor Cases, and shall be valid and enforceable against the Debtors, their estates, any trustee or any other estate representative appointed or elected in the Chapter 11 Cases or any Successor Cases and/or upon the dismissal of any of the Chapter 11 Cases or any Successor Cases, (B) any lien that is avoided and preserved for the benefit of the Debtors and their estates under section 551 of the Bankruptcy Code or otherwise, (C) any intercompany or affiliate lien or claim and (D) any liens arising after the Petition Date; and (ii) shall not be subject to sections 510, 549, 550 or 551 of the Bankruptcy Code or, subject to entry of the Final Order, Section 506(c) of the Bankruptcy Code.

6.      **Lien Perfection**. This Interim Order shall be sufficient and conclusive evidence of the validity, enforceability, perfection and priority of the DIP Liens without the necessity of filing or recording any financing statement, deed of trust, mortgage, or other instrument or document which may otherwise be required under the law of any jurisdiction or the taking of any other action to validate or perfect the DIP Liens or to entitle the DIP Liens to the priorities granted herein. Notwithstanding the foregoing, the Debtors shall be authorized to execute and deliver to the DIP Lender all mortgages, deeds of trust, financing statements, security agreements, notices of liens and other similar documents as the DIP Lender may request to grant, preserve, protect and perfect the validity and priority of the DIP Liens; *provided, however*, that notwithstanding anything to the contrary in this Interim Order, the DIP Credit Agreement or any other DIP Credit Document, no such filing or recordation shall be necessary or required to perfect the DIP Liens, and no Debtor shall be required to execute or deliver any mortgage or deed of trust, authorize any fixture filing or financing statement, execute or deliver any agreement providing "control" as defined in Section 9-104, 9-105, 9-106 and 9-107 of the UCC as in effect in any relevant jurisdiction or undertake any registration in respect of assets subject to a certificate of title in order to perfect the DIP Liens in any portion of the DIP

Collateral, including any and all cash wherever located or held, and all such liens and security interests are hereby deemed fully and automatically perfected. The DIP Lender may, in its sole discretion, file or record, as applicable, such financing statements, mortgages, deeds of trust, security agreements, notices of liens and other similar documents, and is hereby granted relief from the automatic stay of section 362 of the Bankruptcy Code in order to do so, and all such financing statements, mortgages, deeds of trust, security agreements, notices of liens and other similar documents shall be deemed to have been filed or recorded on the Petition Date. The DIP Lender, in its sole discretion, may file a copy of this Interim Order as a financing statement with any recording officer designated to file financing statements or with any registry of deeds or similar office in any jurisdiction in which any Debtor has real or personal property and, in such event, the subject filing or recording officer shall be authorized to file or record such copy of this Interim Order.

7.      **Use of Proceeds of DIP Facility**. Subject to the terms and conditions of this Interim Order, the Debtors are each authorized to use proceeds of the DIP Facility up to the amount of the Interim Financing on an interim basis, solely as provided in the Budget (subject to the Permitted Variances (as defined in the DIP Credit Agreement)) and this Interim Order and for the purposes specified in the DIP Credit Agreement.  The Budget annexed hereto as Exhibit A is hereby approved.

8.      **Maintenance of DIP Collateral; Insurance**. Unless the DIP Lender otherwise consents in writing, until the Termination Date (as defined in the DIP Credit Agreement), the Debtors shall continue to maintain all property, operational and other insurance as and to the extent required and specified in the DIP Credit Documents. Upon entry of this Interim Order and to the fullest extent provided by applicable law, the DIP Lender shall be, and shall be deemed to be, without any further action or notice, named as additional insureds and loss payees on each insurance policy maintained by the Debtors that in any way relates to the DIP Collateral.

9.      **Limitations on the Use of Proceeds**. None of the DIP Facility, the loans extended pursuant thereto, the DIP Collateral, proceeds of any of the foregoing, any portion of the Administrative Carve-Out or any other funds may be used, directly or indirectly, by any of the Debtors, any Committee, or any trustee or other estate representative appointed in the Chapter 11 Cases or any Successor Cases or any other person

or entity to do any of the following (nor shall any professional fees, disbursements, costs or expenses be paid in connection therewith): (a) to object to, contest, prevent, hinder, delay or interfere with, in any way, the DIP Lender's enforcement or realization upon any of the DIP Collateral once an Event of Default (as defined in the DIP Credit Agreement) occurs; (b) to object to or challenge in any way the DIP Liens, the DIP Obligations or the DIP Collateral or any other claims or liens held by the DIP Lender; or (c) to investigate (including by way of examinations or discovery proceedings, whether formal or informal), prepare, assert, join, commence, support or prosecute any action for any claim, counter-claim, action, proceeding, application, motion, objection, defense, or other contested matter seeking any order, judgment, determination or similar relief against, or adverse in any material respect to the interests of, the DIP Lender or any of its agents, officers, directors, shareholders, employees, attorneys, advisors, professionals, predecessors in interest, successors and assigns with respect to any transaction, occurrence, omission, action or other matter arising under, in connection with or related to this Interim Order, the DIP Facility or the DIP Credit Documents, including, without limitation, (A) any Avoidance Claims, (B) any so-called "lender liability" claims and causes of action, (C) any claim or cause of action with respect to the validity, enforceability, priority and extent of, or asserting any defense, counterclaim, or offset to, the DIP Obligations, the DIP Superpriority Claim, the DIP Liens or the DIP Credit Documents, (D) any claim or cause of action seeking to challenge, invalidate, modify, set aside, avoid, marshal, subordinate, disallow, or recharacterize in whole or in part, the DIP Obligations, the DIP Liens, the DIP Superpriority Claim or the DIP Collateral, (E) any action seeking to modify any of the rights, remedies, priorities, privileges, protections and benefits granted to the DIP Lender hereunder or under any of the DIP Credit Documents (in each case, including, without limitation, claims, proceedings or actions that has the effect of preventing, hindering or delaying any of the DIP Lender's assertions, enforcements, realizations or remedies on or against the DIP Collateral in accordance with the applicable DIP Credit Documents and this Interim Order).

10.    **No Further Consents**. To the fullest extent permitted by the Bankruptcy Code or applicable law, any provision of any lease, loan document, easement, use agreement, proffer, covenant, license, contract, organizational document or other instrument or agreement that requires the consent of any

party or the payment of any fees or obligations to any governmental entity or non-governmental entity in order for the Debtors to pledge, grant, mortgage, encumber, sell, assign or otherwise transfer any fee or leasehold interest or the proceeds thereof or any other DIP Collateral is hereby deemed to be inconsistent with the applicable provisions of the Bankruptcy Code and shall have no force or effect with respect to the DIP Liens on such leasehold interests or such other DIP Collateral or the proceeds of any assignment and/or sale thereof by any Debtor in favor of the DIP Lender in accordance with the terms of the DIP Credit Documents and this Interim Order.

> 11.   **Carve-Out**.

> (a)    Subject to the terms and conditions contained in this paragraph 11, the DIP Liens and the DIP Superpriority Claim shall be subject and subordinate to a carve-out (the "**Administrative Carve-Out**"), which shall comprise the following: (i) all fees required to be paid to the Office of the United States Trustee pursuant to 28 USC §1930(a)(6) and to the Clerk of the Court pursuant to 28 U.S.C. § 156(c); (ii) all accrued and unpaid professional fees and expenses (the "**Estate Professional Fees**") incurred by the professionals retained by the Debtors or any Committee, if any, pursuant to sections 327, 328, 330, 363 or 1103 of the Bankruptcy Code (collectively, "**Estate Professionals**") to the extent (x) allowed at any time by the Court (if required), regardless of whether allowed by interim order, procedural order or otherwise, (y) incurred or accrued through the date of service by the DIP Lender of a Carve-Out Trigger Notice (defined below) and (z) up to and as limited by the respective aggregate Budget amounts for each Estate Professional for the Debtors (as set forth on page 2 of the Budget) and each Estate Professional for the Committee (as set forth on page 2 of the Budget), if any, or category of Estate Professionals for the Debtors and category of Estate Professionals for the Committee, if any, through the date of service of said Carve-Out Trigger Notice, *less* the amount of any Prepetition retainers received by such Estate Professionals and not previously applied to their Estate Professional Fees; (iii) all Estate Professional Fees incurred by the Estate Professionals for the Debtors from and after the date of service of a Carve-Out Trigger Notice, to the extent allowed at any time, in an aggregate amount not to exceed $400,000 *less* the remaining amount of Prepetition retainers received by such Estate Professionals not previously applied to the Estate Professional

Fees set forth in clause (ii)(z) above; and (iv) all accrued and unpaid Estate Professional Fees incurred by the Estate Professionals for the Committee, if any, from and after the date of service of a Carve-Out Trigger Notice, to the extent allowed at any time, in an aggregate amount not to exceed $100,000. "**Carve-Out Trigger Notice**" means a written notice by the DIP Lender to lead counsel for the Debtors, the Committee, if any, and the United States Trustee stating that an Event of Default has occurred and is continuing

(b)     Nothing herein or in any of the DIP Credit Documents shall be construed as consent to the allowance of any particular professional fees or expense of the Debtors, of any Committee, or of any other person or shall affect the right of the DIP Lender or any other party to object to the allowance and payment of such fees and expenses. The DIP Lender shall not be responsible for the direct payment or reimbursement of any fees or disbursements of any Estate Professionals incurred in connection with the Chapter 11 Cases or any Successor Cases under any chapter of the Bankruptcy Code.  Subject to the Administrative Carve-Out, nothing in the Interim Order or otherwise shall be construed to obligate the DIP Lender in any way to pay compensation to or to reimburse expenses of any Estate Professional or to guarantee that the Debtors have sufficient funds to pay such compensation or reimbursement

(c)     For the avoidance of doubt, subject to the Administrative Carve-Out, the DIP Lender shall have no obligation to lend or advance any additional funds to or on behalf of Debtors, or provide any other financial accommodations to Debtors, immediately upon or after the occurrence of an Event of Default, or upon the occurrence of any act, event or condition that, with the giving of notice or the passage of time, or both, would constitute an Event of Default

12.     **Proceeds of Subsequent Financing**. If at any time prior to the Termination Date, the Debtors, the Debtors' estates, any trustee, any examiner or any responsible officer subsequently appointed in the Chapter 11 Cases or the Successor Cases, shall in violation of this Interim Order, the DIP Credit Agreement or the other DIP Credit Documents, obtain credit or incur debt pursuant to sections 364(b), (c) or (d) of the Bankruptcy Code, and such financings are secured by any DIP Collateral, then all of the cash proceeds derived from such credit or debt shall immediately be turned over to the DIP Lender for application in accordance with the DIP Credit Agreement or the other DIP Credit Documents.

13.    **Disposition of Collateral**. The Debtors shall not sell (including, without limitation, any sale and leaseback transaction), transfer (including any assignment of rights), lease, encumber or otherwise dispose of any portion of the DIP Collateral, except as expressly permitted by the DIP Credit Agreement or the other DIP Credit Documents.

14.    **Rights and Remedies Upon Event of Default; Modification of Automatic Stay**.

(a)    Any automatic stay otherwise applicable to the DIP Lender, whether arising under sections 105 or 362 of the Bankruptcy Code or otherwise, is hereby modified, to the extent necessary to permit the DIP Lender, upon the occurrence and during the continuation of an Event of Default , and upon five (5) business days' prior written notice of such occurrence (the "**Remedies Notice Period**") , in each case given to the Debtors, their counsel, counsel for any Committee, and counsel to the U.S. Trustee, to exercise all rights and remedies provided for in this Interim Order, any of the DIP Credit Documents or applicable law, including, without limitation,(i) declare the termination of the revolving commitment under the DIP Facility to the extent any such commitment then remains, (ii) declare all DIP Obligations to be immediately due and payable, without presentment, demand, protest, or other notice of any kind, all of which are expressly waived by the Debtors, (iii) increase the rate of interest applicable to the DIP Obligations to the default rate specified in the DIP Credit Agreement, (iv) terminate the DIP Credit Documents as to any future liability or obligation of the DIP Lender, but without affecting any of the DIP Liens or the DIP Obligations of any Debtor, (v) otherwise enforce any and all rights against the DIP Collateral under the DIP Credit Documents and (vi) take any other actions or exercise any other rights or remedies permitted under this Interim Order, the DIP Credit Documents or applicable law.  If the Debtors do not contest the right of the DIP Lender to exercise its rights and remedies within the Remedies Notice Period, or if an emergency hearing is held that does not result in the Court preventing the DIP Lender from exercising its rights and remedies, then the automatic stay, as to the DIP Lender, shall automatically terminate at the end of the Remedies Notice Period.

(b)    The automatic stay imposed under section 362(a) of the Bankruptcy Code is hereby modified pursuant to the terms of this Interim Order as necessary to permit (a) the Debtors to grant the DIP

Liens and the DIP Superpriority Claim, (b) the Debtors to incur all DIP Obligations and pay all fees, costs and expenses under the DIP Credit Agreement and the other DIP Credit Documents, and (c) the implementation of all of the terms, rights, benefits, privileges and remedies of this Interim Order and the DIP Credit Documents, in each case, without further notice, hearing or order of the Court.

15.      **Proof of Claim**. The DIP Lender shall not be required to file a proof of claim in any of the Chapter 11 Cases or any Successor Cases for any claim allowed in this Interim Order. Notwithstanding any order entered by the Court in relation to the establishment of a bar date in any of the Chapter 11 Cases or any Successor Cases to the contrary, the DIP Lender is hereby authorized and entitled, in its sole and absolute discretion, but is not required, to file (and amend and/or supplement, as it sees fit) a proof of claim in each of the Chapter 11 Cases or any Successor Cases for any claim allowed in this Interim Order; for avoidance of doubt, any such proof of claim may (but is not required to) be filed as one consolidated proof of claim against all of the Debtors, rather than as a separate proof of claim against each Debtor. Any order entered by the Court in relation to the establishment of a bar date for any claim (including without limitation administrative claims) in any of the Chapter 11 Cases or any Successor Cases shall not apply to the DIP Lender.

16.      **Good Faith Under Section 364(e) of the Bankruptcy Code; No Modification or Stay of this Interim Order**. The DIP Lender has acted in good faith in connection with the DIP Facility, and its reliance upon this Interim Order is in good faith. Based on the findings set forth in this Interim Order and the record made at the Interim Hearing, and in accordance with section 364(e) of the Bankruptcy Code, in the event any or all of the provisions of this Interim Order are hereafter modified, amended, vacated or stayed by a subsequent order of this Court or any other court, the DIP Lender is entitled to all the protections and benefits provided by section 364(e) of the Bankruptcy Code.

17.      **Expenses**. The Debtors are authorized to pay all prepetition and postpetition fees, costs, disbursement and expenses of the DIP Lender that are payable by Debtors in accordance with the DIP Credit Documents and this Interim Order.  Payment of such fees shall not be subject to allowance by this Court; *provided*, *however*, the U.S. Trustee or counsel for any Committee may seek a determination by this

Court whether such fees and expenses are reasonable in the manner set forth below. Under no circumstances shall professionals for the DIP Lender be required to comply with the U.S. Trustee fee guidelines; *provided*, *however*, within one (1) business day of receipt, the Debtors shall provide to the U.S. Trustee and the lead counsel of any Committee a copy of any invoices received from the DIP Lender for professional fees and expenses during the pendency of the Chapter 11 Cases. Each such invoice shall be sufficiently detailed to enable a determination as to the reasonableness of such fees and expenses (without limiting the right of the various professionals to redact privileged, confidential, or sensitive information). If the U.S. Trustee or any Committee objects to the reasonableness of the invoices submitted by the DIP Lender, and the parties cannot resolve such objection within ten (10) calendar days of receipt of such invoices, the U.S. Trustee or such Committee, as the case may be, shall file with the Court and serve on the applicable DIP Lender an objection (a "**Fee Objection**") limited to the issue of reasonableness of such fees and expenses. The Debtors shall promptly pay, and/or the DIP Lender (as applicable) is hereby authorized to make an advance under the DIP Facility to timely pay, the submitted invoices after the expiration of the ten (10) calendar day notice period if no Fee Objection is received in such ten (10) calendar day period. If a Fee Objection is timely received, the Debtors shall promptly pay, and/or the DIP Lender (as applicable) is hereby authorized to make an advance under the DIP Facility to timely pay, the undisputed amount only of the invoice(s) that is the subject of such Fee Objection, and the Court shall have jurisdiction to determine the disputed portion of such invoice(s) if the parties are unable to resolve the Fee Objection.  Notwithstanding the foregoing, the Debtors are authorized to pay on the Closing Date all reasonable and documented fees, costs, and out-of-pocket expenses of the DIP Lender incurred on or prior to such date to the extent payable in accordance with the terms of the DIP Credit Agreement.

18.    **Indemnification**. The Debtors are authorized to indemnify and hold harmless the DIP Lender and each of the Indemnitees (as defined in the DIP Credit Agreement) in accordance with and subject to the terms and conditions of the DIP Credit Agreement.

19.    **Binding Effect**. The provisions of this Interim Order shall be binding upon and inure to the benefit of the Debtors, the DIP Lender and their respective successors and assigns (including any trustee

or other fiduciary hereinafter appointed as a legal representative of the Debtors or with respect to the property of the estates of the Debtors), any and all creditors of the Debtors, any Committee and any other parties in interests and each of their respective successors and assigns, whether in the Chapter 11 Cases, in any Successor Cases, or upon dismissal of any such chapter 11 or chapter 7 case.

20.    **Section 506(c) Waiver; No Marshalling**. Subject to and effective only upon entry of the Final Order, except to the extent of the Administrative Carve-Out, no expenses of administration of the Chapter 11 Cases or any Successor Case shall be charged against or recovered from the DIP Collateral pursuant to Bankruptcy Code section 506(c), the enhancement of collateral provisions of Bankruptcy Code section 552, or any other legal or equitable doctrine (including, without limitation, unjust enrichment) or any similar principle of law, without the prior written consent of the DIP Lender, and no consent shall be implied from any action, inaction or acquiescence by the DIP Lender. Subject to and effective only upon entry of the Final Order, in no event shall the DIP Lender be subject to (i) the "equities of the case" exception contained in Bankruptcy Code section 552(b) or (ii) the equitable doctrine of "marshaling" or any other similar doctrine with respect to the Collateral.

21.    **Right to Credit Bid**. Subject to the terms and conditions of the DIP Credit Documents, the DIP Lender shall have the unqualified right to "credit bid" up to the full amount of the outstanding DIP Obligations in connection with any sale or other disposition of all or any portion of the DIP Collateral, including, without limitation, sales occurring pursuant to section 363 of the Bankruptcy Code or included as part of any plan subject to confirmation under section 1129(b)(2)(A)(iii) of the Bankruptcy Code.

22.    **Amendments**. Notwithstanding anything contained herein to the contrary, no amendment, modification or supplement of any of the DIP Credit Documents shall be effective unless in writing and in accordance with the applicable DIP Credit Documents. Subject to the terms and conditions of the applicable DIP Credit Documents, the Debtors and the DIP Lender may make any nonmaterial amendment, modification or supplement of any provision of the DIP Credit Agreement or the other DIP Credit Documents, and the Debtors are authorized to enter into any such amendment, modification, supplement or waiver, without further notice to or approval of the Court. In the case of any material amendment,

modification, or supplement to the DIP Credit Documents that is adverse to the Debtors (a "**Material Amendment**"), the Debtors shall provide notice (which may be provided via electronic mail or other electronic means) to counsel to the Committee, if any, and to the United States Trustee, each of whom shall have five (5) calendar days from the date of receipt of such notice to object in writing to such Material Amendment. If no objections are timely received (or if the such parties indicate via electronic mail that they have no objection) to the Material Amendment, the Debtors may proceed to execute the Material Amendment, which shall become effective immediately upon execution. If the Committee, if any, or the U.S. Trustee timely objects to any Material Amendment, such Material Amendment shall only be permitted pursuant to an order of this Court.

23.    **Priority of Terms**. To the extent of any conflict between or among (a) the express terms or provisions of any of the DIP Credit Documents, the Motion, any other order of this Court, or any other agreements, on the one hand, and (b) the terms and provisions of this Interim Order, on the other hand, unless such term or provision herein is phrased in terms of "as defined in" or "as set forth in" any of the DIP Credit Documents, the terms and provisions of this Interim Order shall govern.

24.    **Survival of Interim Order**. The provisions of this Interim Order and any actions taken pursuant hereto shall survive and shall not be modified, impaired or discharged by entry of any order which may be entered (i) confirming any Chapter 11 plan in the Chapter 11 Cases, (ii) converting any of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code, (iii) dismissing any of the Chapter 11 Cases, (iv) withdrawing of the reference of any of the Chapter 11 Cases from this Court or (v) providing for abstention from handling or retaining of jurisdiction of any of the Chapter 11 Cases in this Court. The terms and provisions of this Interim Order, including the DIP Liens, DIP Superpriority Claim, and other rights, privileges, benefits and protections afforded herein and in the DIP Credit Documents to the DIP Lender shall continue in full force and effect notwithstanding the entry of such order, and shall maintain their respective priorities as provided by this Interim Order, the DIP Credit Agreement and the other DIP Credit Documents (as the case may be) until the payment in full of the DIP Obligations, and this Court shall

retain jurisdiction, notwithstanding dismissal of any of the Chapter 11 Cases, for the purposes of enforcing the foregoing to the extent permitted by applicable law.

25.    **Enforceability**. This Interim Order shall constitute findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052 and shall take effect and be fully enforceable *nunc pro tunc* to the Petition Date immediately upon execution hereof. Any finding of fact shall constitute a finding of fact even if it is stated as a conclusion of law, and any conclusion of law shall constitute a conclusion of law even if it is stated as a finding of fact.

26.    **Waiver of Any Applicable Stay**. This Interim Order shall be effective upon its entry and not subject to any stay (all of which are hereby waived), notwithstanding anything to the contrary contained in Bankruptcy Rule 4001(a)(3), 6004 or any other Bankruptcy Rule.

27.    **Discharge**. The DIP Obligations shall not be discharged by the entry of an order confirming any plan in any of the Chapter 11 Cases, notwithstanding the provisions of section 1141(d) of the Bankruptcy Code, unless such obligations have been indefeasibly paid in full in cash, on or before the effective date of such confirmed plan, or the DIP Lender has otherwise agreed in writing.

28.    **Final Hearing**.

(a)    The Final Hearing is scheduled for [•], 2020, at [•] [a.m./p.m.] (Eastern Time) before this Court. The Debtors shall promptly mail copies of this Interim Order (which shall constitute adequate notice of the Final Hearing) to the parties having been given notice of the Interim Hearing, and to any other party that has filed a request for notices with this Court and to any Committee after the same has been appointed, or Committee counsel, if the same shall have been appointed. Any party in interest objecting to the relief sought at the Final Hearing shall serve and file written objections; which objections shall be served (with a copy to the Court's chambers) no later than [•], 2020 at 4:00 p.m. (ET) upon: (a) the U.S. Trustee, 844 King Street, Suite 2007, Lockbox 35, Wilmington, DE 19801; (b) the Debtors [•]; (c) counsel to the Debtors, KTBS Law LLP, 1999 Avenue of the Stars, Thirty-Ninth Floor, Los Angeles, CA 90067 (Attn: David A. Fidler and Maria Sountas-Argiropoulos); (d) Sheppard, Mullin, Richter &

Hampton LLP, Four Embarcadero Center, 17th Floor, San Francisco, CA 94111 (Attn: Todd L. Padnos); and (e) counsel to any Committee then appointed in these Chapter 11 Cases.

29.    **<u>Retention of Jurisdiction</u>**. The Court has and will retain jurisdiction to hear, determine and, if applicable, enforce the terms of, any and all matters arising from or related to the DIP Facility and/or this Interim Order.

Dated: January ___, 2020
Wilmington, Delaware

_____
                           UNITED STATES BANKRUPTCY JUDGE

**<u>Exhibit A</u>**

**Budget**

**American Blue Ribbon Holdings, LLC**
*Weekly Cash Forecast*
**DIP Budget**

($ in thousands)

| Year | | 2020 | 2020 | 2020 | 2020 | 2020 | 2020 | 2020 | 2020 | 2020 | 2020 | 2020 | 2020 | 2020 | 13-Weeks |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Week Ending | | 31-Jan | 7-Feb | 14-Feb | 21-Feb | 28-Feb | 6-Mar | 13-Mar | 20-Mar | 27-Mar | 3-Apr | 10-Apr | 17-Apr | 24-Apr | Total |
| Restaurant Deposits | | 2,898 | 3,094 | 3,373 | 3,251 | 3,501 | 3,439 | 3,954 | 3,549 | 3,569 | 3,469 | 3,377 | 4,145 | 3,291 | 44,912 |
| Gift Card AR Receipts | | 84 | 4 | 3 | 7 | 3 | 7 | 7 | 6 | 4 | 4 | 8 | 5 | 2 | 145 |
| Bakery Deposits | | 824 | 677 | 1,647 | 1,012 | 513 | 757 | 820 | 922 | 1,359 | 406 | 938 | 1,144 | 1,043 | 12,061 |
| Other Deposits | | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Total Operating Receipts** | | **3,806** | **3,776** | **5,023** | **4,271** | **4,016** | **4,203** | **4,782** | **4,477** | **4,932** | **3,880** | **4,323** | **5,294** | **4,336** | **57,118** |
| Payroll & Benefits | (1) | (1,936) | (1,430) | (1,380) | (2,423) | (1,381) | (1,426) | (1,378) | (1,449) | (1,424) | (1,477) | (1,377) | (1,381) | (1,525) | (19,989) |
| Rent | (2) | (1,105) | (135) | (16) | (89) | (1,105) | (135) | (16) | (89) | - | (1,105) | (135) | (16) | (89) | (4,032) |
| Restaurant Vendor AP | | (1,021) | (1,355) | (1,513) | (1,583) | (1,127) | (1,179) | (1,054) | (1,439) | (1,614) | (1,173) | (1,120) | (1,122) | (1,582) | (16,881) |
| Utilities | | (243) | (137) | (140) | (186) | (135) | (262) | (131) | (163) | (237) | (123) | (181) | (121) | (136) | (2,195) |
| Legendary Vendor AP | (3) | (642) | (1,622) | (1,258) | (1,700) | (1,122) | (1,554) | (982) | (1,031) | (715) | (1,160) | (1,468) | (731) | (2,018) | (16,003) |
| Sales Taxes | | (31) | (296) | (771) | (739) | (165) | (48) | (73) | (876) | (283) | (94) | (43) | (670) | (286) | (4,375) |
| Shared Services | (4) | (180) | (180) | (180) | (180) | (173) | (173) | (173) | (173) | (168) | (168) | (168) | (168) | (160) | (2,244) |
| **Total Operating Disbursements** | | **(5,158)** | **(5,155)** | **(5,257)** | **(6,899)** | **(5,208)** | **(4,776)** | **(3,806)** | **(5,219)** | **(4,441)** | **(5,300)** | **(4,493)** | **(4,209)** | **(5,796)** | **(65,718)** |
| **Net Cash Flow from Operations** | | **(1,352)** | **(1,379)** | **(234)** | **(2,629)** | **(1,192)** | **(573)** | **975** | **(742)** | **491** | **(1,421)** | **(169)** | **1,085** | **(1,459)** | **(8,600)** |
| Professional Fees | | - | - | - | - | - | - | - | - | (800) | - | - | - | - | (800) |
| Interest & Fees | (5) | (200) | (11) | - | - | - | (70) | - | - | - | (93) | - | - | - | (374) |
| Other | (6) | (431) | - | - | - | - | - | - | - | - | - | - | - | - | (431) |
| Total Non-Operating Disbursements | | **(631)** | **(11)** | **-** | **-** | **-** | **(70)** | **-** | **-** | **(800)** | **(93)** | **-** | **-** | **-** | **(1,605)** |
| **Net Cash Flow before Financing** | | **(1,983)** | **(1,390)** | **(234)** | **(2,629)** | **(1,192)** | **(644)** | **975** | **(742)** | **(309)** | **(1,513)** | **(169)** | **1,085** | **(1,459)** | **(10,205)** |
| Beg Cash Balance (Book) | (7)(8) | 690 | 3,506 | 3,516 | 3,482 | 3,454 | 3,462 | 3,518 | 3,494 | 3,452 | 3,542 | 3,529 | 3,460 | 3,545 | 690 |
| Net Cash Flow before Financing | | (1,983) | (1,390) | (234) | (2,629) | (1,192) | (644) | 975 | (742) | (309) | (1,513) | (169) | 1,085 | (1,459) | (10,205) |
| DIP Advances (Paydowns) | | 4,800 | 1,400 | 200 | 2,600 | 1,200 | 700 | (1,000) | 700 | 400 | 1,500 | 100 | (1,000) | 1,400 | 13,000 |
| **End Cash Balance (Book)** | (8) | **3,506** | **3,516** | **3,482** | **3,454** | **3,462** | **3,518** | **3,494** | **3,452** | **3,542** | **3,529** | **3,460** | **3,545** | **3,485** | **3,485** |
| Beg DIP Balance | | - | 4,800 | 6,200 | 6,400 | 9,000 | 10,200 | 10,900 | 9,900 | 10,600 | 11,000 | 12,500 | 12,600 | 11,600 | - |
| **End DIP Balance** | | **4,800** | **6,200** | **6,400** | **9,000** | **10,200** | **10,900** | **9,900** | **10,600** | **11,000** | **12,500** | **12,600** | **11,600** | **13,000** | **13,000** |
| *Reimbursement of Pass Through Costs to ABRH (est)* | (9) | *2,369* | *1,626* | *1,669* | *1,858* | *2,366* | *1,575* | *1,201* | *1,691* | *1,851* | *2,400* | *1,436* | *1,259* | *1,807* | *23,108* |

Notes:
*(1) Includes Payroll, related Taxes & Garnishments and Benefits Plan payments for both Legendary and Restaurants*
*(2) Rent assumed to decline based on store closures and lease rejections*
*(3) Legendary Vendor AP includes all Legendary AP Payments*
*(4) Shared services based on estimated allocation methodologies and includes assumptions based on store closure plan*
*(5) Interest & Fees includes 10.75% Interest, paid at month end, Commitment fee of 0.25% accrued weekly and paid at month end, plus 1.0% Up Front Fee paid at Closing*
*(6) Assumes utility adequate assurance deposited 1st week of case*
*(7) Beg Cash Balance (Book) includes estimates.*
*(8) Cash Balance (Book) includes estimates, including store deposits in-transit. It excludes Cash Equivalents (Credit Card in transit and imprest funds).*
*(9) Reimbursement of Direct Expenses paid by Affiliates. Includes substantially all Restaurant Vendor AP, Rent and Utilities*

**PROFESSIONAL FEES**
Excludes Ordinary Course Professionals

| Period Ending Date >> | 23-Feb | 22-Mar | 19-Apr | 17-May | 14-Jun | 12-Jul | 9-Aug | Total |
|---|---|---|---|---|---|---|---|---|
| **EXPENSES (ON AN ACCRUAL BASIS)** | | | | | | | | |
| **Debtors** | | | | | | | | |
| KTBS | 450,000 | 450,000 | 450,000 | 450,000 | 450,000 | 425,000 | | 2,675,000 |
| Young Conaway | 150,000 | 150,000 | 125,000 | 125,000 | 125,000 | 125,000 | | 800,000 |
| Epiq | 75,000 | 50,000 | 75,000 | 75,000 | 75,000 | 50,000 | | 400,000 |
| **Subtotal** | 675,000 | 650,000 | 650,000 | 650,000 | 650,000 | 600,000 | - | 3,875,000 |
| **Unsecureds** | | | | | | | | |
| Legal Counsel | 125,000 | 125,000 | 125,000 | 125,000 | 125,000 | 90,000 | | 715,000 |
| Financial Advisor | 50,000 | 50,000 | 50,000 | 50,000 | 25,000 | 25,000 | | 250,000 |
| **Subtotal** | **175,000** | **175,000** | **175,000** | **175,000** | **150,000** | **115,000** | **-** | **965,000** |
| **US Trustee** | 83,333 | 83,333 | 83,333 | 83,333 | 83,333 | 83,333 | 25,000 | 525,000 |
| **Total** | **933,333** | **908,333** | **908,333** | **908,333** | **883,333** | **798,333** | **25,000** | **5,365,000** |

**<u>Exhibit B</u>**

**DIP Credit Agreement**

*EXECUTION VERSION*

**SENIOR SECURED, SUPERPRIORITY
DEBTOR-IN-POSSESSION CREDIT AGREEMENT**

**dated as of January 27, 2020**

**among**

**AMERICAN BLUE RIBBON HOLDINGS, LLC,
LEGENDARY BAKING, LLC,
LEGENDARY BAKING HOLDINGS, LLC,
LEGENDARY BAKING OF CALIFORNIA, LLC, and
SVCC, LLC
as Borrowers,**

**and**

**CANNAE HOLDINGS, INC.,
as Lender**

---

**$20,000,000
Debtor-in-Possession Credit Facility**

---

# TABLE OF CONTENTS

Page

SECTION 1.    DEFINITIONS AND INTERPRETATION ....................................................... 1
    1.1    Definitions ............................................................ 1
    1.2    Accounting Terms ...................................................... 17
    1.3    Interpretation, etc .................................................... 18
    1.4    Uniform Commercial Code ............................................... 18

SECTION 2.    LOANS; INTEREST; REPAYMENT ........................................................ 18
    2.1    Loans ................................................................ 18
    2.2    Repayment of Loans ................................................... 19
    2.3    Use of Proceeds. ..................................................... 19
    2.4    Evidence of Debt; Register; Lender's Books and Records; Notes ........ 20
    2.5    Interest on Loans. ................................................... 20
    2.6    Fees. ................................................................ 20
    2.7    Optional Prepayments; Reduction or Termination of the Revolving Commitment .......... 21
    2.8    Mandatory Prepayments ................................................ 21
    2.9    Application of Prepayments ............................................ 22
    2.10   General Provisions Regarding Payments. ............................... 22
    2.11   Taxes; Withholding, etc. ............................................. 23

SECTION 3.    CONDITIONS PRECEDENT ............................................................... 24
    3.1    Conditions of Initial Credit Extension ............................... 24
    3.2    Conditions to Each Credit Extension. ................................. 25

SECTION 4.    REPRESENTATIONS AND WARRANTIES ..................................................... 26
    4.1    Organization; Requisite Power and Authority; Qualification ........... 26
    4.2    Due Authorization .................................................... 26
    4.3    No Conflict .......................................................... 27
    4.4    Governmental Consents ................................................ 27
    4.5    Binding Obligation ................................................... 27
    4.6    No Filings Required .................................................. 27
    4.7    [Reserved] ........................................................... 27
    4.8    [Reserved] ........................................................... 27
    4.9    Adverse Proceedings, etc ............................................. 27
    4.10   Payment of Taxes ..................................................... 28
    4.11   Properties ........................................................... 28
    4.12   Environmental Matters ................................................ 28
    4.13   Compliance with Statutes, etc ........................................ 28
    4.14   Interrelated Business ................................................ 29

SECTION 5.    AFFIRMATIVE COVENANTS ............................................................. 29

| 5.1 | Monthly and Other Reports | 29 |
| 5.2 | Existence | 31 |
| 5.3 | Payment of Taxes and Claims | 31 |
| 5.4 | Maintenance of Properties; Intellectual Property | 31 |
| 5.5 | Insurance | 31 |
| 5.6 | Inspections | 32 |
| 5.7 | Lender Meetings | 32 |
| 5.8 | Compliance with Laws | 32 |
| 5.9 | Further Assurances | 32 |
| SECTION 6. | NEGATIVE COVENANTS | 32 |
| 6.1 | Indebtedness | 32 |
| 6.2 | Liens | 33 |
| 6.3 | Equitable Lien | 35 |
| 6.4 | No Further Negative Pledges | 35 |
| 6.5 | Restricted Junior Payments | 35 |
| 6.6 | Investments | 35 |
| 6.7 | Financial Covenants | 36 |
| 6.8 | Fundamental Changes; Disposition of Assets; Acquisitions | 37 |
| 6.9 | Sales and Lease Backs | 38 |
| 6.10 | Conduct of Business | 38 |
| 6.11 | Amendments to Organizational Documents | 38 |
| 6.12 | Prepayments of Certain Indebtedness | 39 |
| 6.13 | Material Contracts | 39 |
| 6.14 | Bankruptcy Matters | 39 |
| SECTION 7. | COLLATERAL | 39 |
| 7.1 | Grant of Security Interest | 39 |
| 7.2 | Deposit Accounts; Cash Collateral | 40 |
| 7.3 | Real Estate Collateral | 40 |
| 7.4 | Other Collateral | 41 |
| 7.5 | Limitations | 41 |
| 7.6 | Further Assurances | 41 |
| 7.7 | Superpriority Nature of Obligations; Lender's Liens. | 41 |
| SECTION 8. | EVENTS OF DEFAULT | 42 |
| 8.1 | Events of Default | 42 |
| 8.2 | Remedies | 46 |
| SECTION 9. | MISCELLANEOUS | 47 |
| 9.1 | Notices | 47 |
| 9.2 | Expenses | 47 |
| 9.3 | Indemnity. | 47 |
| 9.4 | Set Off | 48 |

9.5    Amendments and Waivers ................................................................................. 49

9.6    Successors and Assigns ................................................................................... 49

9.7    Independence of Covenants ............................................................................ 49

9.8    Survival of Representations, Warranties and Agreements ............................. 49

9.9    No Waiver; Remedies Cumulative ................................................................. 49

9.10   Marshalling; Payments Set Aside .................................................................. 50

9.11   Severability ..................................................................................................... 50

9.12   APPLICABLE LAW ...................................................................................... 50

9.13   CONSENT TO JURISDICTION ................................................................... 50

9.14   WAIVER OF JURY TRIAL ........................................................................... 51

9.15   Usury Savings Clause ..................................................................................... 51

9.16   Counterparts .................................................................................................... 52

9.17   Effectiveness ................................................................................................... 52

9.18   Joint and Several Liability; Waivers. .............................................................. 52

**APPENDICES:**    A       Notice Addresses

**SCHEDULES:**    4.11    Real Estate Assets
                   6.1     Certain Indebtedness
                   6.2     Certain Liens
                   6.6     Certain Investments
                   7.2     Deposit Accounts

**EXHIBITS:**    A       Form of Funding Notice
                   B       Form of Interim Order

# SENIOR SECURED, SUPERPRIORITY
# DEBTOR-IN-POSSESSION CREDIT AGREEMENT

This **SENIOR SECURED, SUPERPRIORITY DEBTOR-IN-POSSESSION CREDIT AGREEMENT**, dated as of January 27, 2020, is entered into among **AMERICAN BLUE RIBBON HOLDINGS, LLC** a Delaware limited liability company, as a debtor and a debtor-in-possession ("the Lead Borrower"), **LEGENDARY BAKING, LLC**, a Delaware limited liability company, as a debtor and a debtor-in-possession, **LEGENDARY BAKING HOLDINGS, LLC**, a Delaware limited liability company, as a debtor and a debtor-in-possession, **LEGENDARY BAKING OF CALIFORNIA, LLC**, a Delaware limited liability company, as a debtor and a debtor-in-possession, and **SVCC, LLC**, an Arizona limited liability company, as a debtor and a debtor-in-possession (each of which Persons, individually a "Borrower" and together with the Lead Borrower, collectively, the "Borrowers"), and **CANNAE HOLDINGS, INC.**, a Delaware corporation ("Cannae"), as Lender.

## RECITALS:

**WHEREAS,** capitalized terms used in these Recitals shall have the respective meanings set forth for such terms in Section 1.1 hereof;

**WHEREAS**, on January 27, 2020 (the "Petition Date"), each Borrower (each also referred to herein as a "Debtor") filed a voluntary bankruptcy petition for relief under chapter 11 of the Bankruptcy Code with the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") commencing cases thereunder (such cases being jointly administered under Case Nos. 20-[●], 20-[●], 20-[●], 20-[●] and 20-[●] and are referred to herein as the "Chapter 11 Cases"), and such Debtors continue to operate their businesses and manage their properties as debtors and debtors-in-possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code;

**WHEREAS**, the Borrowers have requested that Lender provide a senior secured, superpriority debtor-in-possession credit facility to the Borrowers in a principal amount up to $20,000,000 in the aggregate to be used for the purposes set forth in Section 2.3;

**WHEREAS**, Lender is willing to make Postpetition loans to the Borrowers of up to such aggregate amount upon the terms and conditions set forth herein; and

**WHEREAS**, the Borrowers have agreed to secure all of their Obligations under the Credit Documents by granting to the Lender security interests in, and liens upon, all or substantially all of their respective existing and after-acquired personal and real property as more fully provided for herein;

**NOW, THEREFORE,** in consideration of the premises and the agreements, provisions and covenants herein contained, the parties hereto agree as follows:

## SECTION 1.  DEFINITIONS AND INTERPRETATION

**1.1     Definitions**.  The following terms used herein, including in the preamble, recitals, exhibits and schedules hereto, shall have the following meanings:

"<u>ABRH</u>" means ABRH, LLC, a Delaware limited liability company.

"<u>Acquisition</u>" means any transaction or series of related transactions for the purpose of or resulting in the acquisition by any Borrower, whether by purchase, merger, or otherwise, of all or substantially all of the assets, all of the Capital Stock, or a business line or unit or division, of any Person.

"<u>Administrative Carve-Out</u>" means the sum of:

(a) all incurred or accrued professional fees and expenses of professionals for the Borrowers and professionals for the Unsecured Creditors Committee to the extent (i) allowed at any time by the Bankruptcy Court (if required), regardless of whether allowed by interim order, procedural order or otherwise, (ii) incurred or accrued through the date of service by the Lender of a Carve-Out Trigger Notice and (iii) up to and as limited by the respective aggregate Budget amounts for each professional for the Borrowers (as set forth on page 2 of the Budget) and each professional for the Unsecured Creditors Committee (as set forth on page 2 of the Budget) or category of professionals for the Borrowers and category of professionals for the Unsecured Creditors Committee through the date of service of said Carve-Out Trigger Notice, less the amount of any Prepetition retainers received by such professionals and not previously applied to fees and expenses (for clarity, all requirements in the foregoing clauses (i) through (iii) must be satisfied for the inclusion of the fees and expenses covered by this clause (a) in the Administrative Carve-Out);

(b) all accrued and unpaid fees, disbursements, costs and expenses incurred by the professionals for the Borrowers from and after the date of service of a Carve-Out Trigger Notice, to the extent allowed at any time, in an aggregate amount not to exceed $400,000 less the remaining amount of Prepetition retainers received by such professionals not previously applied to the fees, disbursements, costs and expenses set forth in clause (a)(iii) above;

(c) all accrued and unpaid fees, disbursements, costs and expenses incurred by the professionals for the Unsecured Creditors Committee from and after the date of service of a Carve-Out Trigger Notice, to the extent allowed at any time, in an aggregate amount not to exceed $100,000; and

(d) allowed administrative expenses (i) for fees payable to the Office of the United States Trustee pursuant to 28 USC §1930(a)(6), as determined by agreement of the United States Trustee or by final order of the Bankruptcy Court and (ii) for fees required to be paid to the Clerk of the Bankruptcy Court pursuant to 28 U.S.C. § 156(c).

"<u>Adverse Proceeding</u>" means any action, suit, proceeding (whether administrative, judicial or otherwise), governmental investigation or arbitration (whether or not purportedly on behalf of any Borrower) at law or in equity, or before or by any Governmental Authority, domestic or foreign (including any Environmental Claims), whether pending or, to the knowledge of any Borrower, threatened against or affecting any Borrower or any property of any Borrower.

"<u>Affiliate</u>" means, as applied to any Person, any other Person directly or indirectly controlling (including any member of the senior management group of such Person), controlled by, or under common control with, that Person.  For the purposes of this definition, "control"

(including, with correlative meanings, the terms "controlling," "controlled by" and "under common control with"), as applied to any Person, means the possession, directly or indirectly, of the power (a) to vote 10% or more of the Securities having ordinary voting power for the election of directors of such Person, or (b) to direct or cause the direction of the management and policies of that Person, whether through the ownership of voting securities or by contract or otherwise.

"Agreement" means this Senior Secured, Superpriority Debtor-in-Possession Credit Agreement, as amended from time to time.

"Asset Sale" means a sale, lease or sub-lease (as lessor or sublessor), sale and leaseback, assignment, conveyance, transfer, license or other disposition to, or any exchange of property with, any Person, in one transaction or a series of transactions, of all or any part of Borrower 's businesses, assets or properties of any kind, whether real, personal, or mixed and whether tangible or intangible, whether now owned or hereafter acquired.  For purposes of clarification, "Asset Sale" shall include (a) the sale or other disposition for value of any contracts and (b) the early termination or modification of any contract resulting in the receipt by Borrower of a cash payment or other consideration in exchange for such event (other than payments in the ordinary course for accrued and unpaid amounts due through the date of termination or modification).

"Authorized Officer" means, as applied to any Borrower, any individual holding the position of the chief executive officer, president, chief financial officer, treasurer, assistant treasurer or controller of Borrower.

"Availability Amount" means, as determined from time to time, the result, if a positive number, of (a) the Revolving Commitment in effect at such time minus (b) the total outstanding Loans at such time.

"Avoidance Claim" means any claim that could be asserted by or on behalf of any Borrower or its Estate under Sections 502(b), 544, 545, 546, 547, 548, 549, 550 or 553 of the Bankruptcy Code.

"Bankruptcy Code" means Title 11 of the United States Code entitled "Bankruptcy," as now and hereafter in effect, or any successor statute.

"Bankruptcy Court" has the meaning ascribed thereto in the recitals hereto.

"Bankruptcy Events" means (a) the filing of the Chapter 11 Cases (and any defaults under Prepetition agreements, so long as the exercise of remedies as a result of such defaults are stayed under the Bankruptcy Code or such defaults or default provisions have been voided or invalidated, as the case may be, by the Bankruptcy Court), (b) any events leading up to, and typically resulting from, the commencement of a case under Chapter 11 of the Bankruptcy Code, and (c) the incurrence of any claim or liability that is Prepetition, unsecured and junior in priority to the Obligations.

"Borrowers" or "Borrower" has the meaning ascribed thereto in the preamble hereto.

"<u>Budget</u>" means the debtor-in-possession thirteen (13) week budget prepared by the Lead Borrower and furnished to the Lender on or before the Closing Date, as the same may or shall, as applicable, be updated, modified and/or supplemented thereafter from time to time as provided in <u>Section 5.1(b)(i)</u>, which budget shall include a weekly cash budget, including information on a line item basis as to (a) projected total cash receipts (which includes sales and other receipts) and (b) projected total disbursements (including ordinary course operating expenses and capital expenditures), bankruptcy-related expenses (including fees and expenses budgeted for the case professionals), and fees and expenses of the Lender and any other fees and expenses relating to the Loan Documents.

"<u>Business Day</u>" means any day excluding (a) Saturday, (b) Sunday, (c) any day which is a legal holiday under the laws of the State of New York and (d) any date on which banking institutions located the State of New York are authorized or required by law or other governmental action to close.

"<u>Cannae</u>" has the meaning ascribed thereto in the preamble hereto.

"<u>Capital Lease</u>" means, as applied to any Person, any lease of any property (whether real, personal or mixed) by that Person, as lessee that, in conformity with GAAP, is or should be accounted for as a capital lease on the balance sheet of that Person.

"<u>Capital Stock</u>" means any and all shares, interests, participations or other equivalents (however designated) of capital stock of a corporation, any and all equivalent ownership interests in a Person (other than a corporation), including partnership interests and membership interests, and any and all warrants, rights or options to purchase or other arrangements or rights to acquire any of the foregoing.

"<u>Carve-Out Trigger Notice</u>" means a written notice by the Lender to lead counsel for the Borrowers, the Unsecured Creditors Committee and the United States Trustee notifying such Persons of the occurrence and continuance of an Event of Default.

"<u>Cash</u>" means, when used in connection with any Person, all monetary and nonmonetary items owned by that Person that are treated as cash in accordance with GAAP, consistently applied.

"<u>Cash Collateral</u>" means all Cash and Cash Equivalents, and any interest or other income earned thereon, of Borrower, including, but not limited to all other "cash collateral" as defined in section 363(a) of the Bankruptcy Code.

"<u>Cash Equivalents</u>" means, as at any date of determination, (a) marketable securities (i) issued or directly and unconditionally guaranteed as to interest and principal by the United States Government, or (ii) issued by any agency of the United States the obligations of which are backed by the full faith and credit of the United States, in each case maturing within one year after such date; (b) marketable direct obligations issued by any state of the United States of America or any political subdivision of any such state or any public instrumentality thereof, in each case maturing within one year after such date and having, at the time of the acquisition thereof, a rating of at least A-1 from S&P or at least P-1 from Moody's; (c) commercial paper maturing no more than one year from the date of creation thereof and having, at the time of the

acquisition thereof, a rating of at least A-1 from S&P or at least P-1 from Moody's; (d) certificates of deposit or bankers' acceptances maturing within one year after such date and issued or accepted by Lender or by any commercial bank organized under the laws of the United States of America or any state thereof or the District of Columbia that (i) is at least "adequately capitalized" (as defined in the regulations of its primary Federal banking regulator), and (ii) has Tier 1 capital (as defined in such regulations) of not less than $100,000,000; and (e) shares of any money market mutual fund that (i) has substantially all of its assets invested continuously in the types of investments referred to in clauses (a) and (b) above, (ii) has net assets of not less than $500,000,000, and (iii) has the highest rating obtainable from either S&P or Moody's.

"Change in Law" means the occurrence, after the date of this Agreement, of any of the following: (a) the adoption or taking effect of any law, rule, regulation or treaty, (b) any change in any law, rule, regulation or treaty or in the administration, interpretation, implementation or application thereof by any Governmental Authority or (c) the making or issuance of any request, rule, guideline or directive (whether or not having the force of law) by any Governmental Authority; provided that, notwithstanding anything herein to the contrary, (x) the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, rules, guidelines or directives thereunder or issued in connection therewith and (y) all requests, rules, guidelines or directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the United States or foreign regulatory authorities, in each case pursuant to Basel III, shall in each case be deemed to be a "Change in Law", regardless of the date enacted, adopted or issued.

"Change of Control" means, at any time, without Lender's consent (a) ABRH shall cease to own and control, of record and beneficially, directly or indirectly, one hundred percent (100%) of the Capital Stock of each of the Borrowers, or (b) the acquisition, through purchase or otherwise, by any Person or group after the date of this Agreement of all or substantially all of the assets of any Borrower.

"Chapter 11 Cases" has the meaning ascribed thereto in the recitals hereto.

"Citibank" has the meaning assigned to such term in the definition of "Kroger Receivables Financing Agreement".

"Closing Date" means the date on which all the conditions precedent in Section 3.1 are satisfied (or otherwise waived by the Lender).

"Collateral" has the meaning ascribed thereto in Section 7.1.

"Collateral Documents" means, collectively: (a) the Interim Order, (b) the Final Order; (c) this Agreement; (d) any Deposit Account Control Agreement; (e) any Mortgage and (f) any other pledge agreement, security agreement, mortgage, landlord access agreement or other similar instrument, document and agreement delivered by Borrower pursuant to this Agreement, the Interim Order, the Final Order or any of the other Credit Documents in order to grant to the Lender a Lien on any real, personal or mixed property of Borrower as security for the Obligations. The Collateral Documents referred to in clauses (c), (d), (e) and (f) above shall further evidence,

and shall not limit, Liens created and granted in favor of the Lender and perfected pursuant to the Interim Order and Final Order.

"Commitment Fee" has the meaning set forth in Section 2.6(a).

"Contractual Obligation" means, as applied to any Person, any provision of any indenture, mortgage, deed of trust, contract, undertaking, agreement or other document or instrument to which that Person is a party or by which it or any of its properties is bound or to which it or any of its properties is subject.

"Credit Date" means the date of a Credit Extension.

"Credit Document" means any of this Agreement, the Notes, if any, any Collateral Documents, and all other documents, instruments or agreements executed and delivered by Borrower for the benefit of the Lender in connection herewith.

"Credit Extension" means an extension of any Loan by the Lender pursuant to the terms hereof and subject to the Interim Order and the Final Order, as applicable.

"Default" means a condition or event that, after notice or lapse of time or both, would constitute an Event of Default.

"Default Rate" means any interest payable pursuant to Section 2.5(c).

"Deposit Account" means a demand, time, savings, passbook or like account with a bank, savings and loan association, credit union or like organization, other than an account evidenced by a negotiable certificate of deposit.

"Deposit Account Control Agreement" means any agreement entered into by and among the Lender, any Borrower and a third party Bank or other institution in which such Borrower maintains a Deposit Account, effective to grant "control" (as defined under the applicable UCC) over such account to the Lender.

"DIP Superpriority Claims" has the meaning set forth in Section 7.7.

"Disqualified Capital Stock" means any Capital Stock issued by any Person that (a) matures or is mandatorily redeemable pursuant to a sinking fund obligation or otherwise, (b) is or may become redeemable or repurchaseable by such Person at the option of the holder thereof, in whole or in part or (c) is convertible or exchangeable at the option of the holder thereof for Indebtedness or Capital Stock described in this definition, on or prior to, in the case of clause (a), (b) or (c), the first anniversary of the latest Maturity Date.

"Dollars" and the sign "$" mean the lawful money of the United States of America.

"Environmental Claim" means with respect to any Borrower, any investigation, notice, notice of violation, claim, action, suit, proceeding, demand, abatement order or other order or directive (conditional or otherwise), by any Governmental Authority or any other Person, arising (a) pursuant to or in connection with any actual or alleged violation of any Environmental Law;

(b) in connection with any Hazardous Material or any actual or alleged Hazardous Materials Activity; or (c) in connection with any actual or alleged damage, injury, threat or harm to health, safety, natural resources or the environment.

"Environmental Laws" means any and all current or future foreign or domestic, federal or state (or any subdivision of either of them), statutes, ordinances, orders, rules, regulations, judgments, Governmental Authorizations, or any other requirements of Governmental Authorities relating to (a) environmental matters, including those relating to any Hazardous Materials Activity; (b) the generation, use, storage, transportation or disposal of Hazardous Materials; or (c) occupational safety and health, industrial hygiene, land use or the protection of human, plant or animal health or welfare.

"Estates" means the estates created in the Chapter 11 Cases for each applicable Borrower pursuant to Section 541(a) of the Bankruptcy Code.

"Event of Default" has the meaning ascribed thereto in Section 8.1.

"Excluded Property" means the "Receivables" as defined in the Kroger Receivables Financing Agreement, so long as the Kroger Receivables Financing Agreement is in effect and such "Receivables" are thereunder purchased by, or granted as collateral to, Citibank. For clarity, Excluded Property does not include any consideration given to the Lead Borrower under the Kroger Receivables Financing Agreement.

"Excluded Taxes" means any of the following Taxes imposed on or with respect to the Lender or required to be withheld or deducted from a payment to the Lender, (a) Taxes imposed on or measured by net income (however denominated), franchise Taxes, and branch profits Taxes, in each case, (i) imposed as a result of the Lender being organized under the laws of, or having its principal office or, in the case of the Lender, its applicable lending office located in, the jurisdiction imposing such Tax (or any political subdivision thereof) or (ii) that are Other Connection Taxes, (b) U.S. federal withholding Taxes imposed on amounts payable to or for the account of the Lender with respect to an applicable interest in a Loan or Commitment pursuant to a law in effect on the date on which (i) the Lender acquires such interest in the Loan or Commitment or (ii) the Lender changes its lending office, except in each case to the extent that, pursuant to Section 2.11(b), amounts with respect to such Taxes were payable either to the Lender's assignor immediately before the Lender became a party hereto or to the Lender immediately before it changed its lending office, and (c) any U.S. federal withholding Taxes imposed under FATCA.

"Facility" means any real property (including all buildings, fixtures or other improvements located thereon) now, hereafter or heretofore owned, leased, operated or used by any Borrower.

"FATCA" means Sections 1471 through 1474 of the Internal Revenue Code, as of the date of this Agreement (or any amended or successor version that is substantively comparable and not materially more onerous to comply with), any current or future regulations or official interpretations thereof and any agreements entered into pursuant to Section 1471(b)(1) of the Internal Revenue Code, and any applicable intergovernmental agreement with respect thereto.

"Final Order" means the order of the Bankruptcy Court entered in the Chapter 11 Cases after a final hearing under Bankruptcy Rule 4001(c)(2) or such other procedures as approved by the Bankruptcy Court which order shall be satisfactory in form and substance to the Lender which, among other matters but not by way of limitation, authorizes the Borrowers to enter into and perform under this Agreement and any other Credit Documents, incur the Obligations, and grant Liens under this Agreement and the other Credit Documents, as the case may be, and provides for the DIP Superpriority Claims (in accordance with and subject to the applicable provisions of Section 7.7 hereof).

"Final Order Entry Date" means the date on which the Final Order shall have been entered by the Bankruptcy Court.

"Final Revolving Commitment Period" means the period commencing on the Final Order Entry Date and ending on the earliest to occur of (a) the Maturity Date and (b) the date of termination of the Revolving Commitment pursuant to Section 8.2.

"Fiscal Quarter" means a fiscal quarter of any Fiscal Year.

"Fiscal Year" means the fiscal year of Borrower ending on December 31st of each calendar year.

"Flood Hazard Property" means any Real Estate Asset subject to a Mortgage in favor of Lender and located in an area designated by the Federal Emergency Management Agency as having special flood or mud slide hazards.

"Funding Notice" means a notice substantially in the form of Exhibit A.

"GAAP" means, subject to the limitations on the application thereof set forth in Section 1.2, United States generally accepted accounting principles in effect as of the date of determination thereof.

"Governmental Authority" means the government of the United States of America or any other nation, or of any political subdivision thereof, whether state or local, and any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government (including any supra-national bodies such as the European Union or the European Central Bank).

"Governmental Authorization" means any permit, license, authorization, plan, directive, consent order or consent decree of or from any Governmental Authority.

"Guarantee" of or by any Person (the "guarantor") means any obligation, contingent or otherwise, of the guarantor guaranteeing or having the economic effect of guaranteeing any Indebtedness or other obligation of any other Person (the "primary obligor") in any manner, whether directly or indirectly and including any obligation, direct or indirect, of the guarantor (a) to purchase or pay (or advance or supply funds for the purchase or payment of) such Indebtedness or other obligation or to purchase (or to advance or supply funds for the purchase of) any security for the payment thereof, (b) to purchase or lease property, securities or services for

the purpose of assuring the owner of such Indebtedness or other obligation of the payment thereof, (c) to maintain working capital, equity capital or any other financial statement condition or liquidity of the primary obligor so as to enable the primary obligor to pay such Indebtedness or other obligation or (d) as an account party in respect of any letter of credit or letter of guaranty issued in support of such Indebtedness or obligation; provided that the term "Guarantee" shall not include endorsements for collection or deposit in the ordinary course of business. The amount of any Guarantee shall be deemed to be an amount equal to the stated or determinable amount of the primary obligation, or portion thereof, in respect of which such Guarantee is made or, if not so stated or determinable, the maximum reasonably anticipated liability in respect thereof (assuming such Person is required to perform thereunder) as determined by such Person in good faith. The term "Guarantee" used as a verb has a corresponding meaning.

"Hazardous Materials" means any chemical, material or substance, exposure to which is prohibited, limited or regulated by any Governmental Authority or which may or could pose a hazard to the health and safety of the owners, occupants or any Persons in the vicinity of any Facility or to the indoor or outdoor environment.

"Hazardous Materials Activity" means any past, current, proposed or threatened activity, event or occurrence involving any Hazardous Materials, including the use, manufacture, possession, storage, holding, presence, existence, location, Release, threatened Release, discharge, placement, generation, transportation, processing, construction, treatment, abatement, removal, remediation, disposal, disposition or handling of any Hazardous Materials, and any corrective action or response action with respect to any of the foregoing.

"Highest Lawful Rate" means the maximum lawful interest rate, if any, that at any time or from time to time may be contracted for, charged, or received under the laws applicable to the Lender which are presently in effect or, to the extent allowed by law, under such applicable laws which may hereafter be in effect and which allow a higher maximum non-usurious interest rate than applicable laws now allow.

"Indebtedness" means, as applied to any Person, without duplication, (a) all obligations of such Person for borrowed money, (b) all obligations of such Person evidenced by bonds, debentures, notes or other similar instruments, (c) all obligations of such Person in respect of the deferred purchase price of property or services (other than income tax accruals and other payment accruals in the ordinary course of business and current trade payables which are not overdue by more than 90 days); (d) all obligations of such Person under any conditional sale or other title retention agreement(s) relating to property acquired by such Person, (e) all obligations in respect of Capital Leases of such Person, (f) all obligations, contingent or otherwise, of such Person in respect of letters of credit, banker's acceptances or similar extensions of credit, (g) all Guarantees of such Person of the type of Indebtedness described in clauses (a) through (f) above, (h) all Indebtedness (excluding prepaid interest thereon) of a third party secured by any Lien on any property or asset owned or held by such Person, whether or not such Indebtedness has been assumed by such Person, (i) all obligations of such Person, contingent or otherwise, to purchase, redeem, retire or otherwise acquire for value any Disqualified Capital Stock of such Person, (j) all Off-Balance Sheet Liabilities and (k) the swap termination value under all swap, hedge or similar contracts or arrangements to which such Person is a party. The Indebtedness of any Person shall include the Indebtedness of any partnership or joint venture (other than a joint venture that is itself

a corporation or limited liability company) in which such Person is a general partner or a joint venturer, except to the extent that the terms of such Indebtedness provide that such Person is not liable therefor.

"Indemnified Liabilities" means, collectively, any and all liabilities, obligations, losses, damages (including natural resource damages), penalties, claims (including Environmental Claims), costs (including the costs of any investigation, study, sampling, testing, abatement, cleanup, removal, remediation or other response action necessary to remove, remediate, clean up or abate any Hazardous Materials Activity), expenses and disbursements of any kind or nature whatsoever (including the reasonable fees and disbursements of counsel for Indemnitees in connection with any investigative, administrative or judicial proceeding commenced or threatened by any Person, whether or not any such Indemnitee shall be designated as a party or a potential party thereto, and any fees or expenses incurred by Indemnitees in enforcing this indemnity), whether direct, indirect or consequential and whether based on any federal, state or foreign laws, statutes, rules or regulations (including securities and commercial laws, statutes, rules or regulations and Environmental Laws), on common law or equitable cause or on contract or otherwise, that may be imposed on, incurred by, or asserted against any such Indemnitee, in any manner relating to or arising out of (a) this Agreement or the other Credit Documents or the transactions contemplated hereby or thereby (including the Lender's agreement to make Credit Extensions or the use or intended use of the proceeds thereof, or any enforcement of any of the Credit Documents (including any sale of, collection from, or other realization upon any of the Collateral)); (b) any Environmental Claim or any Hazardous Materials Activity relating to or arising from, directly or indirectly, any past or present activity, operation, land ownership, or practice of any Borrower; or (c) any actual or prospective claim, litigation, investigation or proceeding relating to any of the foregoing, whether based on contract, tort or any other theory, whether brought by a third party or by any Borrower, and regardless of whether any Indemnitee is a party thereto.

"Indemnified Taxes" means (a) Taxes, other than Excluded Taxes, imposed on or with respect to any payment made by or on account of any obligation of any Borrower under any Credit Document and (b) to the extent not otherwise described in (a), Other Taxes.

"Indemnitee" has the meaning ascribed thereto in Section 9.3(a).

"Intellectual Property" means (a) all inventions and discoveries (whether patentable or unpatentable and whether or not reduced to practice), all improvements thereto, and all patents, patent applications and patent disclosures, together with all reissuances, continuations, continuations-in-part, revisions, extensions and reexaminations thereof, (b) all trademarks, service marks, trade dress, logos, trade names and corporate names, together with all translations, adaptations, derivations and combinations thereof and including all goodwill associated therewith, (c) all copyrightable works, all copyrights and all applications, registrations and renewals in connection therewith, (d) all broadcast rights, (e) all mask works and designs and all applications, registrations and renewals in connection therewith, (f) all know-how, trade secrets and confidential business information, whether patentable or unpatentable and whether or not reduced to practice (including ideas, research and development, know-how, formulas, compositions and manufacturing and production process and techniques, technical data, designs, drawings, specifications, customer and supplier lists, pricing and cost information and business and

marketing plans and proposals), (g) all computer software (including data and related documentation), (h) all other proprietary rights, (i) all copies and tangible embodiments thereof (in whatever form or medium) and (j) any rights or licenses to or from a third party in connection therewith.

"Interest Payment Date" means (i) the last day of each month, commencing on the first such date to occur after the Closing Date and (ii) the Maturity Date.

"Interim Order" means an order of the Bankruptcy Court in the Chapter 11 Cases authorizing the Borrowers to enter into and perform under this Agreement and any other Credit Documents, to incur the Obligations, and grant Liens under this Agreement and the other Credit Documents, as the case may be, and provides for the DIP Superpriority Claims (in accordance with and subject to the applicable provisions of Section 7.7 hereof), for an interim period, under, *inter alia*, Sections 364(c) of the Bankruptcy Code and entered at or after an interim hearing, substantially in the form attached hereto as Exhibit B or otherwise in form and substance satisfactory to the Lender and the Borrowers, together with all extensions, modifications, and amendments thereto approved by the Lender and the Borrowers.

"Interim Revolving Commitment Period" means the period commencing on the Closing Date and ending on the earlier to occur of (a) the Final Order Entry Date and (b) the Maturity Date

"Internal Revenue Code" means the Internal Revenue Code of 1986.

"Investment" means (a) any direct or indirect purchase or other acquisition by any Borrower of, or of a beneficial interest in, any of the Capital Stock, Securities or evidence of Indebtedness of any other Person; (b) any direct or indirect loan, advance (other than advances to employees for moving, entertainment and travel expenses, drawing accounts and similar expenditures in the ordinary course of business), investment or capital contributions by any Borrower to any other Person, including all indebtedness and accounts receivable from that other Person that are not current assets or did not arise from sales to that other Person in the ordinary course of business, (c) any Guarantee by any Borrower of any obligations of another Person and (d) any direct or indirect Acquisition by any Borrower.  The amount of any Investment shall be the original cost of such Investment plus the cost of all additions thereto, without any adjustments for increases or decreases in value, or write-ups, write-downs or write-offs with respect to such Investment.

"Kroger Receivables Financing Agreement" means that certain Supplier Agreement, dated as of September 18, 2018, by and between the Lead Borrower and Citibank, N.A. ("Citibank"), with respect to the purchase by Citibank of accounts owing to the Lead Borrower by The Kroger Co and its subsidiaries and Affiliates, as such agreement may be amended, restated, supplemented or otherwise modified from time.

"Lead Borrower" has the meaning ascribed thereto in the preamble hereto.

"Lender" has the meaning ascribed thereto in the preamble hereto.

"<u>Lien</u>" means (a) any lien, mortgage, pledge, assignment, security interest, charge or encumbrance of any kind (including any agreement to give any of the foregoing, any conditional sale or other title retention agreement, and any lease in the nature thereof) and any option, trust or other preferential arrangement having the practical effect of any of the foregoing, and (b) in the case of Securities, any purchase option, call or similar right of a third party with respect to such Securities.

"<u>Loan</u>" or "<u>Loans</u>" means any loan made by the Lender to the Borrowers pursuant to <u>Section 2.1(a)</u>.

"<u>Material Adverse Effect</u>" means a material adverse effect on and/or material adverse developments with respect to (a) the business operations, properties, assets or condition (financial or otherwise) of the Borrowers taken as a whole; (b) the ability of the Borrowers to fully and timely perform their Obligations; (c) the legality, validity, binding effect, or enforceability of any Credit Document against any Borrower to which it is a party; or (d) the material rights, remedies and benefits available to, or conferred upon, the Lender under any Credit Document. Notwithstanding anything to the contrary herein, a "Material Adverse Effect" shall not be deemed to exist as a result of, or take into account, the effect of the Bankruptcy Events.

"<u>Material Contract</u>" means any contract or other arrangement to which any Borrower is a party (other than the Credit Documents) for which material breach or termination could reasonably be expected to have a Material Adverse Effect.

"<u>Maturity Date</u>" means, subject to the terms and provisions hereof, the earliest to occur of: (a) October 27, 2020; (b) the effective date of a plan confirmation in the Chapter 11 Cases; (c) the effective date of a dismissal of the Chapter 11 Cases; and (d) the date of any termination of the Revolving Commitment Period pursuant to <u>Section 8.2</u>.

"<u>Measurement Period</u>" means any given four-week period up to and through the Friday of the most recent calendar week then ended.

"<u>Moody's</u>" means Moody's Investor Services, Inc.

"<u>Mortgage</u>" means a mortgage, deed of trust, deed to secure debt or similar security instrument made or to be made by a Person owning an interest in real property granting a Lien on such interest in real estate as security for the payment of the Obligations which shall be in form and substance reasonably acceptable to the Lender.

"<u>Mortgaged Property</u>" has the meaning ascribed thereto in the definition of "<u>Real Estate Deliverables</u>."

"<u>Net Asset Sale Proceeds</u>" means, with respect to any Asset Sale, an amount equal to: (a) Cash payments received by the Borrowers from such Asset Sale, <u>minus</u> (b) any bona fide direct costs incurred in connection with such Asset Sale to the extent paid or payable to non-Affiliates, including (i) transfer or other taxes payable at the time of such Asset Sale and income or gains taxes reasonably estimated to be payable by the seller as a result of any gain recognized in connection with such Asset Sale within two years of the date of the relevant transaction, (ii) payment of the outstanding principal amount of, premium or penalty, if any, and interest on any

Indebtedness (other than the Loans) that is secured by a Lien on the stock or assets in question and that is required to be repaid under the terms thereof as a result of such Asset Sale, (iii) a reasonable reserve for any indemnification payments (fixed or contingent) attributable to seller's indemnities and representations and warranties to purchaser in respect of such Asset Sale undertaken by any Borrower in connection with such Asset Sale; provided that, upon release of any such reserve, the amount released shall be considered Net Asset Sale Proceeds and (iv) the reasonable and customary out-of-pocket expenses incurred by any Borrower in connection with such transaction (including, without limitation, appraisals, and brokerage, legal, title and recording or transfer tax expenses and commissions).

"Net Insurance/Condemnation Proceeds" means an amount equal to: (a) any Cash payments or proceeds received by Borrower (i) under any casualty, business interruption or "key man" insurance policies in respect of any covered loss thereunder, or (ii) as a result of the taking of any assets of the Borrowers by any Person pursuant to the power of eminent domain, condemnation or otherwise, or pursuant to a sale of any such assets to a purchaser with such power under threat of such a taking, minus (b) (i) any actual and reasonable costs incurred by the Borrowers in connection with the adjustment or settlement of any claims of the Borrowers in respect thereof, (ii) any bona fide direct costs incurred in connection with any taking or sale of such assets as referred to in clause (a)(ii) of this definition to the extent paid or payable to non-Affiliates, including income taxes payable as a result of any gain recognized in connection therewith and the reasonable and customary out-of-pocket expenses incurred by any Borrower in connection with such transaction and (iii) payment of the outstanding principal amount of, premium or penalty, if any, and interest on any Indebtedness (other than the Loans) that is secured by a Lien on the assets in question and that is required to be repaid under the terms thereof as a result of such casualty or taking.

"Note" means each promissory note (if any) executed and delivered by the Borrowers in favor of the Lender evidencing the Loans, such promissory note being in form and substance reasonably acceptable to the Lender.

"Obligations" means all obligations of every nature of the Borrowers from time to time owed to the Lender under any Credit Document, whether for principal, interest (including interest which, but for the filing of the Chapter 11 Cases bankruptcy with respect to the Borrowers, would have accrued on any Obligation, whether or not a claim is allowed against the Borrowers for such interest in such proceeding), fees, expenses, indemnification or otherwise.

"Off-Balance Sheet Liabilities" of any Person means (a) any repurchase obligation or liability of such Person with respect to accounts or notes receivable sold by such Person, (b) any liability of such Person under any sale and leaseback transactions that do not create a liability on the balance sheet of such Person, (c) any synthetic lease obligations or (d) any obligation arising with respect to any other transaction which is the functional equivalent of or takes the place of borrowing but which does not constitute a liability on the balance sheet of such Person.

"Organizational Documents" means (a) with respect to any corporation, its certificate or articles of incorporation or organization, as amended, and its by-laws, as amended, (b) with respect to any limited partnership, its certificate of limited partnership, as amended, and its partnership agreement, as amended, (c) with respect to any general partnership, its partnership

agreement, as amended, and (d) with respect to any limited liability company, its articles of organization or certificate of formation, as amended, and its operating agreement, as amended. In the event any term or condition of this Agreement or any other Credit Document requires any Organizational Document to be certified by a secretary of state or similar governmental official, the reference to any such "Organizational Document" shall only be to a document of a type customarily certified by such governmental official.

"Other Connection Taxes" means, with respect to the Lender, Taxes imposed as a result of a present or former connection between Lender and the jurisdiction imposing such Tax (other than connections arising from Lender having executed, delivered, become a party to, performed its obligations under, received payments under, received or perfected a security interest under, engaged in any other transaction pursuant to or enforced any Credit Document, or sold or assigned an interest in any Loan or Credit Document).

"Other Taxes" means all present or future stamp, court or documentary, intangible, recording, filing or similar Taxes that arise from any payment made under, from the execution, delivery, performance, enforcement or registration of, from the receipt or perfection of a security interest under, or otherwise with respect to, any Credit Document, except any such Taxes that are Other Connection Taxes imposed with respect to an assignment.

"Permitted Liens" means each of the Liens permitted pursuant to Section 6.2.

"Permitted Prior Liens" means, collectively, Liens against any assets of the Borrowers in existence as of the Petition Date, to the extent any such Liens are valid, enforceable, properly perfected, and non-avoidable as of such date.

"Permitted Variances" has the meaning ascribed thereto in Section 6.7(a).

"Person" means and includes natural persons, corporations, limited partnerships, general partnerships, limited liability companies, limited liability partnerships, joint stock companies, joint ventures, associations, companies, trusts, banks, trust companies, land trusts, business trusts or other organizations, whether or not legal entities, and Governmental Authorities.

"Petition Date" has the meaning ascribed thereto in the recitals hereto.

"Postpetition" means the time period after the Petition Date.

"Prepetition" means the time period before the Petition Date.

"Prime Rate" means the rate of interest quoted in *The Wall Street Journal*, Money Rates Section as the Prime Rate, as in effect from time to time.

"Principal Office" means, for the Lender, such Person's "Principal Office" as set forth on Appendix A, or such other office as such Person may from time to time designate in writing to the Lead Borrower.

"Real Estate Asset" means, at any time of determination, any interest (fee, leasehold or otherwise) then owned by any Borrower in any real property.

"Real Estate Deliverables" means, with respect to each real property subject to a Mortgage, each of the following if requested by Lender in its sole discretion (each in form and substance satisfactory to Lender):

(a)    A fully executed and notarized Mortgage, in proper form for recording in the appropriate place in the applicable jurisdiction, encumbering the fee or the ground leasehold interest of Borrower in such real property (each, a "Mortgaged Property");

(b)    (i) ALTA mortgagee title insurance policies or unconditional commitments therefor issued by a title insurance company acceptable to Lender with respect to such Mortgaged Property (each, a "Title Policy") (with an aggregate amount for all such policies equal to the aggregate original principal amount of the Loans), together with a title report or title reports issued by a title company with respect thereto, along with copies of all recorded documents listed as exceptions to title or otherwise referred to therein, in form and substance reasonably satisfactory to Lender, and (ii) evidence satisfactory to Lender that Borrower has paid to the title company or to the appropriate Governmental Authorities all expenses and premiums of the title company and all other sums required in connection with the issuance of such Title Policy and all recording and stamp taxes (including mortgage recording and intangible taxes) payable in connection with recording such Mortgage for such real property in the appropriate real estate records;

(c)    evidence of flood insurance with respect to each Flood Hazard Property that is located in a community that participates in the National Flood Insurance Program, in each case in compliance with any applicable regulations of the Board of Governors of the Federal Reserve System, in form and substance reasonably satisfactory to Lender;

(d)    ALTA surveys of all Mortgaged Properties, certified to Lender and dated not more than 30 days prior to the date on which the Mortgaged Property is acquired;

(e)    such environmental questionnaires, environmental site assessments and other environmental due diligence as Lender requires with respect to such real property; and

(f)    if such real property is ground-leased by Borrower, (i) a copy of the lease and the recorded memorandum of lease, and (ii) if a leasehold mortgage or deed of trust granted to Lender is prohibited by, or would constitute a breach or default under, the lease for such real property, a consent from the owner of the fee interest in such real property to the leasehold mortgage or deed of trust to be granted to Lender in Borrower's leasehold interest in such real property, in form and content satisfactory to the Lender.

"Related Parties" means, with respect to any Person, such Person's Affiliates and the partners, members, managers, directors, officers, employees, agents, trustees, administrators, advisors and representatives of such Person and of such Person's Affiliates.

"Release" means any release, spill, emission, leaking, pumping, pouring, injection, escaping, deposit, disposal, discharge, dispersal, dumping, leaching or migration of any Hazardous Material into the indoor or outdoor environment (including the abandonment or disposal of any barrels, containers or other closed receptacles containing any Hazardous Material), including the movement of any Hazardous Material through the air, soil, surface water or groundwater.

"Restricted Junior Payment" means (a) any dividend or other distribution, direct or indirect, on account of any shares of any class of Capital Stock of any Borrower now or hereafter outstanding, except a dividend payable solely in shares of that class of Capital Stock to the holders of that class; (b) any redemption, retirement, sinking fund or similar payment, purchase or other acquisition for value, direct or indirect, of any shares of any class of Capital Stock of any Borrower now or hereafter outstanding; (c) any payment made to retire, or to obtain the surrender of, any outstanding warrants, options or other rights to acquire shares of any class of Capital Stock of any Borrower now or hereafter outstanding; and (d) any payment or prepayment of principal of, premium, if any, or interest on, or redemption, purchase, retirement, defeasance (including in substance or legal defeasance), sinking fund or similar payment with respect to, any subordinated Indebtedness.  For the avoidance of doubt, no payment pursuant to the Shared Services Agreements shall be deemed to be a "Restricted Junior Payment" hereunder.

"Revolving Commitment" means the commitment of the Lender to make or otherwise fund Loans in an aggregate amount not to exceed (a) during the Interim Revolving Commitment Period, $10,000,000 and (b) during the Final Revolving Commitment Period, $20,000,000, in each case, as such amount may be terminated or reduced from time to time in accordance with the terms of this Agreement.

"Revolving Commitment Period" means the Interim Revolving Commitment Period and, to the extent the Final Order Entry Date has occurred, the Final Revolving Commitment Period.

"S&P" means Standard & Poor's Financial Services LLC.

"Securities" means any stock, shares, partnership interests, voting trust certificates, certificates of interest or participation in any profit sharing agreement or arrangement, options, warrants, bonds, debentures, notes, or other evidences of indebtedness, secured or unsecured, convertible, subordinated or otherwise, or in general any instruments commonly known as "securities" or any certificates of interest, shares or participations in temporary or interim certificates for the purchase or acquisition of, or any right to subscribe to, purchase or acquire, any of the foregoing.

"Senior Permitted Liens" means Liens described in clauses (b), (e), (g) and (h) of Section 6.2, in each case that are required to be senior to the Obligations pursuant to applicable law or the contractual obligations (to the extent such contract and such requirement are entered into the ordinary course of business) pursuant to which such Lien arises.

"Shared Services Agreements" means (a) the Services Agreement, dated as of December 30, 2019, by and between ABRH and the Lead Borrower and (b) the Contract Staffing Agreement, dated as of December 30, 2019, by and between ABRH and the Lead Borrower, in each case, as he same may be amended, restated, supplemented or otherwise modified from time to time.

"Subsidiary" means, with respect to any Person, any corporation, partnership, limited liability company, association, joint venture or other business entity of which more than 50% of the total voting power of shares of stock or other ownership interests entitled (without

regard to the occurrence of any contingency) to vote in the election of the Person or Persons (whether directors, managers, trustees or other Persons performing similar functions) having the power to direct or cause the direction of the management and policies thereof is at the time owned or controlled, directly or indirectly, by that Person or one or more of the other Subsidiaries of that Person or a combination thereof; <u>provided</u> that, in determining the percentage of ownership interests of any Person controlled by another Person, no ownership interest in the nature of a "qualifying share" of the former Person shall be deemed to be outstanding.

"<u>Taxes</u>" means all present or future taxes, levies, imposts, duties, deductions, withholdings (including backup withholding), assessments, fees or other charges imposed by any Governmental Authority, including any interest, additions to tax or penalties applicable thereto.

"<u>Termination Date</u>" means the date on which (a) all Loans have been repaid in full; (b) all other Obligations (other than contingent indemnification Obligations to the extent no claim giving rise thereto has been asserted in accordance with the terms of this Agreement) under the Agreement and the other Credit Documents have been completely discharged; and (c) the Borrowers shall not have any further right to borrow any monies under this Agreement.

"<u>Threshold Amount</u>" means $500,000.

"<u>Title Policy</u>" has the meaning ascribed thereto in clause (d) of the definition of "<u>Real Estate Deliverables</u>."

"<u>UCC</u>" means the Uniform Commercial Code as in effect from time to time in the State of New York; provided, however, if by reason of mandatory provisions of law, perfection, or the effect of perfection or non-perfection, of a security interest in any Collateral or the availability of any remedy hereunder is governed by the Uniform Commercial Code as in effect in a jurisdiction other than New York, "Uniform Commercial Code" means the Uniform Commercial Code as in effect in such other jurisdiction for purposes of the provisions hereof relating to such perfection or effect of perfection or non-perfection or availability of such remedy, as the case may be.

"<u>Unsecured Creditors Committee</u>" means the official committee of unsecured creditors if appointed in the Chapter 11 Cases, as the composition may be amended from time to time.

"<u>Upfront Fee</u>" has the meaning set forth in <u>Section 2.6(b)</u>.

"<u>Variance Report</u>" means a report prepared by the Lead Borrower reflecting on a line-item basis the Borrowers' actual performance compared to the Budget for the current Measurement Period and the percentage variances of the Borrowers' actual results from those reflected in the then existing Budget, along with an explanation of such variances.

"<u>Withholding Agent</u>" means Borrower and Lender.

**1.2    Accounting Terms**.  All accounting terms not specifically defined herein shall be construed in accordance with GAAP.

1.3 **Interpretation, etc**. Any of the terms defined herein may, unless the context otherwise requires, be used in the singular or the plural, depending on the reference. References herein to any Section, Appendix, Schedule or Exhibit shall be to a Section, an Appendix, a Schedule or an Exhibit, as the case may be, hereof unless otherwise specifically provided. The use herein of the word "include" or "including," when following any general statement, term or matter, shall not be construed to limit such statement, term or matter to the specific items or matters set forth immediately following such word or to similar items or matters, whether or not no limiting language (such as "without limitation" or "but not limited to" or words of similar import) is used with reference thereto, but rather shall be deemed to refer to all other items or matters that fall within the broadest possible scope of such general statement, term or matter. The word "will" shall be construed to have the same meaning and effect as the word "shall". Unless the context requires otherwise (i) any definition of or reference to any agreement, instrument or other document herein shall be construed as referring to such agreement, instrument or other document as it was originally executed or as it may from time to time be amended, restated, supplemented or otherwise modified (subject to any restrictions on such amendments, supplements or modifications set forth herein), (ii) any reference herein to any Person shall be construed to include such Person's successors and permitted assigns, (iii) the words "hereof", "herein" and "hereunder" and words of similar import shall be construed to refer to this Agreement as a whole and not to any particular provision hereof, (iv) any reference to any law or regulation herein shall, unless otherwise specified, refer to such law or regulation as amended, modified or supplemented from time to time and (v) the words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, securities, accounts and contract rights.

1.4 **Uniform Commercial Code**. As used herein, the following terms are defined in accordance with the UCC : "Account", "Chattel Paper", "Commercial Tort Claim", "Document", "Electronic Chattel Paper", "Equipment", "Fixture", "General Intangible", "Goods", "Instrument", "Investment Property", "Letter-of-Credit Right", "Proceeds", and "Supporting Obligation."

## SECTION 2. LOANS; INTEREST; REPAYMENT

2.1 **Loans**.

(a) <u>Revolving Commitment</u>. Subject to the terms and conditions hereof, the Lender agrees to make Loans to the Borrowers, in Dollars, from time to time, on any Business Day during the Revolving Commitment Period, in an aggregate amount not to exceed at any time outstanding the amount of the Revolving Commitment as in effect at such time. Within the limits of the Lender's Revolving Commitment and Availability Amount, and subject to the other terms and conditions hereof, the Borrowers may borrow Loans, prepay under <u>Section 2.7(a)</u>, and reborrow under this <u>Section 2.1</u>.

(b) [Reserved].

(c)    <u>Borrowing Mechanics for Loans</u>.

(i)    <u>Notice of Borrowing</u>. Each Loan shall be made upon the Lead Borrower's irrevocable notice to the Lender, which may be given by: (x) telephone or (y) a Funding Notice; <u>provided</u>, <u>that</u>, any telephonic notice must be confirmed promptly by delivery to the Lender of a Funding Notice. Each such Funding Notice must be received by the Lender not later than 11:00 a.m. (Eastern Time) on the requested date of any Loan. Unless the Lender agrees otherwise in its discretion, each request for a Loan shall be in a principal amount of $200,000 or a whole multiple of $100,000 in excess thereof. Each Funding Notice and each telephonic notice shall specify (I) the requested date of the Loan (which shall be a Business Day) and (II) the principal amount of the Loan to be borrowed.

(ii)    <u>Advances</u>. Upon satisfaction of the applicable conditions set forth in <u>Section 3.2</u> (and, if such Loan is the initial Credit Extension, <u>Section 3.1</u>), the Lender shall make the funds available to the Lead Borrower in each case in accordance with wire instructions provided by the Lead Borrower to the Lender.

**2.2    Repayment of Loans**. The Borrowers shall repay to the Lender the aggregate principal amount of all Loans, together with all accrued and unpaid interest, fees and other amounts payable hereunder, on the Maturity Date.

**2.3    Use of Proceeds**.

(a)    The Borrowers shall use the proceeds of the Loans solely as provided in the Budget (subject to the Permitted Variances) and the Interim Order: (i) for working capital purposes and to pay administrative expenses, (ii) to pay for goods, services and capital expenditures in the ordinary course of business, (iii) to pay amounts owing to the Lender under this Agreement, including, without limitation, the payment of professional fees of the Lender, (iv) to pay transaction expenses in connection with this Agreement, (v) to pay claims in respect of certain Prepetition creditors, which may include, without limitation, employees and taxing authorities in the ordinary course, in each case to the extent authorized by orders of the Bankruptcy Court reasonably acceptable to the Lender, (vi) for other payments permitted to be made by the Interim Order or the Final Order and any other order of the Bankruptcy Court, (vii) to pay fees, expenses, and costs incurred in connection with the Chapter 11 Cases, and (viii) to pay the Administrative Carve-Out; <u>provided</u> that the form of any interim compensation procedures order entered after the Closing Date shall be reasonably acceptable in form and substance to the Lender.

(b)    The Borrowers shall not be permitted to use the proceeds of any Credit Extension: (i) for the payment of interest and principal with respect to subordinated debt, (ii) to finance in any way any action, suit, arbitration, proceeding, application, motion or other litigation of any type adverse to the rights and remedies of the Lender under this Agreement, the other Credit Documents, the Interim Order or the Final Order; (iii) to make any payment in settlement of any claim, action or proceeding, before any court, arbitrator or other governmental body without the prior written consent of the Lender; or (iv) to pay any fees or similar amounts to any person who has proposed or may propose to purchase interests in the Borrowers or their assets to the extent not permitted herein (including so-called "topping fees," "exit fees," and similar amounts) without the prior written consent of the Lender.

**2.4**     **Evidence of Debt; Register; Lender's Books and Records; Notes**.

(a)     <u>Lender's Evidence of Debt</u>.  The Lender shall maintain on its internal records an account or accounts evidencing the Obligations of the Borrowers to the Lender, including the amounts of the Loans made by it and each repayment and prepayment in respect thereof. Any such recordation shall be presumptively conclusive and binding on the Borrowers, unless otherwise determined by the Bankruptcy Court; <u>provided</u> that the failure to make any such recordation, or any error in such recordation, shall not affect the Borrowers' Obligations in respect of any applicable Loans.

(b)     <u>Notes</u>.  If so requested by the Lender by written notice to the Borrowers, the Borrowers shall execute and deliver to the Lender (and/or, if applicable and if so specified in such notice, to any Person who is an assignee of such Lender) a Note or Notes to evidence the Lender's Loan.

**2.5**     **Interest on Loans**.

(a)     <u>Cash Pay Interest</u>.  Except as otherwise set forth in <u>Section 2.5(c)</u>, each Loan shall bear interest on the unpaid principal amount thereof from the applicable Credit Date through repayment (whether by acceleration or otherwise) thereof at a rate per annum equal to Prime Rate plus 6.00%, which shall be computed on the basis of a 360 day year for the actual number of days elapsed in the period during which it accrues.  In computing interest on any Loan, the date the Loan is made shall be included, and the date of payment of such Loan shall be excluded; <u>provided</u> that, if a Loan is repaid on the same day on which it is made, one day's interest shall be paid on that Loan.

(b)     <u>Payment Dates</u>.  Except as otherwise set forth herein, interest on each Loan shall be payable in arrears on (i) each Interest Payment Date applicable thereto and (ii) any prepayment of that Loan, to the extent accrued on the amount being prepaid.

(c)     <u>Default Interest</u>.  Upon the occurrence and during the continuance of an Event of Default, the Lender may elect to notify the Borrowers that the principal amount of all Loans outstanding and, to the extent permitted by applicable law, any interest payments on the Loans and any fees or other amounts owed hereunder, shall thereafter bear interest payable on demand at a rate that is 2.00% per annum in excess of the interest rate otherwise payable under <u>Section 2.5(a)</u> with respect to the Loans. Payment or acceptance of the increased rates of interest provided for in this <u>Section 2.5(c)</u> is not a permitted alternative to timely payment and shall not constitute a waiver of any Event of Default or otherwise prejudice or limit any rights or remedies of the Lender. Default interest payable pursuant to this <u>Section 2.5(c)</u> shall be computed on the basis of a 360-day year, for the actual number of days elapsed in the period during which it accrues.

**2.6**     **Fees**.

(a)     <u>Commitment Fee</u>. The Borrowers shall pay to the Lender, a commitment fee (the "<u>Commitment Fee</u>") calculated on a per annum basis equal to 0.25% times the actual daily amount by which the amount of the Revolving Commitment exceeds the aggregate outstanding amount of all Loans. The Commitment Fee shall accrue at all times during the Revolving Commitment Period, including at any time during which one or more of the conditions in Article

III is not met, and shall be due and payable in arrears on each Interest Payment Date, commencing with the first such date to occur after the Closing Date, and on the last day of the Revolving Commitment Period.

(b)    Upfront Fees.  Borrower shall pay to the Lender an upfront fee equal to $200,000, representing 1.00% of the maximum amount of the Revolving Commitment (the "Upfront Fee").  The Upfront Fee shall be due and payable in full on the Closing Date.

**2.7    Optional Prepayments; Reduction or Termination of the Revolving Commitment**.

(a)    Optional Prepayments.  Borrowers may, upon notice to Lender, at any time or from time to time voluntarily prepay the Loans in whole or in part without premium or penalty, provided, that, unless otherwise agreed by Lender, such notice must be received by Lender not later than 11:00 a.m. (Eastern Time) on the date of prepayment.  Each such notice shall specify the date and amount of such prepayment.  Borrowers shall make such prepayment and the payment amount specified in such notice shall be due and payable on the date specified therein.

(b)    Reduction or Termination of the Revolving Commitment.  The Borrowers may, upon irrevocable notice from the Lead Borrower to the Lender, terminate the Revolving Commitment or from time to time permanently reduce the Revolving Commitment; provided that (i) any such notice shall be received by the Lender not later than 11:00 a.m. (Eastern Time) on the date that is at least three (3) Business Days before the effective date of termination or reduction and (ii) any such partial reduction of the Revolving Commitment shall be in a principal amount of $200,000 or any whole multiple of $100,000 in excess thereof.  The Revolving Commitment shall automatically terminate on the Termination Date.

**2.8    Mandatory Prepayments**.

(a)    Overadvance.  If for any reason (i) at any time prior to the Final Order Entry Date the aggregate Loans outstanding exceed the Revolving Commitment in effect at such time, or (ii) at any time from and after the Final Order Entry Date the aggregate Loans outstanding exceed the Revolving Commitment in effect at such time, the Borrowers shall immediately prepay the Loans (together with all accrued but unpaid interest thereon) in an aggregate amount equal to such excess.

(b)    Asset Sales.   No later than the first Business Day following the date of receipt by the Borrowers of any Net Asset Sale Proceeds (except with respect to any such proceeds from Assets Sales permitted pursuant to Section 6.8 which shall not require any prepayment) in excess of the Threshold Amount in the aggregate since the Closing Date, the Borrowers shall prepay the Loans as set forth in Section 2.9 in an aggregate amount equal to such Net Asset Sale Proceeds; provided that the Lender may elect to forego any such prepayment by written notice to the Borrowers.

(c)    Insurance/Condemnation Proceeds.  No later than three Business Days following the date of receipt by Borrower or Lender as loss payee, of any Net Insurance/Condemnation Proceeds in excess of the Threshold Amount in the aggregate since the Closing Date, the Borrowers shall prepay the Loans as set forth in Section 2.9 in an aggregate

amount equal to such Net Insurance/Condemnation Proceeds; provided that the Lender may elect to forego any such prepayment by written notice to the Borrowers.

(d)    Prepayment Certificate.  Concurrently with any prepayment of the Loans pursuant to Sections 2.8(b) through (c), Borrower shall deliver to the Lender a certificate of an Authorized Officer demonstrating the calculation of the amount of the applicable net proceeds.  In the event that Borrower shall subsequently determine that the actual amount received exceeded the amount set forth in such certificate, Borrower shall promptly make an additional prepayment of the Loans in an amount equal to such excess, and Borrower shall concurrently therewith deliver to the Lender a certificate of an Authorized Officer demonstrating the derivation of such excess.

2.9    **Application of Prepayments**.  Any mandatory prepayment of any Loan pursuant to Section 2.8 shall be applied as follows:

(a)    *first*, to the payment of all fees, and all expenses specified in Section 9.2;

(b)    *second*, to the payment of any accrued interest at the Default Rate, if any;

(c)    *third*, to the payment of any accrued interest (other than Default Rate interest);

(d)    *fourth*, to prepay the Loans to the full extent thereof;

(e)    *fifth*, to the payment in full of all other Obligations; and

(f)    *sixth*, upon satisfaction in full of all Obligations, to the Borrowers.

Subject to items "*first*" through "*sixth*" preceding, the Lender shall have the continuing and exclusive right to apply and reverse and reapply any and all such proceeds and payments to any portion of the Obligations.

2.10    **General Provisions Regarding Payments**.

(a)    All payments by the Borrowers of principal, interest, fees and other Obligations shall be made in Dollars in immediately available funds, without defense, recoupment, setoff or counterclaim, free of any restriction or condition, and delivered to the Lender, not later than 2:00 p.m. (Eastern Time) on the date due via wire transfer of immediately available funds pursuant to instructions provided by the Lender; funds received by the Lender after that time on such due date shall be deemed to have been paid by Borrower on the next Business Day.

(b)    All payments in respect of the principal amount of any Loan (i) shall be accompanied by payment of accrued interest on the principal amount being repaid or prepaid and (ii) shall be without prepayment premium or penalty.

(c)    Whenever any payment to be made hereunder shall be stated to be due on a day that is not a Business Day, such payment shall be made on the next succeeding Business Day and such extension of time shall be included in the computation of the payment of interest hereunder or of the commitment fees hereunder.

(d)     The Lender shall deem any payment by or on behalf of the Borrowers hereunder that is not made in same day funds prior to 2:00 p.m. (Eastern Time) to be a non-conforming payment.  Any such payment shall not be deemed to have been received by the Lender until the later of (i) the time such funds become available funds, and (ii) the applicable next Business Day.  The Lender shall give prompt telephonic notice to the Lead Borrower (confirmed in writing) if any payment is non-conforming.  Any non-conforming payment may constitute or become a Default or Event of Default in accordance with the terms of Section 8.1(a).  Interest shall continue to accrue on any principal as to which a non-conforming payment is made until such funds become available funds (but in no event less than the period from the date of such payment to the next succeeding applicable Business Day) at the Default Rate determined pursuant to Section 2.5 from the date such amount was due and payable until the date such amount is paid in full.

(e)     If an Event of Default shall have occurred and not otherwise been waived, and the Obligations have become due and payable in full hereunder, whether by acceleration, maturity or otherwise, all payments or proceeds received by the Lender hereunder or under any Collateral Document in respect of any of the Obligations, including, but not limited to all proceeds received by the Lender in respect of any sale, any collection from, or other realization upon all or any part of the Collateral, shall be applied in full or in part as follows:  first, to the payment of all costs and expenses of such sale, collection or other realization, including reasonable compensation to the Lender and its agents and counsel, and all other expenses, liabilities and advances made or incurred by the Lender in connection therewith, and all amounts for which the Lender is entitled to indemnification hereunder or under any Collateral Document and all advances made by the Lender under any Collateral Document for the account of the Borrowers, and to the payment of all costs and expenses paid or incurred by the Lender in connection with the exercise of any right or remedy hereunder or under any Collateral Document, all in accordance with the terms hereof or thereof; second, to the extent of any excess of such proceeds, to the payment of all other Obligations in the order provided in Section 2.9; and third, to the extent of any excess of such proceeds, to the payment to or upon the order of the Borrowers or to whosoever may be lawfully entitled to receive the same or as a court of competent jurisdiction may direct.

**2.11    Taxes; Withholding, etc**.

(a)     Defined Terms.  For purposes of this Section 2.11, the term "applicable law" includes FATCA.

(b)     Payments Free of Taxes.  Any and all payments by or on account of any obligation of the Borrowers under any Credit Document shall be made without deduction or withholding for any Taxes, except as required by applicable law.  If any applicable law (as determined in the good faith discretion of an applicable Withholding Agent) requires the deduction or withholding of any Tax from any such payment by a Withholding Agent, then the applicable Withholding Agent shall be entitled to make such deduction or withholding and shall timely pay the full amount deducted or withheld to the relevant Governmental Authority in accordance with applicable law and, if such Tax is an Indemnified Tax, then the sum payable by the Borrowers shall be increased as necessary so that after such deduction or withholding has been made (including such deductions and withholdings applicable to additional sums payable under this Section 2.11) the Lender receives an amount equal to the sum it would have received had no such deduction or withholding been made.

(c)    Payment of Other Taxes by the Borrowers.  The Borrowers shall timely pay to the relevant Governmental Authority in accordance with applicable law, or at the option of the Lender timely reimburse it for the payment of, any Other Taxes.

(d)    Indemnification by the Borrowers.  The Borrowers shall jointly and severally indemnify the Lender, within 10 days after demand therefor, for the full amount of any Indemnified Taxes (including Indemnified Taxes imposed or asserted on or attributable to amounts payable under this Section) payable or paid by the Lender or required to be withheld or deducted from a payment to the Lender and any reasonable expenses arising therefrom or with respect thereto, whether or not such Indemnified Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority.  A certificate as to the amount of such payment or liability delivered to the Borrowers by the Lender shall be conclusive absent manifest error.

(e)    Evidence of Payments.  As soon as practicable after any payment of Taxes by the Borrowers to a Governmental Authority pursuant to this Section 2.11, the Borrowers shall deliver to the Lender the original or a certified copy of a receipt issued by such Governmental Authority evidencing such payment, a copy of the return reporting such payment or other evidence of payment reasonably satisfactory to the Lender.

## SECTION 3.  CONDITIONS PRECEDENT

**3.1    Conditions of Initial Credit Extension**.  The obligation of the Lender to make the initial Credit Extension is subject to the Lender's satisfaction or waiver of the following conditions:

(a)    Credit Documents.  The Lender shall have received sufficient copies of each Credit Document originally executed and delivered by each applicable party thereto.

(b)    Chapter 11 Cases Jurisdiction.  The Borrowers shall have commenced the Chapter 11 Cases in the Bankruptcy Court.

(c)    Organizational Documents.  The Lender shall have received resolutions for the Borrowers approving and authorizing the execution, delivery and performance of this Agreement and the other Credit Documents or by which they or their assets may be bound as of the Closing Date and (ii) and such other documents as the Lender may reasonably request to evidence that each Borrower is duly organized or formed, and that each Borrower is validly existing, in good standing and qualified to engage in business in each jurisdiction where its ownership, lease or operation of properties or the conduct of its business requires such qualification, except to the extent that failure to so qualify in such jurisdiction could not reasonably be expected to have a Material Adverse Effect.

(d)    Material Contracts.  There shall not have occurred any default of any Material Contract of any Borrower which could constitute an Event of Default hereunder, other than defaults under Material Contracts arising Prepetition or as a result of the filing of the Chapter 11 Cases, in each case, the exercise of remedies as a result of which are stayed under the Bankruptcy Code.

(e)  <u>Budget</u>.  On or before the Closing Date, the Lender shall have received the initial Budget, which shall be in form and substance reasonably satisfactory to the Lender.

(f)  <u>Interim Order</u>.  The Bankruptcy Court shall have entered the Interim Order, by no later than the third (3rd) Business Day after the Petition Date (or such later date as to which the Lender may otherwise agree), in form and substance satisfactory to the Lender, which Interim Order shall be in full force and effect and shall not have been materially and adversely amended or modified (without the prior written consent of the Lender), nor stayed or reversed.

(g)  <u>First Day Motions</u>.  All of the "first day" motions and other documents in the Chapter 11 Cases, to be filed with and submitted to the Bankruptcy Court in connection with the Interim Order and this Agreement, shall be in form and substance satisfactory to the Lender.

(h)  [Reserved]

(i)  <u>No Litigation</u>.  Except for the Bankruptcy Events, there shall not exist any action, suit, investigation, litigation or proceeding or other legal or regulatory developments, pending or threatened in any court or before any arbitrator or Governmental Authority that would reasonably be expected to  have a Material Adverse Effect, except, in each such case, which actions, suits, investigations, litigation or proceedings are stayed by virtue of the filing of the Chapter 11 Cases.

**3.2    Conditions to Each Credit Extension**.

(a)  <u>Conditions Precedent</u>.  The obligation of the Lender to make any Loan on any Credit Date, including the Closing Date, are subject to the Lender's satisfaction or waiver of the following conditions precedent:

(i)  the Lender shall have timely received a fully completed and fully executed and delivered Funding Notice;

(ii)  such requested Loan shall not exceed the Availability Amount and, after giving effect to such requested Loan, the aggregate amount of all Loans outstanding does not exceed the Revolving Commitment;

(iii)  after giving pro forma effect to the Credit Extensions (other than the making of the Loans on the Closing Date) requested on such Credit Date and the application of the proceeds thereof, the Borrowers shall be in compliance with the financial covenants with respect to the Budget as set forth in <u>Section 6.7</u>;

(iv)  as of such Credit Date, the representations and warranties contained herein and in the other Credit Documents shall be true and correct in all material respects (other than those representations and warranties that are expressly qualified by a Material Adverse Effect or other materiality, in which case such representations and warranties shall be true and correct in all respects) on and as of such Credit Date to the same extent as though made on and as of that date, except to the extent such representations and warranties specifically relate to an earlier date, in which case such representations and warranties shall have been true and correct in all material respects (other than those representations and

warranties that are expressly qualified by a Material Adverse Effect or other materiality, in which case such representations and warranties shall be true and correct in all respects) on and as of such earlier date; and

(v)     as of the Credit Date, no condition or event has occurred and is continuing or would result from the Credit Extension hereunder that would constitute a Default or an Event of Default.

The Lender shall be entitled, but not obligated to, request and receive, prior to the making of any Credit Extension, additional information reasonably satisfactory to the Lender confirming the satisfaction of any of the foregoing if, in the good faith judgment of the Lender such request is warranted under the circumstances.

(b)     <u>Further Conditions to Each Credit Extension</u>.    Except as otherwise expressly provided herein, the Lender shall not be obligated to fund any Loan on any Credit Date, including the Closing Date, if, as of the date thereof:

(i)     the Credit Extension requested would cause the aggregate outstanding amount of the Loans to exceed the Revolving Commitment then in effect; and

(ii)     at the time of each request for a Credit Extension, and also after giving effect thereto, (A) if such a Credit Extension has been requested before the Final Order Entry Date, the Interim Order shall not be in full force and effect or shall have been vacated, reversed, stayed, modified or amended in any respect without the prior written consent of the Lender, and (B) if such Credit Extension is requested from and after the Final Order Entry Date, the Lender shall not have received a copy of the Final Order or the Final Order shall not be in full force and effect or shall have been vacated, reversed, stayed, modified or amended in any respect without the prior written consent of the Lender.

## SECTION 4.  REPRESENTATIONS AND WARRANTIES

In order to induce the Lender to enter into this Agreement and to make each Credit Extension to be made thereby, each Borrower represents and warrants to the Lender, on the Closing Date and on each other Credit Date, that the following statements are true and correct:

**4.1     Organization; Requisite Power and Authority; Qualification**.  Such Borrower (a) is duly organized, validly existing and in good standing under the laws of its jurisdiction of organization, (b) subject to entry of the Interim Order or the Final Order, as applicable, has all requisite power and authority to own and operate its properties, to carry on its business as now conducted, to enter into the Credit Documents to which it is a party and to carry out the transactions contemplated thereby, and (c) is qualified to do business and in good standing in every jurisdiction where its assets are located and wherever necessary to carry out its business and operations, except in jurisdictions where the failure to be so qualified or in good standing would not reasonably be expected to have, a Material Adverse Effect.

**4.2     Due Authorization**.  Subject to the entry of the Interim Order or the Final Order, as applicable, the execution, delivery and performance of the Credit Documents have been duly authorized by all necessary corporate or other organizational action on the part of such Borrower.

**4.3**     **No Conflict**.  Subject to the entry of the Interim Order or the Final Order, applicable, the execution, delivery and performance by such Borrower of the Credit Documents and the consummation of the transactions contemplated by the Credit Documents do not and will not (a)(i) violate any provision of any law or any governmental rule or regulation applicable to such Borrower, or (ii) any of the Organizational Documents of such Borrower or any order, judgment or decree of any court or other agency of government binding on such Borrower; (b) conflict with, result in a breach of or constitute (with due notice or lapse of time or both) a default under any Contractual Obligation of such Borrower; (c) result in or require the creation or imposition of any Lien upon any of the properties or assets of such Borrower (other than any Liens created under any of the Credit Documents in favor of the Lender); or (d) require any approval of stockholders, members or partners or any approval or consent of any Person under any Contractual Obligation of such Borrower, except, (x) with respect to clauses (a)(i) and (b), such violation or conflict that would not reasonably be expected to be material to the business of the Borrowers and, (y) with respect to clause (d), for such approvals or consents which will be obtained on or before the Closing Date and disclosed in writing to the Lender.

**4.4**     **Governmental Consents**.  Subject to the entry of the Interim Order and, as applicable, the Final Order, the execution, delivery and performance by such Borrower of the Credit Documents and the consummation of the transactions contemplated by the Credit Documents do not and will not require any registration with, consent or approval of, or notice to, or other action to, with or by, any Governmental Authority except for such as have been obtained or made and are in full force and effect.

**4.5**     **Binding Obligation**.  Each Credit Document has been duly executed and delivered by such Borrower and, subject to entry of the Interim Order and, as applicable, the Final Order, is the legally valid and binding obligation of such Borrower, enforceable against such Borrower in accordance with its respective terms, except as may be limited by bankruptcy, insolvency, reorganization, moratorium or similar laws relating to or limiting creditors' rights generally or by equitable principles relating to enforceability.

**4.6**     **No Filings Required**.  The Liens securing the Obligations shall be deemed valid and perfected and duly recorded by entry of the Interim Order or the Final Order, as applicable. The Lender shall not be required to file any financing statements, mortgages, notices of Lien or similar instruments in any jurisdiction or filing office or to cause any account control agreements to be entered into by any otherwise applicable parties with respect to any Deposit Account or securities account or to take any other action in order to validate or perfect the Lien granted by the Interim Order, the Final Order, this Agreement or any Credit Document.

**4.7**     **[Reserved]**.

**4.8**     **[Reserved]**.

**4.9**     **Adverse Proceedings, etc**.  Except for the Bankruptcy Events, there are no Adverse Proceedings, individually or in the aggregate, that would reasonably be expected to have a Material Adverse Effect, except for such proceedings which are stayed by virtue of the filing of the Chapter 11 Cases.  No such Borrower is subject to or in default with respect to any final judgments, writs, injunctions, decrees, rules or regulations of any Governmental Authority, that, individually or in

the aggregate, would reasonably be expected to have a Material Adverse Effect, except, in each case, which are stayed by virtue of the filing of the Chapter 11 Cases.

**4.10    Payment of Taxes**.  Except as otherwise permitted under <u>Section 5.3</u>, all federal and state Tax returns and reports of such Borrower required to be filed have been timely filed or been caused to be timely filed, and all Taxes shown on such Tax returns to be due and payable and all assessments, fees and other governmental charges upon such Borrower and upon its properties, assets, income, businesses and franchises which are due and payable have been paid (or have been caused to be paid) when due and payable except (a) Taxes that are being contested in good faith by appropriate proceedings, for which such Borrower has set aside on its books adequate reserves, and as to which no Lien has been filed, or (b) to the extent that the failure to do so would not reasonably be expected to result in a Material Adverse Effect.

**4.11    Properties**.  Except as disclosed on <u>Schedule 4.11</u>, such Borrower has good record and marketable title in fee simple to, or valid leasehold interests in, all Real Estate Assets necessary or used in the ordinary conduct of its business (as intended to be conducted from and after the Petition Date after giving effect to the proposed rejection of leases which have been identified to the Lender on or prior to the Petition Date), except (a) as a result of the Bankruptcy Events, or (b) for such defects in title or failure to have such title or interests as would not, individually or in the aggregate, reasonably be expected to be material to the business of the Borrowers.  <u>Schedule 4.11</u> contains a true, accurate and complete list of (i) all Real Estate Assets owned by each such Borrower, and (ii) all leases, subleases or assignments of leases (together with all amendments, modifications, supplements, renewals or extensions of any thereof) affecting each Real Estate Asset of such Borrower, whether such Borrower is the landlord or tenant (whether directly or as an assignee or successor in interest) under such lease, sublease or assignment.

**4.12    Environmental Matters**.  To the best of such Borrower's knowledge, none of such Borrower, its Facilities or operations are subject to any outstanding written order, consent decree or settlement agreement with any Person relating to any Environmental Law, any Environmental Claim, or any Hazardous Materials Activity that, individually or in the aggregate, would reasonably be expected to have a Material Adverse Effect.  To the best of such Borrower's knowledge, there are and have been, no conditions, occurrences, or Hazardous Materials Activities which would reasonably be expected to form the basis of an Environmental Claim against such Borrower that, individually or in the aggregate, would reasonably be expected to have a Material Adverse Effect.  To best of such Borrower's knowledge, compliance with all current or reasonably foreseeable future requirements pursuant to or under Environmental Laws would not be reasonably expected to have, individually or in the aggregate, a Material Adverse Effect.  To the best of such Borrower's knowledge, no event or condition has occurred or is occurring with respect to such Borrower relating to any Environmental Law, any Release of Hazardous Materials, or any Hazardous Materials Activity which individually or in the aggregate has had, or would reasonably be expected to have, a Material Adverse Effect.

**4.13    Compliance with Statutes, etc**.  Such Borrower is in compliance with all applicable statutes, regulations and orders of, and all applicable restrictions imposed by, all Governmental Authorities, in respect of the conduct of its business and the ownership of its property (including compliance with all applicable Environmental Laws with respect to any Real Estate Asset or governing its business and the requirements of any permits issued under such

Environmental Laws with respect to any such Real Estate Asset or the operations of such Borrower), except (a) such non-compliance that, individually or in the aggregate, would not reasonably be expected to result in a Material Adverse Effect and (b) with respect to any such statute, regulation, order and or restriction that is being contested in good faith by proceedings diligently conducted or that is stayed by the Chapter 11 Cases.

**4.14    Interrelated Business**.  From time to time a Borrower may render services to or for the benefit of the other Borrowers, purchase or sell and supply goods to or from or for the benefit of the others, make loans, advances and provide other financial accommodations to or for the benefit of the other Borrowers (including inter alia, the payment by such Borrower of creditors of the other Borrowers and guarantees by such Borrower of indebtedness of the other Borrowers and provides, or with respect to the Lead Borrower, causes to be provided through the Shared Services Agreements, administrative, marketing, payroll and management services to or for the benefit of the other Borrowers).

## SECTION 5.  AFFIRMATIVE COVENANTS

The Borrowers covenant and agree that so long as the Revolving Commitment is in effect and until payment in full of all Obligations, the Borrowers shall perform all covenants in this Section 5.

**5.1    Monthly and Other Reports**.  Unless otherwise provided below, the Lead Borrower will deliver to the Lender (all in form and detail reasonably satisfactory to the Lender):

(a)    Monthly Reports.  The Lead Borrower will provide to the Lender, on a monthly basis, copies of all monthly reports submitted to the United States Trustee.

(b)    Budget; Variance Report.

(i)    The Budget may be updated, modified or supplemented (with the consent and/or at the reasonable request of the Lender) from time to time, and each such updated, modified or supplemented Budget shall be approved by, and in form and substance reasonably satisfactory to, the Lender and no such updated, modified or supplemented Budget shall be effective until so approved and if so approved shall be deemed the "Budget."

(ii)    On or before 5:00 p.m. (Eastern time) on Wednesday of each week, commencing Wednesday, March 4, 2020 (for the Measurement Period then ended Friday, February 28, 2020), the Lead Borrower shall deliver to the Lender a Variance Report.

(c)    [Reserved].

(d)    Bankruptcy Court Filings.  As soon as reasonably practicable in advance of filing with the Bankruptcy Court: (i) the motions seeking approval of the credit facility hereunder and cash management arrangements and proposed forms of the Interim Order, Final Order and cash management order, which motions shall be in form and substance reasonably satisfactory to the Lender; (ii) as applicable, any motions seeking approval of bidding procedures and any sale pursuant to Section 363 of the Bankruptcy Code, and the proposed forms of orders related thereto;

and (iii) as applicable, any plan of reorganization or liquidation and/or any disclosure statement relating to such plan;

(e)     Notice of Default.  Promptly upon any officer of any Borrower obtaining knowledge (i) of any condition or event that constitutes a Default or an Event of Default or that notice has been given to any Borrower with respect thereto; (ii) that any Person has given any notice to any Borrower or taken any other action with respect to any event or condition set forth in Section 8.1(b); or (iii) of the occurrence of any event or change that has caused or evidences, either in any case or in the aggregate, a Material Adverse Effect, a certificate of its Authorized Officers specifying the nature and period of existence of such condition, event or change, or specifying the notice given and action taken by any such Person and the nature of such claimed Event of Default, Default, default, event or condition, and what action the Borrowers have taken, are taking and propose to take with respect thereto;

(f)     Notice of Litigation.  Promptly upon any officer of any Borrower obtaining knowledge of (i) the institution of, or non-frivolous threat of, any Adverse Proceeding not previously disclosed in writing by the Borrowers to the Lender (except and excluding the Bankruptcy Events or any Adverse Proceedings in the Chapter 11 Cases), or (ii) any material development in any Adverse Proceeding that, in the case of either clause (i) or (ii) if adversely determined, would be reasonably expected to have a Material Adverse Effect, or seeks to enjoin or otherwise prevent the consummation of, or to recover any damages or obtain relief as a result of, the transactions contemplated hereby, written notice thereof together with such other information as may be reasonably available to Borrowers to enable Lender and its counsel to evaluate such matters;

(g)     Notice Regarding Material Contracts.  Promptly, and in any event within 10 Business Days after any Material Contract of the Borrowers is breached or any default occurs thereunder from and after the Petition Date, other than breaches or defaults arising as a result of the Bankruptcy Events, the exercise of remedies as a result of which are stayed under the Bankruptcy Code;

(h)     Environmental Reports and Audits.  As soon as practicable following receipt thereof, copies of all environmental audits and reports with respect to environmental matters which relate to any environmental liabilities of the Borrowers which, in any such case, individually or in the aggregate, would reasonably be expected to result in a Material Adverse Effect;

(i)     Information Regarding Collateral.  Borrower will furnish to the Lender 15 days' prior written notice of any change (i) in Borrower's corporate name, (ii) in Borrower's identity or corporate structure, or (iii) in Borrower's Federal Taxpayer Identification Borrower also agrees promptly to notify Lender if any material portion of the Collateral is damaged or destroyed;

(j)     Tax Returns.  As soon as practicable and in any event within 15 days following the filing thereof, copies of each federal income tax return filed by or on behalf of the Borrowers; and

(k)     Other Information.  Promptly such other information and data with respect to the Borrowers as may be reasonably requested by the Lender from time to time.

**5.2    Existence**.  Except as otherwise permitted under <u>Section 6.8</u>, each Borrower will at all times preserve and keep in full force and effect its existence and all rights and franchises, licenses and permits material to its business; <u>provided</u> that no Borrower shall be required to preserve any such existence, right or franchise, licenses and permits if such Person's board of directors (or similar governing body) shall determine that the preservation thereof is no longer desirable in the conduct of the business of such Person, and that the loss thereof is not disadvantageous in any material respect to such Person or to the Lender.

**5.3    Payment of Taxes and Claims**.  Except any Taxes that arose Prepetition and to the extent required by the Bankruptcy Code, the Borrowers will pay, or cause to be paid, (a) all Taxes imposed upon them or any of their respective properties or assets or in respect of any of their income, businesses or franchises before any penalty or fine accrues thereon, and (b) all lawful claims (including claims for labor, services, materials and supplies) for sums that have become due and payable except where (i) the validity or amount thereof is being contested in good faith by appropriate proceedings, and (ii) the Borrowers have set aside on their books adequate reserves with respect thereto in accordance with GAAP.

**5.4    Maintenance of Properties; Intellectual Property**.

(a)    The Borrowers will maintain or cause to be maintained in good repair, working order and condition, ordinary wear and tear excepted, all material properties used or useful in the business of the Borrowers, other than Asset Sales as permitted by <u>Section 6.8</u>, and from time to time will make or cause to be made all appropriate repairs, renewals and replacements thereof.

(b)    No Borrower (either itself or through licensees) will do any act or knowingly omit to do any act whereby any Intellectual Property material to the conduct of its business may become invalidated or otherwise impaired.

**5.5    Insurance**.  (a) The Borrowers shall maintain with financially sound and reputable insurance companies, insurance with respect to their properties and business against loss or damage of the kinds customarily insured against by Persons engaged in the same or similar business, of such types and in such amounts as are customarily carried under similar circumstances by such other Persons, including, without limitation, (a) terrorism insurance and (b) flood hazard insurance on all owned real property, on such terms and in such amounts as required by the National Flood Insurance Reform Act of 1994 or as otherwise reasonably required by the Lender. Each such policy of insurance shall (x) name the Lender as an additional insured thereunder as its interests may appear, and (y) in the case of each casualty insurance policy, contain a loss payable clause or endorsement, reasonably satisfactory in form and substance to the Lender, that names the Lender as the loss payee thereunder and provides for at least 30 days' prior written notice to the Lender of any modification or cancellation of such policy.

(b)    Within fifteen (15) days after the Closing Date, the Lender shall have received a certificate from the Borrowers' insurance broker, or other evidence reasonably satisfactory to it, that all insurance required to be maintained pursuant to <u>Section 5.5(a)</u> is in full force and effect, together with endorsements naming Lender as additional insured and loss payee thereunder to the extent required under <u>Section 5.5(a)</u>.

**5.6     Inspections**. Each Borrower will permit any authorized representatives designated by the Lender to visit and inspect any of the properties of the Borrowers, to inspect, copy and take extracts from its and their financial, tax and accounting records, and to discuss its and their affairs, finances, taxes and accounts with its and their officers and independent public accountants and tax advisors, all upon reasonable advance notice and at such reasonable times during normal business hours and as often as may reasonably be requested; provided that the Lender shall use reasonable efforts to minimize any disruption to the business of the Borrowers.

**5.7     Lender Meetings**. The Borrowers will, upon the request of the Lender, participate in meetings with the Lender once during each Fiscal Quarter to be held at Lead Borrower's corporate offices (or at such other location as may be agreed to by the Borrowers and Lender) at such time as may be agreed to by the Borrowers and the Lender.

**5.8     Compliance with Laws**. The Borrowers will comply in all material respects, and shall cause all other Persons, if any, on or occupying any Facilities to comply in all material respects, with the requirements of all applicable laws, rules, regulations and orders of any Governmental Authority (including all Environmental Laws), except in such instances in which (a) such requirement of law or order, writ, injunction or decree is being contested in good faith by appropriate proceedings and with respect to which adequate reserves have been set aside and maintained by the Borrowers in accordance with GAAP and such contest effectively suspends enforcement of the contested laws; (b) the failure to comply therewith would not reasonably be expected to have a Material Adverse Effect, or (c) the failure to comply therewith is otherwise permitted under the Bankruptcy Code or the Interim Order or the Final Order, as applicable.

**5.9     Further Assurances**. At any time or from time to time upon the request of the Lender, the Borrowers will, at their expense, promptly execute, acknowledge and deliver such further documents and do such other acts and things as the Lender may reasonably request in order to effect fully the purposes of the Credit Documents. In furtherance and not in limitation of the foregoing, the Borrowers shall take such actions as the Lender may reasonably request from time to time to ensure that the Obligations are secured by substantially all of the assets of the Borrowers.

## SECTION 6.  NEGATIVE COVENANTS

Each Borrower covenants and agrees that, so long as the Revolving Commitment is in effect and until payment in full of all Obligations, the Borrowers shall perform all covenants in this Section 6.

**6.1     Indebtedness**. No Borrower shall, directly or indirectly, create, incur, assume or guaranty, or otherwise become or remain directly or indirectly liable with respect to any Indebtedness, except:

(a)     (i) the Obligations and, (ii) to the extent constituting Indebtedness, the Administrative Carve-Out;

(b)     Indebtedness incurred by any Borrower arising from agreements providing for indemnification or from guaranties or letters of credit, surety bonds or performance bonds securing the performance of such Borrower pursuant to such agreements, in connection with

Acquisitions permitted hereunder or permitted dispositions of any business, assets or Subsidiary of such Borrower;

(c)    Indebtedness which may be deemed to exist pursuant to any guaranties, performance, surety, statutory, appeal or similar obligations incurred in the ordinary course of business;

(d)    Indebtedness in respect of netting services, overdraft protections and otherwise in connection with deposit accounts;

(e)    purchase money Indebtedness (including obligations in respect of Capital Leases but excluding synthetic leases) hereafter incurred by any Borrower to finance the purchase of fixed assets, provided that (i) such Indebtedness when incurred shall not exceed the purchase price of the asset(s) financed, (ii) no such Indebtedness shall be refinanced for a principal amount in excess of the principal balance outstanding thereon at the time of such refinancing and (iii) the total amount of all such Indebtedness at any time outstanding shall not exceed $500,000;

(f)    to the extent constituting Indebtedness, the Obligations under the Kroger Receivables Financing Agreement;

(g)    Indebtedness existing on the Petition Date and described in Schedule 6.1, and renewals, refinancings and extensions thereof; provided, that no such Indebtedness shall be refinanced for a principal amount in excess of the principal balance outstanding thereon at the time of such refinancing, except by an amount equal to a reasonable premium or other reasonable amount paid, and fees and expenses reasonably incurred, in connection with such refinancing;

(h)    Indebtedness of any Borrower to any other Borrower;

(i)    Guarantees of any Borrower in respect of Indebtedness otherwise permitted hereunder or pursuant to any Borrower's ordinary course Contractual Obligations;

(j)    Indebtedness incurred by any Borrower arising from agreements for indemnification obligations in connection with any Assets Sale permitted pursuant to the terms hereof;

(k)    endorsement of items for deposit or collection of commercial paper received in the ordinary course of business;

(l)    to the extent constituting Indebtedness, judgments entered against any Borrower to the extent not constituting an Event of Default; and

(m)    Other unsecured Indebtedness incurred in the ordinary course of business, which Indebtedness shall not constitute a superpriority claim that is senior to or *pari passu* with the Obligations.

**6.2    Liens**.  No Borrower shall, directly or indirectly, create, incur, assume or permit to exist any Lien on or with respect to any property or asset of any kind (including any document or instrument in respect of goods or accounts receivable) of such Borrower, whether now owned or

hereafter acquired, or any income or profits therefrom, or file or permit the filing of, or permit to remain in effect, any financing statement or other similar notice of any Lien with respect to any such property, asset, income or profits under the UCC of any state, or under any similar recording or notice statute, except:

(a)     Liens in favor of the Lender granted pursuant to any Credit Document, the Interim Order and the Final Order;

(b)     easements, rights-of-way, restrictions, encroachments and other similar encumbrances and other minor defects or irregularities in title, in each case which do not and will not interfere in any material respect with the ordinary conduct of the business of Borrower;

(c)     any zoning or similar law or right reserved to or vested in any governmental office or agency to control or regulate the use of any real property;

(d)     Liens in existence on the Closing Date and set forth on Schedule 6.2; provided that no such Lien is extended to cover any additional property;

(e)     Liens for Taxes not yet due or which are being contested in good faith and by appropriate proceedings diligently conducted, if adequate reserves with respect thereto are maintained on the books of the applicable Person in accordance with GAAP;

(f)     statutory Liens of landlords and Liens of carriers, warehousemen, mechanics, materialmen, repairmen and suppliers and other Liens imposed by law or pursuant to customary reservations or retentions of title arising in the ordinary course of business; provided, that, such Liens secure only amounts not yet due and payable or, if due and payable, are unfiled and no other action has been taken to enforce the same or are being contested in good faith by appropriate proceedings for which adequate reserves determined in accordance with GAAP have been established;

(g)     rights of setoff or bankers' liens upon deposits of cash in favor of banks or other depository institutions, solely to the extent incurred Postpetition in connection with the maintenance of such Deposit Accounts in the ordinary course of business and Liens in favor of collecting banks arising Postpetition under Section 4-210 of the Uniform Commercial Code;

(h)     deposits and pledges of cash securing obligations permitted by Section 6.1(c), but only to the extent such deposits or pledges are made or otherwise arise Postpetition in the ordinary course of business and secure obligations not past due or which are being contested in good faith by appropriate proceedings for which adequate reserves determined in accordance with GAAP have been established;

(i)     precautionary UCC financing statement filings regarding operating leases entered into Postpetition;

(j)     a landlord's interest in any security deposit provided by any Borrower under any Lease entered into in the ordinary course of business;

(k)    any Liens granted in the Excluded Property to secure the obligations under the Kroger Receivables Financing Agreement or any precautionary UCC financing statement filings covering the Excluded Property regarding such obligations;

(l)    Liens securing Indebtedness permitted under <u>Section 6.1(e)</u>, <u>provided</u> that (i) any such Liens attach only to the property (including proceeds thereof) being financed pursuant to such Indebtedness and (ii) do not encumber any other property of the Borrowers;

(m)    the Permitted Prior Liens; and

(n)    the Administrative Carve-Out.

Subject to the applicable provisions of <u>Section 7.7</u>, the prohibition provided for in this <u>Section 6.2</u> specifically includes, without limitation, any effort by any Borrower, the Unsecured Creditors Committee, or any other party-in-interest in the Chapter 11 Cases to prime or create *pari passu* to any claims, Liens or interests of the Lender any Lien irrespective of whether such claims, Liens or interests may be "adequately protected".

**6.3    Equitable Lien**.  If any Borrower shall create or assume any Lien upon any of its properties or assets, whether now owned or hereafter acquired, it shall make or cause to be made effective provisions whereby the Obligations will be secured by such Lien equally and ratably with any and all other Indebtedness secured thereby as long as any such Indebtedness shall be so secured; <u>provided</u> that, notwithstanding the foregoing, this covenant shall not be construed as a consent by the Lender to the creation or assumption of any such Lien not otherwise permitted hereby.

**6.4    No Further Negative Pledges**.  Except with respect to (a) specific property encumbered to secure payment of particular Indebtedness or to be sold pursuant to an executed agreement with respect to a permitted Asset Sale and (b) restrictions by reason of customary provisions restricting assignments, subletting or other transfers contained in leases, licenses and similar agreements entered into in the ordinary course of business (<u>provided</u> that such restrictions are limited to the property or assets secured by such Liens or the property or assets subject to such leases, licenses or similar agreements, as the case may be), no Borrower shall enter into any agreement prohibiting the creation or assumption of any Lien upon any of its properties or assets, whether now owned or hereafter acquired.

**6.5    Restricted Junior Payments**.  No Borrower shall, through any manner or means or through any other Person to, directly or indirectly, declare, order, pay, make or set apart, or agree to declare, order, pay, make or set apart, any sum for any Restricted Junior Payment, except (a) any Subsidiary of any Borrower may make dividends or distributions to such Borrower, (b) reasonable and customary indemnities to directors, officers and employees of any Borrower in the ordinary course of business, to the extent reasonably attributable to the ownership or operations of the Borrowers; and (c) Borrowers (other than the Lead Borrower) may make dividends and distributions to the Lead Borrower, so the Lead Borrower, in turn, may make payments to ABRH pursuant to the Shared Services Agreements.

**6.6    Investments**.  No Borrower shall, directly or indirectly, make or own any Investment in any Person, except:

(a)        Investments in Cash and Cash Equivalents;

(b)        (i) equity Investments owned as of the Closing Date in any Subsidiary of any Borrower and (ii) any capital contributions made by any Borrower to any of its Subsidiaries;

(c)        Investments existing on the Closing Date, and set forth on Schedule 6.6, but not any increase in the amount thereof or any other modification of the terms thereof;

(d)        Investments (i) in any Securities received in satisfaction or partial satisfaction thereof from financially troubled account debtors, and (ii) consisting of deposits, prepayments and other credits to suppliers made in the ordinary course of business consistent with the past practices of the Borrowers;

(e)        accounts receivable created, acquired or made and trade credit extended in the ordinary course of business;

(f)        Guarantees permitted under Section 6.1; and

(g)        Consolidated capital expenditures to the extent permitted by Section 6.7.

Notwithstanding the foregoing, in no event shall any Borrower make any Investment that would cause the Borrowers to fail to comply with the Budget or any order of the Bankruptcy Court or which results in or facilitates in any manner any Restricted Junior Payment not otherwise permitted under the terms of Section 6.5.

6.7        **Financial Covenants**.  The Borrowers shall not breach or fail to comply with any of the following financial covenants, each of which shall be calculated in accordance with GAAP consistently applied:

(a)        Subject to Sections 2.3(a)(i) and (ii) and the terms and conditions set forth below, the proceeds of Loans shall be used by the Borrowers for the purposes and up to the amounts set forth in the Budget, subject to, during the applicable period, the following (the "Permitted Variances"):

(i)        the Borrowers may make disbursements under any Budget line item for any Measurement Period that are no more than 110% of the disbursements projected for such line item for such Measurement Period in the Budget;

(ii)        no amounts allocated to a particular line item in the Budget shall be used to pay any expenses under any other line item(s) in the Budget without the prior express written consent of the Lender, in the Lender's sole and exclusive discretion;

(iii)        the Borrowers may carry forward any unused amounts contained in any line item in the Budget for any Measurement Period to any subsequent Measurement Period for that line item in the Budget; and

(iv)    payments to the Lender and the Lender's professionals shall not be subject to the limitations set forth above and shall not be included in determining compliance with the covenants set forth in this <u>Section 6.7</u>.

(b)    The Lender (i) may assume that the Borrowers will comply with each Budget, (ii) shall have no duty to monitor such compliance and (iii) shall not be obligated to pay (directly or indirectly from the Collateral) any unpaid expenses incurred or authorized to be incurred pursuant to any Budget.  The line items in each Budget for payment of interest, expenses and other amounts to the Lender are estimates only, and the Borrowers remain obligated to pay any and all Obligations in accordance with the terms of the Credit Documents and the Interim Order and Final Order, as applicable.  Nothing in any Budget shall constitute an amendment or other modification of this Agreement or any of such restrictions or other lending limits set forth therein.

**6.8    Fundamental Changes; Disposition of Assets; Acquisitions**.  No Borrower shall enter into any transaction of merger or consolidation, or liquidate, wind-up or dissolve itself (or suffer any liquidation or dissolution), or convey, sell, lease or sub-lease (as lessor or sublessor), exchange, transfer or otherwise dispose of, in one transaction or a series of transactions, all or any part of its business, assets or property of any kind whatsoever, whether real, personal or mixed and whether tangible or intangible, whether now owned or hereafter acquired, or acquire by purchase or otherwise (other than purchases or other acquisitions of inventory, materials and equipment and capital expenditures in the ordinary course of business) the business, property or fixed assets of, or stock or other evidence of beneficial ownership of, any Person or any division or line of business or other business unit of any Person or organize any Person, except:

(a)    any Borrower may be merged into, or consolidated with, another Borrower, so long as (i) no other provision of this Agreement would be violated thereby, (ii) no Default or Event of Default shall have occurred and be continuing either before or immediately after giving effect to such transaction and (iii) the Lender's rights in any Collateral, including, without limitation, the existence, perfection and priority of any Lien thereon, are not adversely affected by such merger or consolidation;

(b)    sales or other dispositions of Inventory to buyers in the ordinary course of business;

(c)    sales, disposals or other dispositions of obsolete or worn out property, whether now owned or hereafter acquired;

(d)    the use or transfer of Cash and Cash Equivalents;

(e)    the licensing by any Borrower of patents, trademarks, copyrights, and other Intellectual Property rights in the ordinary course of business;

(f)    the transfer, assignment, cancellation, abandonment or other disposition of patents, trademarks, copyrights or other Intellectual Property rights which are, in the reasonable judgment of the Borrowers, no longer used or useful or material in the business of any Borrower;

(g)    the granting of licenses, leases or subleases to other Persons in the ordinary course of business and not materially interfering with the conduct of business of any of the Borrowers;

(h)    sales or other dispositions of assets from any Borrower to any other Borrower;

(i)    the expiration of any contract, contract right or other agreement in accordance with its terms;

(j)    in order to resolve disputes that occur in the ordinary course of business, the Borrowers may discount or otherwise compromise for less than face value thereof, notes or accounts receivable to the extent that the aggregate face amount of such notes and accounts receivable does not exceed the Threshold Amount;

(k)    any involuntary condemnation, seizure or taking, by eminent domain or otherwise, or confiscation or requisition of use of property to the extent the fair market value of such property does not exceed the Threshold Amount;

(l)    any insured casualty or destruction of any owned or leased real property (including any Facility subject to a Mortgage);

(m)    Asset Sales, the proceeds of which do not exceed, from and after the Closing Date, $500,000 in the aggregate; provided that (A) the consideration received for such assets shall be in an amount at least equal to the fair market value thereof (as determined in good faith by such Borrower), (B) no less than 100% thereof shall be paid in Cash, and (C) such Asset Sale is approved by the Bankruptcy Court if such approval is required pursuant to the Bankruptcy Code;

(n)    any Asset Sale pursuant to the Kroger Receivables Financing Agreement; and

(o)    Investments made in accordance with Section 6.6.

**6.9    Sales and Lease Backs**.  No Borrower shall, directly or indirectly, become or remain liable as lessee or as a guarantor or other surety with respect to any lease of any property (whether real, personal or mixed), whether now owned or hereafter acquired, which such Borrower (a) has sold or transferred or is to sell or to transfer to any other Person (other than to another Borrower or any of its Subsidiaries), or (b) intends to use for substantially the same purpose as any other property which has been or is to be sold or transferred by such Borrower to any Person (other than any other Borrower or any of its Subsidiaries) in connection with such lease.

**6.10    Conduct of Business**.  From and after the Closing Date, no Borrower shall engage in any business other than the businesses engaged in by the Borrowers on the Closing Date.

**6.11    Amendments to Organizational Documents**.  No Borrower shall amend or permit any amendments to its Organizational Documents if such amendment would be adverse to the Lender.

**6.12    Prepayments of Certain Indebtedness**.  No Borrower shall, nor shall it permit any of its Affiliates to, directly or indirectly, without the express prior written consent of the Lender or pursuant to an order of the Bankruptcy Court after notice and hearing, purchase, redeem, defease or prepay any principal of, premium, if any, interest or other amount payable in respect of any Indebtedness prior to its scheduled maturity, or make any payment or transfer with respect to any Lien or Indebtedness incurred or arising prior to the filing of the Chapter 11 Cases that is subject to the automatic stay provisions of the Bankruptcy Code whether by way of "adequate protection" under the Bankruptcy Code or otherwise, other than (a) the Obligations, (b) Indebtedness secured by a Permitted Lien if the asset securing such Indebtedness has been sold or otherwise disposed of in accordance with Section 6.8 and (c) payments made in compliance in all material respects with the Budget (subject to Permitted Variances).

**6.13    Material Contracts**.  Except as otherwise permitted by this Agreement or as approved by the Lender, no Borrower shall assume, reject, cancel, terminate breach or modify any Material Contract, if such assumption, rejection, cancellation, termination, breach or modification, either individually or in the aggregate, would reasonably be expected to be material to the business of the Borrowers.

**6.14    Bankruptcy Matters**.  Except as approved by the Lender in writing, no Borrower shall: (a) incur, create, assume, suffer to exist or permit any other super-priority administrative claim which is *pari passu* with or senior to the claims of the Lender against the Borrowers hereunder, except for the Administrative Carve-Out; (b) seek or consent to, any modification, stay, vacation or amendment to the Interim Order or Final Order, as applicable; (c) seek or consent to any order seeking authority to take any action that is prohibited by the terms of this Agreement or the other Credit Documents or refrain from taking any action that is required to be taken by the terms of this Agreement or any of the other Credit Documents; or (d) seek or consent to any plan of reorganization or liquidation unless such plan provides for all of the Obligations being paid in full in cash or other immediately available funds and the arrangements provided for herein terminated pursuant thereto prior to or contemporaneously with the effectiveness of such plan.

## SECTION 7.  COLLATERAL

**7.1    Grant of Security Interest**.  To secure the prompt payment and performance of all Obligations, each Borrower hereby grants to the Lender a continuing security interest in and Lien upon all property and assets of such Borrower, whether real, personal or mixed, tangible or intangible, including all of the following such property and assets, whether now owned or hereafter acquired, and wherever located:

(a)    all Accounts;

(b)    all Chattel Paper, including Electronic Chattel Paper;

(c)    all Commercial Tort Claims;

(d)    all Deposit Accounts and any all amounts credited thereto, including any sums in any blocked or lockbox accounts or in any accounts into which such sums are swept;

(e)    all Documents;

(f)    all General Intangibles, including Intellectual Property;

(g)    all Goods, including Inventory, Equipment, and Fixtures;

(h)    all Instruments;

(i)    all Investment Property;

(j)    all Letter-of-Credit Rights;

(k)    all Supporting Obligations;

(l)    all Cash and Cash Equivalents, whether or not in the possession or under the control of the Lender or any bailee or Affiliate of the Lender, including any Cash Collateral;

(m)    subject to entry of the Final Order, all proceeds and property recovered from Avoidance Claims;

(n)    all interests, including fee simple interest and leasehold interest, in the Real Estate Assets;

(o)    all accessions to, substitutions for, and all replacements, products, and cash and non-cash proceeds of the foregoing, including proceeds of and unearned premiums with respect to insurance policies, and claims against any Person for loss, damage or destruction of any Collateral; and

(p)    all books and records (including customer lists, files, correspondence, tapes, computer programs, print-outs and computer records) pertaining to the foregoing.

All of the foregoing is collectively referred to herein as the "Collateral"; provided, however, "Collateral" shall not include the Excluded Property.

**7.2    Deposit Accounts; Cash Collateral.**

(a)    Deposit Accounts.    Schedule 7.2 sets forth a description of all Deposit Accounts of the Borrowers.    After the occurrence and during the continuance of an Event of Default, each Borrower hereby authorizes and directs each bank or other depository to deliver to the Lender, upon request, all balances in any Deposit Account maintained by such Borrower, without inquiry into the authority or right of the Lender to make such request.

(b)    Cash Collateral.  Each Borrower shall not have any right to use, sell or lease any Cash Collateral after the occurrence and during the continuance of an Event of Default, until payment in full of all Obligations.

**7.3    Real Estate Collateral.**  The Obligations shall be secured by Liens created by the Interim Order and, as applicable, the Final Order, in the Borrower's interests in the Real Estate Assets and, if requested by the Lender in its sole discretion, the applicable Borrower shall enter and deliver to Lender a Mortgage upon any fee simple and/or leasehold Real Estate Asset of any Borrower as requested by Lender and shall deliver to Lender all other Real Estate Deliverables with respect to such Real Estate Asset.

7.4     **Other Collateral**.

(a)     <u>Commercial Tort Claims</u>.  Each Borrower shall promptly notify Lender in writing if such Borrower has a Commercial Tort Claim (other than, as long as no Default or Event of Default exists, a Commercial Tort Claim for less than the Threshold Amount), and, if requested by Lender in its sole discretion, shall take such actions as Lender deems appropriate to subject such claim to a duly perfected, first priority Lien in favor of Lender.

(b)     <u>Certain After-Acquired Collateral</u>.  With respect to Collateral with a value equal to or greater than the Threshold Amount, the Lead Borrower shall promptly notify Lender in writing on a monthly basis (or otherwise at the reasonable request of the Lender) if, after the Closing Date, any Borrower obtains any interest in any Collateral consisting of Deposit Accounts, Chattel Paper, Documents, Instruments, Intellectual Property, Investment Property or Letter-of-Credit Rights and, upon the Lender's request, shall promptly take such actions as the Lender reasonably deems appropriate to effect the Lender's duly perfected, first priority Lien upon such Collateral (in accordance with and subject to the applicable provisions of Section 7.7), including obtaining deposit account control agreements and other control agreements or using commercially reasonable efforts to obtain any appropriate possession or lien waiver.  If any Collateral is in the possession of a third party, at the Lender's request, the Borrowers shall use commercially reasonable efforts to obtain an acknowledgment that such third party holds the Collateral for the benefit of the Lender.

7.5     **Limitations**.  The Lien on Collateral granted hereunder is given as security only and shall not subject the Lender to, or in any way modify, any obligation or liability of any Borrower or any other Person relating to any Collateral.

7.6     **Further Assurances**.  Without limitation of any Borrower's obligations under Sections 5.9 and 7.3, promptly upon request, the Borrowers shall deliver such instruments, assignments, title certificates, or other documents or agreements, and shall take such actions, as the Lender deems appropriate under applicable law to evidence or perfect its Lien on any Collateral, or otherwise to give effect to the intent of this Agreement.  Each Borrower authorizes the Lender to file, from and after the date of this Agreement, any financing statement that indicates the Collateral as "all assets" or "all personal property" of such Borrower, or words to similar effect.

7.7     **Superpriority Nature of Obligations; Lender's Liens**.

(a)     The Lender's Liens on the Collateral owned by the Borrowers shall be set forth in the Interim Order and the Final Order.

(b)     All Obligations shall at all times from and after the Petition Date:

(i)     Constitute, pursuant to Section 364(c)(1) of the Bankruptcy Code, allowed superpriority administrative expense claims against the Borrowers in the Chapter 11 Cases, on a joint and several basis (without the need to file any proof of claim) (collectively, the "<u>DIP Superpriority Claims</u>") and, subject only to the Administrative Carve-Out, such DIP Superpriority Claims shall have priority over administrative expense claims, secured claims, unsecured claims and all other claims against the Borrowers, now existing or hereafter arising, of any kind or nature whatsoever, including, without

limitation, all costs and expenses of the kinds specified in, or ordered pursuant to, Sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 546(c), 726, 1114 or any other provision of the Bankruptcy Code or otherwise, shall be payable from and have recourse to all Prepetition and Postpetition property of the Borrowers and all proceeds thereof (including, from and after the Final Order and subject to the approval of the Bankruptcy Court in the Final Order, all proceeds of Avoidance Claims), and shall at all times be senior to the rights of any Borrower, any Borrower's Estate, and any successor trustee or Estate representative in any Chapter 11 Case or any subsequent proceeding or case under the Bankruptcy Code;

(ii)    be secured, pursuant to Section 364(c)(2) of the Bankruptcy Code, by a valid, fully and automatically perfected, continuing, enforceable, non-avoidable first priority security interest and Lien on the Collateral of each Borrower, to the extent such Collateral is not subject to a Permitted Prior Lien, subject only to (1) the Senior Permitted Liens and (2) the Administrative Carve-Out; and

(iii)    be secured, pursuant to Section 364(c)(3) of the Bankruptcy Code, by a valid, fully and automatically perfected, continuing, enforceable, non-avoidable junior security interest and Lien on the Collateral of each Borrower to the extent subject to Permitted Prior Liens, subject only to (1) such Permitted Prior Liens, (2) the Senior Permitted Liens and (3) the Administrative Carve-Out.

(c)    For the avoidance of doubt, and notwithstanding anything herein to the contrary, the Lender agrees that (i) all proceeds received by the Lender from the Collateral subject to the Liens granted herein, in any other Credit Document or by the Interim Order or the Final Order, as applicable, shall be subject to the prior payment of the Administrative Carve-Out and (ii) the Borrowers shall be permitted to pay compensation and reimbursement of expenses allowed and payable under 11 U.S.C. § 328, 11 U.S.C. § 330 and 11 U.S.C. § 331, as the same may be due and payable, up to an aggregate amount not to exceed the Administrative Carve-Out.  The foregoing shall not be construed as a consent to the allowance of any fees and expenses referred to above and shall not affect the right of the Lender to object to the allowance and payment of such amounts.

(d)    Except as set forth herein or in the Interim Order or Final Order, no other claim having a priority superior or *pari passu* to that created and granted to the Lender by the Interim Order or Final Order shall be granted or approved while any Obligations under this Agreement remain outstanding.  Except for the Administrative Carve-Out, no costs or expenses of administration shall be imposed against the Lender or any of the Collateral under Sections 105, 506(c) or 552 of the Bankruptcy Code, or otherwise, and each Borrower hereby waives for itself and on behalf of its Estate in bankruptcy, any and all rights under sections 105, 506(c) or 552, or otherwise, to assert or impose or seek to assert or impose, any such costs or expenses of administration against the Lender.

## SECTION 8.  EVENTS OF DEFAULT

**8.1    Events of Default**.  Each of the following shall constitute an event of default hereunder (each, an "Event of Default"):

(a)    <u>Failure to Make Payments When Due</u>.  Failure by the Borrowers to pay (i) the principal of any Loan whether at stated maturity, by acceleration or otherwise; (ii) when due, any installment of principal of any Loan, by notice of voluntary prepayment, by mandatory prepayment or otherwise; or (iii) within five (5) days after date due, any interest on any Loan or any fee or any other amount due hereunder; or any other amount payable under the Interim Order or Final Order, as applicable, or any other Credit Document; or

(b)    <u>Default in Other Agreements</u>.  Subject to the Bankruptcy Code, (i) failure of the Borrowers to pay when due any principal of or interest on or any other amount payable in respect of one or more items of Postpetition or unstayed Indebtedness (other than Indebtedness referred to in <u>Section 8.1(a)</u>) in an individual principal amount greater than the Threshold Amount beyond the grace period, if any, provided therefor; or (ii) breach or default by any Borrower with respect to any other term of (A) one or more items of Postpetition or unstayed Indebtedness in the principal amount referred to in <u>clause (i)</u> above, or (B) any loan agreement, mortgage, indenture or other agreement relating to such item(s) of Indebtedness, in each case beyond the grace period, if any, provided therefor, if the effect of such breach or default is to cause, or to permit the holder or holders of that Indebtedness (or a trustee on behalf of such holder or holders), to cause, that Indebtedness to become or be declared due and payable (or subject to a compulsory repurchase or redeemable) prior to its stated maturity or the stated maturity of any underlying obligation, as the case may be; or

(c)    <u>Breach of Certain Covenants</u>.  Failure of any Borrower to perform or comply with any term or condition contained in <u>Sections 2.3</u>, <u>5.1</u>, <u>5.2</u>, <u>5.3</u>, <u>5.4</u>, <u>5.5</u>, <u>5.6</u>, <u>5.7</u>, <u>5.8</u> or <u>6</u>; or

(d)    <u>Breach of Representations, etc</u>.  Any representation, warranty, certification or other statement made or deemed made by any Borrower in any Credit Document or in any statement or certificate at any time given by any Borrower in writing pursuant hereto or thereto or in connection herewith or therewith shall be false in any material respect as of the date made or deemed made; or

(e)    <u>Other Defaults Under Credit Documents</u>.  Any Borrower shall default in the performance of or compliance with any term contained herein or any of the other Credit Documents, other than any such term referred to in any other Section of this <u>Section 8.1</u>, and such default shall not have been remedied or waived within 30 days after the earlier of (i) an officer of such Borrower becoming aware of such default, or (ii) receipt by such Borrower of notice from the Lender of such default; or

(f)    <u>Judgments and Attachments</u>.  Any money judgment, writ or warrant of attachment or similar process involving in excess of the Threshold Amount (to the extent not adequately covered by insurance as to which a solvent and unaffiliated insurance company has acknowledged coverage) shall be entered or filed against any Borrower or any of its respective assets and shall remain undischarged, unvacated, unbonded or unstayed for a period of 60 days (or in any event later than 5 days prior to the date of any proposed sale thereunder); or

(g)    <u>Dissolution</u>.  Any order, judgment or decree shall be entered against any Borrower decreeing the dissolution or split up of such Borrower and such order shall remain undischarged or unstayed for a period in excess of 30 days; or

(h)    <u>Change of Control</u>.  A Change of Control shall occur; or

(i)    <u>Collateral Documents and other Credit Documents</u>.  At any time after the execution and delivery thereof, (i) this Agreement or any Collateral Document ceases to be in full force and effect (other than by reason of a release of Collateral in accordance with the terms hereof or thereof or the satisfaction in full of the Obligations in accordance with the terms hereof) or shall be declared null and void, or (ii) the Lender shall not have or shall cease to have a valid and perfected Lien in any Collateral purported to be covered by the Collateral Documents with the priority required by the relevant Collateral Document, in each case for any reason other than the failure of the Lender to take any action within its control, or (iii) any Borrower shall contest the validity or enforceability of any Credit Document in writing or deny in writing that it has any further liability under any Credit Document to which it is a party; or

(j)    <u>Bankruptcy Matters</u>.  Except as authorized by the Lender in writing, the occurrence of any of the following in the Chapter 11 Cases:

(i)    the failure of the Bankruptcy Court to enter a Final Order, in form and substance satisfactory to the Lender, within 35 days after the Petition Date;

(ii)    the bringing of a motion, taking of any action or the filing of any plan of reorganization or disclosure statement attendant thereto by any Borrower in the Chapter 11 Cases other than in connection with a proposed refinancing and repayment in full of the Obligations (other than contingent indemnification Obligations to the extent no claim giving rise thereto has been asserted in accordance with the terms of this Agreement) on the date of the order granting such motion or the effective date of such plan of reorganization: (A) to obtain additional financing under Section 364(c) or (d) of the Bankruptcy Code not otherwise permitted pursuant to this Agreement; (B) to grant any Lien other than the Senior Permitted Liens upon or affecting any Collateral; or (C) except as provided in the Interim Order or Final Order, as applicable, to use Cash Collateral of the Lender under Section 363(c) of the Bankruptcy Code without the prior written consent of the Lender;

(iii)    the entry of an order in any of the Chapter 11 Cases confirming a plan or plans of reorganization or liquidation that does not contain a provision for repayment in full in cash of all of the Obligations under this Agreement on or before the effective date of such plan or plans;

(iv)    the entry of an order amending, supplementing, staying, vacating or otherwise modifying the Credit Documents or the Interim Order or the Final Order, as applicable, without the written consent of the Lender or the filing of a motion for reconsideration with respect to the Interim Order or the Final Order, as applicable;

(v)    other than as provided in the "first day" motions, the payment of, or application for authority to pay prior to the effective date of a confirmed plan, any

Prepetition claim without the Lender's prior written consent unless otherwise permitted under this Agreement or expressly consented to in writing by the Lender in connection with any plan in the Chapter 11 Cases;

(vi)    the appointment of an interim or permanent trustee in the Chapter 11 Cases or the appointment of a receiver or an examiner in the Chapter 11 Cases with expanded powers to operate or manage the financial affairs, the business, or reorganization of the Borrowers; or the sale without the Lender's consent, of all or substantially all of the Borrowers' assets either through a sale under Section 363 of the Bankruptcy Code, through a confirmed plan of reorganization in the Chapter 11 Case, or otherwise that does not provide for payment in full in cash of the Obligations;

(vii)    the dismissal of any Chapter 11 Case, or the conversion of any Chapter 11 Case from one under Chapter 11 to one under Chapter 7 of the Bankruptcy Code or the filing by any Borrower of a motion or other pleading seeking the dismissal of its Chapter 11 Case under Section 1112 of the Bankruptcy Code or otherwise;

(viii)    the entry of an order by the Bankruptcy Court granting relief from or modifying the automatic stay of Section 362 of the Bankruptcy Code (x) to allow any creditor to execute upon or enforce a Lien on any Collateral, in either case in excess of the Threshold Amount, or (y) with respect to any Lien of or the granting of any Lien on any Collateral to any state or local environmental or regulatory agency or authority, in each case with a value in excess of the Threshold Amount;

(ix)    the commencement of a suit or action against the Lender that asserts or seeks (A) a claim in any Chapter 11 Case in excess of the Threshold Amount, (B) any legal or equitable remedy that would have the effect of subordinating any or all of the Obligations or Liens of the Lender under the Collateral Documents to any other claim, or (C) would otherwise have a Material Adverse Effect, including a Material Adverse Effect on the rights and remedies of the Lender under any Credit Document or the collectability of all or any portion of the Obligations;

(x)    the entry of an order in any Chapter 11 Case avoiding or requiring repayment of any portion of the payments made on account of the Obligations owing under this Agreement or the other Credit Documents;

(xi)    the failure of any Borrower to perform any of its material obligations under the Interim Order or Final Order, as applicable;

(xii)    the marshalling of any Collateral other than at the request of the Lender;

(xiii)    the consolidating or combining of any Borrower with any other Person except (A) as permitted under this Agreement, (B) pursuant to a confirmed plan of reorganization or liquidation which provides or the refinancing and repayment in full of the Obligations (other than contingent indemnification Obligations to the extent no claim giving rise thereto has been asserted in accordance with the terms of this Agreement), or (C) with the prior written consent of the Lender; or

(xiv)   the entry of an order in any Chapter 11 Case granting any other superpriority administrative claim or Lien equal or superior to that granted to the Lender (other than in respect of the Administrative Carve-Out or any Permitted Prior Lien).

**8.2    Remedies**.  Upon the occurrence and during the continuance of any Event of Default, the Lender may take any or all of the following actions:

(a)    without any application, motion or notice to, hearing before, or order from, the Bankruptcy Court notwithstanding the provisions of Section 362 of the Bankruptcy Code:

(i)    terminate the Revolving Commitment Period;

(ii)    increase the rate of interest applicable to the Obligations to the Default Rate; and

(iii)    declare all or any portion of the Obligations, including all or any portion of any Loan to be forthwith due and payable all without presentment, demand, protest or further notice of any kind, all of which are expressly waived by Borrower;

(b)    upon application to, following hearing before, and upon entry of any necessary order from, the Bankruptcy Court;

(i)    direct the Borrowers to sell or otherwise dispose of any or all of the Collateral on terms and conditions acceptable to the Lender pursuant to Sections 363, 365 and other applicable provisions of the Bankruptcy Code and, without limiting the foregoing, direct the Borrowers to assume and assign any lease or executory contract included in the Collateral to the Lender's designees in accordance with and subject to Section 365 of the Bankruptcy Code (and following such direction, the Borrowers shall assist the Lender in effecting any Asset Sale or other disposition of the Collateral upon such terms as are acceptable to the Lender);

(ii)    enter onto the premises of any Borrower in connection with an orderly liquidation of the Collateral; or

(iii)    exercise any rights and remedies provided to the Lender under the Credit Documents or at law or equity, including all remedies provided under the Bankruptcy Code and pursuant to the Interim Order and Final Order, as applicable;

(c)    if an Event of Default has occurred and is continuing, each Borrower irrevocably waives the right to direct the application of any and all payments at any time or times thereafter received by the Lender from or on behalf of any Borrower (including the proceeds of any Asset Sale or other realization upon all or any part of the Collateral), and the Lender shall have the continuing and exclusive right to apply and to reapply any and all such payments received at any time or times after the occurrence and during the continuance of an Event of Default to the Obligations as provided in Section 2.10(e); and

(d)    to the extent any Default or Event of Default is cured, whether timely or with the Lender's consent, such cure shall: (i) be effective as of the date of the initial occurrence

of such Default or Event of Default, as applicable, and (ii) operate as if no such Default or Event of Default had occurred.

## SECTION 9.  MISCELLANEOUS

**9.1    Notices**.  Unless otherwise specifically provided herein, any notice or other communication herein required or permitted to be given to any Borrower or the Lender, shall be sent to such Person's address as set forth on Appendix A or in any other relevant Credit Document or such other address as may be designated by such Person to the other party.  Each notice hereunder shall be in writing and may be personally served, telexed or sent by telefacsimile or United States mail or courier service and shall be deemed to have been given when delivered in person or by courier service and signed for against receipt thereof, upon receipt of telefacsimile, or 3 Business Days after depositing it in the United States mail with postage prepaid and properly addressed; provided that no notice to the Lender shall be effective until received by the Lender. Notices and other communications hereunder may be delivered or furnished by electronic communication (including e-mail and Internet or intranet websites) pursuant to procedures approved by the Lender; provided that the foregoing shall not apply to notices if the Lender or the Lead Borrower has notified the other that it is incapable of receiving notices under such Article by electronic communication.

**9.2    Expenses**.  The Borrowers agrees to pay promptly (a) all of the Lender's fees and reasonable out-of-pocket costs and expenses of negotiation, preparation, execution and administration of the Credit Documents (including the reasonable fees, charges and disbursements of counsel for Lender) and any consents, amendments, waivers or other modifications thereto or matters requested by Borrowers; (b) all out-of-pocket costs and reasonable expenses of creating and perfecting Liens in favor of the Lender, including filing and recording fees, expenses and taxes, stamp or documentary taxes, search fees, title insurance premiums and reasonable fees, expenses and disbursements of counsel to the Lender and of counsel providing any opinions that Lender may request in respect of the Collateral or the Liens created pursuant to the Collateral Documents; (c) all of the Lender's out-of-pocket costs and reasonable fees, expenses for, and disbursements of the Lender, auditors, accountants, consultants or appraisers, whether internal or external, and all reasonable attorneys' fees (including the reasonable expenses and disbursements of outside counsel) incurred by the Lender; (d) all reasonable out-of-pocket costs and expenses (including the reasonable fees, expenses and disbursements of any appraisers, consultants, advisors and agents employed or retained by the Lender and its counsel) in connection with the custody or preservation of any of the Collateral; and (e) after the occurrence and during continuation of a Default or an Event of Default, all out-of-pocket costs and expenses, including reasonable attorneys' fees and costs of settlement, incurred by the Lender in enforcing any Obligations of, or in collecting any payments due from, the Borrowers hereunder or under the other Credit Documents by reason of such Default or Event of Default (including in connection with the sale of, collection from, or other realization upon any of the Collateral) or in connection with any refinancing or restructuring of the credit arrangements provided hereunder in the nature of a "work out" or pursuant to any insolvency or bankruptcy cases or proceedings.

**9.3    Indemnity**.

(a)    In addition to the payment of expenses pursuant to Section 9.2, whether or

not the transactions contemplated hereby shall be consummated, the Borrowers agree to defend (subject to Indemnitees' selection of counsel), indemnify, pay and hold harmless, the Lender, its Affiliates and their respective officers, partners, directors, trustees, employees and agents (each, an "Indemnitee"), from and against any and all Indemnified Liabilities, **IN ALL CASES, WHETHER OR NOT CAUSED BY OR ARISING, IN WHOLE OR IN PART, OUT OF THE COMPARATIVE, CONTRIBUTORY, OR SOLE NEGLIGENCE OF SUCH INDEMNITEE**; provided that Borrower shall not have any obligation to any Indemnitee hereunder with respect to any Indemnified Liabilities to the extent such Indemnified Liabilities arise from the gross negligence or willful misconduct, as determined by a court of competent jurisdiction in a final, non-appealable order, of that Indemnitee. To the extent that the undertakings to defend, indemnify, pay and hold harmless set forth in this Section 9.3 may be unenforceable in whole or in part because they are violative of any law or public policy, the Borrowers shall contribute the maximum portion that it is permitted to pay and satisfy under applicable law to the payment and satisfaction of all Indemnified Liabilities incurred by Indemnitees or any of them. This Section 9.3(a) shall not apply with respect to Taxes other than any Taxes that represent losses, claims, damages, etc. arising from any non-Tax claim.

(b)     To the extent permitted by applicable law, the Borrowers shall not assert, and each Borrower hereby waives, any claim against the Lender and its Related Parties, on any theory of liability, for special, indirect, consequential or punitive damages (as opposed to direct or actual damages) (whether or not the claim therefor is based on contract, tort or duty imposed by any applicable legal requirement) arising out of, in connection with, as a result of, or in any way related to, this Agreement or any Credit Document or any agreement or instrument contemplated hereby or thereby or referred to herein or therein, the transactions contemplated hereby or thereby, any Loan or the use of the proceeds thereof or any act or omission or event occurring in connection therewith, and Borrower hereby waives, releases and agrees not to sue upon any such claim or any such damages, whether or not accrued and whether or not known or suspected to exist in its favor. No Person referred to in the immediately preceding sentence shall be liable for any damages arising from the use by unintended recipients of any information or other materials distributed by it through telecommunications, electronic or other information transmission systems in connection with this Agreement or the other Credit Documents or the transactions contemplated hereby or thereby.

**9.4     Set Off**.  In addition to any rights now or hereafter granted under applicable law and not by way of limitation of any such rights, upon the occurrence of any Event of Default, the Lender and its non-Debtor Affiliates each is hereby authorized by the Borrowers at any time or from time to time, without notice to any Borrower or to any other Person, any such notice being hereby expressly waived, to set off and to appropriate and to apply any and all deposits (general or special, including Indebtedness evidenced by certificates of deposit, whether matured or unmatured, but not including trust accounts (in whatever currency)) and any other Indebtedness at any time held or owing by the Lender to or for the credit or the account of the Borrowers (in whatever currency) against and on account of the obligations and liabilities of the Borrowers to the Lender hereunder, and under the other Credit Documents, including all claims of any nature or description arising out of or connected hereto, or with any other Credit Document, irrespective of whether or not (a) the Lender shall have made any demand hereunder, or (b) the principal of or the interest on the Loans or any other amounts due hereunder shall have become due and payable pursuant to Section 2 and although such obligations and liabilities, or any of them, may be

contingent or unmatured.  The Lender agrees to notify Lead Borrower promptly after any such setoff and application; <u>provided</u> that the failure to give such notice shall not affect the validity of such setoff and application.  The rights of the Lender and its non-Debtor Affiliates under this <u>Section 9.4</u> are in addition to other rights and remedies (including other rights of setoff) that Lender or such Affiliates may have.

   **9.5   Amendments and Waivers**.  No amendment, waiver or other modification of any provision of this Agreement or any other Credit Document, and no consent with respect to any departure by any Borrower therefrom, shall be effective unless the same shall be in writing and signed by the Lender.  Any waiver or consent shall be effective only in the specific instance and for the specific purpose for which it was given.  No notice to or demand on any Borrower in any case shall entitle any Borrower to any other or further notice or demand in similar or other circumstances.

   **9.6   Successors and Assigns**.  The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns permitted hereby, except that no Borrower may assign or otherwise transfer any of its rights or obligations hereunder without the prior written consent of the Lender (in its sole discretion), and any such consent shall not, unless otherwise provided in such consent, release such Borrower from its Obligations.  The Lender may assign or otherwise transfer any of its rights or obligations hereunder to any assignee, by way of participation or by way of pledge or assignment of a security interest without notice to or consent from any party.

   **9.7   Independence of Covenants**.  All covenants hereunder shall be given independent effect so that if a particular action or condition is not permitted by any of such covenants, the fact that it would be permitted by an exception to, or would otherwise be within the limitations of, another covenant shall not avoid the occurrence of a Default or an Event of Default if such action is taken or condition exists.

   **9.8   Survival of Representations, Warranties and Agreements**.  All representations, warranties and agreements made herein shall survive the execution and delivery hereof and the making of the Loans.  Such representations and warranties have been or will be relied upon by the Lender, regardless of any investigation made by the Lender or on its behalf and notwithstanding that the Lender may have had notice or knowledge of any Default at the time of any Credit Extension, and shall continue in full force and effect as long as any Loan or any other Obligation hereunder shall remain unpaid or unsatisfied.

   **9.9   No Waiver; Remedies Cumulative**.  No failure or delay on the part of the Lender in the exercise of any power, right or privilege hereunder or under any other Credit Document shall impair such power, right or privilege or be construed to be a waiver of any default or acquiescence therein, nor shall any single or partial exercise of any such power, right or privilege preclude other or further exercise thereof or of any other power, right or privilege.  The rights, powers and remedies given to the Lender hereby are cumulative and shall be in addition to and independent of all rights, powers and remedies existing by virtue of any statute or rule of law or in any of the other Credit Documents.  Any forbearance or failure to exercise, and any delay in exercising, any right, power or remedy hereunder shall not impair any such right, power or remedy or be construed to be a waiver thereof, nor shall it preclude the further exercise of any such right, power or remedy.

**9.10    Marshalling; Payments Set Aside**.  The Lender shall not be under any obligation to marshal any assets in favor of the Borrowers or any other Person or against or in payment of any or all of the Obligations.  To the extent that the Borrowers make a payment or payments to the Lender or the Lender enforces any security interests or exercise its rights of setoff, and such payment or payments or the proceeds of such enforcement or setoff or any part thereof are subsequently invalidated, declared to be fraudulent or preferential, set aside and/or required to be repaid to a trustee, receiver or any other party under any bankruptcy law, any other state or federal law, common law or any equitable cause, then, to the extent of such recovery, the obligation or part thereof originally intended to be satisfied, and all Liens, rights and remedies therefor or related thereto, shall be revived and continued in full force and effect as if such payment or payments had not been made or such enforcement or setoff had not occurred.

**9.11    Severability**.  In case any provision in or obligation hereunder or any Note or other Credit Document shall be invalid, illegal or unenforceable in any jurisdiction, the validity, legality and enforceability of the remaining provisions or obligations, or of such provision or obligation in any other jurisdiction, shall not in any way be affected or impaired thereby.

**9.12    APPLICABLE LAW.  THIS AGREEMENT AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES HEREUNDER SHALL BE GOVERNED BY, AND SHALL BE CONSTRUED AND ENFORCED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK WITHOUT REGARD TO CONFLICT OF LAWS PRINCIPLES (OTHER THAN SECTIONS 5-1401 AND 5-1402 OF THE NEW YORK GENERAL OBLIGATIONS LAW) THEREOF.**

**9.13    CONSENT TO JURISDICTION**.

(a)    **ALL JUDICIAL PROCEEDINGS BROUGHT AGAINST ANY BORROWER ARISING OUT OF OR RELATING HERETO OR ANY OTHER CREDIT DOCUMENT, OR ANY OF THE OBLIGATIONS, MUST BE BROUGHT IN THE UNITED STATES BANKRUPTCY COURT FOR THE DISTRICT OF DELAWARE SO LONG AS THE CHAPTER 11 CASES ARE OPEN OR, IF THE CHAPTER 11 CASES ARE NO LONGER OPEN, MAY BE BROUGHT IN ANY STATE OR FEDERAL COURT OF COMPETENT JURISDICTION IN THE STATE, COUNTY AND CITY OF NEW YORK.    BY EXECUTING AND DELIVERING THIS AGREEMENT, EACH BORROWER, FOR ITSELF AND IN CONNECTION WITH ITS PROPERTIES, IRREVOCABLY (i) ACCEPTS GENERALLY AND UNCONDITIONALLY THE EXCLUSIVE JURISDICTION AND VENUE OF SUCH COURTS; (ii) WAIVES ANY DEFENSE OF FORUM NON CONVENIENS; (iii) AGREES THAT SERVICE OF ALL PROCESS IN ANY SUCH PROCEEDING IN ANY SUCH COURT MAY BE MADE BY REGISTERED OR CERTIFIED MAIL, RETURN RECEIPT REQUESTED, TO SUCH BORROWER AT ITS ADDRESS PROVIDED IN ACCORDANCE WITH <u>SECTION 9.1</u> IS SUFFICIENT TO CONFER PERSONAL JURISDICTION OVER SUCH BORROWER IN ANY SUCH PROCEEDING IN ANY SUCH COURT, AND OTHERWISE CONSTITUTES EFFECTIVE AND BINDING SERVICE IN EVERY RESPECT; AND (iv) AGREES THAT LENDER RETAINS THE RIGHT TO SERVE PROCESS IN ANY OTHER MANNER PERMITTED BY LAW OR TO BRING PROCEEDINGS AGAINST SUCH BORROWER IN THE COURTS OF ANY OTHER JURISDICTION.**

(b)   **EACH BORROWER HEREBY AGREES THAT PROCESS MAY BE SERVED ON IT BY CERTIFIED MAIL, RETURN RECEIPT REQUESTED, TO THE ADDRESSES PERTAINING TO IT AS SPECIFIED IN SECTION 9.1. ANY AND ALL SERVICE OF PROCESS AND ANY OTHER NOTICE IN ANY SUCH ACTION, SUIT OR PROCEEDING SHALL BE EFFECTIVE AGAINST SUCH BORROWER IF GIVEN BY REGISTERED OR CERTIFIED MAIL, RETURN RECEIPT REQUESTED, OR BY ANY OTHER MEANS OR MAIL WHICH REQUIRES A SIGNED RECEIPT, POSTAGE PREPAID, MAILED AS PROVIDED ABOVE.**

**9.14   WAIVER OF JURY TRIAL. EACH OF THE PARTIES HERETO HEREBY AGREES TO WAIVE ITS RESPECTIVE RIGHTS TO A JURY TRIAL OF ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING HEREUNDER OR UNDER ANY OF THE OTHER CREDIT DOCUMENTS OR ANY DEALINGS BETWEEN THEM RELATING TO THE SUBJECT MATTER OF THIS LOAN TRANSACTION OR THE LENDER/BORROWER RELATIONSHIP THAT IS BEING ESTABLISHED.  THE SCOPE OF THIS WAIVER IS INTENDED TO BE ALL ENCOMPASSING OF ANY AND ALL DISPUTES THAT MAY BE FILED IN ANY COURT AND THAT RELATE TO THE SUBJECT MATTER OF THIS TRANSACTION, INCLUDING CONTRACT CLAIMS, TORT CLAIMS, BREACH OF DUTY CLAIMS AND ALL OTHER COMMON LAW AND STATUTORY CLAIMS.  EACH PARTY HERETO ACKNOWLEDGES THAT THIS WAIVER IS A MATERIAL INDUCEMENT TO ENTER INTO A BUSINESS RELATIONSHIP, THAT EACH HAS ALREADY RELIED ON THIS WAIVER IN ENTERING INTO THIS AGREEMENT, AND THAT EACH WILL CONTINUE TO RELY ON THIS WAIVER IN ITS RELATED FUTURE DEALINGS.  EACH PARTY HERETO FURTHER WARRANTS AND REPRESENTS THAT IT HAS REVIEWED THIS WAIVER WITH ITS LEGAL COUNSEL AND THAT IT KNOWINGLY AND VOLUNTARILY WAIVES ITS JURY TRIAL RIGHTS FOLLOWING CONSULTATION WITH LEGAL COUNSEL.  THIS WAIVER IS IRREVOCABLE, MEANING THAT IT MAY NOT BE MODIFIED EITHER ORALLY OR IN WRITING (OTHER THAN BY A MUTUAL WRITTEN WAIVER SPECIFICALLY REFERRING TO THIS SECTION 9.14 AND EXECUTED BY EACH OF THE PARTIES HERETO), AND THIS WAIVER SHALL APPLY TO ANY SUBSEQUENT AMENDMENTS, RENEWALS, SUPPLEMENTS OR MODIFICATIONS HERETO OR ANY OF THE OTHER CREDIT DOCUMENTS OR TO ANY OTHER DOCUMENTS OR AGREEMENTS RELATING TO THE LOANS MADE HEREUNDER. IN THE EVENT OF LITIGATION, THIS AGREEMENT MAY BE FILED AS A WRITTEN CONSENT TO A TRIAL BY THE COURT.**

**9.15   Usury Savings Clause**. Notwithstanding any other provision herein, the aggregate interest rate charged or agreed to be paid with respect to any of the Obligations, including all charges or fees in connection therewith deemed in the nature of interest under applicable law shall not exceed the Highest Lawful Rate.  If the rate of interest (determined without regard to the preceding sentence) under this Agreement at any time exceeds the Highest Lawful Rate, the outstanding amount of the Loans made hereunder shall bear interest at the Highest Lawful Rate until the total amount of interest due hereunder equals the amount of interest which would have been due hereunder if the stated rates of interest set forth in this Agreement had at all times been in effect.  In addition, if when the Loans made hereunder are repaid in full the total interest due hereunder (taking into account the increase provided for above) is less than the total amount of

interest which would have been due hereunder if the stated rates of interest set forth in this Agreement had at all times been in effect, then to the extent permitted by law, the Borrowers shall pay to the Lender an amount equal to the difference between the amount of interest paid and the amount of interest which would have been paid if the Highest Lawful Rate had at all times been in effect. Notwithstanding the foregoing, it is the intention of the Lender and the Borrowers to conform strictly to any applicable usury laws. Accordingly, if the Lender contracts for, charges, or receives any consideration which constitutes interest in excess of the Highest Lawful Rate, then any such excess shall be cancelled automatically and, if previously paid, shall at the Lender's option be applied to the outstanding amount of the Loans made hereunder or be refunded to the Borrowers. In determining whether the interest contracted for, charged, or received by the Lender exceeds the Highest Lawful Rate, such Person may, to the extent permitted by applicable law, (a) characterize any payment that is not principal as an expense, fee, or premium rather than interest, (b) exclude voluntary prepayments and the effects thereof, and (c) amortize, prorate, allocate, and spread in equal or unequal parts the total amount of interest, throughout the contemplated term of the Obligations hereunder.

**9.16    Counterparts**. This Agreement may be executed in any number of counterparts, each of which when so executed and delivered shall be deemed an original, but all such counterparts together shall constitute but one and the same instrument.

**9.17    Effectiveness**. This Agreement shall become effective upon the execution of a counterpart hereof by each of the parties hereto and receipt by the Borrowers and the Lender of written or telephonic notification of such execution and authorization of delivery thereof.

**9.18    Joint and Several Liability; Waivers**.

(a)    Notwithstanding anything in this Agreement or any other Credit Document to the contrary, each Borrower hereby accepts joint and several liability hereunder and under the other Credit Documents in consideration of the financial accommodations to be provided by the Lender under this Agreement and the other Credit Documents, for the mutual benefit, directly and indirectly, of each Borrower and in consideration of the undertakings of the other Borrowers to accept joint and several liability for the Loans and the other Obligations hereunder. Each Borrower, jointly and severally, hereby irrevocably and unconditionally accepts, not merely as a surety but also as a co-debtor, joint and several liability with the other Borrower parties hereto, with respect to the payment and performance of all of the Obligations (including, without limitation, any Obligations arising under this Section), it being the intention of the parties hereto that all the Obligations shall be the joint and several obligations of each of the Borrowers without preferences or distinction among them. If and to the extent that any Borrower shall fail to make any payment with respect to any of the Obligations as and when due or to perform any of the Obligations in accordance with the terms thereof, then in each such event each other Borrower will make such payment with respect to, or perform, such Obligation. Subject to the terms and conditions hereof, the Obligations of each Borrower under the provisions of this Section constitute the absolute and unconditional, full recourse Obligations of each Borrower enforceable against each Borrower.

(b)    The provisions of this Section are made for the benefit of the Lender and its successors and assigns, and may be enforced by the Lender from time to time against any Borrower

as often as occasion therefor may arise and without requirement on the part of the Lender or such successors or assigns first to marshal any of its or their claims or to exercise any of its or their rights against any Borrower or to exhaust any remedies available to it or them against any Borrower or to resort to any other source or means of obtaining payment of any of the Obligations hereunder or to elect any other remedy.  The provisions of this Section shall remain in effect until the Termination Date.

(c)    Each Borrower hereby agrees that it will not enforce any of its rights of contribution or subrogation against the other Borrower with respect to any liability incurred by it hereunder or under any of the other Credit Documents, any payments made by it to the Lender with respect to any of the Obligations or any Collateral until the Termination Date.  Any claim which any Borrower may have against the other Borrowers with respect to any payments to the Lender hereunder or under any other Credit Documents are hereby expressly made subordinate and junior in right of payment, without limitation as to any increases in the Obligations arising hereunder or thereunder, to the Termination Date and, in the event of any insolvency, bankruptcy, receivership, liquidation, reorganization or other similar proceeding under the laws of any jurisdiction relating to any Borrower, its debts or its assets, whether voluntary or involuntary, all Obligations shall be paid in full in cash before any payment or distribution of any character, whether in cash, securities or other property, shall be made to the other Borrowers therefor.  Each Borrower hereby waives and relinquishes any and all suretyship defenses and all rights and remedies accorded by applicable law to sureties or guarantors.

(d)    Each Borrower hereby designates the Lead Borrower as that Borrower's agent to obtain Loans hereunder, the proceeds of which shall be available to each Borrower for those uses as those set forth in Section 2.3.  As the disclosed principal for its agent, each Borrower shall be obligated to the Lender on account of the Loans so made hereunder as if made directly by Lender to that Borrower, notwithstanding the manner by which the Loan is recorded on the books and records of the Lead Borrower and of any other Borrower.  Each Borrower recognizes that credit available to it hereunder is in excess of and on better terms than it otherwise could obtain on and for its own account and that one of the reasons therefor is its joining in the credit facility contemplated herein with all other Borrowers.  Consequently, each Borrower hereby assumes and agrees to discharge all Obligations of all other Borrowers as if the Borrower so assuming were each other Borrower.

(e)    Each Borrower hereby waives all rights and defenses that it may have because the Obligations are secured by real property, even though such Borrower does not own all of or have an interest, whether direct or indirect, in all of, such real property comprising any part of the Collateral.  Each Borrower acknowledges: (i) the Lender may collect from any Borrower without first foreclosing on all real or personal property Collateral pledged by another Borrower; and (ii) if the Lender forecloses on any real property collateral pledged by another Borrower: (A) the amount of the debt may be reduced only by the price for which that Collateral is sold at the foreclosure sale, even if the Collateral is worth more than the sale price, and/or (B) the Lender may collect from any Borrower, even if the Lender, by foreclosing on the real property Collateral, has destroyed any right such Borrower may have to collect from any other Borrower.  This is an unconditional and irrevocable waiver of any rights and defenses each Borrower may have because another Borrower's obligations are secured by real property.  These rights and defenses include any rights or defenses based upon any anti-deficiency and one-action rules under applicable law.

Without limiting the foregoing, ach Borrower expressly waives any and all rights and defenses, which might otherwise be available to such Borrower or any other Borrower under California Code of Civil Procedure Sections 580a, 580b, 580d and 726.

[*The remainder of this page is intentionally left blank.*]

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed and delivered by their respective officers thereunto duly authorized as of the date first written above.

**BORROWERS:**

**American Blue Ribbon Holdings, LLC**

By: _____ CFO
Name: KURT SCHNABEL
Title: CFO

**Legendary Baking, LLC**

By: _____ CFO
Name: KURT J SCHNABERG
Title: CFO

**Legendary Baking Holdings, LLC**

By: _____ CFO
Name: KURT J SCHNABEL
Title: CFO

**Legendary Baking of California, LLC**

By: _____ CFO
Name: KURT J SCHNABERG
Title: CFO

**SVCC, LLC**

By: _____ CFO
Name: KURT J SCHNABERG
Title: CFO

**LENDER:**

**Cannae Holdings, Inc.**

By: _____
Name: _Michael L. Gravelle_
Title: _Executive Vice President
General Counsel and
Corporate Secretary_

[Signature Page to Debtor-in-Possession Credit Agreement]

**APPENDIX A**
**TO DEBTOR-IN-POSSESSION CREDIT AGREEMENT**

**Notice Addresses**

**BORROWER:**

    **American Blue Ribbon Holdings, LLC**
    3038 Sidco Drive
    Nashville, TN 37204
    Attention: Kurt Schnaubelt, Chief Financial Officer
    Telefacsimile:
    Email: Kurt.Schnaubelt@abrholdings.com

in each case, with a copy to (which shall not constitute notice):

    KTBS Law LLP
    1999 Avenue of the Stars
    Thirty-Ninth Floor
    Los Angeles, CA 90067-6049
    Attention: David A. Fidler and Maria Sountas-Argiropoulos
    Telefacsimile: (310) 407-9090
    Email: DFidler@ktbslaw.com
    Email: msargiropoulos@ktbslaw.com

**LENDER:**

    **Cannae Holdings, Inc.**
    1701 Village Center Circle
    Las Vegas, Nevada 89134
    Attention: Richard Cox, Chief Financial Officer
    Telefacsimile:
    Email: Richard.Cox@fnf.com

in each case, with a copy to (which shall not constitute notice):

    Sheppard, Mullin, Richter & Hampton LLP
    Four Embarcadero Center, 17th Floor
    San Francisco, CA 94111
    Attention: Todd L. Padnos
    Telefacsimile: (415) 434.3947
    Email: TPadnos@sheppardmullin.com

SMRH:4825-8496-7089.9

## Schedule 4.11

### Real Estate Assets

Owned Real Estate Assets

| Address | Nature of Interest |
|---|---|
| 2239 Ford Parkway, St. Paul, MN 55116 | Owned |
| 2211 W Jefferson St., Joliet, IL 60435 | Owned |
| 16425 South Kilbourn Ave., Oak Forest, IL 60452 | Owned |
| 300 Lake Hazeltine Dr., Chaska, MN 55318 | Owned |
| 6370 S Parker Rd., Aurora, CO 80016 | Owned |

Leases and Subleases – Borrower as Tenant

| Street Address | City | State | Zip | Landlord Name |
|---|---|---|---|---|
| 4416 Dodge Street | Omaha | NE | 68131 | Great Western Bank |
| 3302 South Memorial Drive | Tulsa | OK | 74145 | Realty Income Corporation |
| 309 North Ft. Crook Road | Bellevue | NE | 68005 | Great Western Bank |
| 8370 Sherman Way | Thornton | CO | 80221 | Harold F. Rosen and Marjorie Rosen |
| 8370 Sherman Way | Thornton | CO | 80221 | Dr. Wayne D. Middeker |
| 2949 N. 29th Street | Lincoln | NE | 68510-1404 | DM Holdings, L.L.C. |
| 921 South Havana Street | Aurora | CO | 80012 | Barbara Kay Kullas & Jean J. Bleakley Revocable Trust |
| 921 South Havana Street | Aurora | CO | 80012 | U.S. Bank National Association |
| 221 West Pleasant Street | Davenport | IA | 52803 | DM Holdings, L.L.C. |
| 221 West Pleasant Street | Davenport | IA | 52803 | Mark J. Richter |
| 5941 South State Street | Murray | UT | 84107 | Sullivan Revocable Trust dated May 29, 2007 |
| 6555 "O" Street | Lincoln | NE | 68510 | DM Holdings, L.L.C. |
| 10770 M Street | Omaha | NE | 68127 | The Morton Ives Trust, Jim P. Mola and  Ruth P Anderson |
| 10770 M Street | Omaha | NE | 68127 | State of Nebraska |
| 7381 West Alameda Avenue | Lakewood | CO | 80226 | W-D NEWCOMB CO., LLLP |
| 535 Garden of the Gods Rd. | Colorado Springs | CO | 80907 | Garden of the Gods #535, LLC |
| 315 Highway 105 | Monument | CO | 80132 | Sally Higby Beck |
| 315 Highway 105 | Monument | CO | 80132 | Mola Partners, Ltd. |
| 10301 SE Stark Street | Portland | OR | 92716 | Dunson 205, LLC |
| 2017 Menaul Boulevard, N.E. | Albuquerque | NM | 87107-1716 | 2017 Menaul, LLC |
| 2017 Menaul Boulevard, N.E. | Albuquerque | NM | 87107-1716 | 2017 Menaul, LLC |
| 2935 West Broadway | Council Bluffs | IA | 51501-3437 | The Morton Ives Trust, Jim P. Mola and  Ruth P Anderson |
| 910 East 400 South | Salt Lake City | UT | 84102 | Florence J. Gillmor Foundation |
| 15395 East Colfax Avenue | Aurora | CO | 80011 | Freund Investments |
| 2282 Wyoming Boulevard, N.E. | Albuquerque | NM | 87112 | B.R.O. Management, LLC |
| 2282 Wyoming Boulevard, N.E. | Albuquerque | NM | 87112 | B.R.O. Management, LLC |
| 450 East 1100 North | North Salt Lake City | UT | 84054 | Mola Partners, Ltd. |

Schedule 4.11 - 2

| | | | | |
|---|---|---|---|---|
| 4681 South Redwood Road | Taylorsville | UT | 84123 | The Kimberly Anne Hart Security Trust created under the George O. Beck Family Trust dated 4/23/1970, Kimberly Anne Hart, and Perry C. Hart, Jr. |
| 5230 South Yale Avenue | Tulsa | OK | 74135 | Realty Income Corporation |
| 2122 53rd Street | Moline | IL | 61265 | Miles Nebraska LLC |
| 2122 53rd Street | Moline | IL | 61265 | MDLJ Properties, LLC |
| 1210 State Street | Bettendorf | IA | 52722 | Miles Nebraska LLC |
| 2949 North 27th Street | Lincoln | NE | 68521 | Miles Nebraska LLC |
| 3333 North 90th Street | Omaha | NE | 68134 | W-D NEWCOMB CO., LLLP |
| 3333 North 90th Street | Omaha | NE | 68134 | W-D NEWCOMB CO., LLLP |
| 212 East University Parkway | Orem | UT | 84058 | Jeffs & Jeffs |
| 4275 North Academy Boulevard | Colorado Springs | CO | 80918 | Academy Blvd. #4275, LLC |
| 3902 Palmer Park Boulevard | Colorado Springs | CO | 80909 | SET, LLC |
| 5425 L Street | Omaha | NE | 68117 | SCF RC Funding I LLC |
| 2300 University Avenue | West Des Moines | IA | 50266-1418 | DONALDSON HOLDINGS, LLC |
| 207 W. Wolfensberger Rd. | Castle Rock | CO | 80109-9632 | Estate of Martin James Delohery |
| 514 Scott Avenue | Farmington | NM | 87401-7152 | C & R Investment, Inc. |
| 15200 East Iliff Avenue | Aurora | CO | 80014 | Loup Management Company |
| #9 Sturgis Drive | Iowa City | IA | 52240 | DM Holdings, L.L.C. |
| 19502 East Parker Square Drive | Parker | CO | 80134 | Rise Anne Williamson & R.C. Williamson Family Trust |
| 2001 First Street A | Moline | IL | 61265 | Kai's Properties, Inc. |
| 4775 Kipling Street | Wheat Ridge | CO | 80033 | Harold C. Leight and Carole Q. Leight |
| 4775 Kipling Street | Wheat Ridge | CO | 80033 | Interstate 17 INC |
| 524 West Lincoln Way | Ames | IA | 50010 | DM Holdings, L.L.C. |
| 1710 Lincoln Way | Clinton | IA | 52732 | DM Holdings, L.L.C. |
| 5959 W. Thunderbird | Glendale | AZ | 85306 | Harold F. Rosen and Marjorie Rosen |
| 1837 Fremont Drive | Canon City | CO | 81212 | L. G. OXFORD |
| 5925 Brady Street | Davenport | IA | 52806 | DM Holdings, L.L.C. |
| 1140 E. Army Post Rd. | Des Moines | IA | 50315 | DES MOINES ASSOC |
| 1155 South Dobson Road | Mesa | AZ | 85202 | Phoenix Dobson, LLC |
| 575 West Apache Trail | Apache Junction | AZ | 85120 | Gustav G. and Erna M. Kuhn |

| 6813 East Main Street | Mesa | AZ | 85207 | Phoenix Dobson, LLC |
| 5001 Van Dorn Street | Lincoln | NE | 68506 | Chee-Vee, Ltd. |
| 8602 N. Dale Mabry | Tampa | FL | 33614 | Catspaw LLC |
| 8602 N. Dale Mabry | Tampa | FL | 33614 | Catspaw LLC |
| 395 W. 120th Avenue | Westminster | CO | 80234 | BRE/LQ Properties, L.L.C. |
| 23 W Centennial Blvd | Highlands Ranch | CO | 80129 | JAMES M. STEVENS |
| 840 Juan Tabo Blvd NE | Albuquerque | NM | 87123-1427 | Lunnon Properties, LLC |
| 840 Juan Tabo Blvd NE | Albuquerque | NM | 87123-1427 | Lunnon Properties, LLC |
| 2745 South Harvard Avenue | Tulsa | OK | 74114-5945 | MIDWEST PANCAKE HOUSES, INC. |
| 8320 East 71st St. South | Tulsa | OK | 74133-2932 | MIDWEST PANCAKE HOUSES, INC. |
| 150 WEST 10600 SOUTH | Sandy | UT | 84070 | ST Mall Owner, LLC |
| 933 South University Avenue | Provo | UT | 84606 | P & M INVESTMENT COMPANY, LTD. |
| 322 E. 12th Street | Ogden | UT | 84404 | Realtynet, LLC |
| 1430 Harrison Road | Colorado Springs | CO | 80923 | Dunahay Properties, LLLP |
| 5239 Elmore Ave | Davenport | IA | 52807 | Daniel L. Beach and Melinda A. Beach Revocable Trust |
| 18601 E. Hampden Avenue | Aurora | CO | 80013-3533 | Jenny Shuk Ling Leung |
| 2800 Commerce Dr | Coralville | IA | 52241-2756 | BERG FAMILY TRUST |
| 7101 S. 27th Street | Lincoln | NE | 68512 | THE J. PETERS COMPANY, INC. |
| 1780 West 5600 South | Roy | UT | 84067-2955 | Roy Village Inn, L.L.C. |
| 1906 Rue Street | Council Bluffs | IA | 51503 | JADCO, L.L.C. |
| 7837 Dodge Street | Omaha | NE | 68114 | FRANCIS J. KUCIREK AND PAMELA K. KUCIREK, TRUSTEES |
| 12622 W Ken Caryl Avenue | Littleton | CO | 80127 | EBS RQTIP PROPERTIES LLC & EBSE PROPERTIES LLC |
| 4040 E Bell Road | Phoenix | AZ | 85032 | Bella-AZ LLLP |
| 3839 N. 138th Street | Omaha | NE | 68164 | MAPLE JOINT VENTURE IV, LLC |
| 1190 E. First Ave | Broomfield | CO | 80020-3702 | Robert C. Irey Revocable Trust |
| 2525 S. 180th Street | Omaha | NE | 68130 | KAILATH WESTERN SPRINGS, LLC |
| 8921 S. Redwood Road | West Jordan | UT | 84088-9208 | Ronald N. Spratling III |
| 310 E. Bell Rd. | Phoenix | AZ | 85022-2304 | Whitestone Fountain Square, LLC |
| 14539 West Grand Avenue | Surprise | AZ | 85374-4295 | Realty Income Corporation |

Schedule 4.11 - 4

| 3160 S. Wadsworth Blvd. | Lakewood | CO | 80227-4803 | 3160 Wadsworth, LLC |
| 7051 Tower Road | Denver | CO | 80249-7312 | Realty Income Corporation |
| 11010 West McDowell Road | Avondale | AZ | 85323-4803 | 3503 RP Avondale McDowell LLC |
| 7384 Duryea Drive | Colorado Springs | CO | 80923 | CCPST |
| 6390 Coors Blvd. NW | Albuquerque | NM | 87120-2710 | WAMAC, LLC |
| 2700 N. Litchfield Road | Goodyear | AZ | 85338 | Realty Income Corporation |
| 2935 S. Alma School Rd. | Chandler | AZ | 85286 | VESTAR CALIFORNIA XXII, L.L.C. |
| 6607 N. 72nd Street | Omaha | NE | 68122-1703 | Realty Income Corporation |
| 1995 WEST LUMSDEN RD. | Brandon | FL | 33511 | Brandon Centre Venture, LLC |
| 8304 South 72nd St. | Papillion | NE | 68046-6059 | Realty Income Corporation |
| 9490 W. Northern Avenue | Peoria | AZ | 85305-1104 | COLD WATER, LLC |
| 5012 S. Power Rd. | Gilbert | AZ | 85212 | Power & Ray LLC |
| 2780 East Germann Road | Chandler | AZ | 85286 | VESTAR DEVELOPMENT CO |
| 3410 8th Street SW | Altoona | IA | 50009-1024 | Lagniappe Investments, LLC |
| 22601 State Road 54 | Land O'Lakes | FL | 34639 | Realty Income Corporation |
| 24102 E. Prospect Ave. | Aurora | CO | 80016-5337 | Morningside Medical Building LLC |
| 4824 W. 3500 S. | West Valley City | UT | 84120-2927 | DURHAM INVESTMENTS, LLC |
| 5961 E. McKellips Road | Mesa | AZ | 85215-2754 | GAZZO PROPERTIES OF MESA L.L.C. |
| 16775 North Washington Street | Thornton | CO | 80020 | Site C, LLC |
| 5790 S. Carefree Circle | Colorado Springs | CO | 80917 | Col-Terra Investments, XIV, LLC |
| 10293 Big Bend Rd. | Riverview | FL | 33579 | GAZZO PROPERTIES OF RIVERVIEW L.L.C. |
| 1863 S. Signal Butte Rd. | Mesa | AZ | 85209-2227 | DTR1C-SGE LLC |
| 11454 S. District Drive | South Jordan | UT | 84095 | THE DISTRICT, LLC |
| 9560 E. 22nd St. | Tucson | AZ | 85748-7501 | ALLIED TRADING AND TRANSACTING CORPORATION, N.V. |
| 5955 W. Arizona Pavilions Drive | Marana | AZ | 85743 | Blue Lion Lot 11 LLC |
| 1859 S. Stapley Drive, Suite 107 | Mesa | AZ | 85204 | DSW Mesa Grand/Spectrum LLC |
| 3130 Daniels Road | Winter Garden | FL | 34787 | DDR Winter Garden LLC |
| 3770 Lakeside Village Court | Lakeland | FL | 33803 | Casto-Oakbridge Venture, LTD |
| 21386 S. Ellsworth Loop Road | Queen Creek | AZ | 85142-5379 | VPQCM, LLC |

Schedule 4.11 - 5

| | | | | |
|---|---|---|---|---|
| 1216 South Hover Street | Longmont | CO | 80501 | NMMS TWIN PEAKS, LLC |
| 9800 W Happy Valley Rd | Peoria | AZ | 85383 | Sheinbert LLC |
| 1949 Robert Street South | West St. Paul | MN | 55118 | Alexander Basch, as Trustee of the Basch Family Trust |
| 1195 South Milwaukee Avenue | Libertyville | IL | 60048 | 3200 W. 111th Street, LLC |
| 10200 West National Avenue | West Allis | WI | 53227 | EDWARD D. AND DIANE J. SINNER |
| 1881 Highway 36 West | Roseville | MN | 55113 | EG ROSEVILLE BAKERS SQUARE LLC |
| 4900 South 76th Street | Greenfield | WI | 53220 | MUSCA PROPERTIES, LLC |
| 3545 Ridge Road | Lansing | IL | 60438 | Orion Venture XII North, LLC |
| 942 S. Lagrange Road | La Grange | IL | 60525 | SCF RC Funding I LLC |
| 8140 Mississippi St. | Merrillville | IN | 46410 | SCF RC Funding I LLC |
| 270 E. Northwest Highway | Palatine | IL | 60067 | SCF RC Funding I LLC |
| 4839 West 111th St . | Alsip | IL | 60803 | Orion Venture XII North, LLC |
| 7800 Plaza Blvd. | Mentor | OH | 44060 | FLORIDA MENTOR PARTNERSHIP |
| 221 County Road 10 NE | Blaine | MN | 55434 | SCF RC Funding I LLC |
| 7011 W. 130th Street | Parma Heights | OH | 44130 | MUSCA PROPERTIES, LLC |
| 24025 Lorain Road | North Olmsted | OH | 44070 | ESTHER GUSHNER |
| 15300 Bluemound Road | Elm Grove | WI | 53122 | FLORIDA BLUE MOUND, INC. |
| 928 Prairie Center Drive | Eden Prairie | MN | 55344 | PRAIRIEVIEW RETAIL LLC |
| 8000 Brooklyn Blvd. | Brooklyn Park | MN | 55445 | I & B, LLC |
| 5220 N. Harlem Avenue | Chicago | IL | 60656 | Albert Hans, LLC |
| 6340 Grand Avenue | Gurnee | IL | 60031 | LASALLE BANK NATIONAL ASSOCIATION AND FREDRICK DAHMER |
| 14651 S. LaGrange Road | Orland Park | IL | 60462 | Orland Park LLC |
| 1319 W. North Avenue | Melrose Park | IL | 60160 | George Andrews & John Andrews |
| 3539 22nd Avenue NW | Rochester | MN | 55901 | pie3539 LLC |
| 796 S. State Route 59 | Naperville | IL | 60540 | Fox River Commons Shopping Center, LLC, Agent for First Chicago Trust Company of Illinois f/k/a First United Trust Company, Trustee Under Agreement dated May 10, 1988 and Known as Trust Number 10093 |
| 1675 U.S. Highway 41 | Schererville | IN | 46375 | GNJ PARTNERS, LLC |
| 12951 Riverdale Dr. NW | Coon Rapids | MN | 55448-1064 | SCF RC Funding I LLC |

| 1861 Madison Ave. | Mankato | MN | 56001 | SCF RC Funding I LLC |
|---|---|---|---|---|
| 1315 E. Armour Road | Bourbannais | IL | 60914 | ATG TRUST COMPANY |
| 1310 N.W. 114th Street | Clive | IA | 50325 | A. Terry Moss |
| 3434 Freedom Drive | Springfield | IL | 62704 | Parivash Mazhari |
| 15711 S. Harlem Ave | Orland Park | IL | 60462 | Rezin Family Investments LLC |
| 2020 W. 75 Street | Woodridge | IL | 60517 | Equity Fund Advisors, Inc. |
| 250 E. Merrill St. | Birmingham | MI | 48009 | ESSCO OF BIRMINGHAM, LLC |
| 2240 Canton Center North | Canton | MI | 48187 | Spirit Master Funding, LLC |
| 7050 WEST CENTRAL AVENUE | Toledo | OH | 43617 | SRK SYLVANIA ASSOCIATES, LLC |
| 710 GARDNER ROAD | Springboro | OH | 40566 | NOVO SOH, LLC |
| 900 Ponce De Leon Blvd | St. Augustine | FL | 32084 | ATLAS SCHATZOW PARTNERSHIP |
| 1741 Rio Rancho Dr. | Rio Rancho | NM | 87124-1052 | Rio Rancho Investment Properties, LLC |
| 4308 W 44th St | Chicago | IL | 60632-3930 | 4220 Kildare LLC |
| 3102 W. Adams Street | Santa Ana | CA | 92704-5808 | The Lehrer Family Trust dated September 17, 1982 |
| 16345 Frontage Road - Unit D | Oak Forest | IL | 60452-4602 | BAMO II-A REO-IL INDUSTRIAL LLC |
| 312 Lake Hazeltine Dr | Chaska | MN | 55318 | RAS Properties - Chaska, LLC |
| 6300 San Mateo Blvd, NE | Albuquerque | NM | 87109 | Jeffrey Bronstein & Paul Bronstein |
| 2340 Yale Boulevard, S.E. | Albuquerque | NM | 87106-4273 | Bronstein, Ltd. |
| 1110 East 23rd Street | Fremont | NE | 68025 | Freemont Mall, LLC |
| 4850 Federal Blvd. | Denver | CO | 80216 | K & G Petroleum, LLC |
| 3809 Twin Creek Drive | Bellevue | NE | 68123-4080 | Realty Income Corporation |

Leases and Subleases – Borrower as Landlord

| Street Address | City | State | Zip | Landlord Name |
|---|---|---|---|---|
| 7050 WEST CENTRAL AVENUE | Toledo | OH | 43617 | American Blue Ribbon Holdings LLC |
| 250 E. Merrill St. | Birmingham | MI | 48009 | American Blue Ribbon Holdings LLC |
| 2240 Canton Center North | Canton | MI | 48187 | American Blue Ribbon Holdings LLC |
| 710 GARDNER ROAD | Springboro | OH | 40566 | American Blue Ribbon Holdings, LLC |
| 1741 Rio Rancho Dr. | Rio Rancho | NM | 87124-1052 | American Blue Ribbon Holdings, LLC |
| 900 Ponce De Leon Blvd | St. Augustine | FL | 32084 | American Blue Ribbon Holdings, LLC |
| 2017 Menaul Boulevard, N.E. | Albuquerque | NM | 87107-1716 | American Blue Ribbon Holdings, LLC |

Schedule 4.11 - 8

**Schedule 6.1**

**Certain Indebtedness**

| Bank/Institution | Letter of Credit Number | Applicant | Issue Date | Expiry Date | Beneficiary | Balance as of December 1, 2019 |
|---|---|---|---|---|---|---|
| City National Bank | ISB00002296 | American Blue Ribbon Holdings, LLC | 3/26/2018 | 3/26/2019 | Arrowood Indemnity Company | $43,000.00 |
| City National Bank | ISB00002297 | American Blue Ribbon Holdings, LLC | 3/26/2018 | 3/26/2019 | Federal Insurance Company | $761,482.00 |
| City National Bank | ISB00002298 | American Blue Ribbon Holdings, LLC | 3/26/2018 | 3/26/2019 | Arch Insurance Company | $456,785.00 |

The Indebtedness pursuant to and evidenced by that certain Supplier Agreement, dated as of September 18, 2018, by and between American Blue Ribbon Holdings, LLC and Citibank, N.A.

The Indebtedness in which the applicable Borrower has granted Liens in connection with each of the UCC-1 financing statements listed on Schedule 6.2.

**Schedule 6.2**

**Certain Liens**

| Debtor | Secured Party | Lien Jurisdiction | Lien Filing Date | UCC Filing No. |
|---|---|---|---|---|
| American Blue Ribbon Holdings, LLC | KMBS | Delaware | 12/30/2015 | 20156347982 |
| American Blue Ribbon Holdings, LLC | Crown Equipment Corporation | Delaware | 07/01/2016 | 20163990429 |
| American Blue Ribbon Holdings, LLC | Citibank, N.A., its Branches, Subsidiaries and Affiliates | Delaware | 12/26/2018 | 20188979144 |
| American Blue Ribbon Holdings, LLC | Thermo Fisher Financial Services, Inc. | Delaware | 05/16/2019 | 20193382954 |
| American Blue Ribbon Holdings, LLC | Thermo Fisher Financial Services, Inc. | Delaware | 09/19/2019 | 20196510569 |
| American Blue Ribbon Holdings, LLC | Wells Fargo Bank, N.A. | Delaware | 08/02/2019 | 20195359778 |
| American Blue Ribbon Holdings, LLC | Wells Fargo Bank, N.A. | Delaware | 11/11/2019 | 20198042983 |

**Schedule 6.6**

**Certain Investments**

| Borrower | Investment | Beneficial Interest |
|---|---|---|
| American Blue Ribbon Holdings, LLC | Legendary Baking, LLC | 100% |
| American Blue Ribbon Holdings, LLC | Legendary Baking Holdings, LLC | 100% |
| American Blue Ribbon Holdings, LLC | Legendary Baking of California, LLC | 100% |
| American Blue Ribbon Holdings, LLC | SVCC, LLC | 100% |

**Schedule 7.2**

**Deposit Accounts**

| Account Owner | Bank | Bank Address | Account Type | Account No. |
|---|---|---|---|---|
| American Blue Ribbon Holdings, LLC | Fifth Third Bank, N.A. | 201 East Kennedy Blvd, Suite 1800, MD T201KA, Tampa, FL 33602 | Concentration | 7361880300 |
| American Blue Ribbon Holdings, LLC | Fifth Third Bank, N.A. | 201 East Kennedy Blvd, Suite 1800, MD T201KA, Tampa, FL 33602 | Sub Account | 7361935302 |
| American Blue Ribbon Holdings, LLC | Fifth Third Bank, N.A. | 201 East Kennedy Blvd, Suite 1800, MD T201KA, Tampa, FL 33602 | Sub Account | 7361879211 |
| American Blue Ribbon Holdings, LLC | Fifth Third Bank, N.A. | 201 East Kennedy Blvd, Suite 1800, MD T201KA, Tampa, FL 33602 | Sub Account | 7361879096 |
| American Blue Ribbon Holdings, LLC | Fifth Third Bank, N.A. | 201 East Kennedy Blvd, Suite 1800, MD T201KA, Tampa, FL 33602 | Sub Account | 7361879070 |
| American Blue Ribbon Holdings, LLC | Fifth Third Bank, N.A. | 201 East Kennedy Blvd, Suite 1800, MD T201KA, Tampa, FL 33602 | Sub Account | 7361879278 |
| American Blue Ribbon Holdings, LLC | Fifth Third Bank, N.A. | 201 East Kennedy Blvd, Suite 1800, MD T201KA, Tampa, FL 33602 | Sub Account | 7361879294 |
| American Blue Ribbon Holdings, LLC | Fifth Third Bank, N.A. | 201 East Kennedy Blvd, Suite 1800, MD T201KA, Tampa, FL 33602 | Sub Account | 7361879310 |
| American Blue Ribbon Holdings, LLC | Fifth Third Bank, N.A. | 201 East Kennedy Blvd, Suite 1800, MD T201KA, Tampa, FL 33602 | Sub Account | 7361935310 |
| American Blue Ribbon Holdings, LLC | Fifth Third Bank, N.A. | 201 East Kennedy Blvd, Suite 1800, MD T201KA, Tampa, FL 33602 | Sub Account | 7361879179 |
| American Blue Ribbon Holdings, LLC | Fifth Third Bank, N.A. | 201 East Kennedy Blvd, Suite 1800, MD T201KA, Tampa, FL 33602 | Sub Account | 7361879286 |

| American Blue Ribbon Holdings, LLC | Fifth Third Bank, N.A. | 201 East Kennedy Blvd, Suite 1800, MD T201KA, Tampa, FL 33602 | Sub Account | 7361935328 |
| American Blue Ribbon Holdings, LLC | Fifth Third Bank, N.A. | 201 East Kennedy Blvd, Suite 1800, MD T201KA, Tampa, FL 33602 | Sub Account | 7024721750 |
| American Blue Ribbon Holdings, LLC | Fifth Third Bank, N.A. | 201 East Kennedy Blvd, Suite 1800, MD T201KA, Tampa, FL 33602 | Sub Account | 7361879252 |
| American Blue Ribbon Holdings, LLC | J.P. Morgan Chase Bank, N.A. | 3424 Peachtree Rd NE, 23rd Floor, Atlanta, GA 30326 | Depository | 816557516 |
| American Blue Ribbon Holdings, LLC | Wells Fargo Bank, N.A. | 3100 West End Ave, Suite 900, MAC W1021-90, Nashville, TN 37203 | Concentration | 4159534197 |
| American Blue Ribbon Holdings, LLC | Wells Fargo Bank, N.A. | 3100 West End Ave, Suite 900, MAC W1021-90, Nashville, TN 37203 | Sub Account | 4944949197 |
| American Blue Ribbon Holdings, LLC | Wells Fargo Bank, N.A. | 3100 West End Ave, Suite 900, MAC W1021-90, Nashville, TN 37203 | Sub Account | 4940912926 |
| American Blue Ribbon Holdings, LLC | Wells Fargo Bank, N.A. | 3100 West End Ave, Suite 900, MAC W1021-90, Nashville, TN 37203 | Sub Account | 4944367796 |
| American Blue Ribbon Holdings, LLC | Wells Fargo Bank, N.A. | 3100 West End Ave, Suite 900, MAC W1021-90, Nashville, TN 37203 | Sub Account | 4944367804 |
| American Blue Ribbon Holdings, LLC | Wells Fargo Bank, N.A. | 3100 West End Ave, Suite 900, MAC W1021-90, Nashville, TN 37203 | Sub Account | 4944367812 |
| American Blue Ribbon Holdings, LLC | Wells Fargo Bank, N.A. | 3100 West End Ave, Suite 900, MAC W1021-90, Nashville, TN 37203 | Sub Account | 4944367986 |
| American Blue Ribbon Holdings, LLC | Wells Fargo Bank, N.A. | 3100 West End Ave, Suite 900, MAC W1021-90, Nashville, TN 37203 | Sub Account | 4945142800 |

| | | | | |
|---|---|---|---|---|
| American Blue Ribbon Holdings, LLC | Wells Fargo Bank, N.A. | 3100 West End Ave, Suite 900, MAC W1021-90, Nashville, TN 37203 | Sub Account | 4944368091 |
| American Blue Ribbon Holdings, LLC | Wells Fargo Bank, N.A. | 3100 West End Ave, Suite 900, MAC W1021-90, Nashville, TN 37203 | Sub Account | 4945142388 |
| American Blue Ribbon Holdings, LLC | Wells Fargo Bank, N.A. | 3100 West End Ave, Suite 900, MAC W1021-90, Nashville, TN 37203 | Sub Account | 4947104659 |
| American Blue Ribbon Holdings, LLC | Wells Fargo Bank, N.A. | 3100 West End Ave, Suite 900, MAC W1021-90, Nashville, TN 37203 | Sub Account | 4944797646 |
| American Blue Ribbon Holdings, LLC | Wells Fargo Bank, N.A. | 3100 West End Ave, Suite 900, MAC W1021-90, Nashville, TN 37203 | Sub Account | 4940912934 |
| American Blue Ribbon Holdings, LLC | Wells Fargo Bank, N.A. | 3100 West End Ave, Suite 900, MAC W1021-90, Nashville, TN 37203 | Sub Account | 4944368109 |
| American Blue Ribbon Holdings, LLC | Wells Fargo Bank, N.A. | 3100 West End Ave, Suite 900, MAC W1021-90, Nashville, TN 37203 | Sub Account | 4947104386 |
| American Blue Ribbon Holdings, LLC | Wells Fargo Bank, N.A. | 3100 West End Ave, Suite 900, MAC W1021-90, Nashville, TN 37203 | Sub Account | 4940912942 |
| American Blue Ribbon Holdings, LLC | Wells Fargo Bank, N.A. | 3100 West End Ave, Suite 900, MAC W1021-90, Nashville, TN 37203 | Sub Account | 4946014461 |
| American Blue Ribbon Holdings, LLC | Wells Fargo Bank, N.A. | 3100 West End Ave, Suite 900, MAC W1021-90, Nashville, TN 37203 | Sub Account | 4945142396 |
| American Blue Ribbon Holdings, LLC | Wells Fargo Bank, N.A. | 3100 West End Ave, Suite 900, MAC W1021-90, Nashville, TN 37203 | Sub Account | 4947104394 |
| American Blue Ribbon Holdings, LLC | Wells Fargo Bank, N.A. | 3100 West End Ave, Suite 900, MAC W1021-90, Nashville, TN 37203 | Sub Account | 4944368182 |

| American Blue Ribbon Holdings, LLC | Wells Fargo Bank, N.A. | 3100 West End Ave, Suite 900, MAC W1021-90, Nashville, TN 37203 | Sub Account | 4944368190 |
|---|---|---|---|---|
| American Blue Ribbon Holdings, LLC | Wells Fargo Bank, N.A. | 3100 West End Ave, Suite 900, MAC W1021-90, Nashville, TN 37203 | Sub Account | 4945108538 |
| American Blue Ribbon Holdings, LLC | Wells Fargo Bank, N.A. | 3100 West End Ave, Suite 900, MAC W1021-90, Nashville, TN 37203 | Sub Account | 4947104402 |
| American Blue Ribbon Holdings, LLC | Wells Fargo Bank, N.A. | 3100 West End Ave, Suite 900, MAC W1021-90, Nashville, TN 37203 | Sub Account | 4940912959 |
| American Blue Ribbon Holdings, LLC | Wells Fargo Bank, N.A. | 3100 West End Ave, Suite 900, MAC W1021-90, Nashville, TN 37203 | Sub Account | 4944368372 |
| American Blue Ribbon Holdings, LLC | Wells Fargo Bank, N.A. | 3100 West End Ave, Suite 900, MAC W1021-90, Nashville, TN 37203 | Sub Account | 4944367655 |
| American Blue Ribbon Holdings, LLC | Wells Fargo Bank, N.A. | 3100 West End Ave, Suite 900, MAC W1021-90, Nashville, TN 37203 | Sub Account | 4940073935 |
| American Blue Ribbon Holdings, LLC | Wells Fargo Bank, N.A. | 3100 West End Ave, Suite 900, MAC W1021-90, Nashville, TN 37203 | Sub Account | 4944368539 |
| American Blue Ribbon Holdings, LLC | Wells Fargo Bank, N.A. | 3100 West End Ave, Suite 900, MAC W1021-90, Nashville, TN 37203 | Sub Account | 4944368554 |
| American Blue Ribbon Holdings, LLC | Wells Fargo Bank, N.A. | 3100 West End Ave, Suite 900, MAC W1021-90, Nashville, TN 37203 | Sub Account | 4944367960 |
| American Blue Ribbon Holdings, LLC | Wells Fargo Bank, N.A. | 3100 West End Ave, Suite 900, MAC W1021-90, Nashville, TN 37203 | Sub Account | 4940912967 |
| American Blue Ribbon Holdings, LLC | Wells Fargo Bank, N.A. | 3100 West End Ave, Suite 900, MAC W1021-90, Nashville, TN 37203 | Sub Account | 4940912975 |

| American Blue Ribbon Holdings, LLC | Wells Fargo Bank, N.A. | 3100 West End Ave, Suite 900, MAC W1021-90, Nashville, TN 37203 | Sub Account | 4944368018 |
|---|---|---|---|---|
| American Blue Ribbon Holdings, LLC | Wells Fargo Bank, N.A. | 3100 West End Ave, Suite 900, MAC W1021-90, Nashville, TN 37203 | Sub Account | 4940912983 |
| American Blue Ribbon Holdings, LLC | Wells Fargo Bank, N.A. | 3100 West End Ave, Suite 900, MAC W1021-90, Nashville, TN 37203 | Sub Account | 4944368034 |
| American Blue Ribbon Holdings, LLC | Wells Fargo Bank, N.A. | 3100 West End Ave, Suite 900, MAC W1021-90, Nashville, TN 37203 | Sub Account | 4944368042 |
| American Blue Ribbon Holdings, LLC | Wells Fargo Bank, N.A. | 3100 West End Ave, Suite 900, MAC W1021-90, Nashville, TN 37203 | Sub Account | 4944368075 |
| American Blue Ribbon Holdings, LLC | Wells Fargo Bank, N.A. | 3100 West End Ave, Suite 900, MAC W1021-90, Nashville, TN 37203 | Sub Account | 4945169126 |
| American Blue Ribbon Holdings, LLC | Wells Fargo Bank, N.A. | 3100 West End Ave, Suite 900, MAC W1021-90, Nashville, TN 37203 | Sub Account | 4944368869 |
| American Blue Ribbon Holdings, LLC | Wells Fargo Bank, N.A. | 3100 West End Ave, Suite 900, MAC W1021-90, Nashville, TN 37203 | Sub Account | 4944368877 |
| American Blue Ribbon Holdings, LLC | Wells Fargo Bank, N.A. | 3100 West End Ave, Suite 900, MAC W1021-90, Nashville, TN 37203 | Sub Account | 4944368885 |
| American Blue Ribbon Holdings, LLC | Wells Fargo Bank, N.A. | 3100 West End Ave, Suite 900, MAC W1021-90, Nashville, TN 37203 | Sub Account | 4944368893 |
| American Blue Ribbon Holdings, LLC | Wells Fargo Bank, N.A. | 3100 West End Ave, Suite 900, MAC W1021-90, Nashville, TN 37203 | Sub Account | 4944368166 |
| American Blue Ribbon Holdings, LLC | Wells Fargo Bank, N.A. | 3100 West End Ave, Suite 900, MAC W1021-90, Nashville, TN 37203 | Sub Account | 4944368935 |

| | | | | |
|---|---|---|---|---|
| American Blue Ribbon Holdings, LLC | Wells Fargo Bank, N.A. | 3100 West End Ave, Suite 900, MAC W1021-90, Nashville, TN 37203 | Sub Account | 4947104642 |
| American Blue Ribbon Holdings, LLC | Wells Fargo Bank, N.A. | 3100 West End Ave, Suite 900, MAC W1021-90, Nashville, TN 37203 | Sub Account | 4944627850 |
| American Blue Ribbon Holdings, LLC | Wells Fargo Bank, N.A. | 3100 West End Ave, Suite 900, MAC W1021-90, Nashville, TN 37203 | Sub Account | 4944628718 |
| American Blue Ribbon Holdings, LLC | Wells Fargo Bank, N.A. | 3100 West End Ave, Suite 900, MAC W1021-90, Nashville, TN 37203 | Sub Account | 4944867787 |
| American Blue Ribbon Holdings, LLC | Wells Fargo Bank, N.A. | 3100 West End Ave, Suite 900, MAC W1021-90, Nashville, TN 37203 | Sub Account | 4944875871 |
| American Blue Ribbon Holdings, LLC | Wells Fargo Bank, N.A. | 3100 West End Ave, Suite 900, MAC W1021-90, Nashville, TN 37203 | Sub Account | 4940912991 |
| American Blue Ribbon Holdings, LLC | Wells Fargo Bank, N.A. | 3100 West End Ave, Suite 900, MAC W1021-90, Nashville, TN 37203 | Sub Account | 4944867795 |
| American Blue Ribbon Holdings, LLC | Wells Fargo Bank, N.A. | 3100 West End Ave, Suite 900, MAC W1021-90, Nashville, TN 37203 | Sub Account | 4944621739 |
| American Blue Ribbon Holdings, LLC | Wells Fargo Bank, N.A. | 3100 West End Ave, Suite 900, MAC W1021-90, Nashville, TN 37203 | Sub Account | 4944484138 |
| American Blue Ribbon Holdings, LLC | Wells Fargo Bank, N.A. | 3100 West End Ave, Suite 900, MAC W1021-90, Nashville, TN 37203 | Sub Account | 4940913007 |
| American Blue Ribbon Holdings, LLC | Wells Fargo Bank, N.A. | 3100 West End Ave, Suite 900, MAC W1021-90, Nashville, TN 37203 | Sub Account | 4940913015 |
| American Blue Ribbon Holdings, LLC | Wells Fargo Bank, N.A. | 3100 West End Ave, Suite 900, MAC W1021-90, Nashville, TN 37203 | Sub Account | 4940288640 |

| | | | | |
|---|---|---|---|---|
| American Blue Ribbon Holdings, LLC | Wells Fargo Bank, N.A. | 3100 West End Ave, Suite 900, MAC W1021-90, Nashville, TN 37203 | Sub Account | 4940984586 |
| American Blue Ribbon Holdings, LLC | Wells Fargo Bank, N.A. | 3100 West End Ave, Suite 900, MAC W1021-90, Nashville, TN 37203 | Sub Account | 4940973118 |
| American Blue Ribbon Holdings, LLC | Wells Fargo Bank, N.A. | 3100 West End Ave, Suite 900, MAC W1021-90, Nashville, TN 37203 | Sub Account | 4944368349 |
| American Blue Ribbon Holdings, LLC | Wells Fargo Bank, N.A. | 3100 West End Ave, Suite 900, MAC W1021-90, Nashville, TN 37203 | Sub Account | 4944368356 |
| American Blue Ribbon Holdings, LLC | Wells Fargo Bank, N.A. | 3100 West End Ave, Suite 900, MAC W1021-90, Nashville, TN 37203 | Sub Account | 4944368398 |
| American Blue Ribbon Holdings, LLC | Wells Fargo Bank, N.A. | 3100 West End Ave, Suite 900, MAC W1021-90, Nashville, TN 37203 | Operating | 4187519673 |
| American Blue Ribbon Holdings, LLC | Wells Fargo Bank, N.A. | 3100 West End Ave, Suite 900, MAC W1021-90, Nashville, TN 37203 | AP Disbursement | 9600136355 |
| American Blue Ribbon Holdings, LLC | Wells Fargo Bank, N.A. | 3100 West End Ave, Suite 900, MAC W1021-90, Nashville, TN 37203 | Payroll Disbursement | 9600136336 |
| American Blue Ribbon Holdings, LLC | Wells Fargo Bank, N.A. | 3100 West End Ave, Suite 900, MAC W1021-90, Nashville, TN 37203 | AP Disbursement | 9681451820 |
| American Blue Ribbon Holdings, LLC | Wells Fargo Bank, N.A. | 3100 West End Ave, Suite 900, MAC W1021-90, Nashville, TN 37203 | Lockbox - LB deposits | 4121118491 |
| American Blue Ribbon Holdings, LLC | Wells Fargo Bank, N.A. | 3100 West End Ave, Suite 900, MAC W1021-90, Nashville, TN 37203 | Vendor ACH | 4121072433 |
| American Blue Ribbon Holdings, LLC | Wells Fargo Bank, N.A. | 3100 West End Ave, Suite 900, MAC W1021-90, Nashville, TN 37203 | Credit Card Receipts | 4121690028 |

| American Blue Ribbon Holdings, LLC | Wells Fargo Bank, N.A. | 3100 West End Ave, Suite 900, MAC W1021-90, Nashville, TN 37203 | Delivery Service Deposits | 4578418063 |
|---|---|---|---|---|
| American Blue Ribbon Holdings, LLC | Wells Fargo Bank, N.A. | 3100 West End Ave, Suite 900, MAC W1021-90, Nashville, TN 37203 | Sales Tax Payments | 4236924155 |
| SVCC, LLC | Wells Fargo Bank, N.A. | 3100 West End Ave, Suite 900, MAC W1021-90, Nashville, TN 37203 | Operating | 4123419343 |
| American Blue Ribbon Holdings, LLC | Regions Bank | 100 Federal Street, MA5-100-09-04, Boston, MA 20110 | Concentration | 226153955 |
| American Blue Ribbon Holdings, LLC | Regions Bank | 100 Federal Street, MA5-100-09-04, Boston, MA 20110 | Sub Account | 226154013 |
| American Blue Ribbon Holdings, LLC | Regions Bank | 100 Federal Street, MA5-100-09-04, Boston, MA 20110 | Sub Account | 226153130 |
| American Blue Ribbon Holdings, LLC | Regions Bank | 100 Federal Street, MA5-100-09-04, Boston, MA 20110 | Sub Account | 226154005 |
| American Blue Ribbon Holdings, LLC | Regions Bank | 100 Federal Street, MA5-100-09-04, Boston, MA 20110 | Sub Account | 226153971 |
| American Blue Ribbon Holdings, LLC | Regions Bank | 100 Federal Street, MA5-100-09-04, Boston, MA 20110 | Sub Account | 226153998 |
| American Blue Ribbon Holdings, LLC | Regions Bank | 100 Federal Street, MA5-100-09-04, Boston, MA 20110 | Sub Account | 226154021 |
| American Blue Ribbon Holdings, LLC | Regions Bank | 100 Federal Street, MA5-100-09-04, Boston, MA 20110 | Sub Account | 254748518 |
| American Blue Ribbon Holdings, LLC | Bank of America, N.A. | 100 Federal Street, MA5-100-09-04, Boston, MA 20110 | Concentration | 8666723264 |

| | | | | |
|---|---|---|---|---|
| American Blue Ribbon Holdings, LLC | Bank of America, N.A. | 100 Federal Street, MA5-100-09-04, Boston, MA 20110 | Sub Account | 8666615212 |
| American Blue Ribbon Holdings, LLC | Bank of America, N.A. | 100 Federal Street, MA5-100-09-04, Boston, MA 20110 | Sub Account | 8666615397 |
| American Blue Ribbon Holdings, LLC | Bank of America, N.A. | 100 Federal Street, MA5-100-09-04, Boston, MA 20110 | Sub Account | 8666615311 |
| American Blue Ribbon Holdings, LLC | Bank of America, N.A. | 100 Federal Street, MA5-100-09-04, Boston, MA 20110 | Sub Account | 8666615330 |
| American Blue Ribbon Holdings, LLC | Bank of America, N.A. | 100 Federal Street, MA5-100-09-04, Boston, MA 20110 | Sub Account | 8666615335 |
| American Blue Ribbon Holdings, LLC | Bank of America, N.A. | 100 Federal Street, MA5-100-09-04, Boston, MA 20110 | Sub Account | 8666615359 |
| American Blue Ribbon Holdings, LLC | Bank of America, N.A. | 100 Federal Street, MA5-100-09-04, Boston, MA 20110 | Sub Account | 8666615378 |
| American Blue Ribbon Holdings, LLC | Bank of America, N.A. | 100 Federal Street, MA5-100-09-04, Boston, MA 20110 | Sub Account | 8670208011 |
| American Blue Ribbon Holdings, LLC | Bank of America, N.A. | 100 Federal Street, MA5-100-09-04, Boston, MA 20110 | Operating | 4640504991 |
| American Blue Ribbon Holdings, LLC | Bank of America, N.A. | 100 Federal Street, MA5-100-09-04, Boston, MA 20110 | Payroll | 2220079437 |
| American Blue Ribbon Holdings, LLC | Bank of America, N.A. | 100 Federal Street, MA5-100-09-04, Boston, MA 20110 | AP Disbursement | 2220079429 |
| American Blue Ribbon Holdings, LLC | PNC Bank, N.A. | 101 South 5th St, 37th Floor, Louisville, KY 40202 | Depository | 1028876498 |

| | | | | |
|---|---|---|---|---|
| American Blue Ribbon Holdings, LLC | US Bank N.A. | 950 17th St, 12th Floor, DN-CO-T12B, Denver, CO 80202 | Concentration | 153910614228 |
| American Blue Ribbon Holdings, LLC | US Bank N.A. | 950 17th St, 12th Floor, DN-CO-T12B, Denver, CO 80202 | Sub Account | 153910614236 |
| American Blue Ribbon Holdings, LLC | US Bank N.A. | 950 17th St, 12th Floor, DN-CO-T12B, Denver, CO 80202 | Sub Account | 153910614244 |
| American Blue Ribbon Holdings, LLC | US Bank N.A. | 950 17th St, 12th Floor, DN-CO-T12B, Denver, CO 80202 | Sub Account | 153910614269 |
| American Blue Ribbon Holdings, LLC | US Bank N.A. | 950 17th St, 12th Floor, DN-CO-T12B, Denver, CO 80202 | Sub Account | 153910614277 |
| American Blue Ribbon Holdings, LLC | US Bank N.A. | 950 17th St, 12th Floor, DN-CO-T12B, Denver, CO 80202 | Sub Account | 153910614293 |
| American Blue Ribbon Holdings, LLC | US Bank N.A. | 950 17th St, 12th Floor, DN-CO-T12B, Denver, CO 80202 | Sub Account | 153910614301 |
| American Blue Ribbon Holdings, LLC | US Bank N.A. | 950 17th St, 12th Floor, DN-CO-T12B, Denver, CO 80202 | Sub Account | 153910614319 |
| American Blue Ribbon Holdings, LLC | US Bank N.A. | 950 17th St, 12th Floor, DN-CO-T12B, Denver, CO 80202 | Sub Account | 153910614327 |
| American Blue Ribbon Holdings, LLC | US Bank N.A. | 950 17th St, 12th Floor, DN-CO-T12B, Denver, CO 80202 | Sub Account | 153910614335 |
| American Blue Ribbon Holdings, LLC | US Bank N.A. | 950 17th St, 12th Floor, DN-CO-T12B, Denver, CO 80202 | Sub Account | 153910614343 |
| American Blue Ribbon Holdings, LLC | US Bank N.A. | 950 17th St, 12th Floor, DN-CO-T12B, Denver, CO 80202 | Sub Account | 153910614368 |

| American Blue Ribbon Holdings, LLC | US Bank N.A. | 950 17th St, 12th Floor, DN-CO-T12B, Denver, CO 80202 | Sub Account | 153910614376 |
|---|---|---|---|---|
| American Blue Ribbon Holdings, LLC | US Bank N.A. | 950 17th St, 12th Floor, DN-CO-T12B, Denver, CO 80202 | Sub Account | 153910614392 |
| American Blue Ribbon Holdings, LLC | US Bank N.A. | 950 17th St, 12th Floor, DN-CO-T12B, Denver, CO 80202 | Sub Account | 153910614400 |
| American Blue Ribbon Holdings, LLC | US Bank N.A. | 950 17th St, 12th Floor, DN-CO-T12B, Denver, CO 80202 | Sub Account | 153910614426 |
| American Blue Ribbon Holdings, LLC | US Bank N.A. | 950 17th St, 12th Floor, DN-CO-T12B, Denver, CO 80202 | Sub Account | 153910614434 |
| American Blue Ribbon Holdings, LLC | US Bank N.A. | 950 17th St, 12th Floor, DN-CO-T12B, Denver, CO 80202 | Sub Account | 153910614467 |
| American Blue Ribbon Holdings, LLC | US Bank N.A. | 950 17th St, 12th Floor, DN-CO-T12B, Denver, CO 80202 | Sub Account | 153910614475 |
| American Blue Ribbon Holdings, LLC | US Bank N.A. | 950 17th St, 12th Floor, DN-CO-T12B, Denver, CO 80202 | Sub Account | 153910614483 |
| American Blue Ribbon Holdings, LLC | US Bank N.A. | 950 17th St, 12th Floor, DN-CO-T12B, Denver, CO 80202 | Sub Account | 153910614491 |
| American Blue Ribbon Holdings, LLC | US Bank N.A. | 950 17th St, 12th Floor, DN-CO-T12B, Denver, CO 80202 | Sub Account | 153910614509 |
| American Blue Ribbon Holdings, LLC | US Bank N.A. | 950 17th St, 12th Floor, DN-CO-T12B, Denver, CO 80202 | Sub Account | 153910614525 |
| American Blue Ribbon Holdings, LLC | US Bank N.A. | 950 17th St, 12th Floor, DN-CO-T12B, Denver, CO 80202 | Sub Account | 153910614533 |

| American Blue Ribbon Holdings, LLC | US Bank N.A. | 950 17th St, 12th Floor, DN-CO-T12B, Denver, CO 80202 | Sub Account | 153910614541 |
|---|---|---|---|---|
| American Blue Ribbon Holdings, LLC | US Bank N.A. | 950 17th St, 12th Floor, DN-CO-T12B, Denver, CO 80202 | Sub Account | 153910614558 |
| American Blue Ribbon Holdings, LLC | US Bank N.A. | 950 17th St, 12th Floor, DN-CO-T12B, Denver, CO 80202 | Sub Account | 153910614566 |
| American Blue Ribbon Holdings, LLC | US Bank N.A. | 950 17th St, 12th Floor, DN-CO-T12B, Denver, CO 80202 | Sub Account | 153910614855 |
| American Blue Ribbon Holdings, LLC | US Bank N.A. | 950 17th St, 12th Floor, DN-CO-T12B, Denver, CO 80202 | Sub Account | 153910614582 |
| American Blue Ribbon Holdings, LLC | US Bank N.A. | 950 17th St, 12th Floor, DN-CO-T12B, Denver, CO 80202 | Sub Account | 153910614590 |
| American Blue Ribbon Holdings, LLC | US Bank N.A. | 950 17th St, 12th Floor, DN-CO-T12B, Denver, CO 80202 | Sub Account | 153910614608 |
| American Blue Ribbon Holdings, LLC | US Bank N.A. | 950 17th St, 12th Floor, DN-CO-T12B, Denver, CO 80202 | Sub Account | 153910614616 |
| American Blue Ribbon Holdings, LLC | US Bank N.A. | 950 17th St, 12th Floor, DN-CO-T12B, Denver, CO 80202 | Sub Account | 153910614632 |
| American Blue Ribbon Holdings, LLC | US Bank N.A. | 950 17th St, 12th Floor, DN-CO-T12B, Denver, CO 80202 | Sub Account | 153910614640 |
| American Blue Ribbon Holdings, LLC | US Bank N.A. | 950 17th St, 12th Floor, DN-CO-T12B, Denver, CO 80202 | Sub Account | 153910614681 |
| American Blue Ribbon Holdings, LLC | US Bank N.A. | 950 17th St, 12th Floor, DN-CO-T12B, Denver, CO 80202 | Sub Account | 153910614699 |

**EXHIBIT A**
**TO DEBTOR-IN-POSSESSION CREDIT AGREEMENT**

**Funding Notice**

Reference is made to the Senior Secured Debtor-in-Possession Credit Agreement, dated as of January 27, 2020 (as amended, restated, supplemented or otherwise modified from time to time, the "Credit Agreement"), by and among American Blue Ribbon Holdings, LLC, as a debtor and a debtor-in-possession (the "Lead Borrower"), Legendary Baking, LLC, as a debtor and a debtor-in-possession, Legendary Baking Holdings, LLC, as a debtor and a debtor-in-possession, Legendary Baking of California, LLC, as a debtor and a debtor-in-possession, and SVCC, LLC, as a debtor and a debtor-in-possession (each a "Borrower" and together with the Lead Borrower, collectively, the "Borrowers"), and Cannae Holdings, Inc. ("Lender"). Capitalized terms used but not otherwise defined herein shall have the meanings specified in the Credit Agreement.

The Lead Borrower hereby requests, in accordance with Section 2.1(a) of the Credit Agreement, that the Lender make a Loan to the Lead Borrower on [mm/dd/yy] (the "Credit Date") in the amount of $[_____].

The Lead Borrower hereby certifies that:

(a) as of such Credit Date, the representations and warranties contained in the Credit Agreement and in the other Credit Documents shall be true and correct in all material respects (other than those representations and warranties that are expressly qualified by a Material Adverse Effect or other materiality, in which case such representations and warranties shall be true and correct in all respects) on and as of such Credit Date to the same extent as though made on and as of that date, except to the extent such representations and warranties specifically relate to an earlier date, in which case such representations and warranties shall have been true and correct in all material respects (other than those representations and warranties that are expressly qualified by a Material Adverse Effect or other materiality, in which case such representations and warranties shall be true and correct in all respects) on and as of such earlier date; and

(b) as of the Credit Date, no condition or event has occurred and is continuing or would result from the Credit Extension hereunder that would constitute a Default or an Event of Default.

American Blue Ribbon Holdings, LLC

By: _____
Name: _____
Title: _____

SMRH:4825-8496-7089.9

**EXHIBIT B**
**TO DEBTOR-IN-POSSESSION CREDIT AGREEMENT**

Form of Interim Order

(see attached)

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| AMERICAN BLUE RIBBON HOLDINGS, LLC, a Delaware limited liability company, *et al.*,[1] | ) Case No. 20-10161 (___) |
| | ) |
| Debtors. | ) (Jointly Administered) |
| | ) |
| | ) **Related to Docket No.** |

**INTERIM ORDER PURSUANT TO 11 U.S.C. §§ 105, 362, 363, 364, 503 AND 507 AND FED. R. BANKR. P. 2002, 4001, 6004 AND 9014 (I) AUTHORIZING DEBTORS TO OBTAIN SENIOR SECURED, SUPERPRIORITY, POSTPETITION FINANCING, (II) GRANTING LIENS AND SUPERPRIORITY CLAIMS, (III) MODIFYING THE AUTOMATIC STAY, (IV) SCHEDULING FINAL HEARING, AND (V) GRANTING RELATED RELIEF**

Upon consideration of the motion (the "**Motion**") of American Blue Ribbon Holdings, LLC, Legendary Baking, LLC, Legendary Baking Holdings, LLC, Legendary Baking of California, LLC, and SVCC, LLC, each as a debtor and debtor in possession (collectively, the "**Debtors**"), pursuant to sections 105, 362, 363, 364(c)(1), 364(c)(2), 364(c)(3), 364(e), 503 and 507 of title 11 of the United States Code (the "**Bankruptcy Code**"), Rules 2002, 4001, 6003, 6004 and 9014 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), and Rules 2002-1, 4001-2 and 9013-1(m) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "**Local Bankruptcy Rules**"), seeking entry of an interim order (this "**Interim Order**") and final order (the "**Final Order**"):

(a)        authorizing the Debtors to obtain post-petition financing pursuant to a senior secured, superpriority debtor-in-possession new money revolving credit facility ("**DIP Facility**") in an aggregate principal amount of up to $20,000,000 on the terms and conditions set forth in the Senior Secured,

---

[1] The Debtors and the last four digits of their respective federal taxpayer identification numbers are as follows: American Blue Ribbon Holdings, LLC (1224-Del.); Legendary Baking, LLC (2615-Del.); Legendary Baking Holdings, LLC (2790-Del.); Legendary Baking of California, LLC (1760-Del.); and SVCC, LLC (9984-Ariz.). The Debtors' address is 3038 Sidco Drive, Nashville, TN 37204.

Superpriority Debtor-In-Possession Credit Agreement substantially in the form attached hereto as Exhibit B (and as hereafter amended, restated, amended and restated, supplemented, or otherwise modified from time to time in accordance with the terms thereof and hereof, the "**DIP Credit Agreement**")[2], by and among the Debtors and Cannae Holdings, Inc. (in such capacity, and together with its successors and assigns, the "**DIP Lender**");

(b)    authorization that during the period (the "**Interim Period**") commencing on the date of this Court's entry of this Interim Order and ending on the earlier of (a) the date this Court enters the Final Order and (b) the occurrence of the Maturity Date (as defined in the DIP Credit Agreement), a portion of the revolving commitment under the DIP Facility shall be borrowed by Debtors, in accordance with the Budget (defined below) and subject to compliance with the terms, conditions, and covenants contained in in this Order and in the DIP Credit Documents, in an aggregate amount up to $10,000,000 (the "**Interim Financing**");

(c)    authorizing the Debtors to execute and deliver the DIP Credit Agreement and other documentation, including security agreements, pledge agreements, mortgages, deeds of trust, guaranties, promissory notes, certificates, instruments, deposit account control agreements and such other documentation which may be necessary or required to implement the DIP Facility and perform thereunder and/or that may be requested by the DIP Lender, in each case, as amended, restated, supplemented or otherwise modified from time to time in accordance with the terms thereof and hereof (collectively, together with the DIP Credit Agreement, the "**DIP Credit Documents**"); to incur and repay or pay, as applicable, all loans, advances, extensions of credit, financial accommodations, reimbursement obligations, fees (including, without limitation, commitment fee and upfront fee), costs, expenses and other liabilities, all other obligations (including indemnities and similar obligations, whether contingent or absolute) and all other amounts due or payable under the DIP Credit Documents, collectively, the "**DIP Obligations**"), and to perform such other and further acts as may be necessary, desirable or appropriate in connection therewith;

---

[2]Capitalized terms used herein but not otherwise defined herein shall have the meanings given to them in the DIP Credit Agreement.

(d)    granting to the DIP Lender allowed superpriority administrative expense claims pursuant to section 364(c)(1) of the Bankruptcy Code in respect of all DIP Obligations, and valid, enforceable, non-avoidable and automatically perfected liens on and security interests in all DIP Collateral (as defined below), pursuant to sections 364(c)(2) and 364(c)(3) of the Bankruptcy Code, to secure the DIP Obligations, in each case as and to the extent, and subject to the relative ranking and priorities (and, in any event, junior to the Administrative Carve-Out), set forth in this Interim Order;

(e)    authorizing the Debtors to use proceeds of the DIP Facility, solely in accordance with the Budget and consistent with this Interim Order and the DIP Credit Documents;

(f)    vacating or modifying the automatic stay imposed by section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms and provisions of this Interim Order;

(g)    subject to entry of the Final Order, authorizing the grant of liens to the DIP Lender on the proceeds of the Debtors' claims and causes of action arising under Bankruptcy Code sections 544, 545, 547, 548, 549 and 550 (collectively, the "**Avoidance Claims**");

(h)    subject to, and only effective upon, the entry of a Final Order granting such relief, approving the waiver by the Debtors of any right to surcharge against the Collateral pursuant to Bankruptcy Code section 506(c) or otherwise;

(i)    waiving any applicable stay (including under Bankruptcy Rule 6004) and providing for immediate effectiveness of this Interim Order; and

(j)    scheduling a final hearing (the "**Final Hearing**") to consider entry of the Final Order granting the relief requested in the Motion on a final basis and authorizing the balance of the borrowings under the DIP Credit Documents on a final basis, as set forth in the Motion and the DIP Credit Documents filed with this Court and approving the Debtors' notice with respect to the Motion.

The hearing on the Motion (the "**Interim Hearing**") having been held by this Court on January [•], 2020, pursuant to Bankruptcy Rules 2002 and 4001(c)(2); and based upon all of the pleadings filed with this Court, the evidence presented at the Interim Hearing and the entire record herein; and this Court having

heard and resolved or overruled any objections to the interim relief requested in the Motion; and the Court having noted the appearances of all parties in interest; and it appearing that the relief requested in the Motion is in the best interests of the Debtors, their estates, and creditors and an appropriate exercise of the Debtors' business judgment; and the Debtors having provided notice of the Motion as set forth in the Motion, and it appearing that no other or further notice of the Motion need be given; and after due deliberation and consideration, and sufficient cause appearing therefor:

**IT IS FOUND, DETERMINED, CONCLUDED AS A MATTER OF LAW AND ADJUDGED**, that:

A.      **Petition Date.**

On January 27, 2020 (the "**Petition Date**"), each of the Debtors filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware commencing these Chapter 11 cases (the "**Chapter 11 Cases**").

B.      **Debtors-in-Possession.**

The Debtors are continuing to operate their businesses and manage their respective properties as debtors-in-possession pursuant to sections 1107 and 1108 of the Bankruptcy Code. No trustee or examiner has been appointed in any of the Chapter 11 Cases.

C.      **Jurisdiction and Venue.**

This Court has jurisdiction over these proceedings, this Motion, the parties, and the Debtors' property pursuant to 28 U.S.C. § 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(D). Venue of the Chapter 11 Cases and the Motion is proper under 28 U.S.C. §§ 1408 and 1409. The statutory predicates for the relief sought herein are Bankruptcy Code sections 105, 362, 363, 364, 503 and 507 and Bankruptcy Rules 2002, 4001, 6004, and 9014 and Local Rules 2002-1, 4001-2 and 9013-l(m).

D.      **Notice.**

The notice given by the Debtors of the Motion and the Interim Hearing was appropriate under the circumstances. Such notice constitutes due and sufficient notice of the Debtors' request for the interim relief granted herein and of the Interim Hearing under the circumstances and complies with Bankruptcy Rules

2002 and 4001(c) and Local Rules 2002-1, 4001-2 and 9013-1(m), such that no other or further notice is necessary or required.

E.      **Committee Formation.**

As of the date hereof, no statutory committee ("**Committee**") has been appointed in the Chapter 11 Cases.

F.      **Permitted Prior Liens.**

Nothing herein shall constitute a finding or ruling by the Court that any alleged Permitted Prior Lien or Senior Permitted Lien (as such terms are defined in the Credit Agreement) is valid, senior, enforceable, prior, perfected, or non-avoidable. Moreover, nothing herein shall prejudice the rights of any party-in-interest, including, but not limited to the Debtors or the DIP Lender, to challenge the validity, priority, enforceability, seniority, avoidability, perfection, or extent of any alleged Permitted Prior Lien or Senior Permitted Lien.

G.      **Immediate Need for Postpetition Financing.**

The Debtors have requested immediate entry of this Interim Order pursuant to Bankruptcy Rule 4001(c)(2) and the Local Bankruptcy Rules. Good cause has been shown for immediate entry of this Interim Order pursuant to such rules. An immediate need exists for the Debtors to obtain funds and liquidity in order to, as the case may be, continue operations, to pay the costs and expenses of administering the Chapter 11 Cases, and to administer and preserve the value of their businesses and estates. The ability of the Debtors to finance their operations, to preserve and maintain the value of their assets and to maximize the return for all creditors requires the availability of the DIP Facility. In the absence of the availability of such funds and liquidity in accordance with the terms hereof, the continued operation of the Debtors' businesses would not be possible, and immediate and irreparable harm to the Debtors and their estates, creditors and other stakeholders would occur. Thus, the ability of the Debtors to preserve and maintain the value of their assets and maximize the return for creditors requires the availability of working capital from the DIP Facility.

**H.      No Credit Available on More Favorable Terms.**

The Debtors have been unable to obtain (a) adequate unsecured credit allowable under section 503(b)(1) of the Bankruptcy Code as an administrative expense or (b) credit for money borrowed with priority over any or all administrative expenses of the kind specified in sections 503(b) or 507(b) of the Bankruptcy Code. The Debtors have been unable to obtain credit for borrowed money without granting the DIP Liens (defined below), the DIP Superpriority Claims (defined below) and certain other protections set forth herein for the DIP Lender. Moreover, the Debtors were unable to obtain sufficient financing from sources other than the DIP Lender on more favorable terms and conditions than the terms and conditions of the DIP Facility.

**I.      Extension of Financing.**

The DIP Lender has indicated a willingness to provide financing to the Debtors in accordance with the DIP Credit Agreement and the other DIP Credit Documents, subject to (i) the entry of this Interim Order, including, among other things, approval of the benefits and protections for the DIP Lender contained herein, (ii) approval of the terms and conditions of the DIP Facility, and (iii) findings by this Court that such financing is essential to the Debtors' estates (and the continued operation of the Debtors), that the DIP Lender has acted in good faith, and that the DIP Lender's claims, superpriority claims, security interests and liens and other protections granted pursuant to and in connection with this Interim Order (and the Final Order) and the DIP Facility (including the DIP Superpriority Claims and the DIP Liens), will not be affected by any subsequent reversal, modification, vacatur, stay or amendment of, as the case may be, this Interim Order, the Final Order or any other order, as provided in section 364(e) of the Bankruptcy Code.

**J.      Business Judgment and Good Faith Pursuant to Section 364(e).**

(a)      The Debtors, in consultation with their advisors, concluded that the DIP Facility represents the best available financing under the circumstances. The DIP Credit Agreement and the other DIP Credit Documents were negotiated in good faith among the Debtors and the DIP Lender. The terms and conditions of the DIP Facility, the DIP Credit Agreement and the other DIP Credit Documents are fair, reasonable, and the best available under the circumstances, reflect the Debtors' exercise of prudent business

judgment consistent with their fiduciary duties, and constitute reasonably equivalent value and consideration.

        (b)     All obligations incurred, payments made, and transfers or grants of security set forth in this Interim Order, the DIP Credit Agreement and the other DIP Credit Documents by any Debtor are granted to or for the benefit of the Debtors for fair consideration and reasonably equivalent value, and are granted contemporaneously with the making of the loans and/or commitments and other financial accommodations secured thereby.

        (c)     The credit to be extended under the DIP Credit Agreement, the DIP Facility and the other DIP Credit Documents shall be deemed to be extended by the DIP Lender in good faith and for valid business purposes and uses, and in express reliance upon the protections offered by section 364(e) of the Bankruptcy Code, and the DIP Lender (along with each of its successors and assigns) is entitled to the full protection and benefits of section 364(e) of the Bankruptcy Code whether or not this Interim Order or any provision hereof is vacated, reversed or modified, on appeal or otherwise.

**K.**       **Adequacy of the Budget.**

        The Debtors have prepared and delivered to the DIP Lender a budget, a copy of which is annexed hereto as <u>Exhibit A</u> (as it may be modified, amended, updated, restated or supplemented with the consent of the DIP Lender on the terms set forth in the DIP Credit Agreement, the "**Budget**"). The Budget has been thoroughly reviewed by the Debtors and their management. The Debtors and their management believe the Budget and the estimate of administrative expenses due or accruing during the period covered by the Budget were developed using reasonable assumptions, and based on those assumptions the Debtors anticipate that sufficient assets will be available to pay all administrative expenses due or accruing during the period covered by the Budget.

**L.**       **Relief Essential; Best Interest.**

        The relief requested in the Motion (and provided in this Interim Order) is necessary, essential and appropriate for the continued operation of the Debtors' businesses and the management and preservation of their respective assets and property. It is in the best interest of the Debtors' estates that the Debtors be

allowed to enter into the DIP Credit Agreement and the other DIP Credit Documents, incur the DIP Obligations and grant the liens and claims contemplated in the DIP Credit Agreement, in this Interim Order and under the other DIP Credit Documents to the DIP Lender.

**NOW, THEREFORE**, on the Motion of the Debtors and the record before this Court with respect to the Motion, including the record made during the Interim Hearing and the declarations submitted in support of the Motion, and with the consent of the Debtors and the DIP Lender, and good and sufficient cause appearing therefor,

**IT IS HEREBY ORDERED** that:

1.      **Motion Granted**. The Motion is hereby granted on an interim basis in accordance with the terms and conditions set forth in this Interim Order. Any objections to the Motion with respect to entry of this Interim Order to the extent not withdrawn or otherwise resolved, and all reservation of rights included therein, are hereby denied and overruled.

2.      **Authorization of DIP Facility; Interim Borrowing**.

(a)      The DIP Facility and the DIP Credit Documents are hereby approved. The Debtors are hereby authorized to enter into the DIP Credit Documents and to pay all DIP Obligations without further order of the Court. The Debtors are hereby authorized to borrow money during the Interim Period pursuant to the DIP Credit Documents up to the aggregate amount of the Interim Financing, in accordance with and subject to the Budget and the terms of this Interim Order and the DIP Credit Documents.

(b)      In furtherance of the foregoing and without further approval of this Court, each Debtor is authorized to perform all acts, to make, execute and deliver all instruments and documents (including, without limitation, the execution or recordation of any DIP Credit Documents), and to pay all fees, that may be required or necessary for the Debtors' performance of their obligations under the DIP Facility, including, without limitation:

(i)     The execution, delivery and performance of the DIP Credit Documents, including, without limitation, the creation and perfection of the DIP Liens described and provided for herein;

(ii)     The non-refundable payment to the DIP Lender of the fees referred to in the DIP Credit Agreement and any other DIP Credit Document (which fees, whether paid prior to or after the date hereof, are hereby approved) and costs and expenses as may be due under such DIP Credit Documents from time to time (whether or not contained in the Budget and irrespective of any estimates contained in the Budget), including, without limitation, fees and expenses of the professionals retained by the DIP Lender as and to the extent provided for in the DIP Credit Documents without the necessity of filing retention motions or fee applications (subject to paragraph 17 hereof with respect to the payment of such professional fees and expenses); and

(iii)     The performance of all other acts that may be necessary, required or advisable under or in connection with the DIP Credit Documents.

(c)     The DIP Credit Agreement and the other DIP Credit Documents shall represent, constitute and evidence the DIP Obligations, and the DIP Credit Documents and DIP Obligations shall be valid and binding, joint and several, obligations of the Debtors, enforceable against the Debtors, their estates and any successors thereto, including without limitation, any trustee appointed in any of the Chapter 11 Cases or any case under chapter 7 of the Bankruptcy Code upon conversion of any of the Chapter 11 cases (collectively, the "**Successor Cases**") in accordance with the terms thereof and this Interim Order. All obligations incurred, payments made, and transfers or grants of security set forth in this Interim Order, the DIP Credit Agreement or the other DIP Credit Documents by any Debtor are granted to or for the benefit of the DIP Lender for fair consideration and reasonably equivalent value, and are granted contemporaneously with the making of the loans and/or commitments and other financial accommodations secured thereby. No obligation incurred, payment made, transfer or grant of security set forth in this Interim Order, the DIP Credit Agreement or the other DIP Credit Documents, in each case whether pre- or post-petition, by any Debtor as approved under this Interim Order shall be stayed, restrained, voided, voidable

or recoverable under the Bankruptcy Code or under any applicable non-bankruptcy law, or subject to any defense, reduction, subordination, setoff, recoupment, counterclaim or any other challenge under the Bankruptcy Code or any applicable non-bankruptcy law, rule or regulation.

3.     **DIP Liens**. Immediately upon the entry of this Interim Order, and effective as of the Petition Date, in order to secure the DIP Obligations, the DIP Lender is hereby granted valid, binding, fully and automatically perfected, continuing, enforceable and non-avoidable liens and security interests (collectively, the "**DIP Liens**") in the DIP Collateral as collateral security for the prompt and complete performance and payment when due (whether at the stated maturity, by acceleration or otherwise) of the DIP Obligations. The term "**DIP Collateral**" shall mean all prepetition and postpetition assets and properties (real and personal) of the Debtors, including all "**Collateral**" as defined in the DIP Credit Agreement, whether now owned by or owing to, or hereafter acquired by, or arising in favor of, the Debtors (including under any trade names, styles, or derivations thereof), whether owned or consigned by or to, or leased from or to, the Debtors, and wherever located including, without limitation, all cash and cash equivalents of the Debtors wherever located including, inventory, accounts and accounts receivable, other rights to payment, contracts, instruments, documents and chattel paper, all securities (whether or not marketable), goods, equipment, inventory and fixtures, all real and leasehold property interests, general intangibles, patents, copyrights, trademarks, trade names and all other intellectual property, capital stock, investment property, all books and records, commercial tort claims (including, subject to the approval of the Court in the Final Order, the proceeds of all Avoidance Claims) and all accessions to, substitutions and replacements for, and rents, profits and products of, each of the foregoing; *provided, however*, that the DIP Collateral shall not include Excluded Property (as defined in the DIP Credit Agreement); *provided, further, however*, that DIP Collateral shall include all proceeds and products of Excluded Property that are not themselves Excluded Property.

4.     **Priority of DIP Liens**. The DIP Liens shall have the following priorities (in each case subject to the Administrative Carve-Out and Senior Permitted Liens):

(a)      pursuant to Section 364(c)(2) of the Bankruptcy Code, a first-priority perfected lien on, and security interest in, all DIP Collateral that is not subject to a valid, perfected, enforceable and unavoidable lien or security interest on the Petition Date or subject to a valid lien or security interest in existence on the Petition Date that is perfected subsequent thereto as expressly permitted by Section 546(b) of the Bankruptcy Code (the "**Permitted Prior Liens**"), and

(b)      pursuant to Section 364(c)(3) of the Bankruptcy Code, a junior perfected lien on, and security interest in, all DIP Collateral that is subject to a Permitted Prior Lien, subject to such Permitted Prior Liens.

5.      **DIP Superpriority Claim**.

(a)      Upon the entry of this Interim Order, effective as of the Petition Date, the DIP Lender is hereby granted pursuant to section 364(c)(1) of the Bankruptcy Code, against each of the Debtors an allowed superpriority administrative expense claim (the "**DIP Superpriority Claim**") for all DIP Obligations, (a) which shall rank junior to the Administrative Carve-Out and (b) with priority over any and all administrative expense claims, unsecured claims and all other claims asserted against the Debtors (without the need to file a proof of claim) or their estates in any of the Chapter 11 Cases or any Successor Cases at any time, now existing or hereafter arising of any kind or nature whatsoever, including all other administrative expenses of the kind specified in or ordered pursuant to sections 105, 326, 328, 330, 331, 364, 365, 503(a), 503(b), 506(c) (subject to entry of the Final Order), 507(a), 507(b), 546(c), 546(d), 726, 1113 and 1114 of the Bankruptcy Code or applicable non-bankruptcy law, and over any and all other administrative expenses, unsecured or other claims arising under any other provision of the Bankruptcy Code. The DIP Superpriority Claim shall, for purposes of section 1129(a)(9)(A) of the Bankruptcy Code, be considered an administrative expense claim allowed under section 503(b) of the Bankruptcy Code, shall be against each Debtor on a joint and several basis, and shall be payable from and have recourse to all prepetition and postpetition property and assets of the Debtors, including all DIP Collateral (including, subject to the approval of the Court in the Final Order, all proceeds of Avoidance Claims). The DIP Superpriority Claim shall be entitled to the full protection of section 364(e) of the Bankruptcy Code in the

event that this Interim Order or any provision hereof is vacated, reversed or stayed in any respect, or modified or amended in any manner, on appeal or otherwise.

(b)    Except as expressly permitted herein or in the other DIP Credit Documents, the DIP Liens and the DIP Superpriority Claim, as applicable, (i) shall not be made subject to or *pari passu* with (A) any lien, security interest or claim heretofore or hereinafter granted in any of the Chapter 11 Cases or any Successor Cases, and shall be valid and enforceable against the Debtors, their estates, any trustee or any other estate representative appointed or elected in the Chapter 11 Cases or any Successor Cases and/or upon the dismissal of any of the Chapter 11 Cases or any Successor Cases, (B) any lien that is avoided and preserved for the benefit of the Debtors and their estates under section 551 of the Bankruptcy Code or otherwise, (C) any intercompany or affiliate lien or claim and (D) any liens arising after the Petition Date; and (ii) shall not be subject to sections 510, 549, 550 or 551 of the Bankruptcy Code or, subject to entry of the Final Order, Section 506(c) of the Bankruptcy Code.

6.    **Lien Perfection**. This Interim Order shall be sufficient and conclusive evidence of the validity, enforceability, perfection and priority of the DIP Liens without the necessity of filing or recording any financing statement, deed of trust, mortgage, or other instrument or document which may otherwise be required under the law of any jurisdiction or the taking of any other action to validate or perfect the DIP Liens or to entitle the DIP Liens to the priorities granted herein. Notwithstanding the foregoing, the Debtors shall be authorized to execute and deliver to the DIP Lender all mortgages, deeds of trust, financing statements, security agreements, notices of liens and other similar documents as the DIP Lender may request to grant, preserve, protect and perfect the validity and priority of the DIP Liens; *provided, however*, that notwithstanding anything to the contrary in this Interim Order, the DIP Credit Agreement or any other DIP Credit Document, no such filing or recordation shall be necessary or required to perfect the DIP Liens, and no Debtor shall be required to execute or deliver any mortgage or deed of trust, authorize any fixture filing or financing statement, execute or deliver any agreement providing "control" as defined in Section 9-104, 9-105, 9-106 and 9-107 of the UCC as in effect in any relevant jurisdiction or undertake any registration in respect of assets subject to a certificate of title in order to perfect the DIP Liens in any portion of the DIP

Collateral, including any and all cash wherever located or held, and all such liens and security interests are hereby deemed fully and automatically perfected. The DIP Lender may, in its sole discretion, file or record, as applicable, such financing statements, mortgages, deeds of trust, security agreements, notices of liens and other similar documents, and is hereby granted relief from the automatic stay of section 362 of the Bankruptcy Code in order to do so, and all such financing statements, mortgages, deeds of trust, security agreements, notices of liens and other similar documents shall be deemed to have been filed or recorded on the Petition Date. The DIP Lender, in its sole discretion, may file a copy of this Interim Order as a financing statement with any recording officer designated to file financing statements or with any registry of deeds or similar office in any jurisdiction in which any Debtor has real or personal property and, in such event, the subject filing or recording officer shall be authorized to file or record such copy of this Interim Order.

7.        **Use of Proceeds of DIP Facility**. Subject to the terms and conditions of this Interim Order, the Debtors are each authorized to use proceeds of the DIP Facility up to the amount of the Interim Financing on an interim basis, solely as provided in the Budget (subject to the Permitted Variances (as defined in the DIP Credit Agreement)) and this Interim Order and for the purposes specified in the DIP Credit Agreement.  The Budget annexed hereto as <u>Exhibit A</u> is hereby approved.

8.        **Maintenance of DIP Collateral; Insurance**. Unless the DIP Lender otherwise consents in writing, until the Termination Date (as defined in the DIP Credit Agreement), the Debtors shall continue to maintain all property, operational and other insurance as and to the extent required and specified in the DIP Credit Documents. Upon entry of this Interim Order and to the fullest extent provided by applicable law, the DIP Lender shall be, and shall be deemed to be, without any further action or notice, named as additional insureds and loss payees on each insurance policy maintained by the Debtors that in any way relates to the DIP Collateral.

9.        **Limitations on the Use of Proceeds**. None of the DIP Facility, the loans extended pursuant thereto, the DIP Collateral, proceeds of any of the foregoing, any portion of the Administrative Carve-Out or any other funds may be used, directly or indirectly, by any of the Debtors, any Committee, or any trustee or other estate representative appointed in the Chapter 11 Cases or any Successor Cases or any other person

or entity to do any of the following (nor shall any professional fees, disbursements, costs or expenses be paid in connection therewith): (a) to object to, contest, prevent, hinder, delay or interfere with, in any way, the DIP Lender's enforcement or realization upon any of the DIP Collateral once an Event of Default (as defined in the DIP Credit Agreement) occurs; (b) to object to or challenge in any way the DIP Liens, the DIP Obligations or the DIP Collateral or any other claims or liens held by the DIP Lender; or (c) to investigate (including by way of examinations or discovery proceedings, whether formal or informal), prepare, assert, join, commence, support or prosecute any action for any claim, counter-claim, action, proceeding, application, motion, objection, defense, or other contested matter seeking any order, judgment, determination or similar relief against, or adverse in any material respect to the interests of, the DIP Lender or any of its agents, officers, directors, shareholders, employees, attorneys, advisors, professionals, predecessors in interest, successors and assigns with respect to any transaction, occurrence, omission, action or other matter arising under, in connection with or related to this Interim Order, the DIP Facility or the DIP Credit Documents, including, without limitation, (A) any Avoidance Claims, (B) any so-called "lender liability" claims and causes of action, (C) any claim or cause of action with respect to the validity, enforceability, priority and extent of, or asserting any defense, counterclaim, or offset to, the DIP Obligations, the DIP Superpriority Claim, the DIP Liens or the DIP Credit Documents, (D) any claim or cause of action seeking to challenge, invalidate, modify, set aside, avoid, marshal, subordinate, disallow, or recharacterize in whole or in part, the DIP Obligations, the DIP Liens, the DIP Superpriority Claim or the DIP Collateral, (E) any action seeking to modify any of the rights, remedies, priorities, privileges, protections and benefits granted to the DIP Lender hereunder or under any of the DIP Credit Documents (in each case, including, without limitation, claims, proceedings or actions that has the effect of preventing, hindering or delaying any of the DIP Lender's assertions, enforcements, realizations or remedies on or against the DIP Collateral in accordance with the applicable DIP Credit Documents and this Interim Order).

10.      **No Further Consents**. To the fullest extent permitted by the Bankruptcy Code or applicable law, any provision of any lease, loan document, easement, use agreement, proffer, covenant, license, contract, organizational document or other instrument or agreement that requires the consent of any

party or the payment of any fees or obligations to any governmental entity or non-governmental entity in order for the Debtors to pledge, grant, mortgage, encumber, sell, assign or otherwise transfer any fee or leasehold interest or the proceeds thereof or any other DIP Collateral is hereby deemed to be inconsistent with the applicable provisions of the Bankruptcy Code and shall have no force or effect with respect to the DIP Liens on such leasehold interests or such other DIP Collateral or the proceeds of any assignment and/or sale thereof by any Debtor in favor of the DIP Lender in accordance with the terms of the DIP Credit Documents and this Interim Order.

11. **Carve-Out**.

(a) Subject to the terms and conditions contained in this paragraph 11, the DIP Liens and the DIP Superpriority Claim shall be subject and subordinate to a carve-out (the "**Administrative Carve-Out**"), which shall comprise the following: (i) all fees required to be paid to the Office of the United States Trustee pursuant to 28 USC §1930(a)(6) and to the Clerk of the Court pursuant to 28 U.S.C. § 156(c); (ii) all accrued and unpaid professional fees and expenses (the "**Estate Professional Fees**") incurred by the professionals retained by the Debtors or any Committee, if any, pursuant to sections 327, 328, 330, 363 or 1103 of the Bankruptcy Code (collectively, "**Estate Professionals**") to the extent (x) allowed at any time by the Court (if required), regardless of whether allowed by interim order, procedural order or otherwise, (y) incurred or accrued through the date of service by the DIP Lender of a Carve-Out Trigger Notice (defined below) and (z) up to and as limited by the respective aggregate Budget amounts for each Estate Professional for the Debtors (as set forth on page 2 of the Budget) and each Estate Professional for the Committee (as set forth on page 2 of the Budget), if any, or category of Estate Professionals for the Debtors and category of Estate Professionals for the Committee, if any, through the date of service of said Carve-Out Trigger Notice, *less* the amount of any Prepetition retainers received by such Estate Professionals and not previously applied to their Estate Professional Fees; (iii) all Estate Professional Fees incurred by the Estate Professionals for the Debtors from and after the date of service of a Carve-Out Trigger Notice, to the extent allowed at any time, in an aggregate amount not to exceed $400,000 *less* the remaining amount of Prepetition retainers received by such Estate Professionals not previously applied to the Estate Professional

Fees set forth in clause (ii)(z) above; and (iv) all accrued and unpaid Estate Professional Fees incurred by the Estate Professionals for the Committee, if any, from and after the date of service of a Carve-Out Trigger Notice, to the extent allowed at any time, in an aggregate amount not to exceed $100,000. "**Carve-Out Trigger Notice**" means a written notice by the DIP Lender to lead counsel for the Debtors, the Committee, if any, and the United States Trustee stating that an Event of Default has occurred and is continuing

(b)    Nothing herein or in any of the DIP Credit Documents shall be construed as consent to the allowance of any particular professional fees or expense of the Debtors, of any Committee, or of any other person or shall affect the right of the DIP Lender or any other party to object to the allowance and payment of such fees and expenses. The DIP Lender shall not be responsible for the direct payment or reimbursement of any fees or disbursements of any Estate Professionals incurred in connection with the Chapter 11 Cases or any Successor Cases under any chapter of the Bankruptcy Code.  Subject to the Administrative Carve-Out, nothing in the Interim Order or otherwise shall be construed to obligate the DIP Lender in any way to pay compensation to or to reimburse expenses of any Estate Professional or to guarantee that the Debtors have sufficient funds to pay such compensation or reimbursement

(c)    For the avoidance of doubt, subject to the Administrative Carve-Out, the DIP Lender shall have no obligation to lend or advance any additional funds to or on behalf of Debtors, or provide any other financial accommodations to Debtors, immediately upon or after the occurrence of an Event of Default, or upon the occurrence of any act, event or condition that, with the giving of notice or the passage of time, or both, would constitute an Event of Default

12.    **Proceeds of Subsequent Financing**. If at any time prior to the Termination Date, the Debtors, the Debtors' estates, any trustee, any examiner or any responsible officer subsequently appointed in the Chapter 11 Cases or the Successor Cases, shall in violation of this Interim Order, the DIP Credit Agreement or the other DIP Credit Documents, obtain credit or incur debt pursuant to sections 364(b), (c) or (d) of the Bankruptcy Code, and such financings are secured by any DIP Collateral, then all of the cash proceeds derived from such credit or debt shall immediately be turned over to the DIP Lender for application in accordance with the DIP Credit Agreement or the other DIP Credit Documents.

13.    **Disposition of Collateral**. The Debtors shall not sell (including, without limitation, any sale and leaseback transaction), transfer (including any assignment of rights), lease, encumber or otherwise dispose of any portion of the DIP Collateral, except as expressly permitted by the DIP Credit Agreement or the other DIP Credit Documents.

14.    **Rights and Remedies Upon Event of Default; Modification of Automatic Stay**.

(a)    Any automatic stay otherwise applicable to the DIP Lender, whether arising under sections 105 or 362 of the Bankruptcy Code or otherwise, is hereby modified,  to the extent necessary to permit the DIP Lender, upon the occurrence and during the continuation of an Event of Default , and upon five (5) business days' prior written notice of such occurrence (the "**Remedies Notice Period**") , in each case given to the Debtors, their counsel, counsel for any Committee,  and counsel to the U.S. Trustee, to exercise all rights and remedies provided for in this Interim Order, any of the DIP Credit Documents or applicable law, including, without limitation,(i) declare the termination of the revolving commitment under the DIP Facility to the extent any such commitment then remains, (ii) declare all DIP Obligations to be immediately due and payable, without presentment, demand, protest, or other notice of any kind, all of which are expressly waived by the Debtors, (iii) increase the rate of interest applicable to the DIP Obligations to the default rate specified in the DIP Credit Agreement, (iv) terminate the DIP Credit Documents as to any future liability or obligation of the DIP Lender, but without affecting any of the DIP Liens or the DIP Obligations of any Debtor, (v) otherwise enforce any and all rights against the DIP Collateral under the DIP Credit Documents and (vi) take any other actions or exercise any other rights or remedies permitted under this Interim Order, the DIP Credit Documents or applicable law.  If the Debtors do not contest the right of the DIP Lender to exercise its rights and remedies within the Remedies Notice Period, or if an emergency hearing is held that does not result in the Court preventing the DIP Lender from exercising its rights and remedies, then the automatic stay, as to the DIP Lender, shall automatically terminate at the end of the Remedies Notice Period.

(b)    The automatic stay imposed under section 362(a) of the Bankruptcy Code is hereby modified pursuant to the terms of this Interim Order as necessary to permit (a) the Debtors to grant the DIP

Liens and the DIP Superpriority Claim, (b) the Debtors to incur all DIP Obligations and pay all fees, costs and expenses under the DIP Credit Agreement and the other DIP Credit Documents, and (c) the implementation of all of the terms, rights, benefits, privileges and remedies of this Interim Order and the DIP Credit Documents, in each case, without further notice, hearing or order of the Court.

15.    **Proof of Claim**. The DIP Lender shall not be required to file a proof of claim in any of the Chapter 11 Cases or any Successor Cases for any claim allowed in this Interim Order. Notwithstanding any order entered by the Court in relation to the establishment of a bar date in any of the Chapter 11 Cases or any Successor Cases to the contrary, the DIP Lender is hereby authorized and entitled, in its sole and absolute discretion, but is not required, to file (and amend and/or supplement, as it sees fit) a proof of claim in each of the Chapter 11 Cases or any Successor Cases for any claim allowed in this Interim Order; for avoidance of doubt, any such proof of claim may (but is not required to) be filed as one consolidated proof of claim against all of the Debtors, rather than as a separate proof of claim against each Debtor. Any order entered by the Court in relation to the establishment of a bar date for any claim (including without limitation administrative claims) in any of the Chapter 11 Cases or any Successor Cases shall not apply to the DIP Lender.

16.    **Good Faith Under Section 364(e) of the Bankruptcy Code; No Modification or Stay of this Interim Order**. The DIP Lender has acted in good faith in connection with the DIP Facility, and its reliance upon this Interim Order is in good faith. Based on the findings set forth in this Interim Order and the record made at the Interim Hearing, and in accordance with section 364(e) of the Bankruptcy Code, in the event any or all of the provisions of this Interim Order are hereafter modified, amended, vacated or stayed by a subsequent order of this Court or any other court, the DIP Lender is entitled to all the protections and benefits provided by section 364(e) of the Bankruptcy Code.

17.    **Expenses**. The Debtors are authorized to pay all prepetition and postpetition fees, costs, disbursement and expenses of the DIP Lender that are payable by Debtors in accordance with the DIP Credit Documents and this Interim Order.  Payment of such fees shall not be subject to allowance by this Court; *provided*, *however*, the U.S. Trustee or counsel for any Committee may seek a determination by this

Court whether such fees and expenses are reasonable in the manner set forth below. Under no circumstances shall professionals for the DIP Lender be required to comply with the U.S. Trustee fee guidelines; *provided*, *however*, within one (1) business day of receipt, the Debtors shall provide to the U.S. Trustee and the lead counsel of any Committee a copy of any invoices received from the DIP Lender for professional fees and expenses during the pendency of the Chapter 11 Cases. Each such invoice shall be sufficiently detailed to enable a determination as to the reasonableness of such fees and expenses (without limiting the right of the various professionals to redact privileged, confidential, or sensitive information). If the U.S. Trustee or any Committee objects to the reasonableness of the invoices submitted by the DIP Lender, and the parties cannot resolve such objection within ten (10) calendar days of receipt of such invoices, the U.S. Trustee or such Committee, as the case may be, shall file with the Court and serve on the applicable DIP Lender an objection (a "**Fee Objection**") limited to the issue of reasonableness of such fees and expenses. The Debtors shall promptly pay, and/or the DIP Lender (as applicable) is hereby authorized to make an advance under the DIP Facility to timely pay, the submitted invoices after the expiration of the ten (10) calendar day notice period if no Fee Objection is received in such ten (10) calendar day period. If a Fee Objection is timely received, the Debtors shall promptly pay, and/or the DIP Lender (as applicable) is hereby authorized to make an advance under the DIP Facility to timely pay, the undisputed amount only of the invoice(s) that is the subject of such Fee Objection, and the Court shall have jurisdiction to determine the disputed portion of such invoice(s) if the parties are unable to resolve the Fee Objection.  Notwithstanding the foregoing, the Debtors are authorized to pay on the Closing Date all reasonable and documented fees, costs, and out-of-pocket expenses of the DIP Lender incurred on or prior to such date to the extent payable in accordance with the terms of the DIP Credit Agreement.

18.    **Indemnification**. The Debtors are authorized to indemnify and hold harmless the DIP Lender and each of the Indemnitees (as defined in the DIP Credit Agreement) in accordance with and subject to the terms and conditions of the DIP Credit Agreement.

19.    **Binding Effect**. The provisions of this Interim Order shall be binding upon and inure to the benefit of the Debtors, the DIP Lender and their respective successors and assigns (including any trustee

or other fiduciary hereinafter appointed as a legal representative of the Debtors or with respect to the property of the estates of the Debtors), any and all creditors of the Debtors, any Committee and any other parties in interests and each of their respective successors and assigns, whether in the Chapter 11 Cases, in any Successor Cases, or upon dismissal of any such chapter 11 or chapter 7 case.

20.    **Section 506(c) Waiver; No Marshalling**. Subject to and effective only upon entry of the Final Order, except to the extent of the Administrative Carve-Out, no expenses of administration of the Chapter 11 Cases or any Successor Case shall be charged against or recovered from the DIP Collateral pursuant to Bankruptcy Code section 506(c), the enhancement of collateral provisions of Bankruptcy Code section 552, or any other legal or equitable doctrine (including, without limitation, unjust enrichment) or any similar principle of law, without the prior written consent of the DIP Lender, and no consent shall be implied from any action, inaction or acquiescence by the DIP Lender. Subject to and effective only upon entry of the Final Order, in no event shall the DIP Lender be subject to (i) the "equities of the case" exception contained in Bankruptcy Code section 552(b) or (ii) the equitable doctrine of "marshaling" or any other similar doctrine with respect to the Collateral.

21.    **Right to Credit Bid**. Subject to the terms and conditions of the DIP Credit Documents, the DIP Lender shall have the unqualified right to "credit bid" up to the full amount of the outstanding DIP Obligations in connection with any sale or other disposition of all or any portion of the DIP Collateral, including, without limitation, sales occurring pursuant to section 363 of the Bankruptcy Code or included as part of any plan subject to confirmation under section 1129(b)(2)(A)(iii) of the Bankruptcy Code.

22.    **Amendments**. Notwithstanding anything contained herein to the contrary, no amendment, modification or supplement of any of the DIP Credit Documents shall be effective unless in writing and in accordance with the applicable DIP Credit Documents. Subject to the terms and conditions of the applicable DIP Credit Documents, the Debtors and the DIP Lender may make any nonmaterial amendment, modification or supplement of any provision of the DIP Credit Agreement or the other DIP Credit Documents, and the Debtors are authorized to enter into any such amendment, modification, supplement or waiver, without further notice to or approval of the Court. In the case of any material amendment,

modification, or supplement to the DIP Credit Documents that is adverse to the Debtors (a "**Material Amendment**"), the Debtors shall provide notice (which may be provided via electronic mail or other electronic means) to counsel to the Committee, if any, and to the United States Trustee, each of whom shall have five (5) calendar days from the date of receipt of such notice to object in writing to such Material Amendment. If no objections are timely received (or if the such parties indicate via electronic mail that they have no objection) to the Material Amendment, the Debtors may proceed to execute the Material Amendment, which shall become effective immediately upon execution. If the Committee, if any, or the U.S. Trustee timely objects to any Material Amendment, such Material Amendment shall only be permitted pursuant to an order of this Court.

23.    **Priority of Terms**. To the extent of any conflict between or among (a) the express terms or provisions of any of the DIP Credit Documents, the Motion, any other order of this Court, or any other agreements, on the one hand, and (b) the terms and provisions of this Interim Order, on the other hand, unless such term or provision herein is phrased in terms of "as defined in" or "as set forth in" any of the DIP Credit Documents, the terms and provisions of this Interim Order shall govern.

24.    **Survival of Interim Order**. The provisions of this Interim Order and any actions taken pursuant hereto shall survive and shall not be modified, impaired or discharged by entry of any order which may be entered (i) confirming any Chapter 11 plan in the Chapter 11 Cases, (ii) converting any of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code, (iii) dismissing any of the Chapter 11 Cases, (iv) withdrawing of the reference of any of the Chapter 11 Cases from this Court or (v) providing for abstention from handling or retaining of jurisdiction of any of the Chapter 11 Cases in this Court. The terms and provisions of this Interim Order, including the DIP Liens, DIP Superpriority Claim, and other rights, privileges, benefits and protections afforded herein and in the DIP Credit Documents to the DIP Lender shall continue in full force and effect notwithstanding the entry of such order, and shall maintain their respective priorities as provided by this Interim Order, the DIP Credit Agreement and the other DIP Credit Documents (as the case may be) until the payment in full of the DIP Obligations, and this Court shall

retain jurisdiction, notwithstanding dismissal of any of the Chapter 11 Cases, for the purposes of enforcing the foregoing to the extent permitted by applicable law.

25.    **Enforceability**. This Interim Order shall constitute findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052 and shall take effect and be fully enforceable *nunc pro tunc* to the Petition Date immediately upon execution hereof. Any finding of fact shall constitute a finding of fact even if it is stated as a conclusion of law, and any conclusion of law shall constitute a conclusion of law even if it is stated as a finding of fact.

26.    **Waiver of Any Applicable Stay**. This Interim Order shall be effective upon its entry and not subject to any stay (all of which are hereby waived), notwithstanding anything to the contrary contained in Bankruptcy Rule 4001(a)(3), 6004 or any other Bankruptcy Rule.

27.    **Discharge**. The DIP Obligations shall not be discharged by the entry of an order confirming any plan in any of the Chapter 11 Cases, notwithstanding the provisions of section 1141(d) of the Bankruptcy Code, unless such obligations have been indefeasibly paid in full in cash, on or before the effective date of such confirmed plan, or the DIP Lender has otherwise agreed in writing.

28.    **Final Hearing**.

(a)    The Final Hearing is scheduled for [•], 2020, at [•] [a.m./p.m.] (Eastern Time) before this Court. The Debtors shall promptly mail copies of this Interim Order (which shall constitute adequate notice of the Final Hearing) to the parties having been given notice of the Interim Hearing, and to any other party that has filed a request for notices with this Court and to any Committee after the same has been appointed, or Committee counsel, if the same shall have been appointed. Any party in interest objecting to the relief sought at the Final Hearing shall serve and file written objections; which objections shall be served (with a copy to the Court's chambers) no later than [•], 2020 at 4:00 p.m. (ET) upon: (a) the U.S. Trustee, 844 King Street, Suite 2007, Lockbox 35, Wilmington, DE 19801; (b) the Debtors [•]; (c) counsel to the Debtors, KTBS Law LLP, 1999 Avenue of the Stars, Thirty-Ninth Floor, Los Angeles, CA 90067 (Attn: David A. Fidler and Maria Sountas-Argiropoulos); (d) Sheppard, Mullin, Richter &

Hampton LLP, Four Embarcadero Center, 17th Floor, San Francisco, CA 94111 (Attn: Todd L. Padnos);

and (e) counsel to any Committee then appointed in these Chapter 11 Cases.

29.     **<u>Retention of Jurisdiction</u>**. The Court has and will retain jurisdiction to hear, determine

and, if applicable, enforce the terms of, any and all matters arising from or related to the DIP Facility and/or

this Interim Order.

Dated: January ___, 2020
Wilmington, Delaware


_____

UNITED STATES BANKRUPTCY JUDGE

**<u>Exhibit A</u>**

**Budget**

*INTENTIONALLY OMITTED*

**Exhibit B**

**DIP Credit Agreement**

*INTENTIONALLY OMITTED*