## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF DELAWARE

| | |
|---|---|
| In re | Chapter 11 |
| AMERICAN BLUE RIBBON HOLDINGS, LLC, a Delaware limited liability company, *et al.*,[1] | Case No.: 20-10161 (___) |
| | (Joint Administration Requested) |
| Debtors. | |

### DECLARATION OF KURT SCHNAUBELT IN SUPPORT OF FIRST DAY MOTIONS

I, Kurt Schnaubelt, declare as follows:

1.      I am the Chief Financial Officer ("CFO") of American Blue Ribbon Holdings, LLC ("Blue Ribbon") and its affiliated debtors and debtors in possession (the "Debtors") in the above-captioned chapter 11 cases (the "Cases").  I have served in my current capacity as CFO for each of the Debtors since June 17, 2019.[2]  I am familiar with the day-to-day operations and business and financial affairs of the Debtors.  All facts set forth in this Declaration are based on my personal knowledge, my communications with other members of the Debtors' senior management, discussions with my colleagues who are also working on this matter, my review of relevant documents, or my opinion, based on my overall professional experience, in light of my personal knowledge of the Debtors' operations, business affairs, and financial condition.  If called as a witness, I could and would competently testify to the matters set forth herein based on the foregoing.

---

[1]     The Debtors and the last four digits of their respective federal taxpayer identification numbers are as follows: American Blue Ribbon Holdings, LLC (1224-Del.); Legendary Baking, LLC (2615-Del.); Legendary Baking Holdings, LLC (2790-Del.); Legendary Baking of California, LLC (1760-Del.); and SVCC, LLC (9984-Ariz.). The Debtors' address is 3038 Sidco Drive, Nashville, TN 37204.

[2]     I also serve as CFO for the Blue Ribbon's parent, ABRH, LLC, as well as for O'Charley's, LLC and 99 Restaurants, LLC.

2.       Prior to joining the Debtors, I served as a managing director with AlixPartners from 2016 through 2019 in its Restaurant & Hospitality practice, and as a director in AlixPartners' Turnaround and Restructuring Services practice from 2009 to 2015.  Prior to joining AlixPartners, I served as Director, Executive Vice President, and Chief Financial Officer of Rita Restaurant Corp. (successor to Avado Brands, Inc., the operator of Don Pablo's and Hop's restaurants), a private restaurant company, from 2005 through 2009, and Director of Financial Planning, Reporting, and Analysis; Vice President; Senior Vice President; and ultimately Chief Financial Officer of Bertucci's Corporation from 1999 through 2004.  I served in several other restaurant and hospitality related roles prior to 1999.  I received a bachelor's degree in Hotel Administration from Cornell University, and a master's degree in Accounting from the University of Rhode Island College of Business.  I am a Certified Financial Manager and a Certified Management Accountant.

3.       On the date hereof (the "<u>Petition Date</u>"), each of the Debtors filed a voluntary petition for relief with the United States Bankruptcy Court for the District of Delaware (the "<u>Court</u>") under chapter 11 of the Bankruptcy Code, thus commencing these Cases.  To enable the Debtors to operate as effectively as possible, minimize disruption to ongoing operations, and maximize the value of their assets, the Debtors have filed various applications and motions seeking immediate or expedited relief.  Specifically, the following have been filed by the Debtors (collectively, the "<u>First Day Motions</u>").

a.       Debtors' Motion for Entry of Interim and Final Orders Pursuant to 11 U.S.C. §§ 105, 362, 363, 364 and 507, (I) Approving Postpetition Financing, (II) Granting Liens and Providing Superpriority Administrative Expense Status, (III) Modifying Automatic Stay, (IV) Granting Related Relief, and (V) Scheduling Final Hearing (the "<u>DIP Motion</u>");

b.       Debtors' Motion for Entry of an Order Authorizing and Directing the Joint Administration of Related Chapter 11 Cases for Procedural Purposes Only (the "<u>Joint Administration Motion</u>");

c.      Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing Payment of Certain Prepetition Employee Claims, (II) Authorizing Honoring of Certain Prepetition Employee Benefits and Confirming Right to Continue Employee Benefits on Postpetition Basis, (III) Authorizing Reimbursement for Prepetition Expenses, (IV) Authorizing Payment of Withholding and Payroll-Related Taxes, (V) Authorizing Banks to Honor Prepetition Checks and Fund Transfers for Authorized Payments, and (VI) Scheduling Final Hearing (the "Employee Compensation and Benefits Motion");

d.      Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing Continued Use of Cash Management System, (II) Authorizing the Continuation of Intercompany and Affiliate Transactions, (III) Granting Administrative Priority Status to Postpetition Intercompany and Affiliate Claims, (IV) Authorizing Use of Prepetition Bank Accounts and Payment Methods, (V) Extending Time to Comply with Requirements of 11 U.S.C. § 345(B), (VI) Scheduling Final Hearing, and (VII) Granting Related Relief (the "Cash Management Motion");

e.      Debtors' Application for an Order Appointing Epiq Corporate Restructuring, LLC as Claims and Noticing Agent Effective as of the Petition Date (the "Section 156(c) Application");

f.      Debtors' Motion for Entry of Interim and Final Orders (I) Approving the Debtors' Proposed Adequate Assurance of Payment for Future Utility Services, (II) Prohibiting Utility Companies From Altering, Refusing, or Discontinuing Services, (III) Approving the Debtors' Proposed Procedures for Resolving Adequate Assurance Requests, and (IV) Granting Related Relief (the "Utilities Motion");

g.      Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Payment of Prepetition Sales, Use, and Franchise Taxes and Similar Taxes and Fees, (II) Authorizing Banks and Other Financial Institutions to Receive, Process, Honor, and Pay Checks Issued and Electronic Payment Requests Made Relating to the Foregoing, and (III) Scheduling Final Hearing (the "Tax Motion");

h.      Debtors' Motion for Entry of an Order Authorizing Maintenance, Administration, and Continuation of Certain Customer Programs (the "Customer Programs Motion");

i.      Debtors' Motion for Entry of an Order Authorizing Payment of Certain Prepetition Shipping, Delivery, and Warehousing Charges (the "Shipping and Warehousing Motion");

j.      Debtors' Motion for Entry of an Order, Pursuant to Sections 105(a), 363, and 541 of the Bankruptcy Code, (I) Authorizing the Payment of

Prepetition Claims Asserted Under the Perishable Agricultural Commodities Act and the Packers and Stockyards Act and (II) Authorizing Banks to Honor and Process Checks and Electronic Transfer Requests Related to the Foregoing (the "<u>PACA & PASA Motion</u>");

k.      Debtors' Motion for Order Confirming Administrative Expense Priority Status of Debtors' Undisputed Obligations for Postpetition Delivery of Goods Ordered Prepetition (the "<u>Prepetition Ordered Goods Motion</u>"); and

l.      Debtors' First Omnibus Motion for the Entry of an Order, Pursuant to Sections 105(a), 365(a) and 554(a) of the Bankruptcy Code, Authorizing the Debtors to (I) Reject Certain Unexpired Non-Residential Real Property Leases and (II) Abandon Any Remaining Property Located at the Leased Premises *Nunc Pro Tunc* to the Petition Date (the "<u>Lease Rejection Motion</u>").

4.      This Declaration is submitted in support of the First Day Motions, which are described in greater detail below, and may serve as support for additional motions that may be filed on or after the Petition Date.

## I. GENERAL BACKGROUND

### A.    Debtors Overview and Operations

5.      The Debtors' business consists of three brands: (i) Village Inn, (ii) Bakers Square, and (iii) Legendary Baking.

6.      Founded in 1958 and 1969, respectively, Village Inn and Bakers Square are full-service sit-down family dining restaurant concepts (together, the "<u>Family Dining Business</u>") that feature a variety of menu items for all meal periods.  Village Inn is particularly well-known for serving breakfast items throughout the day, including pancakes, omelets, skillets, and eggs.  Bakers Square is particularly well-known for its unique pie offerings, accounting for approximately 30% of its sales.  The Family Dining Business appeals to a diverse customer base seeking great-tasting food and affordable prices with an average guest check of $10-$11 within a comfortable family-friendly environment.  The Family Dining Business also maintains an e-

commerce presence through which customers living in close proximity to physical restaurants can order food for delivery from such restaurants.

7.     Legendary Baking is the Debtors' manufacturing operation that produces pies in two Debtor-owned production facilities.  Legendary Baking provides those pies to the Family Dining Business for sale in Village Inn and Bakers Square restaurants while also selling pies to O'Charley's and Ninety-Nine restaurants, third-party restaurants, independent bakers, and other food service-oriented customers, including supermarkets.  Legendary Baking's pies have the distinction of being the most awarded pies in America, having placed first in the America Pie Council National Pie Championships over 300 times in the last decade.

8.     As of the Petition Date, in connection with the Family Dining Business, the Debtors operate 97 restaurants in 13 states and franchise 84 Village Inn restaurants.  Of the Debtor-operated restaurants, 75 are Village Inn brand restaurants, and 22 are Bakers Square brand restaurants.  The Debtors lease each of the Family Dining Business (*i.e.*, Bakers Square and Village Inn) restaurant locations from third-party landlords, with the exception of one Bakers Square restaurant, located in Minnesota and one Village Inn restaurant, located in Colorado, which operate in Debtor-owned properties.  The Debtors closed 33 underperforming restaurants shortly before the Petition Date, and unequivocally and irrevocably surrendered possession of the associated premises to the applicable landlords.  The Debtors also closed and irrevocably and unequivocally surrendered possession of an additional seventeen (17) restaurant properties that had closed in the past two years.  The Debtors' restaurants are concentrated in the East, Southeast, Midwest, and Rocky Mountain regions.  Each restaurant has a general manager along with other management personnel depending on a variety of factors and approximately 25 to 42

hourly workers.  Each geographic area has an operations director, each of whom generally supervises approximately seven (7) stores.

9.      In addition, in connection with the production and storage of bakery goods at Legendary Baking, the Debtors own and operate two bakery facilities located in Oak Forest, Illinois and Chaska, Minnesota, and lease a cold storage distribution center located in Chicago, Illinois.

10.      The Debtors own numerous service marks and trademarks, including "Village Inn," "Legendary Baking," and "Bakers Square," as well as others, and view those marks as playing an important role in the marketing of the Debtors' restaurants.  The Debtors license certain of their marks to franchisees and third parties through franchise agreements and licenses.

11.      As discussed further below, the Debtors utilize the services of approximately 4,567 employees.  Of that total, approximately 4,181 employees work in the Family Dining Business, and approximately 386 employees work for Legendary Baking.  Shortly before the Petition Date, the Debtors executed a reduction-in-force of approximately 1,100 individuals in connection with the restaurant closings discussed herein.

12.      The Debtors maintain corporate headquarters in Nashville, Tennessee, at 3038 Sidco Drive.  The Debtors' senior management and numerous other staff operate out of that location.

13.      The Debtors' revenues are primarily derived from restaurant sales, bakery operations, franchise fees and sales royalties.  Revenues for fiscal year ending December 29, 2019 were approximately $318 million, compared to revenues for fiscal year ending December 30, 2018 of $354 million.

**B.    Organizational Structure**

14.    Blue Ribbon, one of the Debtors, is a Delaware limited liability company that was incorporated in December 2008.  Blue Ribbon purchased substantially all the Family Dining Business stores and the Legendary Baking business in 2009 from VICORP Restaurants, Inc. ("VICORP") during VICORP's 2008 bankruptcy case in the United States Bankruptcy Court for the District of Delaware.

15.    The other Debtors are wholly-owned subsidiaries of Blue Ribbon: (i) Legendary Baking, LLC, a Delaware limited liability company ("Legendary Baking"); (ii) Legendary Baking Holdings, LLC, a Delaware limited liability company ("Legendary Holdings"); (iii) Legendary Baking of California, LLC, a Delaware limited liability company ("Legendary California"); and (iv) SVCC, LLC, an Arizona limited liability company ("SVCC").  The following is a chart of the Debtors' organizational structure.



16.    Blue Ribbon is wholly-owned by ABRH, LLC ("ABRH"), a non-debtor, which, in turn, is wholly owned by Fidelity Newport Holdings, LLC, ("FNH") also a non-debtor.  The indirect ultimate majority owner of FNH is Cannae Holdings, Inc. ("Cannae"), which is a

publicly traded company that manages and operates businesses in multiple industries.  As explained below, Cannae has agreed to provide the Debtors with postpetition financing on what the Debtors, in their business judgment, believe are favorable terms.  Certain of the Debtors' non-debtor affiliates operate the restaurant brands O'Charley's Restaurant and Bar ("O'Charley's") and Ninety Nine Restaurant and Pub ("Ninety Nine").  As discussed below, in order to achieve operating efficiencies, ABRH coordinates numerous essential business services that are shared (and their costs allocated) among the Debtors' businesses and the non-debtor affiliates' restaurant brands.

## C.    Capital Structure

### a.    Secured Debt

17.    The Debtors have no outstanding senior secured debt.  The Debtors do have certain equipment leases and a factoring arrangement with Citibank in respect of Legendary Baking's receivables from Kroger's supermarkets.

### b.    Unsecured Debt

18.    As of the Petition Date, the Debtors believe that unsecured claims against the Debtors total approximately $14 million.  Unsecured claims against the Debtors include (i) accrued and unpaid trade and other unsecured debt incurred in the ordinary course of the Debtors' business; (ii) claims by landlords for unpaid rent and other obligations under the Debtors' leases; and (iii) litigation claims.  Claims on account of rejected leases during the Cases could cause the amount of unsecured claims to increase significantly.

19.    The Debtors also maintain three letters of credit, in an aggregate amount of approximately $1.3 million, in respect of workers' compensation claims for legacy claims periods.  The letters of credit are cash collateralized by ABRH, but are nonetheless primary obligations of the Debtors.

### c. Equity Interests

20.     As discussed above, Debtor Blue Ribbon is wholly owned by ABRH.

## D. Relationships With Non-Debtor Affiliates

### a. Overview

21.     In the ordinary course of business and for efficiency, the Debtors engage in certain affiliate transactions with their non-debtor affiliate ABRH (collectively, the "Affiliate Transactions").  Specifically, the Debtors rely on employees provided by ABRH via a contract staffing arrangement, as well as on numerous support services that are provided by ABRH and shared among the Debtors' businesses (Village Inn, Bakers Square, and Legendary Baking) and non-debtor affiliates' brands (O'Charley's and Ninety Nine).  The Debtors have contracted with ABRH for the provision of those services and reimbursement of costs, which ABRH coordinates and allocates without any markup or premium among the various Debtor businesses and non-debtor brands.

22.     This longstanding historical practice of ABRH providing employees and support services for the Debtors' businesses allows the Debtors (as well as the non-debtors) to realize synergies and efficiencies for each of the businesses, and to ultimately pay costs below the amount that would be necessary were each business to maintain its own separate employee base and support services.  For example, the Debtors and the non-debtor affiliates benefit from lower overhead costs as a result of shared back-office and management services, more competitive contracts with shared vendors as a result of bargaining together as a larger unit, and a more efficient supply chain procurement approach.  Specifically, certain examples include economies of scale in respect of property and casualty insurance coverage, payroll processing costs, employee benefits, and payroll taxes.  I estimate the Debtors and their non-debtor affiliates,

collectively, save millions of dollars annually as a result of sharing the employment arrangement and support services described herein.

23.     More fundamentally, however, without the services provided by ABRH, the Debtors would simply be unable to operate, and their business operations would almost immediately cease.  The Debtors do not have the contracts, infrastructure, or human resources to independently maintain their operations absent the services and staffing provided by ABRH.  For example, the Debtors maintain no employee benefit programs.  Were ABRH to no longer offer its benefit programs to the ABRH employees rendering services to the Debtors' businesses, the likely resulting attrition would cripple the Debtors.  As another example, the Debtors do not have their own accounting systems and software.  Were ABRH to no longer manage accounting on behalf of the Debtors, the Debtors would have no ability to perform these critical financial functions.  Accordingly, continuation of the longstanding prepetition relationship between the Debtors and ABRH in respect of the Affiliate Transactions is critical to preserving the value of the Debtors' businesses.

24.     I have been involved in these relationships and the Affiliate Transactions.  I have analyzed the foregoing, and I have been involved in the drafting of the agreements, discussed in the following paragraphs, that formalize these arrangements.  I believe that the Affiliate Transactions are fair and reasonable to the Debtors, and that they provide significant benefits to the Debtors by allowing the Debtors to maintain the current team members working in their businesses and obtain critical business services at a fairly allocated cost, with no additional markup, profit, charges, fees, commissions, or other payments being paid by the Debtors to ABRH or any other non-debtor affiliate.  Put differently, ABRH does not profit from this arrangement at the expense of the Debtors in any way (however, and as noted, all the

organizations ABRH services benefit from the synergies created by this longstanding relationship).

### b.    Services Agreement

25.    As noted above, the Debtors and the other non-debtor affiliates have enjoyed a longstanding historical practice of obtaining services from ABRH, which practice has been in effect for years.  Effective as of December 30, 2019, Debtor Blue Ribbon and non-debtor ABRH determined to formally document those shared services performed by ABRH on behalf of the Debtors, and to delineate the corresponding cost allocation formula and reimbursement mechanism, by entering into that certain "Services Agreement" that sets forth the terms and conditions of the services arrangement between the Debtors and ABRH, including (i) the particular services which ABRH provides to the Debtors, and (ii) the allocation methodology that is intended to approximate, without any markup or premium, each applicable entity's use of or benefit from such services.

### (1)    Service Categories and Costs

26.    The Services Agreement sets forth eleven (11) categories of services (each, a "Service Category"):

27.    Service Category 1 consists of General Accounting, Reporting & Audit.  Among the specific services covered are making restaurant lease payments, handling common area maintenance charges from landlords, maintaining accounting records and the accounting system, providing trial balance and income statements, accounting for insurance reserves, accounting for inventory, revenue, and cash, providing support to restaurants regarding the foregoing, and assisting with the foregoing during financial statement audits.  The basis for determining the

Debtors' share of allocable costs in Service Category 1 is the revenues of the Debtors compared to revenues of non-debtors.[3]

28.     Service Category 2 consists of Accounts Payable, Accounts Receivable & Treasury.  Among the specific services covered are the maintenance of accounts payable, invoices scanning and processing, alcoholic beverage payments, execution of ACH transfers, wire transfers, and other disbursements, maintenance of the Concur expense system, filing Form 1099s, accounting for gift cards, supporting vendor matters, tracking and reconciling cash deposits, and tracking franchisee payments.  The basis for determining the Debtors' share of allocable costs in Service Category 2 is the revenues of the Debtors compared to revenues of non-debtors.

29.     Service Category 3 consists of Payroll.  Among the specific services covered are processing restaurant and corporate payroll, processing, remitting, and recording all payroll taxes, garnishments, and other wage encumbrances, administering severance and leaves of absence, processing bonus payments and merit increases, and filing numerous federal forms as required by law.  The basis for determining the Debtors' share of allocable costs in Service Category 3 is the number of ABRH employees utilized by the Debtors compared to the number of ABRH employees utilized by non-debtors.

30.     Service Category 4 consists of Tax.  Among the specific services covered are preparation and filing of tax returns, payment of taxes, management of tax audits, and

---

[3]    Each Category uses a particular allocation methodology.  The Debtors and ABRH have endeavored both in their longstanding historical practices and in the Shared Services Agreement, to select an allocation for each Category that most closely reflects the parameters that are the cost driver of the particular services included in such Category.

preparation and filing of licenses.  The basis for determining the Debtors' share of allocable costs

in Service Category 4 is the revenues of the Debtors compared to revenues of non-debtors.

31.     Service Category 5 consists of Information Technology.  Among the specific

services covered are maintenance of billing, invoices, and payments for IT systems, maintenance

of telecom infrastructure for restaurants and any offices, maintenance of hosting and

management of email servers, hosting and management of intranet content, and maintenance and

support in respect of a variety of other IT-related functions.  The basis for determining the

Debtors' share of allocable costs in Service Category 5 is the number of store locations of the

Debtors compared to the number of store locations of non-debtors.

32.     Service Category 6 consists of Legal, Risk & Real Estate.  Among the specific

services covered are maintenance of corporate governance and organization documents,

maintenance of food, liquor and other licensing systems, supporting management in legal

matters, management of outside litigation costs and firms, monitoring of workers' compensation

and general liability claims, settling claims as approved and directed by Blue Ribbon

management, reviewing basic real estate legal matters, and overseeing capital spending

procedures.  The basis for determining the Debtors' share of allocable costs in Service Category

6 is (i) the revenues of the Debtors compared to revenues of non-debtors for general legal

services and internal audit, and (ii) the number of ABRH employees utilized by the Debtors

compared to the number of ABRH employees utilized by non-debtors for risk management

(which costs are weighted toward workers' compensation claims services).

33.     Service Category 7 consists of Human Resources & Benefits Administration.

Among the specific services covered are management of the 401(k) program, preparation of

certain federal forms, maintenance of employee benefits and processing the same, maintenance

of executive compensation and non-qualified benefit plans, maintenance and processing of

employee verifications, maintenance of COBRA notices and payments and other personnel

matters, maintenance of the Code of Conduct, handbook, and policies and procedures, state

addenda, ensuring that content is posted to intranet, and handling of recruiting and background

checks.  The basis for determining the Debtors' share of allocable costs in Service Category 7 is

the number of ABRH employees utilized by the Debtors compared to the number of ABRH

employees utilized by non-debtors.

34.    Service Category 8 consists of Corporate Facilities.  Among the specific services

in this category are the provision and maintenance of facilities (*i.e.* the support center facility and

restaurant properties), utilities, and supplies required for personnel providing support services to

the Debtors.  The basis for determining the Debtors' share of allocable costs in Service Category

8 is the number of store locations of the Debtors compared to the number of store locations of

non-debtors.

35.    Service Category 9 consists of Procurement & Supply Chain.  Among the specific

services in this category are purchasing and procurement activities for all food, beverage,

supplies, and other third party spending, serving as contact point for vendors in respect of

delivery, quality, and invoicing issues, organizing, planning, and managing distribution and

logistics of the supply chain, and managing procurement and distribution contracts across all

brands.  The basis for determining the Debtors' share of allocable costs in Service Category 9 is

the cost of goods of the Debtors compared to the cost of goods of the non-debtors.

36.    Service Category 10 consists of Marketing & Product Development.  Among the

specific services in this category are developing, testing, and evaluating commercial viability,

and implementing new products, developing strategic marketing plans, developing and managing

advertising, and designing (along with printing) menus for guest satisfaction, operational effectiveness, and overall profitability.  The basis for determining the Debtors' share of allocable costs in Service Category 10 is the revenues of the Debtors compared to the revenues of non-debtors.

37.     Service Category 11 consists of Executive Oversight & Professional Fees. Among the specific services in this category, through which the Debtors obtain their senior level management, are the oversight of the Debtors' businesses, strategic goals and plans, the determination of resources required to achieve strategic goals, monitoring the Debtors' financial performance, managing annual audits, and other senior-level tasks and responsibilities.  The basis for determining the Debtors' share of allocable costs in Service Category 11 is the revenues of the Debtors compared to the revenues of non-debtors.

38.     For the avoidance of doubt, the costs to be paid by the Debtors to ABRH for each Service Category (the "Service Costs") are calculated strictly as discussed herein, with no additional markup, profit, charges, fees, commissions, or other payments being paid by the Debtors to ABRH.  Put differently, ABRH does not profit from this arrangement at the expense of the Debtors in any way (as noted, each of the businesses benefits from the synergies created by this relationship).  The Debtors' payments to ABRH in respect of the Shared Services have averaged a total of $223,487 per week thus far in calendar year 2020.  However, in light of the prepetition store closures and reduction-in-force, I expect the Debtors' weekly cost for Shared Services to decline during the pendency of these Cases, beginning at approximately $180,000 per week.

### (2)     Pass-Through Costs

39.     In connection with, and in addition to, the Service Costs, the Debtors also reimburse ABRH for payments made by ABRH to third parties on the Debtors' behalf (the

"Pass-Through Costs"). These Pass-Through Costs, which do not duplicate any Service Costs and are also without any markup, profit, charges, fees, or commissions to ABRH, generally fall into three categories:

40. Operational Pass Through Costs: These consist of normal and customary out-of-pocket costs of operations, which are payable to third parties (or to ABRH employees utilized by the Debtors), including accounts payable and employment-related items, in each case for payments made by ABRH on behalf of the Debtors. Operational pass-through costs can generally be characterized as falling into two categories. First, certain operational pass-through costs are in respect of programs—such as an employee medical plan, or an insurance policy—maintained and/or administered by ABRH for the benefit of both the Debtors and other non-Debtor affiliates. For these types of costs, ABRH is generally the invoiced entity, and ABRH then allocates the costs of such services (*i.e.*, medical plan costs or insurance premiums) between the Debtors and the other non-Debtor affiliates benefiting from the program. Second, certain other operational pass-through costs are in respect of general accounts payable for which the Debtors are liable, without any sharing or allocation with non-Debtor affiliates—for example, general accounts payable of the Family Dining Business, such as orders placed by the Debtors with food distribution vendors. For these costs, orders are placed by the Debtors and invoices are sent to the Debtors. The invoices are then sent to by the Debtors to ABRH for payment. ABRH then makes these payments on the Debtors behalf and is subsequently reimbursed by the Debtors.

41. Workers' Compensation and General Liability Costs: These consist of workers' compensation and general liability claims settlements and/or any other liabilities arising with

respect to the ABRH employees rendering services to the Debtors, including, charges, penalties, or any awards in any employment related litigation.

42.    <u>Contractual Costs</u>: These are out-of-pocket costs of maintaining contracts for which ABRH or an affiliate thereof is the counterparty, to the extent such contracts are related to the provision of the services (in a Service Category) to the Debtors.

43.    For the avoidance of doubt, the Pass-Through Costs are calculated strictly as discussed herein, with no additional markup, profit, charges, fees, commissions, or other payments being paid by the Debtors to ABRH.  Historically, over calendar year 2019, the Debtors' payments to ABRH in respect of the Pass-Through Costs averaged $2,603,206 per week.  However, in light of the prepetition store closures and reduction-in-force, I expect the Debtors' weekly cost for Pass-Through Costs during the Cases will be approximately $2,000,000 per week.  Of these amounts, in excess of 75% is generally in respect of ordinary course accounts payable, rent, and utilities for the Family Dining Business—in other words costs incurred solely by the Family Dining Business, which, as discussed above, are invoiced by vendors to the Debtors, and involve only the Debtors' operations (*i.e.*, are not shared among any non-Debtor entities).  These invoices are paid by ABRH on behalf of the Debtors, and are then reimbursed to ABRH by the Debtors.[4]

### c.    Contract Staffing Agreement

44.    Also, in December 2019, Debtor Blue Ribbon and non-debtor ABRH determined to formally document the longstanding employee staffing arrangement between the parties by

---

[4]    Although Pass-Through Costs are currently approximately $2 million per week, the final prepetition payment for Pass-Through Costs from the Debtors to ABRH occurred on or about January 24, 2020, and covered approximately two weeks of Pass-Through Costs (for costs through January 9, 2020), and thus was in the amount of approximately $5.5 million.

entering into that certain "Contract Staffing Agreement" that sets forth the terms and conditions

of the employee staffing arrangement between the Debtors and ABRH.  This arrangement is

essential for the Debtors to conduct orderly operations of the Family Dining Business and

Legendary Baking.  The Debtors are responsible for all payments in respect of the ABRH

employees staffed to the Debtors' businesses pursuant to the Contract Staffing Agreement;

certain payments (such as wages) are paid directly by the Debtors to the ABRH employees, and

other payments (such as benefits, payroll taxes, and self-insured workers' compensation) are

initially paid by ABRH, and reimbursed by the Debtors to ABRH as Pass-Through Costs

pursuant to the Services Agreement, as discussed above.

**E.**     **The Debtors' Restaurant Industry Businesses**

45.     The restaurant industry is highly competitive and is often affected by changes in

consumer tastes and discretionary spending patterns; changes in general economic conditions;

public safety conditions or concerns; demographic trends; weather conditions; the cost of food

products, labor, energy, and other operating costs; and governmental regulations. Higher labor

costs due to state and local minimum wage increases and shopping pattern shifts to e-commerce

and "ready to eat" grocery and convenience stores have had a negative impact on restaurant

performance, including in the mid-scale restaurant category in which the Family Dining Business

operates.

46.     The restaurant industry is also characterized by relatively high fixed or semi-

variable restaurant operating expenses.  Because of the high fixed and semi-variable expenses,

changes in sales in existing restaurants are generally expected to significantly affect restaurant

profitability because many restaurant costs and expenses do not change at the same rate as sales.

Restaurant profitability can also be negatively affected by inflationary and regulatory increases

in operating costs and other factors.  The most significant commodities that may affect the

Debtors' cost of food are beef, seafood, poultry, and dairy, which accounted for approximately half of the Debtors' overall cost of food in the past.

47.    As a result of these and other challenges, the restaurant industry has, from time to time, encountered periods of distress.  Indeed, prior to the Debtors' bankruptcy filings, several other restaurant companies filed for bankruptcy, including the Perkins and Marie Callender's restaurant brands in August 2019, which operate in the same industry segment as the Debtors. And, just over one week ago, on January 19, 2020, fast-food chain Krystal, a quick-service restaurant company with approximately 300 restaurants (including franchise locations), also filed for chapter 11 protection.

**F.    Events Leading to the Chapter 11 Cases and Goals During These Chapter 11 Cases**

48.    Several factors contributed to the Debtors' financial distress and subsequent bankruptcy filings.  First, there has recently been increased competition in the restaurant business and particularly in the segment thereof in which the Family Dining Business competes, due to, among other things, (i) new brands and new competitor locations in existing markets; (ii) growth from existing larger family dining brands that have substantial advertising expenditures (many multiples of expenditures by the Debtors' brands) to message consumers; and (iii) increasing competition from grocery stores as the gap between consumers' cost of food away from home remains elevated from cost of dining at home, including grocery stores' expanded prepared meal offerings.

49.    Second, the Debtors have been faced with continuing margin pressure from rising labor costs, including dramatic increases over the past two years in Arizona, Colorado, Illinois and Minnesota, four states in which, as of December 31, 2019, 67 (over half) of the Debtors' then 130 company-operated stores were located, resulting in a negative financial impact of approximately $2.0 million over the last two years.

50.    Third, the Debtors had an increasing number of unprofitable restaurants due to, among other things, unfavorable trade area locations and above-market rents or otherwise high occupancy costs.

51.    Fourth, the restaurant industry has faced a decline in foot traffic, owing to, among other things, an increase in convenience via takeout and delivery at the expense of dine-in customers at restaurants.

52.    Finally, the financial performance of Legendary Baking declined from fiscal 2016 through fiscal 2018 as a result of over-expansion, the addition of a new leased production facility combined with a significant decline in operating efficiencies at the previously existing facilities.

53.    The Debtors' financial trends were negative and of concern at the end of fiscal 2017.  During 2018, a potential transaction to separate the businesses from existing equity ownership was proposed but did not ultimately occur, despite considerable effort.  At that point, in the third quarter of 2018, both the Family Dining Business and Legendary Baking had new leadership designated to address the performance shortfalls.

54.    The Debtors have sustained large operating losses[5] over the last two years, including losses of approximately $11 million in fiscal 2018, and approximately $7 million in fiscal 2019.  During 2018, ABRH and other non-debtor affiliates assisted the Debtors in funding the Debtors' operations.  During 2019, in order to fund the operating losses, the Debtors closed and sold the support center facility in Denver, closed and sold three fee simple restaurant properties, and accelerated collections of Legendary Baking's receivables, which were all one-

---

[5]    For the purposes of this motion, operating losses are a non-GAAP measure defined as a) Adjusted EBITDA (or Earnings Before Interest, Taxes, Depreciation, and Amortization) less b) capital expenditures less c) rent payments on closed restaurants, and less d) project costs to dispose of assets or separate the Debtors' businesses from existing equity ownership.

time sources of cash flow.  While new leadership substantially improved the performance of the

Debtors' businesses by reducing losses by more than a third (with most of the improvement

coming from a turnaround at Legendary Baking), the projections for fiscal year 2020 indicated

continued losses estimated at $5 million if Blue Ribbon continued to operate without

restructuring its operations.  Under the circumstances, ABRH and the Debtors' other affiliate

companies indicated to the Debtors that they are no longer willing to fund the Debtors' money-

losing operations.

55.    In light of the foregoing, in the absence of continued funding by ABRH or

otherwise, the Debtors projected that they would face a liquidity crisis on or about the Petition

Date.  Accordingly, in an effort to avert continued losses and avoid further deterioration of the

businesses, the Debtors have filed these Cases to (i) explore strategic options while under the

protection of the Bankruptcy Code, including by focusing the Family Dining Business on the

Debtors' remaining profitable store locations, and (ii) obtain postpetition financing that will

provide sufficient liquidity for the Debtors to fund their operations during the Cases.  I believe

that these efforts will allow the Debtors to maximize their value for the benefit of all

stakeholders, including customers, employees, and creditors.

56.    To reduce losses, shortly before the Petition Date, the Debtors ceased operations

at, and irrevocably and unequivocally surrendered possession of, thirty three (33)

underperforming restaurant lease locations, including two (2) restaurants on which leases were

due to expire effective January 31, 2020.  Substantially contemporaneously therewith, the

Debtors effectuated a reduction-in-force of approximately 1,100 ABRH employees who had

been utilized and funded by the Debtors in connection with those 33 closed restaurant locations.

Finally, the Debtors irrevocably and unequivocally surrendered possession of an additional

seventeen (17) restaurant properties that had closed in the past two years.  In addition, as

discussed below, to avoid incurring any unnecessary administrative expenses with respect to

these closed locations, the Debtors have sought to reject the related leases *nunc pro tunc* to the

Petition Date.

## II.  FACTS IN SUPPORT OF FIRST DAY MOTIONS

57.    In order to ensure a smooth transition of the Debtors' business operations into

chapter 11, the Debtors have requested various types of relief in the First Day Motions filed

concurrently with this Declaration.  A summary of the relief sought in each First Day Motion, as

well as the factual basis for each First Day Motion, is set forth below.

58.    I have reviewed each of these First Day Motions (including the exhibits and

schedules thereto).  The facts stated therein are true and correct to the best of my knowledge,

information and belief, and I believe that the type of relief sought in each of the First Day

Motions: (i) is necessary to enable the Debtors to operate in chapter 11 with minimal disruption

to their current business operations; and (ii) is in the best interests of the Debtors and their

stakeholders.

**A.    DIP Motion**

59.    The Debtors have negotiated and reached agreement on the DIP Facility, pursuant

to which the Debtors, subject to Court approval, will be provided with a senior secured debtor-

in-possession revolving loan from Cannae.  As discussed above, Cannae is the Debtors' indirect

ultimate majority owner.  Cannae is a holding company engaged in actively managing and

operating a group of companies and investments.  One of those investments is a majority

ownership in Fidelity Newport Holdings, LLC, which is the 100% owner of ABRH, which, as

discussed earlier, is the 100% owner of Debtor Blue Ribbon.

60.    I believe that the terms and amount of the proposed DIP Facility will permit the Debtors to meet their obligations in these Cases.  In particular, funds from the DIP Facility are expected to be used for (i) working capital requirements, including payments to vendors, employees, landlords, and, importantly, to build necessary inventory at Legendary Baking, (ii) the Debtors' obligations pursuant to Affiliate Transactions, and (iii) to fund fees under the DIP Facility.

61.    Acting under my supervision, the Debtors' management has prepared a cash flow and operating budget ("Budget").  The Budget represents the Debtors' estimate of their near term receipts and disbursements.  The Budget is expressly premised on approval of the DIP Facility on an interim and final basis.  Without the availability provided under the DIP Facility, the Debtors would be unable to fund operations in these Cases.

62.    The Debtors have sought and were unable to obtain post-petition financing to support the reorganization from any other sources, including a preferable DIP facility that would be on an unsecured, administrative expense basis.  The Debtors engaged in discussions with several third-party lenders, none of whom were interested in providing financing to the Debtors, citing, among other things, the Debtors' losses, their perspective on the restaurant industry, and the small size (in their view) of the requested financing.  Notably, the parties with whom the Debtors had discussion were not interested notwithstanding that the Debtors had no prepetition secured debt encumbering their assets.  In parallel to these third-party discussions, the Debtors also engaged in discussions with Cannae regarding providing the Debtors with a facility.

63.    Although, as noted, Cannae is ultimately an affiliate of the Debtors, the Debtors negotiated with Cannae in good faith to ensure that the terms of the DIP Facility are consistent with "market" terms, and are fair and reasonable to the Debtors.  To that end, the Debtors, on the

one hand, and Cannae, on the other hand, each had separate business teams and used separate counsel in negotiating the DIP Facility.  In addition, my team analyzed, at my direction, the terms of debtor-in-possession financings from other recent restaurant-industry bankruptcy cases to ensure that the terms of the DIP Facility were consistent with the terms used in those cases. The following chart summarizes the key terms of those other financing facilities, as well as the same key terms of the proposed DIP Facility.

| | Debtors | Granite City | Perkins/Marie Callender's | Houlihan's (HRI) |
|---|---|---|---|---|
| Lender | Cannae | JPM Capital Partners | Bank of America | CIT Bank |
| Type | Revolving | Term | Revolving | Revolving |
| Amount | $20.0MM | $5.0MM | $7.75MM | $5.0MM |
| Rate | 10.75% (Prime + 6%) | 9.0% (Fixed) | 10.75% (Prime + 6%) | 11.75% (Prime + 7%)[6] |
| Total Fees | $237,500 | $850,000 | $235,600 | $275,000 |
| Total Fees as a Percentage of Commitment | 1.2% | 17.0% | 3.0% | 5.5% |

64.    I believe that the terms of the DIP Facility are fair and reasonable to the Debtors and appropriate under the circumstances, and that the relief requested in the DIP Motion is both necessary and in the best interests of the Debtors' estates and their creditors.  I also believe that the DIP Facility is on the best terms and conditions available to the Debtors.  Also, as explained above, the proposed DIP Facility will provide the Debtors with necessary liquidity to fund and continue operations during these Cases, and will send a strong positive signal to vendors, employees, customers and other parties critical to maintaining the Debtors' viability as a going concern.

---

[6]    HRI agreement also permitted LIBOR Loans under certain circumstances at a rate equal to the prevailing LIBO Rate (as defined therein) + 8%.

**B.** **Joint Administration Motion.**

65.     The Debtors are affiliated entities.  Debtors Legendary Baking, Legendary

Holdings, Legendary California, and SVCC are wholly-owned subsidiaries of Debtor Blue

Ribbon.  Joint administration will prevent duplicative efforts and unnecessary expenses.

66.     I understand that the joint administration of the Cases will permit the Clerk of the

Court to utilize a single general docket for these Cases and combine notices to creditors of the

Debtors' respective estates and other parties in interest, which will result in significant savings to

the estates.  Accordingly, I believe that the relief requested in the Joint Administration Motion is

in the best interests of the Debtors' estates.

**C.** **Employee Compensation and Benefits Motion.**

67.     As described above, ABRH furnishes substantially all of the Debtors' workforce

pursuant to the Staffing Agreement and provides the Debtors with the services of senior

management executives pursuant to the Services Agreement.

68.     *Overview of the Debtors' Current Workforce.*  The Debtors' workforce is

comprised of full-time salaried employees, full time hourly employees (collectively, the "Full

Time Employees"), and part time hourly employees (the "Part Time Employees" and with the

Full Time Employees, the "Employees").  As of the Petition Date, the Debtors' workforce

includes approximately 1,510 Full Time Employees and 3,057 Part Time Employees, for a total

of 4,567 Employees, approximately 172 of which are salaried and 4,395 of which are hourly.

Approximately 4,181 of those Employees (2,262 in operations and 1,919 in administration)

support the Debtors' Village Inn and Bakers Square restaurant concepts, and approximately 386

Employees (357 in operations and 29 in administration[7]) support the Debtors' Legendary Baking concept. The Employees are dispersed across 17 states, with the greatest number of Employees concentrated in Colorado, Illinois, Arizona, Nebraska, and Minnesota.[8]

69.     The Debtors also contract with approximately 115 workers in addition to those leased from ABRH under the Staffing Agreement. Two such workers are independent contractors. The remaining 113 workers, who work in the Legendary Baking business, are leased by the Debtors from temporary placement and staffing agencies ACE Employment Services, Inc. and Pronto Staffing Services. These 115 individuals are compensated outside of the Debtors' payroll system, and receive, in the aggregate, approximately $66,000 per week.

70.     *Payroll and Ordinary Course Compensation.*  All 4,567 Employees are paid (the "Employee Compensation") weekly on Fridays in arrears for the week ending on the prior Sunday. The Debtors fund payroll costs approximately two business days before each pay date. Payroll processing company Ceridian HCM, Inc. ("Ceridian")[9] is responsible for distributing net pay to the Employees. For those few Employees that elect to receive payment via live check, those checks are also mailed weekly on Fridays. Ceridian charges both an annual fee and a monthly fee for its payroll processing services. The Debtors' allocable share of the annual fee is approximately $438,000, and the Debtors' allocable share of the monthly fee is approximately $33,000. Both of these fees are initially paid to Ceridian on the Debtors' behalf by ABRH and

---

[7]   Administration includes roles such as Restaurant Managers, Regional Operations, Marketing, Recruiters, and Purchasing Directors. Some of these Employees work at restaurant locations, whereas others work regionally or at the Debtors' headquarters in Nashville, Tennessee.

[8]   The 17 states in which the Debtors have Employees are Arizona, Colorado, Florida, Georgia, Iowa, Illinois, Indiana, Minnesota, Nebraska, New Mexico, Ohio, Oklahoma, Tennessee, Texas, Utah, Washington, and Wisconsin.

[9]   Ceridian is an affiliate of non-debtor Cannae, which is the ultimate parent of ABRH.

subsequently reimbursed by the Debtors, pursuant to the Services Agreement.[10]  As of the

Petition Date, approximately $33,000 is owed in respect of Ceridian's monthly fee for the month

of January 2020.  Any interruption in the Debtors' payroll process could be highly disruptive to

the Debtors' business and harmful to Employee morale.

71.     Over the 12 months preceding the Petition Date, the Debtors' average gross costs

for wages have been approximately $1,838,500 per week.  The Debtors' most recent prepetition

payroll date was January 24, 2020.  It covered the pay period from January 13, 2020 through

January 19, 2020.  The total gross amount of the January 24, 2020 payroll was approximately

$1,729,837.  The next two scheduled payroll dates are January 31, 2020 (which will cover the

pay period from January 20, 2020 through January 26, 2020), and February 7, 2020 (which will

cover the pay period from January 27, 2020 through February 2, 2020).  In light of the Debtors'

prepetition reduction in force, the Debtors expect that weekly payroll expenses going forward

will be less than the foregoing historical amounts.

72.     The Debtors believe that, as of the Petition Date, approximately $1,800,000 was

earned but remains unfunded with respect to Employees on account of accrued prepetition wages

and salaries.  This amount is primarily in respect of the January 20, 2020 to January 26, 2020 pay

period, and also includes approximately $6,700 of floating prepetition compensation checks in

respect of wages earned in the 180 days preceding the Petition Date by Employees who choose

to be paid via live check.  The amount owed to any individual Employee on account of

prepetition wages and salaries for which the Debtors seek payment authority hereunder does not

exceed $13,650, and is not in respect of any time period more than 180 days before the Petition

Date.  In connection with the Debtors' prepetition reduction in force, the Debtors' terminated

---

[10]   Pass-Through Costs are discussed in detail in the First Day Declaration.

approximately 1,100 Employees in the days immediately preceding the Petition Date.  Such

terminated Employees also earned wages that would be payable on the Debtors' normally-

scheduled January 31, 2020 payroll date.

73.    In addition, as noted above, the Debtors rely on the services of 115 additional

workers who are compensated outside of the Debtors' payroll system and collectively receive

approximately $66,000 per week.  The Debtors believe that, as of the Petition Date,

approximately $66,000 was earned but remains unfunded with respect to such workers on

account of prepetition wages.  The amount owed to any such worker on account of prepetition

wages for which the Debtors seek payment authority hereunder does not exceed $13,650, and is

not in respect of any time period more than 180 days before the Petition Date.

74.    The Debtors' ability to preserve the value of their estates and successfully

prosecute these Cases for the benefit of their stakeholders depends on the expertise and service

of the Debtors' workforce.

75.    *Employee Bonus Programs.*  In the ordinary course of business, the Debtors

maintain several bonus programs for their Employees.  First, the Debtors have a bonus program

(the "Restaurant Bonus Program") to compensate non-insider Employees who serve as

operations directors and restaurant managers at the Debtors' Village Inn and Bakers Square

restaurant locations (respectively, the "Operations Directors" and the "Restaurant Managers").[11]

Bonuses under the Restaurant Bonus Program are based on several financial metrics, and are

targeted to reward financial growth and profitability at the restaurant level.  Second, the Debtors

have a bonus program (the "Facility Bonus Program" and together with the Restaurant Bonus

---

[11]    There are 21 covered Operations Directors with responsibility for restaurant operations oversight at multiple locations.  There are 383 Restaurant Managers, each of which is responsible for supervising day-to-day operations at a single restaurant location.

Program, the "Operations Bonus Programs") to compensate non-insider Legendary Baking

Employees working at the Debtors' bakery facilities.[12]  Bonuses under the Facility Bonus

Program are based on achieving performance, safety, and production metrics.  Bonuses under the

Operations Bonus Programs are paid out quarterly.  Bonuses under the Operations Bonus

Programs are typically in the range of $100 to $13,000 per quarter for each individual Employee,

with an average bonus amount of $1,600 for an individual Employee.  Approximately $740,000

in the aggregate was earned by non-insider Employees pursuant to the Operations Bonus

Programs for the fourth quarter of 2019, which amounts are payable in February 2020.  Bonuses

for the first quarter of 2020, if any, will become payable in May 2020.

76.    Finally, the Debtors maintain a bonus program for Legendary Baking

management (the "Management Bonus Program").[13]  Bonuses under the Management Bonus

Program are discretionary and are based on revenues, profitability, and individual performance.

Bonuses under the Management Bonus Program are paid annually.  During 2019, approximately

$66,000 in the aggregate was paid for the 2018 year to Employees pursuant to the Management

Bonus Programs.  Bonuses for 2020, if any, will become payable in February 2021.  The Debtors

are not seeking under this Motion to make any payments in respect of the Management Bonus

Program, and no such payments will be made by the Debtors during these Bankruptcy Cases

without seeking a separate order from this Court.

77.    None of the Employees under the Operations Bonus Programs (collectively, the

"Bonus Participants") are "insiders," as defined by the Bankruptcy Code.  No Bonus Participant

---

[12]    There are 24 covered Legendary Baking Employees, including hourly Employees in the roles of floor managers at the Debtors' bakery facilities and cold storage distribution center who are responsible for facility operations.

[13]    The management Employees covered by the Management Bonus Program include 20 Employees in roles such as plant managers at the bakery facilities and sales and finance roles for Legendary Baking.

has authority to make company-wide decisions for the Debtors, no Bonus Participant is a director, officer, or person in control of the Debtors, and no Bonus Participant is a relative of any director, officer, or person in control of the Debtors.

78.     Furthermore, the Bonus Participants' duties do not extend to the Debtors' business operations and affairs as a whole, but rather relate only to specific and discrete areas of the Debtors' business.  For example, each Restaurant Manager supervises the day-to-day operations of a single restaurant location, and each Operations Director supervises restaurant operations at a subset of the Debtors' restaurant locations.  Each of the Restaurant Managers and Operations Directors reports to a more senior member of the Debtors' workforce, and must obtain approval from appropriate senior personnel before taking any significant action with respect to, among other things, the Debtors' corporate policies or the disposition of material assets.  No Bonus Participants has a title of "president."  Accordingly, despite the terms "Restaurant Manager" and "Operations Director" in the Bonus Participants' titles, such titles do not confer on such Bonus Participants the status of "director" and "officer," as such terms are used in section 101(31) of the Bankruptcy Code with respect to insiders.

79.     *Vacation Time.*  The Debtors maintain distinct policies for vacation time ("Vacation") applicable to (i) hourly restaurant Employees at Village Inn and Bakers Square locations ("Hourly Restaurant Employees"), (ii) salaried and hourly Restaurant Managers, and (iii) Legendary Baking Employees.

80.     Eligible Hourly Restaurant Employees earn Vacation based on hours worked multiplied by an accrual rate that is determined by years of service, with a maximum amount of accrued Vacation of 40 hours (for those Hourly Restaurant Employees with two to four years of service), 80 hours (for those Hourly Restaurant Employees with five to nine years of service), or

120 hours (for those Hourly Restaurant Employees with 10 or more years of service).  Eligible

Restaurant Managers are awarded a fixed number of yearly Vacation days based on years of

service, as follows: five days for six months of service, 10 days for one to three years of service,

12 days for four years of service, 17 days for five to six years of service, 18 days for seven to

nine years of service, and 20 days for 10 or more years of service.  Eligible Legendary Baking

Employees are awarded a fixed number of Vacation days based on years of service, as follows:

one week for first year of service, two weeks for two to five years of service, three weeks for five

to 15 years of service, and four weeks for 15 or more years of service.

81.    Vacation pay is calculated based on the Employee's applicable hourly pay or base

salary.  With exceptions only for certain Legendary Baking Employees, (i) Vacation may not be

cashed out, at separation or otherwise, and (ii) Vacation earned but not used in a given year is

forfeited and may not be carried over to the following year.[14]  At any point in time, Vacation is

being used, making it difficult to quantify the cost of accrued Vacation as of the Petition Date.[15]

82.    *Sick Leave.*  The Debtors maintain distinct policies for sick leave ("Sick Leave")

for (i) Legendary Baking Employees and (ii) all other Employees.  Eligible Legendary Baking

Employees earn up to 40 hours of Sick Leave per full calendar year worked, with two sick days

earned on January 1 of each year, and one sick day earned on each of April 1, July 1, and

---

[14]    Some Legendary Baking Employees are permitted to cash out and carry over Vacation time. Specifically, Legendary Baking Employees in Oak Forest, Illinois (i) may request cash payment in lieu of Vacation, (ii) receive cash payment of earned and unused Vacation upon termination of employment, and (iii) are permitted to carry over earned and unused Vacation from one year to the next, up to a set maximum number of hours.  In addition, Legendary Baking Employees in Minnesota (i) may request cash payment in lieu of Vacation once a minimum of 40 hours of Vacation have been used, and (ii) may be permitted to carry over earned and unused Vacation from one year to the next, if Vacation could not be taken in the year it was awarded due to personal hardship or operational necessity.  The Debtors estimate that Legendary Baking Employees have approximately $520,000 in the aggregate of accrued and unused Vacation as of the Petition Date.

[15]    The Debtors estimate that prior to the Petition Date, Employees (including Legendary Baking Employees) had accrued paid time off (including Vacation, sick leave, and other forms of paid leave) in the amount of approximately $1,700,000 in the aggregate.

October 1 of each year.  All other eligible Employees earn up to six days of Sick Leave on January 1 of each calendar year.  Unused Sick Leave does not carry over from year to year and Sick Leave is never cashed out.  The Debtors therefore do not make any cash payments on account of the Sick Leave policy.

83.    *Other Paid Time Off.*  The Debtors offer Employees leaves of absence as required by law for the purposes of fulfilling any required legal or military obligation (*e.g.*, jury duty or military reserve duty), or to attend to medical, family, or personal needs (*e.g.*, bereavement or FMLA).  These leave policies are in accordance with local, state, and federal laws and are paid where required by such laws.[16]  Employees are generally required to use some or all of their available Sick Leave or Vacation during a leave of absence.

84.    *Severance.*  During the months leading up to the Petition Date, as part of their financial improvement efforts, the Debtors terminated two non-insider corporate level Employees (specifically a Vice President of Marketing and a Vice President of Franchise), and awarded them severance, payable in weekly amounts based on their annual salary and years of employment.  The amounts outstanding for these two individuals are $43,000 and $25,000, respectively.

85.    Additionally, immediately prior to the Petition Date, on January 25, 2020, the Debtors terminated 81 Restaurant Managers and 1,036 Hourly Restaurant Employees in connection with the closure of 33 restaurant locations.  The Debtors agreed to pay severance amounts to these non-insider Employees upon their termination.  Specifically, for Restaurant Managers, the Debtors seek to pay severance in the amount of four weeks of pay, and for Hourly

---

[16]    In some cases, in the exercise of their discretion, the Debtors agree to offer pay for time off even when not required by law.  For example, the Debtors may pay a portion of an Employee's salary while on military leave.

Restaurant Employees, the Debtors seek to pay severance in the amount of one week of pay, which totals to approximately $757,700 in the aggregate. The Debtors believe that the payment of severance is important to the morale of the Debtors' remaining workforce, and that the costs of paying severance will be less than the costs the Debtors would incur as a result of lost productivity and attrition from remaining Employees in the event they are unable to pay severance. Moreover, the amount sought to be paid to any individual Employee on account of severance shall not exceed $13,650.

86. None of the Employees that the Debtors seek authority to pay severance to under this Motion (collectively, the "<u>Severance Participants</u>") are "insiders," as defined by the Bankruptcy Code. No Severance Participant had authority to make company-wide decisions for the Debtors, and no Severance Participant is a director, officer, or person in control of the debtors. None of them are relatives of any director, officer, or person in control of the Debtors.

87. Furthermore, the Severance Participants' duties do not extend to the Debtors' business operations and affairs as a whole, but rather relate only to specific and discrete areas of the Debtors' business. As noted above, each Restaurant Manager supervises the day-to-day operations of a single restaurant location. The two terminated Vice Presidents were responsible for very specific aspects of the Debtors' operations. Each of the Restaurant Managers and the two terminated Vice Presidents reports to a more senior member of the Debtors' workforce, and must obtain approval from appropriate senior personnel before taking any significant action with respect to, among other things, the Debtors' corporate policies or the disposition of material assets.

88. *Medical Insurance Program*. Eligible Employees enjoy a self-funded medical and prescription drug program (the "<u>Medical Plan</u>") administered by various third-party

administrators, including HealthScope.  The costs of coverage under the Medical Plan are paid in

part by the Debtors (through reimbursement to ABRH) and in part by the Employees through

paycheck withholding.  The Debtors' allocable share of the administration costs (excluding

amounts paid through paycheck deductions) of maintaining the Medical Plan for Employees is

approximately $22,000 in the aggregate per month.

89.     In addition, because the Medical Plan is self-funded, the Debtors, through pass-

through reimbursements to ABRH, make payments of claims under the Medical Plan.  The

Debtors estimate that their weekly disbursement in respect of claim payments under the Medical

Plan is approximately $45,000 in the aggregate per week.[17]  As of the Petition Date, the Debtors

estimate that $45,000 has accrued but has not been funded in respect of prepetition claims under

the Medical Plan.  Atlantic Specialty Insurance Group provides stop-loss insurance (the "Stop-

Loss Policy") with respect to the Medical Plan.  The Debtors' allocable share of the annual

premium for the Stop-Loss Policy is approximately $257,000, which amount is paid through

pass-through reimbursements to ABRH.  As of the Petition Date, the Debtors believe that no

prepetition amounts are owing in respect of the Stop-Loss Policy.  The Debtors submit that

continuation of payments under the Medical Plan is of paramount importance to the wellbeing

and morale of the Employees rendering services to the Debtors.

---

[17]   In addition, the Debtors are still paying claims under a legacy medical benefit plan that expired on December 31, 2019 and was administered by Blue Cross Blue Shield (the "Legacy Medical Plan").  Estimated weekly claims under the Legacy Medical Plan total approximately $77,000.  The Debtors submit that continuation of payments under the Legacy Medical Plan is significant to Employee wellbeing and morale.  Accordingly, the Debtors seek to make payment of prepetition claims under the Legacy Medical Plan (through pass-through reimbursements to ABRH), as well as to continue to make payments on postpetition claims under the Legacy Medical Plan (through pass-through reimbursements to ABRH) in the ordinary course of their business.

90.    *Dental Insurance Program.*  Eligible Employees enjoy dental insurance (the "Dental Plan") from Lincoln Financial Group Dental.  Premiums under the Dental Plan are paid in full by the Employees through paycheck withholding.  The Debtors' allocable share of the administration costs (excluding amounts paid through paycheck deductions) of maintaining the Dental Plan for Employees is approximately $31,000 in the aggregate per month.

91.    *Vision Insurance Program.*  Eligible Employees enjoy vision insurance (the "Vision Plan") from EyeMed Vision Care, LLC ("EyeMed").  Premiums under the Vision Plan are paid in full by the Employees through paycheck withholding.  The Debtors' allocable share of the administration costs (excluding amounts paid through paycheck deductions) of maintaining the Vision Plan for Employees is approximately $5,700 in the aggregate per month.

92.    *Basic Life Insurance and Disability.*  Eligible Employees enjoy basic life insurance and short-term and long-term disability insurance (the "Basic Insurance Plan") from Lincoln Financial Group.  Premiums under the Basic Insurance Plan for Employees are paid in full by the Debtors.  The Debtors' allocable share of the cost of maintaining the Basic Insurance Plan for Employees is approximately $22,500 in the aggregate per month.

93.    *Voluntary Life Insurance, Disability, and Employee Assistance Program.*  Eligible Employees enjoy voluntary life insurance and disability insurance (the "Voluntary Insurance Plans") from Lincoln Financial Group.  Premiums under the Voluntary Insurance Plans are paid in full by the Employees through paycheck withholding.  The Debtors' allocable share of the cost of maintaining the Voluntary Insurance Plans for Employees is approximately $2,500 in the aggregate per month.

94.    *Employee Assistance Program.*  Eligible Employees may participate in the employee assistance program (the "EAP") from Magellan Healthcare.  Costs of the EAP are paid

in full by the Debtors.  The Debtors' allocable share of the cost of maintaining the EAP for Employees is approximately $600 in the aggregate per month.

95.    *COBRA*.  In the ordinary course of business, the Debtors make payments in respect of Section 4980B of the Internal Revenue Code to administer Continuation Health Coverage (26 U.S.C. § 4980B) ("COBRA") for Employees and their qualifying dependents who incur a COBRA qualifying event or loss of coverage in connection with a self-insured benefit plan.  COBRA benefits are administered by PayFlex.  The Debtors' allocable share of the cost for PayFlex to administer COBRA is approximately $3,900 in the aggregate per year.

96.    *Flexible Spending Accounts*.  Eligible Employees have the opportunity to contribute funds for healthcare spending into flexible spending accounts (the "FSAs"), which are administered by PayFlex.  The Debtors' allocable share of the cost for PayFlex to administer the FSAs is approximately $8,000 in the aggregate per year.

97.    *Continuation of Benefit Programs Postpetition*.  The Benefit Programs are an important component of the total compensation offered to the Employees and are essential to the Debtors' efforts to maintain morale and minimize attrition.  The Debtors believe that payment of expenses associated with the Benefit Programs is reasonable and necessary in light of the potential attrition, loss of morale, and loss of productivity that would result if the Benefit Programs were discontinued.

98.    *Ambassador Card Program*.  In addition to their salary or wage, eligible Employees at the Debtors' restaurants also receive ambassador cards, which are cards loaded with a pre-set dollar limit for use by an Employee at such Employee's assigned restaurant during a specific period.  The Employees may use the cards to charge meals, beverages, and whole pies.  Unused funds are never cashed out and are not carried over to a subsequent period.  Accordingly,

the Debtors do not make cash payments on account of ambassador cards.  The ambassador card

program is an important component of the total compensation offered to Employees.

99.    *Workers' Compensation Program.*   Under the laws of various states, the

Employees are entitled to workers' compensation coverage for injury claims arising from or

related to their employment.  Employees enjoy a workers' compensation benefits program (the

"WC Program") from Safety National Casualty Corporation and, with respect to Ohio

Employees, the Ohio Bureau of Workers' Compensation.  The WC Program provides benefits to

all Employees for claims arising from or related to employment.  The Debtors' allocable share of

the annual premium for the WC Program is approximately $186,000 in the aggregate per year.

100.    Claims under the WC Program are administered by Sedgwick Claims

Management Services, Inc. ("Sedgwick") pursuant to a contract between Sedgwick and ABRH.

The Debtors allocable share of the administrative fee charged by Sedgwick is $320,000 per year,

which is billed and paid quarterly in advance.  The Debtors fund an imprest account in the name

of Sedgwick on a weekly basis, based on an estimate of claims to be paid as provided by

Sedgwick.  Sedgwick then makes payments for claims as appropriate.[18]  The Debtors estimate

that their payments for claims under the WC Program was $2,800,000 in 2019.  The deductible

under the WC Program is $350,000 per incident.[19]

101.    As of the Petition Date, the Debtors estimate that approximately $4,200,000 has

accrued but not been funded in respect of prepetition claims under the WC Program.  The

---

[18]    In addition, third party administrators Frank Gates, CareWorks, and York administer legacy workers'
compensation claims, for which the Debtors make payments of approximately $6,500 annually.

[19]    In addition, in connection with the WC Program, Debtor American Blue Ribbon Holdings, LLC has caused
three standby letters of credit to be issued in the aggregate amount of approximately $1,300,000 in respect of
workers' compensation claims for legacy claims periods.  The letters of credit are cash collateralized by ABRH,
but are nonetheless primary obligations of the Debtors.

Debtors submit that continuation of payments under the WC Program is of paramount importance to the wellbeing and morale of the Employees rendering services to the Debtors, and is generally required under applicable state law.

102.    *Retirement Savings Program.*  Eligible Employees enjoy a 401(k) retirement savings plan (the "Retirement Plan"), administered by Merrill Lynch and Newport Group, through which qualified and participating Employees may defer a portion of their salary to help meet their financial goals and accumulate savings for their future.[20]  The Retirement Plan is funded by Employee contributions and by quarterly matching contributions, made by ABRH, in the range of 0.5% to 2%, for certain Employees (including approximately 579 of the Debtors' Employees).  The Debtors' allocable share of matching contributions for the Retirement Plan is approximately $39,000 in the aggregate per quarter.  The Debtors believe that the Retirement Plan and the matching contributions are important components of Employee compensation and are critical to maintaining morale.

103.    *Employee Expenses.*  Prior to the Petition Date, the Debtors reimbursed Employees for certain expenses incurred on behalf of the Debtors in the scope of their employment (the "Employee Expenses").  The Employee Expenses are incurred in the ordinary course of the Debtors' business operations and include, without limitation, expenses for meals, travel, and other business-related expenses, as well as relocation costs in certain cases.[21]  The

---

[20]    ABRH also maintains a deferred compensation plan, however, none of the Debtors' Employees participate in that plan.  Seven former employees of the Debtors still hold balances in that plan, but the Debtors do not pay any amounts, and this Motion does not seek any relief, with respect to that plan.

[21]    Nine Bank of America (BOA) Travel & Entertainment Corporate Cards are available for use by Employees for Employee Expenses.  Employees who request and receive such a credit card receive and pay the bill personally and then submit a reimbursement request once the bill is paid.  In addition, the Debtors maintain corporate credit cards that are used by the legal and information technology departments, which cards are paid directly by accounts payable (the "Company Cards").  The Debtors are not seeking authority to pay any prepetition amounts with respect to the Company Cards.

Debtors' costs for Employee Expenses are approximately $57,000 in the aggregate each month.

Because a delay often occurs between the time such expenses are incurred and the time an

expense reimbursement request is submitted, it is difficult to determine with precision the

aggregate amount of outstanding Employee Expenses.  However, the Debtors estimate that, as of

the Petition Date, accrued unpaid Employee Expenses totals approximately $57,000.

104.    Absent authority to pay prepetition Employee Expenses, those Employees could

be obligated, in some cases, to pay such amounts out of their personal funds, which would be

unfair and would hurt morale.

105.    *Employee Withholdings.*  Certain amounts are routinely deducted from the

compensation paid to Employees on account of earnings that judicial or government authorities

or the Employees have designated for deduction, including, for example, various federal, state,

and local income, Federal Insurance Contribution Act ("FICA"), and other taxes; support

payments; tax levies; savings programs contributions; benefit plans; health and wellness

programs; commuting programs; insurance programs; and other similar programs (collectively,

the "Employee Withholdings").  The amount deducted and remitted by the Debtors in respect of

Employee Withholdings is approximately $1,900,000 in the aggregate per month.  As of the

Petition Date, approximately $482,000 has accrued and remains unfunded on account of the

Debtors' allocable share of prepetition Employee Withholdings.

106.    In addition, the Debtors are responsible for remitting, for their own account,

various taxes and fees associated with payroll pursuant to FICA and federal and state laws

regarding unemployment and disability taxes ("Payroll Taxes").  These amounts are generally

wired by the Debtors to a non-Debtor, and then wired by such non-Debtor to Ceridian, which

manages Payroll Taxes for the Debtors and their affiliates.  The Debtors estimate that their

weekly Payroll Taxes total approximately $465,000.  As of the Petition Date, approximately $465,000 is owing on account of the Debtors' allocable share of prepetition Payroll Taxes.

107.    I believe that the relief sought in the Employee Compensation and Benefits Motion represents a sound exercise of the Debtors' business judgment, and is necessary to avoid immediate and irreparable harm to the Debtors' estates.  I believe that without the relief requested in the Employee Compensation and Benefits Motion being granted, there is significant risk that the Employees required for the Debtors' success will seek alternative opportunities. Such a development would deplete the Debtors' workforce, thereby hindering the Debtors' ability to successfully conduct these Cases.

**D.    Cash Management Motion.**

108.    In the ordinary course of their business, the Debtors maintain a complex cash management system (the "Cash Management System"), which includes all activities necessary and pertinent to collecting and disbursing the Debtors' cash assets.  The Cash Management System allows the Debtors to efficiently identify the Debtors' cash requirements and transfer cash as needed to respond to these requirements.  The Cash Management System is important to the efficient execution and achievement of the Debtors' objectives, and, ultimately, to maximizing the value of the Debtors' estates.  The Cash Management System generally operates similarly to the centralized cash management systems used by other companies to manage the cash of numerous operating units in a cost-effective, efficient manner.  The Cash Management System consists of bank accounts (the "Bank Accounts") maintained at Bank of America, PNC Bank, US Bank, Regions, Wells Fargo, JP Morgan Chase, and Fifth Third Bank.

109.    Receipts from the Debtors' operations are all initially deposited into one of numerous depository accounts or sub-accounts maintained either for the Debtors' stores or in respect of credit card receipts or online delivery services (collectively, the "Depository

Accounts").  Generally, the Debtors maintain one "main" Depository Account at each bank, and numerous "sub-accounts" that deposit their cash into the main accounts.  Cash from the Depository Accounts is then deposited into Blue Ribbon's main operating account (account number ending 9673) maintained by Blue Ribbon at Wells Fargo (the "Operating Account").  Funds on deposit in the Operating Account are transferred to six different accounts.  Five of these are Debtor disbursement accounts, including an account for Legendary Baking accounts payable (account number ending 6355), an account for payroll disbursements (account number ending 6336), an account for vendor ACH payments (account number ending 2433), and an account for sales tax payments (account number ending 4155).  Funds from the Operating Account are also manually transferred to a concentration account at Regions Bank held by non-debtor affiliate O'Charley's Management Company, LLC, which funds are used by the Debtors' non-debtor affiliates for a variety of payments on behalf of the Debtors and their operations, as discussed below.

110.    In addition, Debtor SVCC maintains an operating account at Wells Fargo (account number ending 9343), and Debtor Legendary California maintains operating, payroll, and accounts payable accounts at Bank of America (account numbers ending 4991, 9437, and 9429, respectively).

111.    Prior to the Petition Date, the Debtors engaged in certain intercompany transactions with each other in the ordinary course of business (collectively, the "Intercompany Transactions").  In addition, as described above in the discussion of the Services Agreement, Service Costs, Pass-Through Costs, and Contract Staffing Agreement, the Debtors engage in the Affiliate Transactions.  The Intercompany Transactions and Affiliate Transactions create receivables and payables (respectively, the "Intercompany Claims" and "Affiliate Claims").  If

the Intercompany Transactions and Affiliate Transactions were to be discontinued, I believe that

the Debtors would be unable to operate, and the prosecution of these Cases would be severely

disrupted, to the detriment of the Debtors, their creditors, and the Debtors' estates.  Indeed, I

believe the Debtors are simply unable to cleave off their operations from those of ABRH and the

other non-debtor affiliates without massive disruptions that would impact every facet of their

business, from their supply chain, to their restaurant and baking operations, to their banking, to

their human capital management.

112.     In light of the substantial size and complexity of the Debtors' operations, I believe

that it is critical that the Debtors continue to utilize their existing Cash Management System

without disruption, and believe that the relief requested in the Cash Management Motion is both

necessary and in the best interests of the Debtors' estates and their creditors.

**E.     Section 156(c) Application**

113.     Prior to the selection of Epiq Corporate Restructuring, LLC ("Epiq") as claims

and noticing agent, the Debtors obtained and reviewed engagement proposals from at least three

reputable claims and noticing agents to ensure selection through a competitive process.  I

believe, based on all engagement proposals obtained and reviewed, that Epiq's rates are

competitive and reasonable.

114.     In view of the number of anticipated claimants and the complexity of the Debtors'

business, I believe that the appointment of Epiq as claims and noticing agent is both necessary

and in the best interests of the Debtors' estates and their creditors.

**F.     Utilities Motion**

115.     In connection with the operation of their business and management of their

properties, the Debtors obtain electricity, natural gas, telephone, water, waste disposal, and other

similar services (collectively, the "Utility Services") from several utility companies or brokers

(collectively, the "Utility Companies").  Uninterrupted Utility Services are essential to the Debtors' ongoing business operations and the overall success of these Cases.  The Debtors' operations require electricity and gas for, among other things, lighting, cooking, heating, cooling, and air conditioning.  In addition to operating two regional restaurant brands, the Debtors maintain and operate two bakery facilities, located in Oak Forest, Illinois and Chaska, Minnesota, and lease a cold storage distribution center, located in Chicago, Illinois.  Should any Utility Provider refuse or discontinue service, even for a brief period, the Debtors' business operations could be severely disrupted.  Accordingly, it is essential that the Utility Services continue uninterrupted during these Cases.

116.    On average, the Debtors pay (as Pass-Through Costs) approximately $927,000 in the aggregate each month for third party Utility Services in connection with their restaurants, bakery facilities, and cold storage distribution center.  In the aggregate, the Utility Companies currently hold approximately $33,200.00 in deposits from the Debtors.

117.    For the reasons already set forth herein and in the Utilities Motion, the relief requested in the Utilities Motion is in the best interest of the Debtors and their estates, will not harm unsecured creditors, and may reduce harm and administrative expense to the Debtors' estates.

**G.    Tax Motion**

118.    In the ordinary course of business, the Debtors incur or collect and remit certain taxes, including sales, use, franchise, commercial activity, business and occupation taxes, and various other similar taxes, fees, charges, and assessments (the "Taxes and Fees").  The Debtors remit such Taxes and Fees to various federal, state, and local taxing and other governmental authorities and/or certain municipal or governmental subdivisions or agencies (the "Taxing Authorities") in connection with the sale of their products or services at the Debtors' restaurant

and production facilities.  The Taxes and Fees are paid monthly, quarterly, semi-annually, or annually to the respective Taxing Authorities, depending on the given Tax or Fee and the relevant Taxing Authority to which it is paid.

119.    As of the Petition Date, the Debtors estimate that they owe approximately $2,500,000 in the aggregate in unremitted prepetition Taxes and Fees.  Of that amount, approximately $1,600,000 will come due in the first 21 days after the Petition Date.  To the best of the Debtors' knowledge, the Taxes and Fees generally consist of current tax and fee obligations, and are not in respect of catch-up payments, other than any prepetition payments that were interrupted by the commencement of these Cases.

120.    Any regulatory dispute or delinquency that impacts the Debtors' ability to conduct business in a particular jurisdiction could have a wide-ranging and adverse effect on the Debtors' operations as a whole, as described further in the Taxes Motion.  I believe that payment of the Taxes and Fees is in the best interest of the Debtors and their estates, will not harm unsecured creditors, and may reduce harm and administrative expense to the Debtors' estates.

## H.    Customer Programs Motion

121.    In the ordinary course of business, the Debtors provide customers with certain customer-related programs as described in the Customer Programs Motion (the "Customer Programs") that engender goodwill, maintain loyalty, increase the Debtors' sales opportunities, and provide the Debtors a comparative advantage over their competition.  Specifically, the Customer Programs relate to the Debtors' programs by which they offer gift cards, coupons, and other promotions to their customers, as well as processing customer purchases through the use of credit cards.  The Debtors believe that their ability to continue the Customer Programs and to honor their obligations thereunder in the ordinary course of business is necessary to, among other things, (i) retain their reputation for reliability, (ii) meet competitive market pressures,

(iii) maintain positive customer relationships, and (iv) ensure customer satisfaction, thereby retaining current customers, attracting new ones, and, ultimately, enhancing revenue and profitability for the benefit of all the Debtors' stakeholders.

122.    As discussed above, the Debtors operate two restaurant chains, Village Inn and Bakers Square.  In the ordinary course of business, the Debtors sell gift cards for each restaurant (collectively, the "Gift Cards") to customers in amounts ranging from $5 to $200.  Customers can purchase Gift Cards for each restaurant chain at a restaurant location for that chain, online at their respective websites, bakerssquare.com and villageinn.com, and at various retail outlets where gift cards are sold.  Gift Cards can be used for eat-in or take-out dining at the Debtors' restaurant locations, including franchisee-operated locations.[22]  Gift card programs of this nature are commonplace and popular in the dining industry, and the Debtors' competitors offer similar programs to their customers.

123.    The Debtors rely on Worldpay, Inc. (f/k/a Vantiv) ("Worldpay") to track and process Gift Cards in the ordinary course of business.  The Debtors pay Worldpay approximately $10,000 in the aggregate per year for these services, which amount is deducted by Worldpay from Gift Card sales.  The Debtors receive the net Gift Card sales less the processing fees deducted by Worldpay.

124.    As of December 29, 2019, the Debtors' books and records reflect an aggregate net liability in respect of Gift Cards of approximately $1,754,000 for Village Inn Gift Cards and approximately $445,000 for Bakers Square Gift Cards.

---

[22]    For the avoidance of doubt, Gift Cards are not interchangeable among the two restaurant chains.  Rather, Village Inn Gift Cards can only be purchased from Village Inn locations and from Village Inn's website, and can only be used at Village Inn locations; and Bakers Square Gift Cards can only be purchased from Bakers Square locations and from Bakers Square's website, and can only be used at Bakers Square locations.

125.     In addition, the Debtors also offer customers and members of the community the opportunity to raise funds for organizations, events, and causes through two different fundraising programs maintained at both the Village Inn and the Bakers Square restaurant chains.  These programs engender goodwill in local communities by associating the Debtors' restaurants with charitable causes and community organizations.  They also help to drive customers to the Debtors' restaurants and to introduce new customers to the Debtors' brands.

126.     One such program is the Sweet Returns program, whereby the Debtors sell cards (the "Sweet Returns Cards") which are redeemable at the Debtors' restaurants for one whole pie. Pursuant to this program, Debtor SVCC, LLC issues Sweet Returns Cards at discounted rates to members of the public, and in turn, those members of the public then re-sell the Sweet Returns Cards for a higher price, and retain the delta to raise funds for an organization, event, or cause. Sweet Returns Cards may be purchased for each restaurant chain at a restaurant location for that chain and online at their respective websites.

127.     As of December 29, 2019, the Debtors' books and records reflect an aggregate net liability in respect of Sweet Returns Cards of approximately $609,000 for Village Inn Sweet Returns Cards, and approximately $571,000 for Bakers Square Sweet Returns Cards.  The Debtors request authority, in their sole discretion, (i) to honor all Sweet Returns Cards purchased prior to the Petition Date, and (ii) to continue selling and honoring Sweet Returns Cards in the ordinary course of business.

128.     The other fundraising program is the Raising Forks for Funds program ("Raising Forks").  Pursuant to this program, customers may submit applications to host a fundraising event for a qualifying organization at one of the Debtors' Village Inn or Bakers Square restaurant locations.  If the event is approved, the Debtors then contribute 20% of the

total bill for the event back to the participating organization.  Typically, the donation amount is mailed to the participating organization approximately three weeks after the event.

129.    During 2019, a total of $17,000 in the aggregate was paid by the Debtors for Raising Forks.  Due to the timing of the events and the minimal amount of money involved, the Debtors do not accrue for this liability on a monthly basis, but rather process donations as they are requested.

130.    The Debtors offer various promotional offers to customers throughout the year (collectively, the "Promotions").  The Promotions are aimed at driving sales, maintaining market competitiveness, and building brand loyalty.  The Debtors offer various in-restaurant and online promotions that provide discounts to customers, such as giveaways, "$5 dollars off," "buy-one-get-one-free," and "gift with purchase" promotions.  In addition, the Debtors offer customers the ability to enroll in the Debtors' "eClub," a promotional email subscription for each of the Debtors' restaurant chains.  Customers who enroll in the eClub receive emails regarding deals, coupons, and promotions, as well as restaurant news such as events and new menu items.  The Promotions are similar to those routinely offered by the Debtors' competitors in the dining industry.

131.    In addition to cash, the Debtors accept other methods of payment from customers at their point of sale, including credit cards, PayPal, and checks.  The Debtors also offer delivery from their restaurant locations through third-party delivery services, such as Grub Hub and Door Dash.  In addition, the Debtors accept online orders facilitated by Mobo Systems, Inc. (d/b/a Olo).  For all methods of non-cash or check payment, the Debtors receive the net customer sales less any chargebacks and processing fees charged.  The processing fees charged by each company vary, but are in the range of 1% to 4% for credit card companies, and 18% to 23% for

the delivery and online ordering service providers.  The fees that are owing to these companies are set off from the funds that are remitted to the Debtors on a daily or weekly basis.

132.    Maintaining the use of credit cards and other payment mechanisms is essential to the continuing operation of the Debtors' business because the vast majority of the Debtors' sales are made using non-cash payment methods.

133.    The Customer Programs are common in the dining industry.  If the Debtors are unable to honor or continue their Customer Programs, their ability to conduct business and generate sales will be severely hampered.  Continuing to administer their Customer Programs without interruption during the pendency of these Cases will help preserve the Debtors' valuable customer relationships and goodwill, which will inure to the benefit of all of the Debtors' stakeholders.  For the reasons set forth herein and in the Customer Programs Motion, the relief requested in the Customer Programs Motion is necessary to avoid immediate and irreparable harm to the Debtors, for the Debtors to operate their business without interruption, and to preserve value for the Debtors' estates.

I.    **Shipping and Warehousing Motion**

134.    As of the Petition Date, in the ordinary course of business, the Debtors have incurred certain prepetition claims for shipping, freight forwarding, and warehousing charges (collectively, the "Transporter Claims").  The Debtors' business depends, in large part, on the daily process of receiving and shipping goods into their restaurants, and into and out of their (i) bakery facilities, located in Oak Forest, Illinois and Chaska, Minnesota, and (ii) cold storage distribution center, located in Chicago, Illinois.  In order to ensure the steady movement of goods, the Debtors rely on a network of shippers, freight forwarders, and warehousemen (the "Shippers") who process and ship deliveries to these restaurants and facilities.  In addition to receiving goods and products at the restaurant locations and facilities, the Debtors also ship pies

and other bakery products from their bakery facilities and cold storage distribution center to their restaurants and to franchisee operated restaurants and third-party customers, including retailers and grocery stores.

135.    The Debtors are critically in need of the services of the Shippers and other similar service providers and cannot easily, economically, or quickly replace them.  Moreover, if the Debtors fail to pay the Shippers for charges incurred in connection with the transportation of the Debtors' goods, various statutes, tariffs, and agreements could permit the Shippers to assert possessory liens against any goods in their possession.

136.    As of the Petition Date, the Debtors estimate that approximately $350,000 is owed in the aggregate on account of prepetition Transporter Claims, all of which the Debtors believe will come due in the first twenty-one days after the Petition Date.  These amounts include both invoices that the Debtors have received, as well as amounts that the Debtors have not yet received, but are believed to have been incurred as of the Petition Date based on historical practice.

137.    Payment of the foregoing Transporter Claims will avoid disruption in the Debtors' business, prevent the possibility of possessory liens being asserted against the Debtors' goods, and enable the Debtors to realize the value of the goods and continue their operations uninterrupted.  For the reasons set forth herein and in the Shipping & Warehousing Motion, the relief requested in the Shipping & Warehousing Motion is necessary to avoid immediate and irreparable harm to the Debtors, for the Debtors to operate their business without interruption, and to preserve value for the Debtors' estates.

**J.    PACA & PASA Motion**

138.    In the ordinary course of business, the Debtors regularly purchase fruit and vegetable products subject to the Perishable Agricultural Commodities Act of 1930, as amended,

7 U.S.C. §§ 499a–499t ("PACA") and meat, poultry, and other similar products subject to the Packers and Stockyards Act of 1921, as amended, 7 U.S.C. §§ 181–231 ("PASA"). The Debtors' restaurant chains and their baking facility depend on a steady and uninterrupted supply of these products. As of the Petition Date, the Debtors estimate that they owe approximately $600,000 in the aggregate to vendors for goods subject to PACA or PASA and delivered prior to the Petition Date. I believe that payment of these claims is necessary to ensure that the Debtors' supply of produce, meat, poultry, and other similar products continues unimpeded.

139. For the reasons set forth herein and in the PACA & PASA Motion, the relief requested in the PACA & PASA Motion will not harm unsecured creditors and is necessary to avoid immediate and irreparable harm to the Debtors, for the Debtors to operate their business without interruption, and to preserve value for the Debtors' estates.

## K.    Prepetition Ordered Goods Motion

140. As a result of the commencement of these Cases, the Debtors believe that several suppliers (collectively the "Suppliers") with whom, as of the Petition Date, the Debtors had outstanding prepetition purchase orders (collectively, the "Outstanding Orders") may perceive a risk that they will be treated as prepetition general unsecured creditors with respect to any shipments made after the Petition Date pursuant to the Outstanding Orders. As a result, the Suppliers may refuse to deliver such goods to the Debtors unless the Debtors assure payment. The Debtors' business depends on, among other things, the ability to quickly obtain necessary goods from their Suppliers in order to stock their restaurants[23] and bakery facilities. The

---

[23] With respect to the Debtors' Village Inn and Bakers Square restaurants, the Debtors place orders directly with Suppliers and are the parties named as obligors on the invoices received from Suppliers. However, payment in respect of these invoices is typically made, in the first instance, by ABRH in accordance with the Services Agreement. As further discussed above, the Debtors reimburse ABRH for these payments as Pass-Through Costs under the Services Agreement. The Debtors believe the relief requested herein is nevertheless appropriate to give the Suppliers comfort in view of the fact that the Debtors are the parties invoiced by Suppliers. For

inability to maintain sufficient supplies due to the Suppliers' refusal to deliver goods could have

a significant detrimental impact on the Debtors' business and therefore on the success of these

Cases.

141.    For the reasons set forth herein and in the Prepetition Ordered Goods Motion, the

relief requested in the Prepetition Ordered Goods Motion is necessary for the Debtors to operate

their business without interruption and to preserve value for the Debtors' estates.

**L.    Lease Rejection Motion**

142.    As described above, the Debtors closed 33 restaurants shortly before to the

Petition Date and previously closed 17 additional restaurants in the past two years.  The Rejected

Leases that are the subject of the Lease Rejection Motion are unexpired real property leases in

respect of (i) these 50 closed restaurant locations (the "<u>Closed Locations</u>") and (ii) three

restaurant locations at which the Debtors are both lessee and sub-lessor—in other words, the

Debtors sublease the leased premises to a sub-tenant (the "<u>Sublease Locations</u>").[24]  The Sublease

Locations have not been closed, as the Debtors are unable to access the premises.  There are

more Rejected Leases than restaurant locations because some of the locations had more than one

lease; for example, separate ground, parking, and building leases.

143.    Prior to the Petition Date, the Debtors irrevocably and unequivocally surrendered

each of the leased premises (or, with respect to the Sublease Locations, all of the Debtors'

interests in such leased premises) and, except with respect to the Sublease Locations,

surrendered, forfeited, and abandoned any remaining personal property at the leased premises to

the respective landlord.  The Debtors sent to each landlord of a Closed Location, via Federal

---

Legendary Baking, the Debtors place orders directly with Suppliers, are the parties names as obligors on the invoices received from Suppliers, and generally make payment directly to the Suppliers.

[24]  Two of the closed restaurants are those for which the leases were due to expire effective January 31, 2020.

Express for delivery no later than the Petition Date, a letter: (i) notifying such landlords that the Debtors had vacated the leased premises; (ii) informing the landlords that the letter served as written notice that the Debtors were surrendering the leased premises and surrendering, forfeiting, and abandoning any remaining personal property located on the leased premises; and (iii) delivering to the landlords the keys for the leased premises. Similarly, the Debtors sent each landlord of a Sublease Location, via Federal Express for delivery no later than the Petition Date, a letter notifying the landlords that the Debtors were surrendering all of their rights in such Rejected Lease.

144.    I believe the Rejected Leases are, and, absent rejection, will continue to be, a burden on the Debtors' estates. The Debtors thus have no further use for the leased premises, and the Rejected Leases no longer provide any economic benefit to the Debtors. Additionally, I believe there is no net benefit that can be realized from an attempt to market and assign the Rejected Leases, and I do not believe that the value of any Rejected Lease will increase in the near future. As a result, as an integral component of their efforts to preserve and maximize the value of their estates, the Debtors have determined that rejection of the Rejected Leases is in the best interest of the Debtors' estates and creditors. I also believe that retroactive rejection to the Petition Date is warranted to eliminate the potential of any unnecessary administrative claims against the Debtors' estates on account of the Rejected Leases.

145.    For the reasons set forth herein and in the Lease Rejection Motion, the relief requested in the Lease Rejection Motion is a sound exercise of business judgment, and is necessary, prudent, and in the best interests of the Debtors, their estates, and their creditors.

*[Remainder of Page Intentionally Left Blank]*

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Executed this 27th day of January 2020 at Nashville, Tennessee.

American Blue Ribbon Holdings, LLC, *et al.*,
Debtors and Debtors in Possession

By: */s/ Kurt Schnaubelt*
Kurt Schnaubelt
Chief Financial Officer

25942059.3